# EXHIBIT 2

# WAIVER OF IMMUNITY

## Article 32

1. The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under Article 37 may be waived by the sending State.
2. Waiver must always be express.
3. The initiation of proceedings by a diplomatic agent or by a person enjoying immunity from jurisdiction under Article 37 shall preclude him from invoking immunity from jurisdiction in respect of any counter-claim directly connected with the principal claim.
4. Waiver of immunity from jurisdiction in respect of civil or administrative proceedings shall not be held to imply waiver of immunity in respect of the execution of the judgment, for which a separate waiver shall be necessary.

## Authority to waive immunity

Much of the confusion which surrounded previous decisions of national courts in regard to waiver resulted from failure to distinguish between two separate questions. The first question is whether the decision of substance whether or not to waive any diplomatic immunity is in law one for the sending State or one for the head of the mission or the individual member of the mission whose immunity is in issue. The second question is the procedural one of what evidence a court in the receiving State is entitled to require as proof that immunity has been waived by the sending State. Is that court entitled to require a statement from the head of the mission that immunity has been waived, and if it receives such a statement is it entitled to go beyond it and make inquiry of the government of the sending State? Or may it assume that all things done at least by the head of mission or even by any diplomatic agent are done with the apparent authority of the sending State? On this latter assumption, the national court might conclude that whenever a diplomatic agent without protest enters an appearance to a civil action or pleads in response to a criminal charge, any immunity has been validly waived and that it is a matter between the diplomatic agent and his government if he has failed to consult as he should.

Article 32.1 answers the first of these two questions clearly—diplomatic immunity belongs not to the individual but to the sending State and may be waived only by the sending State. This rule reflects the customary international law as stated by writers from Vattel[1] onwards, and in numerous decisions of national courts.[2] Thus in the English case of *R v Kent*,[3] where a cipher clerk in the London Embassy of the United States had been dismissed and his diplomatic immunity waived by the US Government to enable him to

---

[1] (1758) IV. VII. para 111.
[2] eg *Cottenet et Cie. c Dame Rafalovitch*, 1909 Journal de Droit International Privé 151; *In Re the Republic of Bolivia Exploration Syndicate* [1914] 1 Ch 139; *Acuña de Arce v Solórzano y Menocal* 1956 ILR 422; *Bolasco v Wolter* 1957:24 ILR 525; *Waddington* incident, described in Satow (5th edn 1979) para 15.20 and in Salmon (1994) para 428.
[3] [1941] 1 KB 454, 1941–2 AD No 110. See also *Zoernsch v Waldock* [1964] 2 All ER 256.

2016. OUP Oxford. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

EBSCO Publishing : eBook Collection (EBSCOhost) - printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE) 1823451; Eileen Denza; Diplomatic Law : Commentary on the Vienna Convention on Diplomatic Relations Account: s.

be tried for theft of embassy documents and for espionage, the court said 'that the privilege claimed by the appellant is a privilege which is derived from, and in law is the privilege of the ambassador and ultimately of the State which sends the ambassador'. The rule in Article 32.1 also reflects the functional approach of the Vienna Convention as set out in its Preamble: 'that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States'.

The Court of Appeal of Paris in 1978 applied the terms of Article 32.1 in the case of *Nzie v Vessah*,[4] saying that it followed from its terms 'that the waiver made by a diplomatic agent who is sued before a court must always be expressly authorized by the Government'. A letter written by a diplomat in the Cameroon Embassy in Paris, some months before his wife instituted divorce proceedings against him, saying that he agreed to divorce her in Paris was not a waiver by Cameroon and did not show 'the unequivocal and clear intention necessary to constitute a waiver of immunity from jurisdiction'. The Supreme Court of Spain in *Gustavo JL and Another*[5] in 1987 stressed that:

> The power to waive must be exercised by the sending State itself through its sovereign organs and not by the official or agent himself. This is the logical conclusion to be reached on the basis of the provisions of the Vienna Convention and for two other reasons. Firstly, the Head of the State in question is in a position to decide whether or not to waive the privilege of immunity after taking account of the nature of the alleged offence and all the circumstances of the case. Secondly such a procedure avoids excess and abuses of diplomatic assignments. Taking advantage of the protection afforded by immunity could otherwise lead to undeserved impunity in the receiving State.

A decision by Colombia to waive the immunity of a Colombian diplomat accused of drug trafficking offences was not a violation of the constitutional prohibition in Spain on the retroactive application of criminal law.

In the context of Article 32 'the sending State' means the Government recognized by the receiving State at the time when any waiver is given or withheld. The US Court of Appeals even held in 1987 in the case of *In re Grand Jury Proceedings, Doe No 700*[6] that the current government of a State also had, by analogy with Article 32, the power to revoke the immunity of a former Head of State, so that the Government of the Philippines could waive the immunity of their former President Ferdinand Marcos and his wife from the jurisdiction of US courts.

Where a diplomat wishes to stand trial, but the sending State is unwilling to waive immunity, it is of course open to the diplomat to resign his or her appointment. This was the course chosen by Lubna Ahmed al-Hussein, a UN information officer in Sudan entitled to diplomatic immunity, when charged with wearing indecent clothing (loose trousers and a long smock) at a private party in a restaurant in Khartoum. The offence carried a potential penalty of forty lashes and a fine. The UN Secretary-General did not waive her immunity, but publicly expressed concern and denounced flogging as a violation of human rights. In the event she was not sentenced to flogging but only to a fine, which was paid—contrary to her wishes—by the journalists' union.[7]

---

[4] 74 ILR 519.
[5] 86 ILR 517. See also *Public Prosecutor v JBC* 94 ILR 339.
[6] 81 ILR 599.
[7] *The Times*, 30 July 2009; *Al-Jazeera*, 8 September 2009.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

The second question of authority—that of the evidence which a court may require to establish that a valid waiver has been made by the sending State—is not addressed by Article 32. This question is thus one to be determined under the national law of each receiving State Party. Some States may require a statement emanating from a minister of the government of the sending State—particularly if the immunity of the head of mission is in issue.[8] A more usual national practice would be that followed in the United Kingdom, where it is provided in section 2(3) of the Diplomatic Privileges Act 1964[9] that: 'For the purposes of Article 32, a waiver by the head of the mission of any State or any person for the time being performing his functions shall be deemed to be a waiver by that State.' This practice reflects a more general rule that a State is entitled to assume that an ambassador is authorized to perform any act which he purports to perform in the name of his sending State.[10] States might also accept a waiver by a member of the diplomatic staff of the mission where it purported to be made on behalf of the sending State—but if there is any likelihood of a challenge at a later stage to the validity of the waiver, this would be a risky course.

The question of the appropriate test of authority was examined thoroughly by the US Court of Appeals in 1989 in the case of *First Fidelity Bank NA v Government of Antigua and Barbuda—Permanent Mission*.[11] The Ambassador of Antigua to the United Nations obtained as his Government's representative a loan of US$250,000 from the predecessor to First Fidelity Bank, apparently for renovations to the Permanent Mission. In fact the loan was invested in a casino. In proceedings for a default judgment against the State of Antigua, the ambassador agreed to waive sovereign immunity from jurisdiction, attachment, and execution. In later proceedings, Antigua argued that the ambassador had exceeded both his actual and his apparent authority and that it had not waived its right to sovereign immunity. The majority in the Court of Appeals held that the appropriate test of authority was the agency law of the United States, that the correct test was therefore one of apparent authority, and, since the lenders had mistrusted the ambassador's bona fides at the time, the default judgment would be set aside on certain conditions. Circuit Judge Newman, dissenting, held, however, that the correct test was one of 'inherent authority', since the test favoured by the majority would lead to enquiries as to his actual or apparent authority. Such enquiries would put relationships with foreign governments more widely at risk.

Where there may be a challenge to the validity of a waiver—more likely in criminal cases—the authorities of the receiving State will be very careful to ensure that a waiver has been made with authority. It may well not be possible to regularize the situation at a later stage. Thus in the case of *R v Madan*[12]—an English case prior to the Diplomatic Privileges Act 1964—the solicitor appearing before the court purported to waive

---

[8] See Harvard Draft Art 26, 26 AJIL (1932 Supp) 125. In the UK case of *Fayed v Al-Tajir* [1988] 1 QB 712, [1987] 2 All ER 396, [1987] 3 WLR 102, 86 ILR 131 the Ambassador of the United Arab Emirates expressly waived his own immunity from proceedings for libel.

[9] C 81. See also *In Re Suarez* [1918] 1 Ch 176 at 191.

[10] cp Art 7.2(b) of the Vienna Convention on the Law of Treaties, 1969, UKTS No. 58 (1980), which provides that heads of diplomatic missions are considered as representing their State without having to produce full powers, for the purpose of adopting the text of a treaty between the accrediting State and the State to which they are accredited.

[11] 877 F 2d 189 (1989); 99 ILR 125.

[12] [1961] 2 QB 1, [1961] 1 All ER 588.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

diplomatic immunity on behalf of his client, a member of the staff of the High Commissioner for India, in proceedings for obtaining a season ticket and money by false pretences. On appeal from conviction the appellant argued that this had not been a valid waiver, so that the proceedings were a nullity. Although the High Commissioner had by then written to the court to say that he was prepared to waive immunity in the case, the Court of Criminal Appeal held that he had not purported to do so with retrospective effect, and they quashed the convictions. In 1987 a member of the administrative and technical staff of the Irish Embassy in London was discovered to have been selling Irish passports to persons not lawfully entitled to them. He was dismissed and his immunity waived by the Government of Ireland, but before he could be arrested he returned to Ireland and it became necessary to seek his extradition to the United Kingdom. The Irish courts in the case of *Deputy Commissioner McMahon v Kevin McDonald*[13] took the position that the English warrants which formed the basis for the extradition proceedings would be valid only if at the time of their issue an effective waiver of diplomatic immunity was in existence. The evidence tendered to the Irish courts on behalf of the Irish State included the formal request to the ambassador for waiver of immunity, consultation by the ambassador with the Irish Department of Foreign Affairs in Dublin, and written confirmation of a telephone call to the Foreign and Commonwealth Office in London stating that the Irish Government had given formal agreement to waiver of immunity in the case. The Irish Ambassador to the United Kingdom also testified that he had no independent power to waive immunity and that his own understanding was that the waiver had already started when he signed his formal letter—two days before issue of the warrants. The Irish courts accepted that this waiver was effective under English law, and Kevin McDonald was extradited, tried, and convicted in England.

States may provide in internal rules how decisions on waiver of the immunity of members of their own diplomatic missions are to be taken. They may provide that all decisions on how to respond to a request for waiver are to be referred back for instructions. Alternatively they may delegate authority to heads of mission to waive immunity in certain categories of case. The UK Government, for example, requires missions abroad to seek authority from the Foreign and Commonwealth Office in each case before any waiver of immunity is made. It also requires authority to be sought before legal proceedings are instituted by any member of a UK diplomatic mission abroad, because of the consequential loss of immunity under Article 32.3. The German Ministry of Foreign Affairs also requires its diplomats abroad to seek authority before waiving immunity or giving evidence in a court of the receiving State.[14] In 1970 The Netherlands Air Attaché in London asked his own government for waiver of his immunity so that he could stand trial in the United Kingdom on a charge of causing death by dangerous driving. The Netherlands agreed, and he was acquitted of the charge.[15] Article 32 does not, however, impose any requirement that the sending State should authorize initiation of legal proceedings. The Federal Tribunal of Switzerland emphasized in *S v India*[16] in 1984

---

[13] Supreme Court Judgment 185/88 of 27 July 1988 by Finlay CJ; further District Court judgment of 19 October 1988, unreported.
[14] Richtsteig (1994) p 75. See also Salmon (1994) para 434.
[15] 1971 RGDIP 212.
[16] 82 ILR 13.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

that no provision of the Convention limited the right of a member of a diplomatic mission to institute proceedings without the consent of the sending State.

## Waiver must always be express

There was prolonged discussion in the International Law Commission as to whether waiver must always be express or whether an implied waiver in regard to civil proceedings should be valid. There were many cases to the effect that although failure to enter an appearance at all did not constitute an implied submission to the jurisdiction of the courts of the receiving State, an appearance by the defendant with full knowledge of his rights and without any protest or claim to immunity was to be regarded as an implied waiver and was valid.[17] The Commission's draft article therefore provided that: 'In civil proceedings, waiver may be express or implied. A waiver is presumed to have occurred if a diplomatic agent appears as defendant without claiming any immunity.'[18] It was, however, argued against this provision, both in the Commission and at the Vienna Conference, that it was not logical to permit implied waiver when immunity belonged to the sending State and not to the member of its diplomatic mission. In theory there is no reason why a court should not be entitled to assume that an implied waiver, just as much as an express one, is made after proper internal consultation with the government of the sending State. But in practice a requirement for express waiver does lessen the chance that the sending government will not be informed of what is being done. This seems to have been the basis on which the Conference adopted a Polish amendment which provided that no distinction should be made in Article 31.2 between civil and criminal proceedings and that waiver in regard to all proceedings should be express.[19]

The Supreme Court of Malaysia in the case of *Public Prosecutor v Orhan Olmez*[20]—discussed above in the context of Article 31.2—attached importance to the requirement that waiver must be express in construing a diplomatic note offering the attendance of the First Secretary of the Turkish Embassy in court 'in his capacity as consul of this Embassy solely for authentication of the legal documents prepared and sent by the Turkish authorities as well as letters, notes and documents sent by this Embassy'. The Supreme Court held that this conditional offer of assistance did not constitute express waiver of immunity. There was similar reliance on the need for express waiver by the English Court of Appeal in *Propend Finance Pty Ltd v Sing and the Commissioner of the Australian Federal Police*.[21] The court held that undertakings not to remove documents from the Australian High Commission in London given to a High Court judge by the first defendant, a diplomat at the High Commission, in the context of judicial review of a decision to issue a search warrant, could not constitute express waiver of his diplomatic immunity in regard to the separate proceedings begun earlier by writ.

---

[17] eg *Taylor v Best* 14 CB 487, 139 ER 201; *In Re Suarez* [1918] 1 Ch 176; *Foureau de la Tour v Errembault de Dudzeele* 1891 Journal de Droit International Privé 157; *In Re Scarponi and others* 1952:19 ILR 382; *Re Franco-Franco* 1954:21 ILR 248.
[18] *ILC Yearbook* 1957 vol I pp 110–18; 1958 vol II p 99.
[19] UN Docs A/Conf. 20/C 1/L 171; A/Conf. 20/14 pp 174–7. See Barker (1996) pp 119–25.
[20] 87 ILR 212.
[21] Judgment of 17 April 1997, Times Law Reports, 2 May 1997.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

In the case of *US v Deaver*,[22] in which efforts were made to secure the appearance of the Canadian Ambassador as a witness in criminal proceedings, the State Department wrote to the Independent Counsel investigating the case, setting out US practice on the nature of an express waiver as follows:

> The customary form of requesting a waiver of diplomatic immunity is through diplomatic channels. The United States, for its part, does not respond to requests for waiver received by other means. The customary means of responding to such a request, which is also followed by the United States, is to provide a diplomatic note expressly waiving immunity.

The United States later filed a Statement of Interest in the case, arguing that offers by the Canadian Government of informal and voluntary co-operation could not be construed as express waiver of diplomatic immunity. The District Judge agreed that there had been no waiver of immunity.

It follows from Article 32.2 that a failure to enter an appearance or to appeal does not constitute a waiver of diplomatic immunity. This was confirmed by the Court of Justice of Geneva in *Champel Bellevue v State of Geneva*.[23] Nor does the payment of a fine by a member of a mission.[24] In general, however, those entitled to diplomatic immunity are better advised to enter an appearance under protest and to take steps to ensure that the court or tribunal in question are aware of their diplomatic status. A default judgment given by a court unaware of the diplomatic status of the defendant, although not enforceable while immunity subsists, is liable to cause embarrassment and may lead to consequences set out more fully above in the context of Article 31.4.

## Waiver is irrevocable

Although the absence of a valid waiver, or a newly acquired entitlement to immunity, may be raised at any stage of criminal or civil proceedings, the earlier cases tend to confirm that proceedings are to be regarded as a whole and that it is not possible for the sending State to revoke a waiver once it has been given with authority and with full knowledge of any entitlement. The International Law Commission stated in the Commentary to their draft articles that: 'It goes without saying that proceedings, in whatever court or courts, are regarded as an indivisible whole, and that immunity cannot be invoked on appeal if an express or implied waiver was given in the court of first instance.'[25]

## Prior undertaking to waive immunity

Neither the text nor the *travaux préparatoires* of Article 32 clearly resolve the question of the effect of a prior agreement by a diplomatic agent or a sending State to waive diplomatic immunity or to submit to the jurisdiction of the courts of the receiving State in regard to a particular contract or category of potential dispute. Diplomatic agents and others entitled to immunity frequently have difficulty in securing rented

---

[22] Cr No 87–0096 TPJ (DDC 1987). The State Department interventions are described in 1981–8 DUSPIL 980.
[23] 1986 ASDI 98, 102 ILR 180.
[24] 1983 Can YIL 309.
[25] *ILC Yearbook* 1958 vol II p 99, para (5) of Commentary on Art 30.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

accommodation because landlords are reluctant to lease accommodation to persons who cannot be taken to a court or tribunal in the ordinary way. In the English case of *Parker v Boggan*[26] the court held that it was unreasonable for a landlord to refuse consent to an underlease on the ground that the proposed underlessee was entitled to diplomatic immunity, but this decision illustrated rather than ended the problem. An undertaking on behalf of the sending State that diplomatic immunity would be waived in the event of any dispute arising from the proposed tenancy might help to overcome any difficulty, but there remains the question of whether national courts would recognize such an undertaking as an express waiver of immunity.

In the related field of sovereign immunity it is now accepted that a State may agree in advance to submit a class of dispute to the jurisdiction of the courts of another State and that such an agreement may constitute a valid waiver of its own immunity. Article 2 of the European Convention on State Immunity of 1972[27] provides that a Contracting State cannot claim immunity from the jurisdiction of a court of another Contracting State if it has undertaken to submit to the jurisdiction of that court whether by international agreement, by express term contained in a contract in writing, or by an express consent given after a dispute has arisen. The Explanatory Report on the Convention states that, for these purposes, a specification that the law of a particular State is to be applied does not by itself imply submission to the jurisdiction of the courts of that State. Article 2 of the European Convention together with the above comment from the Explanatory Report are given effect in the United Kingdom by section 2(2) of the State Immunity Act 1978.[28]

Prior to the State Immunity Act English cases had decided that an advance undertaking to waive immunity or to submit to the jurisdiction was not an effective waiver for the purpose of particular proceedings.[29] In *Empson v Smith*[30] the English Court of Appeal held that these authorities applied in regard to diplomatic immunity, so that 'there could be no effective waiver of immunity until the court is actually seized of the proceedings'. It might be argued that given the decision that the principles applicable to waiver of state immunity were also applicable to waiver of diplomatic immunity, and given the change when the European Convention on State Immunity was implemented in English law, English courts should now recognize the possibility of an advance undertaking by a State to waive diplomatic immunity. The point arose in 1989 in the case of *A Company Ltd v Republic of X*,[31] where it was held at first instance that in the light of the earlier authorities the State could be bound only by an undertaking or consent given at the time when the court was asked to exercise jurisdiction. The case was, however, dealing with the special situation of possible execution against mission premises and diplomatic residences, it did not concern an express waiver of diplomatic immunity, and it was not taken on appeal. It should not therefore be taken as clearly decided in English law that a prior undertaking by a State to waive diplomatic immunity would not now be regarded as a valid waiver of diplomatic immunity. Provided that the undertaking was in clear terms and given for

---

[26] [1947] 1 All ER 46, 1946 AD 159.
[27] 1972:11 ILM 470; European Treaty Series No 74.
[28] C 33.
[29] *Mighell v Sultan of Johore* [1894] 1 QB 149; *Duff Development Co Ltd v Government of Kelantan* [1924] AC 797; *Kahan v Pakistan Federation* [1951] 2 KB 1003.
[30] [1966] 1 QB 426, [1965] 2 All ER 881, 41 ILR 407.
[31] Judgment in Chambers by Saville J on 21 December 1989, 87 ILR 412, Times Law Reports, 9 April 1990.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

consideration, there seems no reason of principle why the State, which has the sovereign power to waive immunity, should not be held to its agreement. There is some limited evidence of personal undertakings by ambassadors that diplomatic immunity will not be asserted on behalf of a named diplomat, but these undertakings have apparently been honoured and so their effectiveness has not so far been tested.[32]

A distinction must, however, be drawn between undertakings to submit to the jurisdiction of the courts of the receiving State and provisions that in the event of any dispute the law of the receiving State should be applied. In the case of *Embassy of Czechoslovakia v Jens Nielsen*[33] the Supreme Court of Denmark held that: 'Neither according to the Vienna Convention nor according to the rules of international law can an embassy be held to be exempt from proceedings based on a civil law contract concluded by the embassy which provides that disputes are to be settled by the courts of the receiving State.' By contrast, mere signature by a State of an agreement providing for arbitration was held by the Swedish courts in *Tekno-Pharma AB v State of Iran*[34] in 1972 and in *LIAMCO v Libya*[35] in 1980 not to constitute a waiver of immunity when there was no domestic legal relationship with the forum State.

These principles are accurately reflected in Article 7 of the 2004 UN Convention on Jurisdictional Immunities of States and Their Property, which provides:

Express consent to exercise of jurisdiction
1. A State cannot invoke immunity from jurisdiction in a proceeding before a court of another State with regard to a matter or case if it has expressly consented to the exercise of jurisdiction by the court with regard to the matter or case:
    (a) by international agreement;
    (b) in a written contract; or
    (c) by a declaration before the court or by a written communication in a specific proceeding.
2. Agreement by a State for the application of the law of another State shall not be interpreted as consent to the exercise of jurisdiction by the courts of that other State.[36]

The European Union in Article 12 of its 2006 Agreement with the International Criminal Court on co-operation and assistance has made the following undertaking:

Privileges and Immunities
　If the Court seeks to exercise its jurisdiction over a person who is alleged to be criminally responsible for a crime within the jurisdiction of the Court and if such person enjoys, according to the relevant rules of international law, any privileges and immunities, the relevant institution of the EU undertakes to cooperate fully with the Court and, with due regard to its responsibilities and competencies under the EU Treaty and the relevant rules thereunder, to take all necessary measures to allow the Court to exercise its jurisdiction, in particular by waiving any such privileges and immunities in accordance with all relevant rules of international law.[37]

---

[32] See Satow (6th edn 2009) at para 9.27, where it is suggested that the 'safer course' is for a waiver to be sought for proceedings about to be instituted.
[33] 78 ILR 81.
[34] 65 ILR 383.
[35] 62 ILR 228.
[36] UN Doc A/RES/59/38. For an account of state practice on waiver in the context of state immunity see Fox and Webb (2013) ch 11 'The Consent of the Foreign State: Waiver and the Arbitration Exception'.
[37] OJ L115/49, 28 April 2006.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

Such an advance undertaking by an international organization to waive immunity appears to be novel, and has not yet been tested in practice.

## Initiation of proceedings by diplomat and counterclaims

Article 32.3 sets out a principle long accepted in decisions of national courts.[38] There was no challenge to it or detailed discussion of it during the preparation of the Convention. It should be noted, however, that its terms are in fact inconsistent with paragraphs 1 and 2 of the same Article. Submission to the jurisdiction for the purpose of instituting proceedings constitutes an implied and not an express waiver of diplomatic immunity, and nothing in the Convention obliges the diplomat to consult his government before instituting proceedings or allows the receiving State to treat the proceedings as invalid if he does not in fact consult. States may as a matter of internal law or professional discipline require that their own diplomats seek authority before launching proceedings in the receiving State, but as pointed out above, and emphasized by the Swiss court in *S v India*,[39] such a requirement does not derive from the Vienna Convention. The United Kingdom does impose such a rule, but it is not general practice.

The position was clearly set out by the Local Court of The Hague in the case of *Hart v Helinski*.[40] A member of the US Embassy in The Netherlands, Helinski, instituted legal proceedings against his landlord seeking repayment of excess rent, and the landlord counterclaimed. Both claim and counterclaim were accepted—the diplomat's claim being for a much larger amount—and the diplomat raised his immunity as a bar to execution of the judgment on the counterclaim. The Local Court noted that Article 32.3 differed from the previous paragraphs in that express authority of the sending State was not required to empower a diplomat to initiate proceedings and that the effect of his so doing was that he lost his immunity—'he cannot have it both ways'. They further commented: 'No doubt, any State has the power to deny to its diplomats the right to initiate civil proceedings in the receiving State. In that case it is an internal instruction that cannot be invoked by the opposing party.' The landlord Hart appealed to the Supreme Court of The Netherlands, but the appeal failed.

The same position was taken by the Supreme Court of Austria in 1977 in the case *Re RFN*.[41] RFN was the child of divorced parents living under the care and control of his mother. The father, an official of the International Atomic Energy Agency entitled under the Headquarters Agreement between the IAEA and Austria to the immunities accorded to diplomats by the Vienna Convention, lodged an application for custody of the child, expressly submitting himself to Austrian jurisdiction. The mother obtained an enforceable order against the father for maintenance and lodged a cross-petition for custody of the child. At this point the father withdrew his submission to the jurisdiction as well as his own claim, and sought to deny the jurisdiction of the court to determine the

---

[38] eg *Drtilek v Barbier* 1925–6 AD 320; *Chinese Embassy (Immunities) Case* 1925–6 AD 321. Giuliano in 1960 *Recueil des Cours* II vol 100 p 108 suggested that this was not really a case of waiver, but of non-applicability of immunity, but see critical comment on this theory in Salmon (1994) para 444.
[39] 82 ILR 13.
[40] 78 ILR 4 at 8.
[41] 77 ILR 452. To the same effect see later decision of the Austrian Supreme Court reported in 5 ARIEL 310 at 314.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

cross-petition, arguing that his immunity could be waived only by the IAEA. On appeal by the curator appointed for the father, the Supreme Court held that:

> the initiation of proceedings by a diplomatic agent is not dependent on the consent of the sending State and has unavoidable consequences. A diplomat who initiates proceedings loses the right to invoke immunity in respect of a counter-claim directly connected with the principal claim ... It can be inferred from the Convention that this connection between voluntary submission to the jurisdiction and subjection to counter-claims directly connected to the principal claims corresponds to general international considerations of justice.

The Supreme Court also held that: 'The term counter-claim (*widerklage*) is dependent not so much on the specific legal proceedings in which the claim is raised but rather on the connection between two competing claims.' Once jurisdiction had been established the position was not altered by withdrawal of the diplomat's claim.

The English case of *High Commissioner for India v Ghosh*[42] predated the Vienna Convention but contains a helpful comment on the connection necessary between claim and counterclaim for immunity to be lost. The High Commissioner for India had brought proceedings for recovery of money lent, and the defendant counterclaimed for slander related to his professional reputation as a doctor. An application to strike out the counterclaim was accepted, and the Court of Appeal in affirming the order said:

> By bringing their action in this country and submitting to the jurisdiction, the plaintiffs must be taken to have submitted to the jurisdiction not only for the purpose of having their claim adjudicated upon but also for the purpose of enabling the defendant, against whom they are prosecuting their claim, to defend himself adequately, and his adequate defence may include a claim or demand asserted by way of counterclaim.

For the rule to apply, the diplomat himself must initiate the relevant legal proceedings. It is not sufficient for him to have an interest or involvement in the proceedings if they are formally begun by another person or entity. In the case of *Propend Finance Pty Ltd v Sing and the Commissioner of the Australian Federal Police*[43] mentioned above, the proceedings seeking assistance from UK courts by way of search warrants were begun by the Metropolitan Police on the direction of the Home Secretary who was responding, pursuant to an inter-Commonwealth scheme of Mutual Assistance in Criminal Matters, to a request from the Attorney-General of Australia. The diplomatic agent Mr Sing assisted and gave evidence in the proceedings, but since he did not institute them, the Court of Appeal held that Article 32.3 did not operate so as to cause him to lose his own immunity.

Where a diplomat institutes legal proceedings without full knowledge of his entitlement to immunity, he is entitled on becoming aware of the facts to have both claim and counterclaim dismissed. This was confirmed by the US Court of Appeals in *Abdulaziz v Metropolitan Dade County and Others*.[44] Prince Turki Bin Abdulaziz was a member of the royal family of Saudi Arabia resident in Florida. Following an allegation that he was holding an Egyptian woman against her will, and in the belief that he was not entitled to diplomatic immunity, a search warrant was issued and police officers attempted to execute

---

[42] [1960] 1 QB 134.
[43] Judgment of 17 April 1997, Times Law Reports, 2 May 1997.
[44] 741 F 2d 1328 (1984); 99 ILR 113. For a colourful account of events see Ashman and Trescott (1986) pp 148–52.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to
https://www.ebsco.com/terms-of-use.

it. The attempt was resisted and there was a confrontation. The Prince and his family sued the police for violation of their civil rights and the police counterclaimed for injuries received during the incident. The State Department then filed papers confirming the entitlement of the Prince to diplomatic status as a 'special envoy', and he immediately moved to have both proceedings dismissed. The Court of Appeals confirmed that 'the action was properly dismissed when immunity was acquired and the court was so notified'.

## Waiver and execution

Article 32.4, providing that waiver of immunity from jurisdiction in respect of civil or administrative proceedings should not be held to imply waiver of immunity from execution of any judgment, is firmly based on previous customary international law. Attempts at the Vienna Conference to delete the paragraph met with very little support.[45]

Article 32.4 deals only with civil and administrative proceedings. There is no mention of the position in regard to criminal proceedings. It may therefore be argued that the implication of the text is that in respect of criminal proceedings no separate waiver in respect of execution of any penalty is necessary and that waiver of immunity in a criminal case cannot be confined to the proceedings to determine guilt.

The omission of any reference to criminal proceedings in Article 32 is probably accidental. The original draft of Article 32.4 by the Special Rapporteur provided that: 'Waiver of immunity from jurisdiction in respect of legal proceedings shall not be held to imply waiver of immunity regarding execution of the judgment.' On this the Chairman of the International Law Commission commented that it 'laid down a principle that was, he thought, universally recognized', and it was debated no further. The Drafting Committee of the Commission, however, limited the provision to 'civil proceedings'.[46] The reason for this was probably that the earlier part of the Article had been modified to provide that while in criminal proceedings waiver must always be express, it could be implied in civil proceedings. It was therefore not necessary to make clear for criminal proceedings that waiver of immunity in regard to proceedings did not imply waiver of immunity in regard to execution, since an express waiver would usually make the position clear. But since implied waiver was then to be permitted for civil proceedings it was important to make clear that waiver of immunity from execution in civil proceedings could not be implied. The Conference reversed the decision of the Commission on the question of implied waiver, but appear to have overlooked the implications for the formulation of paragraph 4.

The argument against requiring a separate waiver in regard to execution, or permitting a waiver extending only to the point of a finding of guilt or innocence, is that criminal proceedings are an indivisible whole and that the penalty is inseparable from a finding of guilt.[47] This is, however, not in practice how criminal proceedings are carried out, and it is

---

[45] UN Docs A/Conf. 20/C 1/L 179 and L 200/Rev. 2; A/Conf. 20/14 pp 173–7.
[46] UN Doc A/CN 4/91, Art 21 para 3; *ILC Yearbook* 1957 vol I p 118, vol II p 139 (Art 25.4).
[47] See statement by UK representative in the Sixth Committee of the General Assembly, in 1989 BYIL 630: 'In the view of my delegation, a double waiver is both unreasonable and impracticable given the nature of criminal proceedings.' But see Satow (5th edn 1979) para 15.23: 'But execution of a judgment and the carrying out of penalty or sentence following criminal proceedings are regarded as separate from the issue of liability or guilt, and a separate waiver is required before they may be carried out.' See also Barker (1996) pp 126–7; Salmon (1994) para 450.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

common under many legal systems for there to be an interval and further evidence and argument between verdict and imposition of a sentence or fine. Imposition of a monetary penalty against a diplomat raises the same issues as delivery of a civil judgment requiring payment of damages or compensation, and forcible execution would involve invasion of the diplomat's residence and property which are inviolable under Article 30. A penalty of imprisonment would involve his personal inviolability under Article 29, which to an even greater extent should be regarded as separate from the question of immunity from jurisdiction. Article 31.3 states that: 'No measures of execution may be taken in respect of a diplomatic agent except in the cases coming under sub-paragraphs (a), (b) and (c) of this Article, and provided that the measures concerned can be taken without infringing the inviolability of his person or of his residence.' It is difficult to argue that this very specific provision is to be limited by the mere absence of a reference to criminal proceedings in Article 32.4.

There may well be cases where the sending State is prepared to allow the issue of criminal responsibility to be determined by the courts of the receiving State where a diplomat protests innocence, but would not be prepared to allow him as a necessary consequence of conviction to suffer imprisonment, preferring in that event to recall and perhaps to dismiss him from its service. The receiving State would be able to declare him *persona non grata* if he were found guilty and not recalled and would be in a stronger position in so doing than if no proceedings had taken place. It is submitted that the better view is that the Convention does not exclude a waiver of immunity by the sending State expressly limited to the proceedings necessary to determine guilt. States should not, however, in view of the uncertainty of the position waive immunity from criminal proceedings without either making an express reservation in regard to sentence or accepting that the court may proceed without seeking a further waiver. The fact that the ambiguity has not apparently arisen in any reported case tends to show that the usual practice for receiving States when confronted by evidence that a member of their diplomatic mission has committed a serious criminal offence is to take either the protective course of immediate recall or the alternative course of waiver, often accompanied by dismissal. Although the intermediate course of waiver not extending to sentence would seem to be fairer to the accused as well as to victims of any crime, it has not proved attractive to sending States. This may well be due at least in part to the uncertainty as to whether such a course is permitted under Article 32.4.

## Current practice

It is clear that in recent years waivers of immunity have been more rigorously sought in the light of public concern at abuse of diplomatic immunity, and—at least in those receiving States where the fairness of civil and criminal proceedings is guaranteed—more readily granted. In the United Kingdom it is standard practice to press for waiver of immunity in cases of drunken driving even in the absence of any previous offence, and if no waiver is forthcoming, the withdrawal of the diplomat will normally be requested from the sending State.[48] In 1985 the United Kingdom requested a waiver of immunity in regard to a drug-

---

[48] Circular Note to diplomatic missions, printed in 1984 BYIL 469; Review of the Vienna Convention, Cmnd 9497, paras 63–9.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

related offence from the Zambian Government, and this was promptly granted.[49] In 1988, following a difference of view between the Governments of the United Kingdom and of Liberia as to whether Lorrain Osman had in May 1987 been notified to the Foreign and Commonwealth Office as Ambassador-at-large and Economic Consultant to the Government of Liberia (discussed below in the context of Article 39), the Liberian Embassy waived the immunity which they had claimed for him, so allowing proceedings to extradite him to Hong Kong on fraud charges to take their course.[50] Also in 1988 the UK Foreign and Commonwealth Office sought waiver of immunity to allow the Ambassador of Panama and his staff to be questioned about the seizure of the Panamanian Consulate in London—at the time under the control of supporters of the deposed President of Panama—by a private security firm. The ambassador was given a deadline and a threat that in the event of his refusing waiver his recall would be requested. Seven men from the security firm were charged with violent disorder, but the case was later dropped when it became clear that the raid had taken place following consultation with the police responsible for diplomatic protection.[51] In 1992 the Government of Thailand waived the immunity of a second secretary in its London Embassy charged and later convicted and sentenced to twenty years' imprisonment for the illegal import of heroin worth over £7 million.[52] In 2003 the President of Colombia, following a high-level intervention by Prime Minister Tony Blair, waived the immunity of Jairo Soto-Mendoza, a military attaché at the Colombian Embassy in London, who then stood trial for the murder of a man who had mugged and robbed his son. The diplomat's plea that he had acted in self-defence was accepted and he was acquitted.[53] The United Kingdom stated in 1987 that it had agreed on twenty-eight occasions to waiver of the immunity of its own diplomats and their families overseas—all but three of these involving appearance as a witness and the remaining three, minor traffic offences.[54]

In 1996 the French Government asked Zaire to waive the immunity of its ambassador to enable him to be tried in respect of an accident in which the car he was driving struck and killed two boys in the South of France. The Government of Zaire dismissed him, waived immunity, and insisted that he return from Zaire to France to stand trial.[55] France also persuaded UNESCO in 1999 to waive the immunity of one of its senior officers who was accused of enslaving and maltreating his niece, and a formal investigation was launched by French police.[56]

The US Government in 1988 secured waiver of the immunity of the Ambassador of Honduras to Panama who was then arrested on a charge of illegal import of cocaine.[57] In 1997 the Government of Georgia lifted the immunity of a senior diplomat in its embassy in Washington suspected of responsibility for a multiple car crash in which a young girl was killed. He stood trial and was convicted. The personal representatives of the girl who had been killed later brought civil proceedings against a number of defendants, including

---

[49] 1985 BYIL 436; 1987 BYIL 564.
[50] 1988 BYIL 483.
[51] *The Times*, 8, 9 and 11 March 1988, 4 June 1988.
[52] *The Times*, 29 May 1992, 5 December 1992.
[53] *The Times*, 23 July 2003.
[54] Hansard HC Debs 26 January 1987 WA col 42; 1987 BYIL 547; *The Times*, 27 January 1987.
[55] *The Times*, 3 and 4 December 1996, 22 and 27 January 1997.
[56] *The Times*, 19 March 1999.
[57] *The Times*, 18 May 1988.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

the diplomat himself and the State of Georgia, but the court dismissed the diplomat from the proceedings on the ground that the waiver of his immunity from criminal jurisdiction did not include a waiver of his separate immunity from civil jurisdiction. This finding was in line with a suggestion to the court made by the State Department.[58] As to their own diplomats abroad, the US Government appears in practice to prefer immediate recall to waiver of immunity. State Department guidance in 1986 to the US Foreign Service stated that: 'While the power to waive immunity is always available, it is the usual practice of the Department of State to waive only in benign circumstances (e.g. to permit an employee or dependant to testify in court).' McClanahan commented, with reference to a particular incident in 1987, that 'even where there is little question of the fact of a serious crime having been committed, of the probable fairness of the courts, or of the treatment that would be accorded the accused if detained, other considerations may be of sufficient weight to cause refusal of a waiver of immunity'.[59] In recent years, however, the United States has given more careful consideration to the possibility of waiving the immunity from jurisdiction of staff of its overseas missions and has waived immunity in one case where criminal charges of embezzlement were brought against a member of the administrative and technical staff of one of its missions.[60]

In 2012, following the murder in her Embassy in Kenya of the recently appointed Venezuelan chargé d'affaires, Venezuela almost immediately waived the immunity of its first secretary Dwight Sagaray. Sagaray was charged with the murder a few days later and pleaded not guilty, but nine months later he was granted bail on surrender of his passport and no date was set for a trial.[61] Also in 2012, the Government of Mauritius waived the immunity of Somduth Soborun, its Ambassador to the US in respect of criminal proceedings relating to failure to pay a Filipina private servant the minimum wage under US law. The Ambassador pleaded guilty to the charge—though maintaining that he had paid the sum agreed under contract—and was fined and required to pay $24,153 in back wages to the domestic worker.[62]

In 2014, The Netherlands Government—following various criticisms of diplomats in the media—issued a statement saying that it would more frequently ask for diplomatic immunity to be waived in cases of serious misconduct.[63]

## Waiver of other immunities

It should be noted that although Article 32 deals in express terms only with waiver of diplomatic immunity from jurisdiction, there may also be waiver of the inviolability of mission premises, archives, or communications, of the person, residence, or property of a diplomatic agent, or any other immunity accorded by the Vienna Convention. Waiver in respect of the giving of evidence has already been discussed above in the context of Article 32.1. In these cases, the fundamental principles established by Article 32 apply—in particular that the decision is in substance one for the sending State, but that the

---

[58] *US v Makharadze*, No F-1446–97 (DC Super Ct) described in 1999 AJIL 485 and in 1991–9 DUSPIL 1292; *The Times*, 7 January 1997, 17 February 1997.
[59] Barker (1996) pp 130–1; McClanahan (1989) pp 137–9.
[60] State Department information.
[61] *New York Times*; *Guardian*, 6 September 2012.
[62] *Washington Post*, 1 January 2014; US Attorney's Office Press Release. 26 November 2012.
[63] Ministry of Foreign Affairs statement, 23 April 2014, quoted in Duquet and Wouters (2015a) p 8.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.

receiving State is entitled to assume that the head of mission speaks for his State and that he either has delegated authority to give waivers or permissions or has consulted in regard to the specific case. Article 22.1 does refer to the possibility of 'the consent of the head of the mission'. There is no reference, in other provisions of the Convention conferring immunity to the eventuality of waiver or consent by the sending State, but this does not mean that these immunities cannot be waived. The possibility of waiver flows from the nature of inviolability and immunity as prerogatives of sending States and from the fact that their purpose is to ensure the efficient performance of the functions of diplomatic missions.[64]

---

[64] Salmon (1994) para 451 takes a similar view of the applicable principles.

EBSCOhost: eBook Collection (EBSCOhost) printed on 11/21/2025 2:09:23 PM UTC via RALPH J BUNCHE LIBRARY (DEPARTMENT OF STATE). All use subject to https://www.ebsco.com/terms-of-use.