UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

UNITED STATES OF AMERICA,

    -against-                                         24-cr-178 (CM)

RUI-SIANG LIN,

            Defendants.

———————————————————————————— x

## DECISION AND ORDER DENYING DEFENDANT'S
## MOTION TO DISMISS THE INDICTMENT

McMahon, J.:

      While awaiting sentencing following his plea of guilty to various narcotics and money laundering charges, Defendant Rui-Siang Lin ("Defendant" or "Mr. Lin") has moved to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(2).  He argues that the Court lacks subject matter jurisdiction over him because he is allegedly protected by diplomatic immunity. Dkt. Nos. 44–46.

      The Government asks the Court to deny the motion, arguing that Lin "does not have, and has never had, diplomatic privileges and immunities."  Dkt. No. 49, at 1.

      For the following reasons, Defendant's motion is DENIED.  We will proceed to sentencing on January 22, 2026.

## I.        Background

      Defendant was arrested on May 18, 2024, at John F. Kennedy International Airport in Queens, New York.   He arrived via a JetBlue flight from St. Lucia, where he had worked as an information technology ("IT") employee at Taiwan's Technical Mission in St. Lucia.   *See* Dkt.

No. 45, Ex. D.  Prior to his arrest, Defendant had purchased a ticket to fly from New York City to Singapore on May 20, 2024.  His trip included a four-hour layover in Taipei, Taiwan, his home country.  *See* Dkt. No. 45, Ex. B.

After his arrest at John F. Kennedy International Airport ("JFK"), and following the administration of *Miranda* warnings, Defendant admitted that he operated under the online moniker "Pharoah" and was responsible for the operation of a $100 million online narcotics market called "Incognito."

On December 16, 2024, pursuant to a plea agreement with the Government, Defendant pleaded guilty to Counts Two through Four of the Indictment: Count Two – Conspiracy to Distribute and Possess with Intent to Distribute Narcotics, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(b)(1)(A); Count Three – Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and Count Four – Conspiracy to Sell Adulterated and Misbranded Medication, in violation of 18 U.S.C. § 371.

On October 24, 2025, Defendant filed the instant motion to dismiss the indictment for lack of subject matter jurisdiction, claiming that he is immune from prosecution because he has diplomatic immunity.  Dkt. No. 44.  Mr. Lin asserts that, at the time of his arrest on May 18, 2024, he possessed diplomatic immunity under the terms of the Vienna Convention on Diplomatic Relations ("VCDR").  *See, e.g.*, Dkt. No. 46, Mem. Supp. Mot. to Dismiss, at 4, 10, 14.  Defendant argues that, as a member of the "technical" staff at Taiwan's Technical Mission in St. Lucia, he is entitled to diplomatic immunity under the VCDR.  He further argues that, as a diplomatic agent, he is entitled to *in transitu* immunity because he was travelling between his post in St. Lucia and his home country, Taiwan, at the time of his arrest.

After Mr. Lin moved to dismiss the indictment, the Government asked the United States State Department, through the American Institute in Taiwan ("AIT"), to confirm with Taiwanese authorities whether Defendant possessed diplomatic privileges and immunities by virtue of his position in St. Lucia. On November 18, 2025, the Taipei Economic and Cultural Representative Office in the United States ("TECRO")[1] provided a response from the Taiwan Ministry of Foreign Affairs. TECRO states in its letter that:

1. When Mr. Lin was arrested in the U.S., he was serving alternative military service as an assistant technician stationed in Taiwan's Technical Mission in St. Lucia. He was neither a "diplomatic agent," "member of the administrative and technical staff," "member of the service staff," nor holding any position under Article 1 of the Vienna Convention on Diplomatic Relations.

2. In conclusion, Mr. Lin did not and does not enjoy diplomatic privileges and immunities under the Vienna Convention on Diplomatic Relations or any other source of law in connection with his position with Taiwan's Technical Mission in St. Lucia or any other Taiwan entity.

Dkt. No. 49, Ex. 1.

## II.    Legal Standards

Under Rule 12(b)(2) of the Federal Rules of Criminal Procedure, a "motion that the court lacks jurisdiction may be made at any time while the case is pending." If a person is entitled to diplomatic immunity under the VCDR, a criminal case against him must be dismissed for lack of subject matter jurisdiction. *See Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).

Diplomatic immunity is governed by the VCDR, *see* 23 U.S.T. 3227, which was incorporated into U.S. law pursuant to the Diplomatic Relations Act ("DRA"), Pub. L. No. 95-

---

[1] Under the Taiwan Relations Act ("TRA"), the President has authority to recognize TECRO as the entity empowered to provide or render "any performance, communication, assurance, undertaking, or other action" on behalf of Taiwan. 22 U.S.C. § 3309(a)). The President has formally determined that TECRO serves as the instrumentality for these purposes. Exec. Order No. 13014 § 2-203, 61 Fed. Reg. 42,963 (Aug. 15, 1996). The TRA further provides that U.S. Government agencies conduct programs, transactions, and other relations with Taiwan through AIT, in the manner and to the extent directed by the President. 22 U.S.C. § 3305(a).

393, 92 Stat. 808 (1978) (codified at 22 U.S.C. §§ 254a-e).  The DRA makes clear that a district court must dismiss "Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention."  22 U.S.C. § 254d.  The provisions of the DRA, and thus the VCDR, are applied to Taiwanese nationals through the Taiwan Relations Act.  *See* 22 U.S.C. § 3303(c) ("For all purposes, including actions in any court in the United States, the Congress approves the continuation in force of all treaties and other international agreements, including multilateral conventions, entered into by the United States and the governing authorities on Taiwan[.]").

Diplomatic immunity operates as a limitation on the Court's subject matter jurisdiction. Therefore, the party invoking the Court's jurisdiction – the Government – bears the ultimate burden of establishing that jurisdiction exists.  Although the defendant invokes the VCDR, courts addressing analogous treaty-based immunity in the civil context have held that, where immunity derives from a self-executing treaty, the plaintiff – the proponent of the court's exercise of jurisdiction – must show that jurisdiction exists.  *See, e.g.*, *Georges v. United Nations*, 84 F. Supp. 3d 246, 249–50 (S.D.N.Y. 2015), *aff'd*, 834 F.3d 88 (2d Cir. 2016).  Accordingly, while Defendant has the burden of going forward on the issue of diplomatic immunity, it is the Government – the party that can be analogized to the "plaintiff" in the civil context – that bears the ultimate burden of showing, by a preponderance of the evidence, that the Court possesses subject matter jurisdiction.  *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 444 (2d Cir. 2019).

## III.    Discussion

### A.  Framework Under the Vienna Convention on Diplomatic Relations

The Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, provides the exclusive framework for determining diplomatic privileges and immunities.  Its stated purpose emphasizes

4

that these privileges exist "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."  23 U.S.T. 3227, Preamble.

The VCDR defines the categories of persons that may be entitled to immunity in Article 1. A "diplomatic agent" is defined as "the head of the mission or a member of the diplomatic staff of the mission," Art. 1(e), and a "member of the diplomatic staff" is "a member of the staff of the mission having diplomatic rank," Art. 1(d).  Individuals who fall into these categories are entitled to diplomatic immunity, and Article 31(1) of the VCDR confers on them immunity from criminal prosecution: "A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State."  Article 40(1) also provides such individuals with limited *in transitu* immunity, but only "If a diplomatic agent passes through or is in the territory of a third State . . . while proceeding to take up or to return to his post."  Thus, Article 40 presupposes, rather than creates, diplomatic status.

The VCDR recognizes other categories of mission employees, including administrative, technical, and service staff of a mission, *see* Articles 1(f)–(g).  However, these personnel do not enjoy the protection of Articles 31 and 40.  They are entitled only to limited privileges and immunities under Article 37, which provides that administrative, technical, and service staff members do not enjoy immunity from criminal prosecution, except "in respect of acts performed in the course of their duties."  This distinguishes persons occupying these roles from diplomatic agents, who enjoy broader immune from criminal prosecution.  The VCDR thus differentiates between "diplomatic agents," who are entitled to full immunity from criminal jurisdiction under Article 31, and other, non-diplomatic personnel, who are not.

The process by which an individual becomes recognized as a diplomatic agent is set out in Articles 4, 7, 9, and 10. Article 4(1) provides that, "The sending State must make certain that the agrément of the receiving State has been given for the person it proposes to accredit as head of the mission to that State." Thus, acquiring diplomatic status depends on formal, bilateral recognition; it commences with the sending State's notifying the receiving State that a particular individual is being sent as a diplomatic agent; the receiving State has the right to accredit that individual or to deny accreditation and withhold agrément. Although Article 4(1) refers only to heads of mission, Article 7 extends appointment authority to members of the mission generally, and they are subject to the approval mechanisms established in Articles 5, 8, 9, and 11.

To allow the receiving State to decide whether to grant agrément, Article 10(1)(a) requires that the receiving state be notified of the appointment of members of the mission and receive notice of their arrival, as well as the termination of their functions. And Article 9 allows the receiving State to notify the sending State that a member of the diplomatic staff is *persona non grata*; if it does so, it effectively withdraws its agrément, and the sending State must recall any such individual or terminate that person's functions.

Taken together, these provisions demonstrate that diplomatic status is created only through formal acts of designation by the sending State and, where relevant, acceptance by the receiving State.

Article 31 immunity attaches only if the individual has first been formally recognized as (1) a diplomatic agent, or (2) a member of the diplomatic staff holding diplomatic rank. Recognition of such status by the sending State, and where applicable by the receiving State, is a mandatory precondition. *See* Arts. 4, 7, 9, 10. Without that recognition, Article 31 immunity does

not exist, and an individual employed by a mission in a non-diplomatic capacity remains subject to criminal prosecution. And since *in transitu* immunity under Article 40 applies only to "diplomatic agents" as defined in Article 1, other mission employees, including members of the technical and support staff, are subject to arrest in a third State, even while travelling to or from their home country.

### B.    Defendant Is Not Entitled to Diplomatic Immunity

1.    <u>Under the Plain Meaning of the VCDR, Defendant Is Not a Diplomatic Agent</u>

Applying the VCDR framework to the facts of this case, the threshold question – whether Mr. Lin qualifies as a "diplomatic agent" because he is the head of mission or a member of the diplomatic staff entitled to immunity – is easily answered. As a member of the technical staff of a Technical Mission, he is neither.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez–Machain*, 504 U.S. 655, 663 (1992). When interpreting treaties, "we are guided by principles similar to those governing statutory interpretation." *Iceland S.S. Co., Ltd.-Eimskip v. Dep't of Army*, 201 F.3d 451, 458 (D.C. Cir. 2000). The Court must give effect to the plain meaning of the VCDR; if the text is unambiguous, the analysis is at an end. *See MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 86 (2d Cir. 2023). In ascertaining the plain meaning of treaty language, courts read the language "in its context, not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).

Here, the VCDR plainly limits immunity to individuals who have been formally recognized by their own governments as "diplomatic agents." As the Court emphasized, *see supra* Section III(A), the VCDR confers immunity only upon recognition by the sending State – and, where

relevant, the receiving State – that an individual is a member of the diplomatic staff.  *See* Arts. 4, 7, 10, 31.  The Government of Taiwan's assertion that it never granted Mr. Lin diplomatic status means that he cannot claim diplomatic immunity from prosecution.  Article 31(1), which provides immunity from criminal jurisdiction, applies exclusively to "diplomatic agents."  Because Lin was never designated as a "diplomatic agent," he is not entitled to immunity from criminal prosecution in the United States.

The 1958 Report of the International Law Commission ("ILC") and the Special Rapporteur's commentary confirms as much.[2]  The Supreme Court has recognized that, in interpreting treaties, courts may consult the negotiating and drafting history (*travaux préparatoires*) and the post-ratification understanding of the contracting parties.[3]  *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996).  Because the VCDR was drafted by the ILC between 1954 and 1958, its commentary constitutes *travaux préparatoires* and is an established interpretive source under the customary international-law principles reflected in Articles 31 and 32 of the Vienna Convention on the Law of Treaties ("VCLT").  *See Report of the*

---

[2] The International Law Commission began its work on diplomatic intercourse and immunities in 1954, appointing a Special Rapporteur to prepare draft articles with commentary.  Report, at 11.  In 1957, the ILC adopted a provisional draft and submitted it, with commentary, to the U.N. Secretary-General for circulation to member states; the General Assembly's Sixth Committee also reviewed the draft.  *See id.*  After receiving states' comments, the ILC in 1958 adopted revised draft articles and the Rapporteur's commentary and transmitted them to the General Assembly with a recommendation that they form the basis of a diplomatic convention.  *Id.*

On December 7, 1959, the General Assembly requested the Secretary-General to convene a diplomatic conference in Vienna by the spring of 1961 and expressly referred the ILC's 1958 report "as the basis for its consideration of the question of diplomatic intercourse and immunities."  G.A. Res. 1450 (XIV) (Dec. 7, 1959).  The 1961 Vienna Conference subsequently adopted the Vienna Convention on Diplomatic Relations.  Accordingly, the ILC's 1958 draft articles and Special Rapporteur commentary constitute authoritative *travaux préparatoires* for the VCDR.

[3] As the Vienna Convention on the Law of Treaties ("VCLT") provides, "There shall be taken into account, together with the context" of a treaty, "Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation."  Vienna Convention on the Law of Treaties, art. 31(3), May 23, 1969, 1155 U.N.T.S. 331.  Although the VCLT postdates the VCDR, courts treat the VCLT's interpretive rules as customary international law, and thus applicable to treaties generally.  *See Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008) (internal quotation marks omitted).

*International Law Commission to the General Assembly*, [1958] 2 Y.B. Int'l L. Comm'n 89 ("Report"). The ILC's commentary states unequivocally that, for heads of mission, "the sending State ascertains in advance whether a person whom it proposes to accredit as head of its mission to another State is *persona grata* with that State. If the agrément is not given, then the person in question cannot be accredited." Report, at 13. The commentary further explains that, with respect to "other members of the mission," "they are in principle freely chosen by the sending State," meaning "their names are not always submitted in advance;" nevertheless, there is a presumption that the sending State has already designated them for mission service, and any immunity or diplomatic status still depends on that prior designation. *See id.* If the receiving State objects to a member before that person takes up duties, it may inform the sending State that the individual is *persona non grata*, "with the same effect as for a head of mission." *Id.* Thus, the ILC confirms that diplomatic status, and any claim to immunity, presupposes antecedent appointment by the sending State, even for non-heads of mission. *See also* Art. 10 (requiring the sending State to notify the receiving State of "the appointment of members of the mission [and] their arrival and their final departure"). There must be a diplomat for the receiving State to accept or reject.

Because Taiwan never presented Mr. Lin to St. Lucia as a diplomat or as holding any position under Article 1 of the VCDR, *see* Dkt. No. 49-1, Ex. 1, the VCDR's accreditation process never began. The VCDR affords immunities only to individuals whom the sending State has first designated; Taiwan did not do so here. St. Lucia never had an opportunity to grant or withhold agrément in the first place. With no nomination, no agrément, and no accreditation, Mr. Lin has no claim to diplomatic-agent immunity.

Because he is not entitled to immunity under Article 31 of the VCDR, Mr. Lin's argument that he could not be arrested during his layover in the United States fails, regardless of whether

Taiwan was his ultimate destination.  Article 40, which addresses *in transitu* immunity through third States, presupposes that the individual is already a recognized "diplomatic agent" – *i.e.*, someone who qualifies for immunity from prosecution pursuant to Article 31.  It does not independently create immunity from arrest for persons who do not qualify as "diplomatic agents."  Taiwan has certified that Lin was not a "diplomatic agent."  That ends the inquiry about *in transitu* immunity.

In the circumstances of this case, Mr. Lin is not even entitled to the limited immunity accorded members of a mission's technical staff under Article 37.  Taiwan takes the position that Mr. Lin was not a member of its "administrative and technical staff."  Dkt. 49-1, Ex. 1.  Assuming *arguendo* that Mr. Lin were a member of that staff, he would be immune from prosecution only for "acts performed in the course of [official] duties."  Courts construe that phrase narrowly; it includes only conduct that is directly related to the mission's diplomatic functions as defined in Article 3.  *See United States v. Kostadinov*, 734 F.2d 905, 907–12 (2d Cir. 1984).  It goes without saying that the drug and money laundering charges to which Mr. Lin has pleaded guilty, *see* Dkt. No. 45-5, can in no way be regarded as "conduct that is directly related to the mission's diplomatic function."  Therefore, it cannot possibly qualify as an "exercise of his functions as a member of the [diplomatic] mission," within the meaning of the Diplomatic Relations Act, 22 U.S.C. § 254d, and the VCDR Art. 39, ¶ 2.  Under no circumstances would Mr. Lin enjoy immunity from prosecution for such conduct.

### 2.   Defendant's Case Law Arguments Fail

Defendant relies on *United States v. Kuznetsov*, 442 F. Supp. 2d 102 (S.D.N.Y. 2006), to argue that only the receiving State's view matters in determining diplomatic status.  This is a fundamental misreading of the case.  *Kuznetsov* does not support the proposition that the sending

State's recognition is irrelevant; to the contrary, it reinforces that diplomatic status, and any resulting immunity, requires acknowledgment by both the sending and receiving States.

In *Kuznetsov*, the defendant, indicted in this district for money laundering, claimed that he was a "career diplomatic agent" of the Russian Federation assigned to the United Nations. 442 F. Supp. 2d at 106. He submitted letters from the Russian Mission asserting that he had long served as a Russian diplomatic officer and that he continued to perform functions on behalf of the Ministry of Foreign Affairs. *Id.* at 105–06. Thus, unlike in the present case, the sending state in *Kuznetsov* affirmatively asserted that the defendant was a diplomat.

Nevertheless, the district court rejected the immunity claim because the defendant had not been accredited or recognized by the U.S. Department of State as a "diplomatic agent" at the time of his arrest. *Id.* at 107–08. The court explained that diplomatic-agent status under the VCDR is not established solely by the sending state's internal designation. As discussed above, *see supra* Section III(A), status as a diplomatic agent is a function of recognition both by the sending state and by the receiving state. This result follows directly from the structure of the VCDR: Articles 4, 7, 9, and 11 permit a receiving state to reject the individual proposed by the sending State before diplomatic-agent immunities attach. *Kuznetsov* therefore applied the uncontroversial treaty rule: where the Convention requires accreditation by both states, the sending state's designation alone is insufficient. "No person or government may *unilaterally* assert diplomatic immunity." *Id.* at 105 (emphasis added).

Nothing in *Kuznetsov* diminishes the foundational principle that the sending state must first confer diplomatic rank before immunity attaches. Nor does the case suggest that recognition by the receiving State alone can create diplomatic immunity if the sending State has not designated

11

the individual as a diplomat.  To the contrary, *Kuznetsov* stands only for the unremarkable proposition that, under the VCDR, both sending and receiving States must complete the diplomatic accreditation process.  A receiving State's approval cannot grant immunity that the sending State never conferred in the first place.

Defendant also invokes *United States v. Lumumba*, 741 F.2d 12 (2d Cir. 1984).  Again, his reliance is misplaced.  In *Lumumba*, the defendant, an attorney charged with criminal contempt arising from his courtroom conduct, claimed that he was immune from prosecution because he was the "Vice President and Minister of Justice of the Provisional Government of the Republic of New Afrika."  *Id.* at 15.  He did not claim to have been sent to the United Nations or to any foreign state.  Rather, he argued that his self-proclaimed "Republic of New Afrika," which was said to encompass several southern U.S. states, was a sovereign nation that had designated him a diplomatic official.  *Id.*  Lumumba offered materials produced by the "Provisional Government" of this Republic to support his claim of diplomatic immunity.

Both the district court and the Second Circuit made short work of Lumumba's argument. They held that there is no nation-state called the "Republic of New Afrika," so the "Republic" was incapable of designating mission personnel under Articles 1, 4, 7, or 10 of the VCDR.  Because no sovereign "sending state" existed, nothing the purported "Republic" asserted had any legal relevance.  In that unusual circumstance, only the views of the receiving state – the United States – mattered.  As the United States had never recognized either the Republic of New Afrika or Lumumba himself as possessing diplomatic rank, the Second Circuit stated, "Neither Lumumba nor anyone else is able unilaterally to assert diplomatic immunity."  *Id.* at 16 (citing Restatement (Third) of Foreign Relations Law § 461).  The court concluded that diplomatic immunity "only exists when there is recognition . . . by the Department of State."  *Id.*

Defendant argues from *Lumumba* that Taiwan is no different from the Republic of New Afrika – that it occupies a unique geopolitical status and is not officially recognized by the United States as a nation-state, so, as in *Lumumba*, only the position of the receiving state as to an individual's diplomatic status is relevant. But that dog won't hunt. Unlike the invented "Republic of New Afrika," Taiwan is a distinct political entity that Congress has expressly designated as a "sending State" for purposes of extending VCDR diplomatic privileges and immunities.

In 1979, the United States formally shifted diplomatic recognition from the Republic of China in Taipei to the People's Republic of China in Beijing. To address the resulting legal and diplomatic gap with respect to Taiwan and preserve U.S.–Taiwan relations, Congress enacted the Taiwan Relations Act. *See* Taiwan Relations Act, Pub. L. No. 96-8, 93 Stat. 14 (1979) (codified as amended at 22 U.S.C. §§ 3301–3316). The TRA ensures that "the absence of diplomatic relations or recognition shall not affect the application of the laws of the United States with respect to Taiwan." 22 U.S.C. § 3303(a). Congress mandated that, whenever U.S. law refers to foreign "countries, nations, states, [or] governments," "such terms shall include and apply with respect to Taiwan." *Id.* § 3303(b)(1). Congress also "approved the continuation in force of all treaties and other international agreements, including multilateral conventions, entered into by the United States and the governing authorities on Taiwan," *id.* § 3303(c), thereby ensuring that the Diplomatic Relations Act and the VCDR continue to apply to Taiwanese personnel. Accordingly, for purposes of diplomatic privileges and immunities, Taiwan functions as a sending State whose certifications and determinations regarding personnel are treated as authoritative. *See Taiwan v. U.S. District Court for the N. Dist. of Cal.*, 128 F.3d 712, 718 (9th Cir. 1997).

The legislative history further confirms that this framework was central to Congress's design. As a threshold matter, Conference Reports – and particularly the Joint Explanatory

Statement of the Committee of Conference – are "the most persuasive evidence of congressional intent" after the statutory text itself.  *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981).  In the Joint House–Senate Conference Report issued before the enactment of the TRA, Congress explained that the TRA was enacted "to authorize the continuation of commercial, cultural, and other relations between the people of the United States and the people on Taiwan" and "to preserve and promote extensive, close, and friendly relations" notwithstanding derecognition.  H.R. Conf. Rep. No. 96-71, at 11–12 (1979), reprinted in 1979 U.S.C.C.A.N. 35, 95–96.  Congress emphasized that "United States laws shall apply with respect to Taiwan as they did before January 1, 1979," *id.* at 14, and expressly "approved the continuation in force of all treaties and other international agreements in force between the United States and Taiwan prior to January 1, 1979," *id.* at 15.  The Conference Committee further explained that the Act was intended to ensure that the United States would maintain "a stable and durable institutional framework" for its relations with Taiwan, through which Taiwan could continue to "provide assurances and take other actions on behalf of Taiwan" in implementing international legal commitments.  *Id.* at 17.

The text, legislative history, and purpose of the TRA uniformly demonstrate Congress's intent to preserve and institutionalize U.S.–Taiwan relations, even after formal diplomatic recognition ended.  As a result, Taiwan continues to exercise the rights, obligations, and treaty-based privileges it held prior to 1979, functioning effectively as a sovereign for purposes of U.S. law on diplomatic matters.  The TRA's provisions establish that, for U.S. courts and agencies, Taiwan is to be treated as a "state or government or similar entity" for all relevant purposes, including treaty-based immunities under the VCDR.  *See* 22 U.S.C. § 3303(a).  This statute thus confirms that Taiwan retains the status of a "sending State" for purposes of diplomatic immunity

and that its determinations regarding who qualifies as a diplomatic agent or mission staff carry the same legal force as those of any other sovereign under Articles 1, 4, 7, and 10 of the VCDR.

Needless to say, Congress has enacted no comparable statute with respect to the so-called "Republic of New Afrika." Mr. Lin's reliance on *Lumumba* is therefore a distraction. Despite its unique international status, Taiwan functions as a "sending State" just like any recognized country, such as France or India, for purposes of conferring or withholding diplomatic rank. Accordingly, Taiwan's disavowal of ever having conferred diplomatic status on Mr. Lin is binding and authoritative.

Finally, Defendant contends that *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 585 U.S. 33 (2018), supports the proposition that "Taiwan's opinion with respect to Mr. Lin's diplomatic immunity is not dispositive, or even persuasive." Dkt. No. 51, Def.'s Reply Supp. Mot. to Dismiss, at 6. This, too, reflects a misunderstanding of the case. In *Animal Science Products*, the Supreme Court addressed the weight that federal courts should accord a foreign sovereign's statement concerning the content of its own domestic law. The issue there was whether Chinese law required vitamin C manufacturers to fix export prices and quantities. 585 U.S. at 37. The Chinese Ministry of Commerce filed amicus briefs asserting that Chinese law mandated the conduct alleged, and the Second Circuit held that federal courts were "bound to defer" to such statements whenever "reasonable." *Id.* at 40. The Supreme Court rejected the Second Circuit's categorical approach. It held that a foreign government's submissions are entitled to "respectful consideration," but courts are "not bound to accord conclusive effect" to them and may consider "any relevant material or source" under Federal Rule of Civil Procedure 44.1. *Id.* at 43–44. The weight due depends on factors such as the submission's clarity, thoroughness, context, purpose, and consistency with past positions. *Id.*

That principle, however, has no bearing here.  *Animal Science Products* concerned the interpretation of the law of a foreign country.  Diplomatic status under the VCDR is not a question of foreign domestic law at all.  The treaty is substantive law of the United States – it is not "foreign domestic law."  As a treaty ratified by the United States, the VCDR is the "supreme Law of the Land."[4]  *See* U.S. Const. art. VI, cl. 2.  A simple reading of the VCDR reveals that whether an individual is a "diplomatic agent" or member of the "diplomatic staff" is determined, in the first instance, by the sending State; it communicates to the receiving State that a particular individual is intended to be a diplomatic agent and then obtains the agrément of the receiving State to accredit the diplomat.  Therefore, the view of the sending State about a person's diplomatic status – far from being irrelevant or unpersuasive – is both highly relevant and potentially dispositive under the VCDR.  *See* VCDR Arts. 1, 4, 7, 10.

Moreover, even if this Court were to give Taiwan's submission only "respectful consideration," the conclusion would be the same: Mr. Lin was not a diplomatic agent entitled to immunity under Article 31.  His title and role in St. Lucia place him, at most, within the mission's technical staff.  Nothing in the record indicates that Taiwan ever tendered him as a diplomat pursuant to Article 4(1) – and Taiwan expressly confirms that it did not.  This declaration is clear, authoritative, and fully consistent with the record concerning Mr. Lin's work at the Technical Mission.  It would be illogical to give greater weight to St. Lucia's unilateral views than to those of the sending State, whose recognition is a prerequisite for diplomatic accreditation.

---

[4] The Supremacy Clause of the United States Constitution makes clear that along with the Constitution and laws of the United States, "all Treaties . . . made . . . under the Authority of the United States . . . shall be the Supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Under Article II, a treaty is ratified when it is signed by the President and ratified by two-thirds of the Senate.  U.S. Const. art. II, § 2, cl. 2.  Once a treaty is ratified, it becomes the law of the United States and is fully binding, carrying the same legal weight as a federal statute.  *United States v. Schooner Peggy*, 5 U.S. 103, 110 (1801).

In sum, the absence of Taiwan's recognition forecloses Mr. Lin's claim to immunity. Because the first and indispensable condition for diplomatic status – recognition by the sending State – is lacking, any argument regarding St. Lucia's understanding as the receiving State is irrelevant.  Mr. Lin is not entitled to immunity under Articles 31 or 40.  Nor does he qualify for the limited official-acts immunity under Article 37, as his prosecution concerns conduct unrelated to the technical functions he performed in St. Lucia.  In short, Mr. Lin has no claim to diplomatic immunity, and the United States may proceed to hold him accountable for the crimes to which he has pleaded guilty.

## Conclusion

For the foregoing reasons, Mr. Lin's motion to dismiss for lack of subject matter jurisdiction is DENIED.  Diplomatic immunity derives from diplomatic status, which in turn requires formal designation by the sending State.  Because Taiwan never designated Mr. Lin as a diplomatic agent, he is not entitled to immunity under Articles 31, 37, or 40 of the VCDR.

Mr. Lin will be sentenced as previously scheduled on January 22, 2026, at 2:00 p.m.

This constitutes the decision and order of the Court.  The Clerk of Court is directed to remove the motion located at Docket Entry Number 44 from the Court's list of open motions.

Dated: December 12, 2025

U.S.D.J.

BY ECF TO ALL COUNSEL