**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

RUI-SIANG LIN,

              Defendant.

Case No. 24 Cr. 178 (CM)

**SENTENCING MEMORANDUM OF RUI-SIANG LIN**

Noam Biale
Katie Renzler
Michael Bass
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
nbiale@shertremonte.com

*Attorneys for Rui-Siang Lin*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

I.    MR. LIN'S PERSONAL BACKGROUND ................................................ 3

    A.    Mr. Lin's Childhood and Adolescence .......................................... 3

    B.    Mr. Lin's Educational Background ................................................. 6

    C.    ███████████████████████████████████████

    D.    Mr. Lin's Volunteer Work and Employment ................................ 8

II.    INCOGNITO ............................................................................................ 9

    A.    Mr. Lin Is Recruited to Join and Helps Develop Incognito ...................... 9

    B.    ███████████████████████████████████████

    C.    ███████████████████████████████████████

    D.    ███████████████████████████████████████

    E.    ███████████████████████████████████████

    F.    Mr. Lin Shuts Down Incognito ................................................... 18

III.    MR. LIN'S ARREST, PROSECUTION, AND INCARCERATION ................. 19

    A.    Arrest ............................................................................................ 19

    B.    Pretrial Detention ........................................................................ 19

    C.    Plea Agreement ............................................................................ 23

    D.    The Presentence Report and the Probation Department's Recommendation ....................................................................... 24

    E.    Criminal Investigation in Taiwan ............................................... 24

ARGUMENT ...................................................................................................... 25

I.      LEGAL STANDARD ........................................................................... 26

II.     OUTSTANDING OBJECTIONS TO THE PSR .................................... 27

III.    MR. LIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT
        A SENTENCE OF TEN YEARS' IMPRISONMENT ......................... 27

        A.      Mr. Lin Was Only Nineteen Years Old When Incognito Started .............. 28

        B.      Mr. Lin Is Genuinely Remorseful and Committed to Building
                a New, Law-Abiding Life ........................................................ 30

        C.      Mr. Lin Is a Caring and Intelligent Person................................. 31

IV.     

V.      A SENTENCE OF TEN YEARS IS SUFFICIENT TO MEET THE GOALS
        OF SPECIFIC AND GENERAL DETERRENCE ................................. 38

VI.     A SENTENCE OF TEN YEARS IS APPROPRIATE AND NECESSARY
        TO AVOID UNWARRANTED SENTENCING DISPARITIES ......................... 43

VII.    THE CONDITIONS OF CONFINEMENT TO WHICH MR. LIN
        HAS BEEN SUBJECTED WARRANT LENIENCY .......................... 48

CONCLUSION.................................................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ................................................................................. 26, 28

*Jones v. Mississippi,*
    593 U.S. 98 (2021) ..................................................................................... 28

*Pepper v. United States,*
    562 U.S. 476 (2011) ................................................................................... 26

*United States v. Adegboruwa,*
    19-cr-260 (JNP) (D. Utah) ..................................................................... 44, 45

*United States v. Al Halabi,*
    563 F. App'x 55 (2d Cir. 2014) .................................................................. 26

*United States v. Beltran,*
    571 F.3d 1013 (10th Cir. 2009) .................................................................. 35

*United States v. Bigley,*
    786 F.3d 11 (D.C. Cir. 2015) ..................................................................... 35

*United States v. Boykin,*
    785 F.3d 1352 (9th Cir. 2015) ............................................................... 34, 35

*United States v. Caban,*
    173 F.3d 89 (2d Cir. 1999) ........................................................................ 35

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ...................................................................... 26

*United States v. Chavez,*
    710 F. Supp. 3d 227 (S.D.N.Y. 2024) ....................................................... 49

*United States v. Ciszkowski,*
    492 F.3d 1264 (11th Cir. 2007) .................................................................. 35

*United States v. Cochran,*
    25-cr-63 (RER) (E.D.N.Y.) ....................................................................... 47

*United States v. Colucci,*
    No. 23 Cr. 417, 2024 WL 364857 (E.D.N.Y. Aug. 5, 2024) ..................... 48

*United States v. Cromitie,*
No. 09 Cr. 558 (CM), 2011 WL 2693297 (S.D.N.Y. June 29, 2011) ...................................... 35

*United States v. Fontes,*
415 F.3d 174 (1st Cir. 2005) ................................................................................................ 35

*United States v. Gagliardi,*
506 F.3d 140 (2d Cir. 2007) ................................................................................................ 35

*United States v. Kenney,*
756 F.3d 36 (1st Cir. 2014) ................................................................................................. 34

*United States v. Love,*
710 F. App'x 351 (11th Cir. 2017) ...................................................................................... 38

*United States v. Mishoe,*
241 F.3d 214 (2d Cir. 2014) ................................................................................................ 40

*United States v. Nunez,*
23 Cr. 517 (AT), 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024) ..................................... 48, 49

*United States v. Orgil,*
23-cr-20018 (KMW) (S.D. Fla.) ......................................................................................... 47

*United States v. Salem,*
597 F.3d 877 (7th Cir. 2010) ............................................................................................... 37

*United States v. Serrano,*
No. 08-CR-612, 2010 WL 147924 (E.D.N.Y. Jan. 11, 2010) ............................................. 42

*United States v. Singh,*
877 F.3d 107 (2d Cir. 2017) ................................................................................................ 27

*United States v. Srinivasan,*
22 Cr. 183 (DOC) (C.D. Cal.) ............................................................................................. 18

*United States v. Studley,*
47 F.3d 569 (2d Cir. 1995) .................................................................................................. 37

*United States v. Thavaraja,*
740 F.3d 253 (2d Cir. 2014) ................................................................................................ 26

*United States v. Torres,*
563 F.3d 731 (8th Cir. 2009) .......................................................................................... 34, 35

*United States v. Ulbricht,*
858 F.3d 71 (2d Cir. 2017) .................................................................................................. 44

*United States v. Ulbricht,*
  14-cr-68 (LGS) (S.D.N.Y) ................................................................................. 44

**Statutes**

18 U.S.C. § 3553 .......................................................................... 2, 25, 26, 34, 50

18 U.S.C. § 3632 ............................................................................................... 40

18 U.S.C. § 3661 ............................................................................................... 37

21 U.S.C. § 848 ................................................................................................. 44

**Rules**

U.S.S.G. § 1B1.3 ............................................................................................... 37

U.S.S.G. § 2D1.1 .............................................................................................. 23

U.S.S.G. § 3B1.1 .............................................................................................. 23

U.S.S.G. § 5H1.1 .............................................................................................. 29

**Other Authorities**

*2022 Country Reports on Human Rights Practices: Taiwan*, U.S. Dep't of State,
  https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/taiwan/
  (last visited Jan. 13, 2026) ................................................................................ 39

*2024 Amendments in Brief*, U.S. Sent'g Comm'n, https://www.ussc.gov/sites/default/files/pdf/
  amendment-process/amendments-in-brief/AIB_2024-youthful.pdf
  (last visited Jan. 13, 2026) ................................................................................ 29

Azn Han Solo, *Inmates sleep on the floor in Taiwanese prisons*, Medium (Mar. 20, 2018),
  https://medium.com/@AznHanSolo/inmates-sleep-on-the-floor-in-taiwanese-prisons-
  bc868da06a8f ................................................................................................... 39

Daniel S. Nagin and Greg Polansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction
  Threats into a Model of General Deterrence: Theory and Evidence*,
  Criminology, 39(4) (2001) ................................................................................ 42

*Details of wanted criminals*, Taiwan Ministry of Justice InvestigationBureau (Nov. 25, 2025),
  https://www.mjib.gov.tw/Crimes/Crimes_Detail?uid=448 ................................. 25

Fawubu Fagui Ziliaoku, Narcotics Hazard Prevention Act, Art. 4 (as amended May 4, 2022) ... 39

*Five Things About Deterrence*, Nat'l Institute of Justice, https://www.nij.go.v/five-things/pages/deterrence.aspx (last visited Jan. 11, 2026) ...................................................... 42

*Guidance, Information for British people detained or imprisoned in Taiwan*, GOV.UK (last updated Dec. 11, 2024), https://www.gov.uk/government/publications/taiwan-prisoner-pack/information-pack-for-british-prisoners-in-taiwan#detention-conditions-in-taiwan ........ 39

*History*, Tor Project, https://www.torproject.org/about/history/ (last visited Jan. 13, 2026).......... 5

James C. Howell et al., *Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know*, Office of Justice Programs (Jul. 2013), https://www.ojp.gov/pdffiles1/nij .................. 28

Jonathan Lusthaus, Industry of Anonymity: Inside the Business of Cybercrime (1st ed. 2018).. 42

*List of Participating Countries/Governments*, U.S. Dep't of Justice, https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments (last visited Jan. 13, 2026) ...................................................................................................... 40

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006)................... 43

*NTU Student Single-Handedly Building "Dark NetNarcotics Empire"; 120 Million NTD in Taiwanese assets seized... Taipei DistrictProsecutor's Office issues a 40-year arrest warrant 台大學霸林睿庠一手打造「毒品暗網帝國」1.2 億在台資產都被扣...北檢下達 40 年通緝)*, MirrorMedia (Nov. 25, 2025), https://www.mirrormedia.mg/external/amp/mirrordaily_31565.............................................. 25

Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family L. 1. (2006) .......................................................................................................... 41

Steven Crook, *Seventy-two days in a Taiwanese jail*, Taipei Times (Dec. 31, 2019), https://www.taipeitimes.com/News/feat/archives/2019/12/31/2003728456 ........................... 39

U.S. Att'y's Off., Central District of California, Press Release (Apr. 29, 2024), https://www.justice.gov/usao-cdca/pr/oc-and-houston-men-sentenced-decades-prison-supplying-fentanyl-and-other-drugs-sold ................................................................................ 46

U.S. Att'y's Off., District of Massachusetts, Press Release (Mar. 11, 2022), https://www.justice.gov/usao-ma/pr/leader-dark-web-drug-trafficking-operation-sentenced-eight-years-prison-and-59-bitcoin ........................................................................ 48

U.S. Att'y's Off., District of Utah, Press Release (Nov. 14, 2024), https://www.justice.gov/usao-ut/pr/convicted-dark-web-drug-dealer-sentenced-360-months-imprisonment ............... 45

U.S. Att'y's Off., Eastern District New York, Press Release (Aug. 28, 2024),
    https://www.justice.gov/usao-edny/pr/dark-web-vendor-pleads-guilty-distributing-
    fentanyl-through-mail ............................................................................................ 47

U.S. Att'y's Off., Southern District New York, Press Release (May 29, 2015),
    https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-
    manhattan-federal-court-life-prison ...................................................................... 44

U.S. Att'y's Off., Southern District of Florida, Press Release (May 21, 2024),
    https://www.justice.gov/usao-sdfl/pr/dark-web-drug-vendor-and-clandestine-lab-
    manufacturer-sentenced-prison-trafficking............................................................ 47

U.S. Sent'g Comm'n, Guidelines Manual Ch. 1 (Nov. 2025) ...................................... 29

Vincent Chiraldi et al., *Community-Based Responses to Justice-Involved Youth Adults*,
    Office of Justice Programs (Sept. 2015), https://www.ncjrs.gov/pdffiles1/nij/248900.pdf...... 28

## PRELIMINARY STATEMENT

Starting at ten years old, Rui-Siang Lin felt an acute responsibility for his family. His idyllic home life was shattered when, without warning, his father divorced his mother and abandoned their two sons, leaving the family barely surviving and ostracized by their broader community in Taiwan. Deeply devoted to his mother and to his little brother, Mr. Lin gave up his childhood dream of becoming a classical musician and turned to more practical pursuits that would allow him to financially support his family. He chose math and computer programming; it turned out he was brilliant at both—a whiz with computers and technology who taught himself to code. The Internet offered him an escape—a place where the financial strain of his family and his responsibility for his younger brother did not exist. Mr. Lin embraced that escape at a time when he had little guidance from adults, and at age thirteen he began spending time on the darknet, an online ecosystem rife with illegality and negative influences. It was in this ecosystem that, several years later, when he was still a young and naïve nineteen-year-old, Mr. Lin accepted employment as an administrator of Incognito, a darknet marketplace dedicated to the sale of narcotics. Mr. Lin first coded the site and built its back-end technical infrastructure and then ran it in partnership with two other administrators.

For the next three years, Mr. Lin led a double life—excelling as a college student and working in the Taiwanese Technical Mission in Saint Lucia as part of his alternative military service, while secretly running Incognito at night. ███████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

[redacted]

To be clear, Mr. Lin absolutely and unequivocally has accepted responsibility for his role in developing and running Incognito. Indeed, he admitted as much shortly after his arrest, before he had any inkling of the government's involvement in the site. And he pleaded guilty before this Court and fully accepted responsibility. He has never looked back from that decision and is profoundly remorseful for his conduct, the harm of which he has come to appreciate even more while in the MDC, where he has seen firsthand—for the first time in his life—how drugs impact individuals and communities. He is resolved to follow a different path if he is given a second chance.

He knows that is not guaranteed—Mr. Lin's stipulated Sentencing Guidelines range is life ([redacted]). But a Guidelines sentence in this case would pile tragedy upon tragedy and would be greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a). Moreover, Mr. Lin faces severe legal consequences in Taiwan: his crimes carry the potential for punishment up to and including the death penalty and life imprisonment. Taiwanese prosecutors have already indicated that they intend to investigate and prosecute Mr. Lin (and his family) aggressively. Further, he has been vilified by the local press, so even if he does walk free in Taiwan again, he will be a pariah. Because of the unique mitigating circumstances of both Mr. Lin and the offense, detailed below, we respectfully submit that a sentence of ten years'

imprisonment, the mandatory minimum term, is sufficient to meet the statutory goals. We recognize that this is a request for extraordinary mercy, but it is warranted by the extraordinary circumstances present here.

**FACTUAL BACKGROUND**

I.      **MR. LIN'S PERSONAL BACKGROUND**

        A.      **Mr. Lin's Childhood and Adolescence**

Mr. Lin was born in Taipei, Taiwan on February 1, 2001. At the time, his parents were married and living together in a comfortable house in a safe, urban neighborhood in Taipei. When Mr. Lin was three years old, he asked his mother for a baby brother as a birthday present, and—"magically," as Mr. Lin describes it—his mother delivered his younger brother on Mr. Lin's fourth birthday.

Mr. Lin and his brother have always been extremely close. His brother explains that "[f]rom the moment I can remember, my brother has been my best friend." Declaration of Noam Biale ("Biale Decl."), Ex. 2-B at 1. As little kids, Mr. Lin and his brother happily passed the time playing together, enjoying "Lego[s], sports, and board games." *Id.* Mr. Lin always took the time to teach and guide his brother, including teaching him "English, math, and science." *Id.* Because of the role that Mr. Lin plays in his brother's life, his brother describes Mr. Lin as his "mentor" and "Dad." *Id.* Notwithstanding the geographical distance currently between them, Mr. Lin and his brother remain very close—sharing the details of their daily lives through regular calls and handwritten letters.

Aside from his brother, Mr. Lin's mother was the shining center of his childhood. Soon after his brother was born, she stopped working so that she could focus on raising her children. She was strict—for example, requiring Mr. Lin and his brother to stay inside to study while their friends were outside playing—but also extremely caring and loving. Mr. Lin's mother nurtured

3

her children's interests and innate skills.  As a little boy, Mr. Lin dreamed of being a musician, so Mr. Lin's mother signed Mr. Lin up to take lessons for singing and multiple instruments.  With his mother's encouragement, Mr. Lin began playing the violin, which he took to immediately. *Id.*, Ex. 2-C at 2.  Above all, Mr. Lin's mother prioritized her children's education—making sure that they developed a love of learning and studied hard in school.  *See id.*, Ex. 2-A at 3.

Mr. Lin's memories of his father are less vivid.  When Mr. Lin was very young, his father was often working or traveling.  Even when he was around, he was distant.

When Mr. Lin was about ten years old, however, his life changed significantly. Seemingly out of the blue, his parents got divorced.  As Mr. Lin remembers it, one day his father came home, handed his mother divorce papers, and promptly moved out.  For one year following the divorce, Mr. Lin's father paid child support and visited Mr. Lin and his brother.  Then he stopped abruptly and disappeared entirely from Mr. Lin's life.  Mr. Lin has not spoken to or seen his father since he was eleven years old.

Following Mr. Lin's father's abandonment, his mother tried to keep life as normal as possible.  But doing so was difficult.  No extended family members stepped into help.  Mr. Lin's mother and her two sons were all alone.  Although Mr. Lin's mother managed to keep Mr. Lin and his brother in the same private school that they had always attended, she could no longer afford their house, so they moved to a small apartment in a less safe neighborhood.

Mr. Lin's mother never explained the family's new circumstances to her children—such as why their father left, why they had to move, or why she went back to work.  Nonetheless, at ten years old, Mr. Lin understood that his family was under financial stress.  He felt a new and acute sense of responsibility and resolved to become the "man of the house" who could support his mother and brother financially.  To ten-year-old Mr. Lin, this meant giving up on his dream of

being a musician and focusing instead on studying math and thinking about ways to support his family. In his letter, his brother attests to this shift in Mr. Lin, recounting that following their parents' divorce, Mr. Lin became his "Dad," "bringing [him] joy and happiness, giving [him] courage whenever [he] felt depressed, and advising [him] on important decisions such as [his] choice of [college] major and future career." *Id.*, Ex. 2-B at 1. Mr. Lin's childhood friend, Stephanie Chang, explained that following Mr. Lin's father's departure, Mr. Lin was "under insurmountable pressure in comparison to peers of his age," harboring "a strong desire to support the family financially, while not being able to reconcile with the pain stemming from his inability to reduce the burden his mother was carrying at the time." *Id.*, Ex. 2-D at 2.

Ashamed of the changes his family was experiencing, Mr. Lin withdrew from his friends. As a result, in middle school, Mr. Lin spent most of his time at home alone (or with his brother), where he became obsessed with playing video games. This hobby, in turn, inspired an interest in computer coding and programming—initially so that he could learn how to beat the games he was playing and create his own games, and later because he saw it as a path to financial stability.

Mr. Lin's interest in computer programming and coding ultimately led him to stumble across the darknet when he was only thirteen years old. While researching online to teach himself more about programming and coding, Mr. Lin learned about Tor,[1] the darknet generally, and specifically the darknet illicit marketplace Silk Road. At first, he did not explore the darknet—he went onto it only to see if he could get a fake passport as part of a juvenile fantasy

---

[1] Tor, short for "The Onion Routing," is a tool for browsing the internet anonymously. When browsing with Tor, a user's real IP address and other system information are obscured from the websites visited, and the user's activity is hidden from their internet service provider. The network relies on a series of virtual tunnels, where a user's traffic is sent through server "hops" or "relays" that encrypt said traffic at each step. *See History*, Tor Project, https://www.torproject.org/about/history/ (last visited Jan. 13, 2026).

of running away.  Then, out of curiosity, Mr. Lin used Google to figure out how to get onto Silk Road, and he explored it without buying anything.  He returned to the darknet while in high school in search of tutorials about computer programming and coding.  At this early age, he had no guidance from adults on Internet safety.  His mother was busy working and the adults at Mr. Lin's school had no idea what he was doing at home.  He thus became inculcated in the lawless culture of the dark web at a time when his own sense of right and wrong was still developing.

Notably, however, while the darknet—and Silk Road in particular—is known for its free market for narcotics, Mr. Lin never bought drugs.  Indeed, he has never tried drugs in life and, prior to his incarceration at MDC, had virtually no exposure to drug users or addiction.  The concept of drug use was essentially abstract to him—what was occurring on the dark web felt to a smart but immature young teenager like one big video game.

**B.    Mr. Lin's Educational Background**

Mr. Lin has always loved learning and sharing his knowledge with those around him. Throughout middle and high school, Mr. Lin consistently ranked among the top students in his classes.  From 2015 until 2019, Mr. Lin attended Fuhshing High School, where he excelled in math.  During one summer in high school, Mr. Lin volunteered to teach math and science to underprivileged children in a remote village in Taiwan.  After high school, Mr. Lin enrolled at National Taiwan University ("NTU") in September 2019.  Mr. Lin was enrolled in NTU's Mathematics program for two years and then transferred to NTU's Information Management program.  In June 2023, Mr. Lin graduated from NTU with a bachelor's degree in Business Administration.

In the fall of 2023, Mr. Lin applied to business school in the United States and Singapore. He was accepted to the Master of Science (Management) and CEMS Master's in International

6

Management double degree program at the National University of Singapore ("NUS") Business School, which he planned to attend had he not been arrested.

**C.** ████████████████████████████

While Mr. Lin's family struggled financially in the absence of his father, their situation became far more dire in 2019, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Mr. Lin was halfway through his first year of college and in the process of applying to study abroad in the United States. But he immediately abandoned that plan so that he could stay home and care for his mother and his brother, who was at the time in ninth grade. ████████████████████████████████████████████████████████████, his days quickly transformed from that of a regular college student to days filled with "caring for his younger brother and managing household affairs" and balancing doctors' appointments and college classes. Biale Decl., Ex. 2-A at 4. Mr. Lin's younger brother recalls that Mr. Lin "woke up at 5 a.m. every morning to do laundry, prepare breakfast for [his brother], and even make steamed eggs with chicken essence for" their mother. *Id.*, Ex. 2-B at 1.

In September 2020, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████  But this experience left an indelible mark on Mr. Lin,

deepening his financial anxiety and feeling that he was responsible for caring for his family.

D.    **Mr. Lin's Volunteer Work and Employment**

Concerned with providing extra financial support to his family and also wanting to use his natural talent at teaching, in addition to his studies, Mr. Lin participated in volunteer programs and worked while in college. As his mother recalls, "in order to reduce the family's financial burden, [while in college] Rui-Siang worked as a tutor while also interning at the blockchain research and development division of Cathay Financial Holdings." *Id.*, Ex. 2-A at 4; *see also* PSR ¶¶ 105-06. Mr. Lin was Cathay Financial Holdings' "first college freshman intern and was the only intern whose employment was extended for nearly two and a half years after the internship period ended." Biale Decl., Ex. 2-A at 4. Additionally, in the summer of 2021, Mr. Lin developed and led a one-week computer programming camp to students aged seven through twelve in a remote village in Taiwan as part of a program that his professor ran. *Id.*, Ex. 2-E at 3. He also worked as a research assistant at the NTU College of Electrical Engineering in 2022, PSR ¶ 104, where his contributions were so highly valued that the school offered him a spot in its master's program. From fall 2019 through winter 2020, Mr. Lin also tutored two primary-school-aged children in math. *See id.* ¶ 106.

As the Court is aware, from September 2023 until his arrest in May 2024, Mr. Lin completed his alternative military service as a Diplomatic Specialist with the Taiwan Technical Mission in Saint Lucia. *Id.* ¶ 102; Ex. Biale Decl., Ex. 2-F at 1. Mr. Lin's colleague from this time, C.Y. Tsai, describes working with him as a "privilege," noting that he was "not only a promising graduate but also a remarkable volunteer who has actively contributed to the society." Biale Decl., Ex. 2-F at 1. In her letter, Ms. Tsai highlights three projects Mr. Lin took on that

"showcase his character and commitment to service": the development of a facial identification application for Saint Lucian hospitals to use to streamline their patient identification processes; "the development of an online e-commerce platform designed to empower Saint Lucian youths and entrepreneurs," which "positively impacted the local community by providing new opportunities for economic growth and collaboration"; and the provision of cryptocurrency training for the Saint Lucia Police Force that was designed to teach "valuable skills to investigate and analyze cryptocurrency transactions." *Id.* at 2.

## II.    INCOGNITO

### A.    Mr. Lin Is Recruited to Join and Helps Develop Incognito

While Mr. Lin was succeeding in his studies and his work, from the time he was a sophomore in college until March 2024, he in fact was living a double life.

In early 2020, two individuals, using the ███████████████████████████ contacted Mr. Lin, who used the moniker "Pharoah," to solicit his help in creating a new darknet drug marketplace. *See* PSR ¶ 16. At first, Mr. Lin ignored ███████████████████████ entreaties. He was nineteen years old and focused on college. When they reached out again in the fall of 2020, however, Mr. Lin's circumstances had changed. Mr. Lin was reeling from his ██████████████████████ and watching her recover from her difficult surgery. *See supra* Factual Background Section I.C. He was anguished that the family had not been able to afford the less invasive surgery. Determined to make enough money to ensure his family would never have to suffer like that again, in October 2020, Mr. Lin made the misguided decision to accept ████████████████████ offer to start Incognito with them. *See id.*

By December 2020, the website was operational. Incognito functioned as an e-commerce platform where users could purchase narcotics from vendors who advertised their product on the platform. PSR ¶ 16. In order to sell on Incognito, vendors first had to apply for access to the

site, then, as discussed below, ██████████████████ would decide whether to accept or reject them. *Id.* If accepted, vendors were allowed to advertise narcotics permitted under Incognito's policies at a price of their choosing. *Id.* Users, in turn, purchased those narcotics with cryptocurrency. *Id.* Incognito collected approximately five percent of the purchase price for every transaction on the site. *Id.*

████████████████, and Mr. Lin ran Incognito collectively as a partnership, dividing the responsibilities among the three of them according to their skills. *See* Biale Decl., Ex. 3 at USAO_00006421, USAO_00006425-26. None had control over the others, and all three weighed in on matters of site policy and procedure. Significantly, at Incognito's inception, all three agreed that the site should ban the sale of all opioids, including fentanyl, because of their highly addictive nature and associated health risks. ████████████████, and Mr. Lin subsequently eased the ban on all opioids but maintained the ban on fentanyl and related products. *See id.*, Ex. 29. According to Incognito's site rules, which were posted for all vendors and users to see, "[w]e disallow any sale of fentanyl or its analogues and related chemicals, including carfentanyl or products containing fentanyl or carfentanyl. Any vendor found to be selling products containing fentanyl or carfentanyl under a different name to circumvent this rule will be promptly banned." *Id.*, Ex. 4-A at 1-2.

Mr. Lin was responsible for managing the technical aspects of the site, such as backend coding, user interface, security, and financial logistics. He coded and built the website, including its banking component, which allowed users to make purchases with cryptocurrency, and he managed the site's security and servers. Occasionally, Mr. Lin posted updates about Incognito on darknet forums, such as Dread. His posts typically related to the technical aspects of the

10

marketplace that were within his purview, like improvements to the user interface and solutions to technical problems. *See, e.g.*, ECF No. 1 ("Compl.") ¶¶ 23(e)-(g).

█████████████████████, on the other hand, managed the narcotics-related aspects of Incognito. ████████ responsibilities included vetting and approving vendor applications, granting and revoking vendor and user privileges, monitoring and approving vendor listings, monitoring user activity, answering support tickets from users and vendors, which typically involved technical support related to shipping and refunds, and resolving disputes between users and vendors, such as those regarding the quantity, quality, or type of drugs sold. *See* Biale Decl. ¶ 43; *see also id.*, Ex. 6 at USAO_0036263; *id.*, Ex. 7; *id.*, Ex. 8 at USAO_00004245-46. ████████████ was in charge of promoting Incognito, which he did by placing ads on Dread, for example. *See id.*, Ex. 9 at USAO_00032720-21; Compl. ¶¶ 23(a)-(d).

From December 2020 until April 2022, Incognito experienced a relatively modest amount of activity. During that time, Incognito processed 6,634 orders, totaling $1,057,313.59. *See* Biale Decl., Ex. 5-A. With ████████████████████ approval, Mr. Lin programmed Incognito's bank so that when Incognito's wallet reached 0.2 Bitcoin or higher, the profits would be split in four equal parts to Mr. Lin's personal wallet, ████████████ personal wallet, ████████ personal wallet, and Incognito's "market wallet." The market wallet, which only Mr. Lin could access, was used purely for site expenses, such as server costs or ad placements. *See id.*, Ex. 10 at 1 ████████████████████████████████████████████ ████████).

**B.** ████████████████████████████████████████

████████████████████████████████████  ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████





**D.**





**E.**

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████    ████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████

### F.    Mr. Lin Shuts Down Incognito

In 2023, Mr. Lin started thinking seriously about walking away from Incognito.  As he approached his college graduation in June 2023, Mr. Lin began to feel like he was collapsing under the anxiety of operating Incognito and keeping his involvement in the dark web secret from his friends and family.  He was barely sleeping because he was in school all day and was up all night working on Incognito.  Mr. Lin began experiencing shortness of breath, loss of feeling

---

[3]    As discussed *infra*, Mr. Lin has come to appreciate that his reliance on other darknet administrators to police the safety of the site was deeply misguided and does not in any way excuse his conduct.  He has fully accepted responsibility and sees that his role directly contributed to all of the harm that Incognito caused.

in his fingers, and insomnia. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ and Mr. Lin knew it. The true source of his anxiety was his

participation in Incognito—his inability to confide in anyone about Incognito and the toll it was

taking on him mentally and physically made his anxiety even worse.

By March of 2024, Mr. Lin could no longer bear his anxiety, so he decided to use his

technical skills to shut down Incognito. As part of the shutdown, Mr. Lin posted on Incognito's

message board stating that he would disclose Incognito's users' transaction histories unless they

paid him an additional fee, which he described as "EXTORTION." *See* PSR ¶ 60. Despite

Mr. Lin's words, he did not release anyone's transaction history; he moved on and focused on his

work in Saint Lucia and planning his future in business school after shutting down the site. *See*

Biale Decl., Ex. 36 ████████████████████████████████████████████████

██████████████████████████████████████████████████.

## III.    MR. LIN'S ARREST, PROSECUTION, AND INCARCERATION

### A.    Arrest

On May 18, 2024, Mr. Lin was arrested at John F. Kennedy Airport while traveling from

Saint Lucia to Taiwan, en route to Singapore to visit NUS Business School. Immediately

following his arrest, Mr. Lin agreed to speak with the arresting agents without an attorney

present. He participated in a nearly three-hour-long interview. After initially minimizing his

conduct and evading the agents' questions, Mr. Lin admitted his role in Incognito to the agents

and answered their questions honestly and truthfully.

### B.    Pretrial Detention

Mr. Lin has been detained at the MDC in Brooklyn, New York, since his arrest on May

18, 2024. Over the intervening twenty months, Mr. Lin has endured difficult conditions of

confinement due to a combination of factors, including obstacles to accessing his discovery, extended lockdowns, unsanitary conditions, the long distance from his family in Taiwan, exposure to violence, and poor medical care.

Since the beginning of this case, Mr. Lin has been an active participant in his defense. Mr. Lin's ability to assist in his defense, however, was severely curtailed for months by MDC's failure to provide him with adequate access to his discovery materials. Even with the government's assistance, it took months for Mr. Lin to receive his discovery at MDC. *See* ECF No. 20. And, after the materials arrived at MDC, he continued to struggle to secure regular access to review them. MDC staff routinely denied Mr. Lin's requests to review his discovery, Biale Decl., Ex. 37, notwithstanding a Court order requiring Mr. Lin be allowed access to his discovery laptop for fifteen hours per week, ECF No. 21.

The physical and environmental conditions of Mr. Lin's confinement have been abysmal. While at MDC, Mr. Lin has been forced to endure countless days of lockdowns—during which he is confined to his cell, unable to shower, and forced to drink the yellow water from his cell's faucet—served spoiled food, and exposed to extreme violence between inmates. He also has seen, for the first time in his life, individuals suffering from the effects of drug addiction, including mental health issues, withdrawal symptoms, and overdoses.

Mr. Lin has also received inadequate medical and dental care. Last winter, Mr. Lin contracted the flu and suffered from symptoms including a high fever, severe cough, and body aches. Despite promptly requesting medical attention, he was not able to see the MDC doctor until four weeks later. Beginning in the fall of 2025, Mr. Lin has also needlessly endured agonizing tooth pain due to MDC's inadequate dental care. While at MDC, a piece of Mr. Lin's tooth fell out of his mouth. After waiting five weeks to see a dentist, Mr. Lin was told that he

needed a filling but would not be able to get one for *two to three years*.  Mr. Lin was given two options: pull out the remaining piece of the tooth or continue to suffer with the broken tooth until he can receive a filling.  Mr. Lin chose the latter.

Adding to these challenges is the long distance between Mr. Lin and his mother and brother, both of whom live in Taiwan.  As a "pillar of [his] family," Mr. Lin's absence has left and will continue to "leave an irreplaceable void, emotionally and practically" in his brother's and mother's lives.  Biale Decl., Ex. 2-B at 1.  Knowing he has caused this harm to his family haunts Mr. Lin.  *See id.* at 3.  Due to the expense of travel between Taiwan and the United States, Mr. Lin's family has not been able to visit him during his pre-trial detention, nor do they anticipate being able to visit him for the duration of any future incarceration in the United States.  Mr. Lin and his family have stayed in close contact, nonetheless.  They try to speak every other day, with Mr. Lin calling early in the morning or late at night to accommodate the twelve-hour time difference.  Despite their best efforts, however, technical issues and lockdowns at MDC often prevent Mr. Lin from reaching his family, sometimes for weeks at a time.  Mr. Lin does not have any friends or other family members in or near the United States who can visit him.  As a result, Mr. Lin's only visits have been from counsel and representatives of the Taiwanese consulate.

Mr. Lin's distance from his family has been especially difficult in recent months. █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Mr. Lin's inability to be with his family during this difficult time has been devastating to him.

Notwithstanding these challenges, Mr. Lin has made the most of his time at MDC. Notably, since October 22, 2024, Mr. Lin has participated in MDC's Suicide Watch Companion Program. *See* Biale Decl., Ex. 38 at 1. "Suicide Watch Companions maintain a constant visual observation of individuals placed on Suicide Watch in order to ensure their safety and to better facilitate treatment with Psychology Services Staff." *Id.* at 8. Given the gravity of this role, MDC's Chief Psychologist, Dr. Schlessinger, explains, "Suicide Watch companions are selected based on strict criteria including their emotional stability, maturity, work ethic, and continued engagement in prosocial behavior." *Id.* As part of the program, Mr. Lin works six-hour shifts, often overnight and sometimes many nights in a row, in the suicide watch unit. The unit's observation cells house inmates who are on suicide watch or have other mental health issues and safety concerns. During his shifts, Mr. Lin serves as a source of comfort for those in the unit. If someone is having an outburst or is otherwise emotionally disturbed, Mr. Lin is the first one to try to calm them down and reassure them. Mr. Lin also takes it upon himself to educate the other inmates about the resources available to them at MDC, such as psychological services, administrative remedies, and how to contact counsel, family, and friends. According to Dr. Schlessinger, Mr. Lin "has served diligently in his role and has often provided assistance beyond the requirements." *Id.*

Mr. Lin recently completed a course taught by a professor at Columbia University, titled "Visualizing History: Photography in Conflicts and Crisis." *See id.* at 19. Mr. Lin has also participated in and completed at least ten programs, ranging in topics from health and exercise to business and personal skills. *See generally id.*; PSR ¶ 11.

22

Finally, as reported in the PSR, Mr. Lin has not incurred any disciplinary infractions while at MDC.  PSR ¶ 11.

### C.    Plea Agreement

On December 17, 2024, Mr. Lin entered into a written plea agreement with the government.  *See* Biale Decl., Ex. 39.  Pursuant to the plea agreement, Mr. Lin agreed to plead guilty to Counts Two, Three, and Four of the Indictment, charging Mr. Lin, respectively, with conspiracy to distribute and possess with intent to distribute narcotics in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and conspiracy to sell adulterated and misbranded medication in violation of 18 U.S.C. § 371.  As part of his plea agreement, Mr. Lin acknowledged and took responsibility for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  *See id.* at 10 (citing U.S.S.G. § 3B1.1).  He also agreed to enhancements for, among other things, distributing a controlled substance through mass-marketing by means of an interactive computer service, acting with willful blindness or conscious avoidance of knowledge that a drug marketed as legitimate contained fentanyl or a fentanyl analogue, and committing a narcotics offense as part of a pattern of criminal conduct engaged in as a livelihood.  *See id.* at 8-9 (citing U.S.S.G. §§ 2D1.1(b)(7), 2D1.1(b)(13), and 2D1.1(b)(16)(C), (E)).  Mr. Lin agreed to forfeit over $100 million dollars and specific property, including cryptocurrency and non-fungible tokens.  *Id.* at 2-7.  The plea agreement carries a mandatory minimum sentence of ten years and stipulates, among other things, that Mr. Lin's offense level is 53 and his Criminal History Category is I, with a resulting Guidelines range of life imprisonment.[4]

---

[4]    Count One, which the government has agreed to move to dismiss at sentencing, carries a mandatory life sentence.

At the change of plea hearing, Mr. Lin fully admitted his conduct and accepted responsibility. The Court accepted the plea.

### D.    The Presentence Report and the Probation Department's Recommendation

After a series of letter objections and responses from defense counsel and the government, on April 3, 2025, the Probation Department issued the Presentence Report and sentencing recommendation. Based on its calculation that Mr. Lin has a total offense level of 43[5] and belongs in Criminal History Category I, the Probation Department found that Mr. Lin's Sentencing Guidelines range is life. PSR ¶ 112. Notwithstanding its Guidelines calculation, the Probation Department recommends a downward variance to 360 months' imprisonment. *Id.* at 51. The PSR details at length the justification for this recommendation and includes among its reasons Mr. Lin's young age, his educational achievements, that "[h]e maintained employment prior to his arrest," the support he offered to his family, and his "positive adjustment to incarceration with no disciplinary infractions to date," including his participation in "several institutional programs," such as "MDC's suicide watch companion program." *Id.* at 50.

### E.    Criminal Investigation in Taiwan

In addition to the investigation and case brought by U.S. authorities, Taiwanese officials are investigating Mr. Lin for his conduct involving Incognito. Immediately following Mr. Lin's arrest in the United States, Taiwanese authorities froze Mr. Lin's bank accounts and commenced proceedings to seize his property. In a conversation with the undersigned and the government, Taiwanese prosecutors confirmed that they are investigating Mr. Lin for his conduct involving Incognito and are contemplating charges related to narcotics offenses and money laundering.

---

[5]    According to the PSR, "[p]ursuant to Chapter 5, Part A (comment n.2) [of the Guidelines], in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43." PSR ¶ 77.

The Taiwanese prosecutors also advised the undersigned that based on Mr. Lin's refusal to participate in an interview with them regarding their investigation into his conduct, he is currently considered to be a fugitive. Biale Decl. ¶ 50. On November 25, 2025, the Taiwan Ministry of Justice Investigation Bureau published on its website a June 27, 2025 warrant for Mr. Lin's arrest accusing him of money laundering. *See Details of wanted criminals*, Taiwan Ministry of Justice Investigation Bureau (Nov. 25, 2025), https://www.mjib.gov.tw/Crimes/Crimes_Detail?uid=448. Mr. Lin's warrant is valid for forty years. *See NTU Student Single-Handedly Building "Dark Net Narcotics Empire"; 120 Million NTD in Taiwanese assets seized... Taipei District Prosecutor's Office issues a 40-year arrest warrant (台大學霸林睿庠一手打造「毒品暗網帝國」1.2億在台資產都被扣...北檢下達40年通緝)*, MirrorMedia (Nov. 25, 2025), https://www.mirrormedia.mg/external/amp/mirrordaily_31565. The Taiwanese investigation has also focused scrutiny on Mr. Lin's family. This has caused Mr. Lin substantial anxiety and deep feelings of guilt and responsibility for causing his family's situation to worsen significantly, when his aim was to help them.

## ARGUMENT

On behalf of Mr. Lin, we respectfully request that the Court sentence him to ten years' imprisonment. We recognize that a ten-year sentence would be an extraordinary variance from the Guidelines range but, based on the confluence of unique factors present here, we respectfully submit that this sentence is sufficient, but not greater than necessary, pursuant to 18 U.S.C. § 3553(a).

## I.    LEGAL STANDARD

District courts have an "overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). Section 3553(a) sets forth these purposes:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). Though a sentencing court must consider the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Sentencing Guidelines]," *id.* § 3553(a)(4), "calculating the correct Guideline range [is] 'just an initial step in the sentencing process,'" *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (summary order) (citation omitted). A "district court may not presume that a guideline sentence is reasonable." *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). Rather, a court must "make an individualized assessment based on the facts presented." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in Section 3553(a), including the "nature and circumstances of the offense" and the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Indeed, the United States Supreme Court has "emphasized that highly relevant—if not *essential*—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 488 (emphasis added) (citations, alterations, and quotation marks omitted).

26

"In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation omitted).

## II.    OUTSTANDING OBJECTIONS TO THE PSR

The Probation Department has resolved most of Mr. Lin's objections to the PSR, and Mr. Lin withdraws his objections to the paragraphs concerning Mr. ████████ death.  Mr. Lin maintains his objections to Paragraphs 14, 17 (with the exception of the last sentence, which the final PSR modified), 61, and 71.  These paragraphs incorrectly characterize Mr. Lin's role as being superior to the other administrators of Incognito.  As described above, *see supra* Factual Background Section II, Incognito was run as a partnership and each administrator had a unique role, with none directing the activities of any other.  Indeed, the PSR itself acknowledges that Mr. Lin was recruited by the other administrators to write the code for the website, but at the same time contradictorily maintains that Mr. Lin was the "principal" administrator who directed the others.  *Compare* PSR ¶ 15, *with id.* ¶ 61.  While the facts concerning the respective roles of the Incognito administrators are not in dispute, the fair inferences from those facts do not support the aforementioned paragraphs of the PSR as currently written.

## III.    MR. LIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A SENTENCE OF TEN YEARS' IMPRISONMENT

When Mr. Lin started working on Incognito, he was a nineteen-year-old college student struggling to make sense of ████████████████████  Desperate to be helpful, he made the misguided and naïve decision to engage in criminal conduct with the hope of making money to support his family.  This choice was out of character for Mr. Lin, who had never before been in legal trouble and, by all accounts, had a bright future ahead of him.  He deeply regrets his

decision and, if given the opportunity to reenter society, has every intention of being a productive and law-abiding citizen.

### A.     Mr. Lin Was Only Nineteen Years Old When Incognito Started

A defendant's youth is universally recognized as extremely mitigating of culpability.  As the Supreme Court has explained, because "a lack of maturity and an undeveloped sense of responsibility" in young people "often result in impetuous and ill-considered actions," courts "should account for age when inquiring into the conduct of a defendant."  *Gall*, 552 U.S. at 57-8 (citations and internal quotation marks omitted); *see also Jones v. Mississippi*, 593 U.S. 98, 105 (2021) (explaining "youth matters in sentencing").  Scientific studies have even gone so far as to "conclude that human brain development may not become complete until the age of *twenty-five* . . . ."  *Gall*, 552 U.S. at 58 (emphasis added) (citation and internal quotation marks omitted).  Thus, "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment and control impulses."  James C. Howell et al., *Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know*, Office of Justice Programs (Jul. 2013), https://www.ojp.gov/pdffiles1/nij/grants/242935.pdf at 18; *see also* Vincent Chiraldi et al., *Community-Based Responses to Justice-Involved Youth Adults*, Office of Justice Programs (Sept. 2015), https://www.ncjrs.gov/pdffiles1/nij/248900.pdf ("Recent scientific work suggests that the human brain continues to develop well into the 20s, particularly in the prefrontal cortex region, which regulates impulse control and reasoning.").  In 2024, this research led the Sentencing Commission to revise the Guidelines Age Policy Statement, then reflected in U.S.S.G. § 5H1.1, to advise that a "downward departure also may be warranted due to the defendant's youthfulness

at the time of the offense or prior offenses."[6] U.S. Sent'g Comm'n, Guidelines Manual § 5H1.1, p.s. (Nov. 2024).  It made this change based on "testimony and comment from experts in the science and data community conveying advancements in the understanding of youthful development and sentencing, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability." *2024 Amendments in Brief*, U.S. Sent'g Comm'n, https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-youthful.pdf (last visited Jan. 13, 2026).

The Court should take into account Mr. Lin's youth when imposing a sentence.  Mr. Lin first started working on Incognito when he was only nineteen years old.  When he shut down Incognito, he was twenty-three.  When he stands before the Court for sentencing on January 27, 2026, he will be five days shy of turning twenty-five.  Thus, notwithstanding Mr. Lin's intelligence, throughout the entirety of his offense conduct, his prefrontal cortex—the part of his brain responsible for maturity, judgment, and decision-making—was still developing.  Much like the ten-year-old Mr. Lin who thought that if he studied math he could make his family's troubles go away, nineteen-year-old Mr. Lin naively thought that he had found a magic bullet in Incognito, a way to make enough money so that his mother and brother would never have to suffer for lack of funds.  At the time, from behind his computer screen, he did not fully appreciate the harmful, real-world effects of his choices—for himself and his family, as well as for those suffering from drug addiction, who, at the time, he understood only as "numbers on the

---

[6]    This policy statement, along with all other policy statements regarding departures, was removed pursuant to the 2025 Simplification Amendment.  U.S. Sent'g Comm'n, Guidelines Manual Ch. 1, intro. comment. (Nov. 2025) ("In 2025, the Commission amended the Guidelines Manual to remove departures and policy statements relating to specific personal characteristics.").

screen." Biale Decl., Ex. 1 at 2. He does now. Mr. Lin's physiological and psychological lack of maturity at the time of his involvement in Incognito warrant leniency.

### B.    Mr. Lin Is Genuinely Remorseful and Committed to Building a New, Law-Abiding Life

Mr. Lin deeply regrets his decision to participate in Incognito. It is the worst decision he has ever made. He recognizes that although his decision was motivated by his desire to take care of his sick mother and younger brother, "there is no excuse for [his] actions." Biale Decl., Ex. 1 at 1. Moreover, he is acutely aware that rather than help his family, his choice to engage in criminal conduct has caused them immeasurable harm—exposing them to criminal investigation and public opprobrium and preventing them from seeing him for years to come. Mr. Lin would never risk hurting them again.

Mr. Lin also acknowledges that Mr. ██████ died from an overdose from drugs purchased through Incognito, for which he is deeply remorseful. Recognizing the harmful effects of opioids, and fentanyl in particular, Mr. Lin sought to prevent their sale on Incognito (*see supra* Factual Background Section II.A, II.E), and, until he reviewed the discovery in this case, he believed that he and his partners had been successful in doing so. He recognizes now that this belief was an "extremely foolish" rationalization and, regardless, he in no way minimizes or excuses the tragedy of Mr. ██████ death or the pain of his loved ones. Biale Decl., Ex. 1 at 2. Mr. Lin hopes to speak to the ██████ at sentencing and convey his profound regret for their loss. He has also discussed with counsel his desire to do something to honor Mr. ██████ memory, including developing programs to disrupt drug sales over the darknet.

Mr. Lin committed a serious crime, and he deserves to be punished. Following the completion of that punishment, which will likely include additional incarceration in Taiwan,

however, Mr. Lin is focused on spending time with his family. He yearns to give his mother and brother a hug, to share his favorite dumplings with them across the dinner table, and to start a family of his own one day. He realizes now that what his family needed most from him was not financial support, but his time. And through his actions, Mr. Lin has deprived them of both. He will not make the same mistake again. As Mr. Lin puts it, "[f]or all the years fueled by an urge to provide financially, maybe all my family ever wanted was for the three of us to be happily together, rich or poor." *Id.* at 3. In the "second chapter" of life that Mr. Lin hopes to have, he is committed to using his "skills for the betterment of society." *Id.*

### C.    Mr. Lin Is a Caring and Intelligent Person

Though only twenty-four years old, Mr. Lin has managed to touch and improve the lives of many people. Letters submitted by his family members, colleagues, friends, and teachers illustrate that he is a natural teacher, drawn to helping those around him, family and strangers alike. Starting at home as a young boy, Mr. Lin assumed the role of mentor and teacher for his younger brother, teaching him about everything from math to board games. Biale Decl., Ex. 2-B at 1. As Mr. Lin's brother recounts in his letter, Mr. Lin has never stopped teaching him. To this day, Mr. Lin's brother looks to Mr. Lin for guidance, including what to study in college and what internships to take. *Id.* Mr. Lin's impact on his brother's development is so huge that his brother describes Mr. Lin as "a mentor, protector, and guiding light who has shaped [him] into who [he] is today." *Id.* at 2.

In school, Mr. Lin also played the role of teacher. Mr. Lin's mother recalls that as a little boy in school he was "regarded by both teachers and classmates as the most competent peer-mentor, whether in mathematics or other science subjects, he could always explain difficult problems in a clear and accessible manner, helping classmates understand laborious concepts quickly." Biale Decl., Ex. 2-A at 3. As he got older, Mr. Lin continued to fill the role of teacher

31

with his friends by "form[ing] study groups with classmates to review problems together, improving the collective performance of his class." *Id.* at 4. Mr. Lin's teachers and classmates similarly recount his willingness to help others. Biale Decl., Ex 2-E at 3; *id.*, Ex. 2-G at 2. As both a high-schooler and a college student, Mr. Lin volunteered to teach week-long programs to underserved children in remote areas of Taiwan. *Id.*, Ex 2-E. Mr. Lin's co-teacher recalls that Mr. Lin's "students were left in awe with the possibilities that programming offers" and that he "profoundly changed the lives of several of our students." *Id.* at 3.

Mr. Lin has actively worked to improve the communities to which he belongs. During his college internship, Mr. Lin spearheaded efforts to improve the office's culture, including by creating and leading a book club and proposing technological solutions to improve internal communications. Biale Decl., Ex. 2-H at 1. Likewise, while completing his service in Saint Lucia, Mr. Lin was regarded as an "honest, diligent, reliable kind-hearted and compassionate individual," who was "deeply committed to . . . the well-being of others." *Id.*, Ex. 2-F at 1. As Mr. Lin's colleague at the Taiwanese Technical Mission notes, Mr. Lin's work at the Mission "stemmed from a profound sense of kindness, warm-heartedness, and enthusiasm, without any expectation of material reward." *Id.*

Caretaking comes naturally to Mr. Lin. When his father left his mother, one of Mr. Lin's first reactions was to think about how he could take care of his mother and brother—even though he was only ten years old. Nine years later, when Mr. Lin was in college and ███████████ ███████████████, Mr. Lin again snapped into caretaking mode. ███████████████ ███████████████████████████████████ He made sure that his brother, a high schooler at the time, got to school on time, did his homework, and ate dinner. ████████ ███████████████████████████████████████

████████████████████████████████████████████████████  Biale

Decl., Ex. 2-A at 4.

Even at MDC, Mr. Lin has continued to care for others.  As discussed above, through the
Suicide Watch program, Mr. Lin has devoted countless hours over the past fourteen-plus months
to monitoring, comforting, and assisting his fellow inmates in their most difficult moments.
Many of those moments have been truly disturbing.  Among many other devastating scenes,
Mr. Lin witnessed fellow inmates throw feces at the walls and scream for hours and three fellow
inmates being removed from their cells following suicide attempts, including two in which the
inmates had tried to slit their wrists and were bleeding profusely.  These experiences have had a
profound effect on him.  He has also seen firsthand in MDC how drugs destroy communities and
individuals, something he sees now he appreciated only at an abstract level when he was running
Incognito from behind a computer screen.  As Mr. Lin describes in his letter, "It is horrifying to
witness what I used to perceive as numbers on the screen solidify into reality: able-bodied men
turning into little more than zombies under the influence, lights going out of unfocused eyes as if
there's no longer a soul underneath, bodies on the floor having seizures after an overdose."  Biale
Decl., Ex. 1 at 2.

Mr. Lin's intelligence is undeniable.  The nature of his offense conduct demonstrates as
much.  As does his academic success, which includes graduating at the top of his classes in high
school and college, and his acceptance into business school in Singapore.  Past experience
demonstrates that Mr. Lin wants to and can use his gifts for good.  For example, for his capstone
graduation project, he created a prototype for a computer program he called "LetterYou," which
was "a time capsule powered by blockchain technology" that "serves as a 'will' for elders who
never had the opportunity to put their thoughts into words for their children and loved ones

during their lifetimes." Biale Decl., Ex. 2-B at 1; *id.*, Ex. 2-E at 3; *id.*, Ex. 2-H at 1. Reflecting on this project, Mr. Lin's professor praised Mr. Lin's "commitment to producing rigorous, high-quality work" that "reflects not only his academic potential but also his passion for contributing meaningful advancements to the field of data security." *Id.*, Ex. 2-H at 1-2. Similarly, his projects from his time in Saint Lucia, which included projects designed to help hospitals, law enforcement, and young entrepreneurs, also speak to his ability and "genuine desire" to use technology to "make a difference" in society and "showcase his character and commitment to service." *Id.*, Ex. 2-F at 2. Mr. Lin has a strong desire and commitment to use his intelligence for good.

**IV.** ████████████████████████████████████████

At least six circuits recognize the government's manipulation of a defendant's offense conduct—referred to as "sentencing manipulation"—as an important consideration under Section 3553(a). *See United States v. Kenney*, 756 F.3d 36, 51 (1st Cir. 2014); *United States v. Torres*, 563 F.3d 731, 734-36 (8th Cir. 2009); *United States v. Boykin*, 785 F.3d 1352, 1360-62

(9th Cir. 2015); *United States v. Beltran*, 571 F.3d 1013, 1019 (10th Cir. 2009); *United States v. Ciszkowski*, 492 F.3d 1264 (11th Cir. 2007); *United States v. Bigley*, 786 F.3d 11, 15 (D.C. Cir. 2015). "Sentencing manipulation occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." *Torres*, 563 F.3d at 734; *see also United States v. Caban*, 173 F.3d 89, 93 n.1 (2d Cir. 1999) (sentencing manipulation occurs "when the government engages in improper conduct that has the effect of increasing the defendant's sentence" (citation omitted)). When analyzing sentencing manipulation, "the judicial gaze should, in the usual case, focus primarily—though not necessarily exclusively—on the government's conduct and motives." *Boykin*, 785 F.3d at 1360 (quoting *United States v. Fontes*, 415 F.3d 174, 181-82 (1st Cir. 2005)). Though the Second Circuit has neither explicitly recognized nor rejected the doctrine, the Circuit "has suggested that a viable sentencing manipulation claim would likely require a showing of outrageous government conduct." *United States v. Cromitie*, No. 09 Cr. 558(CM), 2011 WL 2693297, at *1 (S.D.N.Y. June 29, 2011) (McMahon, J.) (quotation marks omitted) (quoting *United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007)), *aff'd*, 727 F.3d 194 (2d Cir. 2013).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

## V. A SENTENCE OF TEN YEARS IS SUFFICIENT TO MEET THE GOALS OF SPECIFIC AND GENERAL DETERRENCE

This is Mr. Lin's first criminal offense, the consequences of which have been and will continue to be enormous for him regardless of what sentence the Court orders. At the young age of twenty-four, Mr. Lin is facing a sentence of at least ten years and up to the rest of his life. And, if the Court sentences him to anything less than life, upon the completion of his sentence, Mr. Lin will be sent back to Taiwan where he faces additional prosecution and punishment. *See supra* Factual Background Section III.E. The penalties for drug crimes in Taiwan are severe. Indeed, Mr. Lin may face a death sentence or life imprisonment if convicted of transporting or

selling "Heroin, Morphine, Opium, Cocaine, and their derivative products." Fawubu Fagui Ziliaoku, Narcotics Hazard Prevention Act, Art. 4 (as amended May 4, 2022). While the exact charges Mr. Lin will face in Taiwan remain uncertain, it is likely that the Taiwanese government will zealously prosecute him given the significant attention the government and media have already dedicated to his case. *See id.*; *see also* Biale Decl. ¶ 49.

Moreover, Taiwanese prisons are notorious for their poor conditions. Inmates sleep on bamboo mats in overcrowded cells and are permitted outside for only twenty to sixty minutes per week. *See* Guidance, *Information for British people detained or imprisoned in Taiwan*, GOV.UK (last updated Dec. 11, 2024), https://www.gov.uk/government/publications/taiwan-prisoner-pack/information-pack-for-british-prisoners-in-taiwan#detention-conditions-in-taiwan; Steven Crook, *Seventy-two days in a Taiwanese jail*, Taipei Times (Dec. 31, 2019), https://www.taipeitimes.com/News/feat/archives/2019/12/31/2003728456; Azn Han Solo, *Inmates sleep on the floor in Taiwanese prisons*, Medium (Mar. 20, 2018), https://medium.com/@AznHanSolo/inmates-sleep-on-the-floor-in-taiwanese-prisons-bc868da06a8f. In addition, even in investigative detention, defendants can be deprived of family visits and permitted to meet only with their lawyers (it is, moreover, unclear how Mr. Lin will be represented in Taiwan, which does not have a public defender system, given that all of his assets have been seized and forfeited). *See 2022 Country Reports on Human Rights Practices: Taiwan*, U.S. Dep't of State, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/taiwan/ (last visited Jan. 13, 2026). Thus, even if the Court sentences Mr. Lin to the mandatory minimum, the chances of him serving more than ten years for his offense conduct are

39

high.[8] And if he is ultimately released in Taiwan, the notoriety of his case in that country will continue to haunt him, making the effects of his case lifelong, even if he is one day released from prison.

In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2014), in the context of the Career Offender Guidelines, the Second Circuit pointed out that "[t]he [Sentencing] Commission has explained that the escalating sentence ranges prescribed by the CHCs are intended to achieve the purpose of deterrence[.]" *Id.* at 220. Yet, courts have concluded that for defendants who have not yet experienced extended incarceration, a sentence far shorter than that set forth in the Guidelines may serve the purpose of specific deterrence. For example, the *Mishoe* court remarked that:

> [A] major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. . . . If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years. Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.

*Id.* Mr. Lin is in Criminal History Category I, yet he faces the possibility of a life sentence. The logic of *Mishoe* applies with equal, if not greater, force here: a sentence of life, thirty years, or anything close to either of those, is simply not necessary to achieve a deterrent effect as to Mr. Lin specifically.

---

[8] Unlike many other defendants, Mr. Lin will serve the full length of any sentence that the Court imposes on him. As a deportable non-U.S. citizen, Mr. Lin cannot reap the benefits under the First Step Act of any good time credits he accrues while incarcerated. *See* 18 U.S.C. § 3632(d)(4). Moreover, there is no prisoner transfer treaty between the United States and Taiwan from which Mr. Lin would be able to benefit. *See List of Participating Countries/Governments*, U.S. Dep't of Justice, https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments (last visited Jan. 13, 2026).

In addition to the logic set forth above, perhaps the most significant reason that Mr. Lin will avoid recidivism is his close relationship with his mother and brother. "The single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to . . . commit future crimes after their release than prisoners without such ties." Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family L. 1. 191, 196 (2006). Mr. Lin has strong ties to his family. From his arrest through present day, his family has supported him, including by speaking with him nearly every other day (notwithstanding the twelve-hour time difference and the expense of international calls), MDC conditions permitting. Indeed, Mr. Lin's desire to provide for his family was a primary reason that he engaged in the offense conduct in the first place—he recognizes now that his choice was gravely misguided and has ultimately caused his family more harm than good. For example, Mr. Lin's family has not been able to see him since his arrest and, due to the expense of international travel, likely will not see him until after his term of imprisonment concludes. His family has also suffered due to the Taiwanese investigation into Mr. Lin's involvement with Incognito, which has led to the seizure of Mr. Lin's assets, including his family's home, and the Taiwanese press's coverage of this case, which has villainized Mr. Lin. *See* Biale Decl. ¶ 49. Mr. Lin is highly incentivized to avoid causing any further harm to his loved ones.

Mr. Lin's age and intelligence provide additional reasons why a ten-year sentence would serve the goal of specific deterrence. As discussed above, Mr. Lin was in his late teens and early twenties at the time of the offense conduct. Though highly capable, Mr. Lin's brain was not yet fully developed, including especially those parts related to sound decision-making. *See supra* Argument Section III.A. At the conclusion of a ten-year sentence, Mr. Lin will be a thirty-three-

year-old man with a fully developed prefrontal cortex, significantly more capable of making reasoned and good decisions than he was at the time he decided to develop and participate in Incognito. *See United States v. Serrano*, No. 08-CR-612, 2010 WL 147924, at *2 (E.D.N.Y. Jan. 11, 2010) (citing, among other things, the defendant's "relative youth at the time of the offense" as contributing to specific deterrence). With the benefit of maturation and the hard lessons learned by his prosecution and incarceration, there is good reason to believe that, rather than return to crime, Mr. Lin will focus instead on using his skills and interest in technology in a socially productive manner. His offense, though conducted over an extended period, was out of character for Mr. Lin. Mr. Lin's employment history, which reflects balancing jobs while studying, demonstrates that he is capable of maintaining lawful employment. Research indicates that individuals like Mr. Lin who engage in cybercrime at a young age but have legitimate employment opportunities and educational pursuits "generally gravitate[] away from cybercrime as other life opportunities" arise. Jonathan Lusthaus, Industry of Anonymity: Inside the Business of Cybercrime 78 (1st ed. 2018). Finally, through his volunteer work teaching underserved children in Taiwan and his service work in Saint Lucia, Mr. Lin has demonstrated that he wants to, and can, put his intelligence and skills towards positive and productive ends.

As to general deterrence, numerous studies, including those conducted by the Department of Justice, have found that "punishment certainty is far more consistently found to deter crime than is punishment severity." Daniel S. Nagin and Greg Polansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, Criminology, 39(4) (2001); *accord Five Things About Deterrence*, Nat'l Institute of Justice, https://www.nij.go.v/five-things/pages/deterrence.aspx (last visited Jan. 11, 2026) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than

even draconian punishment."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime
& Just. 1, 28 (2006) (while the certainty of being caught and punished has a deterrent effect,
research shows that "increases in severity of punishments do not yield any significant (if any)
marginal deterrent effects"). That Mr. Lin was apprehended less than two months after Incognito
shut down and will be sentenced to a significant term of incarceration sends a strong message
that those who engage in the sale of drugs will be caught and punished—even if that conduct
occurs overseas and behind the anonymity of the darknet. A sentence beyond the mandatory
minimum of ten years will not achieve additional general deterrence and thus would be "greater
than necessary" to achieve the goals of sentencing.

## VI.    A SENTENCE OF TEN YEARS IS APPROPRIATE AND NECESSARY TO AVOID UNWARRANTED SENTENCING DISPARITIES

Mr. Lin recognizes the seriousness of his conduct and that such conduct requires
significant punishment. Given the unique circumstances of Mr. Lin's case a sentence of life or
even the thirty years recommended by Probation would be disproportionately severe when
viewed against other individuals' sentences for convictions related to the sale of drugs over the
darknet. Those individuals who have received sentences in the life or thirty-year range have
refused to accept responsibility for their actions, been previously convicted of crimes, and/or
engaged in conduct significantly more serious than Mr. Lin—including that their conduct
involved manufacturing narcotics, violence, and the sale of illicit goods other than narcotics.
Instead, as discussed below, Mr. Lin is more similarly situated to individuals who received lower
sentences in the ten-year range.

First, Mr. Lin's conduct is less serious than that of Ross Ulbricht, who was sentenced to
life in prison in connection with his creation and administration of Silk Road, though he served
approximately only eleven years of that sentence until January 21, 2025, when President Trump

pardoned him. *See* U.S. Att'y's Off., Southern District New York, Press Release (May 29, 2015), https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison [hereinafter, "Ulbricht Press Release"]; *United States v. Ulbricht*, 14-cr-00068 (LGS), ECF No. 403 (S.D.N.Y. Jan. 21, 2025). Ulbricht went to trial, and a jury convicted him of seven charges, including Continuing Criminal Enterprise (21 U.S.C. § 848(a)), which carries a mandatory minimum sentence of twenty years. *United States v. Ulbricht*, 14-cr-00068 (LGS), ECF No. 183 (S.D.N.Y. Feb. 5, 2015). Silk Road was a multi-million-dollar darknet marketplace that Ulbricht operated from January 2011 through October 2013, when he was in his *late* twenties, an important distinction in terms of maturity and brain development from Mr. Lin. *See* Ulbricht Press Release. Ulbricht "controlled and oversaw every aspect of Silk Road, and managed a staff of paid, online administrators, and computer programmers who assisted with the day-to-day operations of the site." *Id.* Vendors on Silk Road primarily sold narcotics, which were connected to at least six overdose deaths. *Id.* Ulbricht also agreed to allow deadly substances like cyanide to be sold on Silk Road, in addition to recreational drugs. *See United States v. Ulbricht*, 858 F.3d 71, 130 (2d Cir. 2017). In addition to narcotics, vendors on Silk Road sold other illegal goods, including internet hacking services, malicious software, and fake identification documents. Ulbricht Press Release. Finally, Ulbricht "demonstrated a willingness to use violence to protect" Silk Road by "soliciting six murders-for-hire in connection with operating the site . . . ." *Id.*

Mr. Lin's conduct is also less serious than that of Oluwole Adegboruwa, who was sentenced to thirty years' imprisonment after a jury found him guilty of seven federal offenses, including 21 U.S.C. § 848(a), in connection with his sale of narcotics on the darknet. *United States v. Adegboruwa*, 19-cr-00260 (JNP), ECF No. 756 (D. Utah June 5, 2024); *Adegboruwa*,

44

19-cr-00260 (JNP), ECF No. 1004 (D. Utah Nov. 13, 2024). Adegboruwa conceived of, created, and managed a dark web drug trafficking operation that ran from October 2016 through May 2019 and generated millions of dollars from the sale of more than 300,000 oxycodone pills. *See* U.S. Att'y's Off., District of Utah, Press Release (Nov. 14, 2024), https://www.justice.gov/usao-ut/pr/convicted-dark-web-drug-dealer-sentenced-360-months-imprisonment [hereinafter "Adegboruwa Press Release"]. Adegboruwa managed at least five people whose responsibilities included, among other things, "locating and procuring pharmacy grade pills" and "packaging the pills and/or shipping them to customers." *Id.* Adegboruwa testified at trial that "he was the only one who had access to his vendor pages on the dark web markets to process order from customers," he "had the power to hire and fire individuals," and he "controlled sales on the dark web markets and the monetary accounts." *Id.*; *United States v. Adegboruwa*, 19-cr-00260 (JNP), ECF No. 980 at 2 (D. Utah Oct. 31, 2024). Adegboruwa was in his mid-to-late forties at the time of his offense and had a prior federal felony conviction. *See* Adegboruwa Press Release; *Adegboruwa*, 19-cr-00260 (JNP), ECF No. 980 at 2.

In contrast to both Adegboruwa and Ulbricht, Mr. Lin accepted responsibility for his actions immediately upon being arrested and subsequently by pleading guilty. Moreover, Mr. Lin's conduct, while no doubt serious, was less serious than that of Adegboruwa and Ulbricht. As explained above, Mr. Lin did not possess sole control over Incognito in the way that Adegboruwa and Ulbricht did over their criminal operations. *See* Factual Background Section II. Unlike Adegboruwa, Mr. Lin did not personally participate in the manufacture or distribution of narcotics, nor does he have a prior criminal history. And, unlike Ulbricht, Mr. Lin has shown absolutely no willingness to engage in violence. It is significant also that, whereas Silk Road openly promoted the sale of narcotics, including fentanyl, and various other illicit

goods, Incognito allowed for the sale of narcotics only and Mr. Lin tried, albeit unsuccessfully, to prevent the sale of fentanyl. *See supra* Factual Background Section II.A, II.E. Finally, although Incognito is linked to one overdose, for which Mr. Lin is deeply remorseful, Silk Road was connected to six overdose deaths. Accordingly, a sentence of life or thirty years would be a disparate outcome.

A sentence of twenty years would also be disproportionately harsh. The operators of RedLightLabs, Michael Ta and Rajiv Srinivasan, who sold the drugs that caused ▬▬▬▬▬▬▬ death, received sentences of 260 and 235 months, respectively. *See* U.S. Att'y's Off., Central District of California, Press Release (Apr. 29, 2024), https://www.justice.gov/usao-cdca/pr/oc-and-houston-men-sentenced-decades-prison-supplying-fentanyl-and-other-drugs-sold. Ta and Srinivasan were both personally involved in, among other things, procuring, processing purchases of, and distributing narcotics, including fentanyl, methamphetamine, fentanyl powder, black tar heroin, and cocaine. *See id.* In their plea agreements, Ta and Srinivasan admitted "to causing the fentanyl overdose deaths of three victims," including Mr. ▬▬▬▬ and "to distributing fentanyl-laced pills to additional victims, both of whom suffered fatal drug overdoses shortly after they received the pills." *Id.* Ta and Srinivasan knew that they were sending lethal doses of fentanyl to unsuspecting users, and their conduct led to the deaths of five victims. Mr. Lin's conduct, in contrast, though serious and harmful, reflects a lower level of culpability than these individuals and includes mitigating circumstances that were not present in their cases. A sentence of or around twenty years for Mr. Lin, therefore, would be disproportionately long.

Sentences that dark web vendors have received further demonstrate that a ten-year sentence is appropriate for Mr. Lin. Twenty-four-year-old Tenzin Orgil, who pleaded guilty to

charges in connection with his three-year participation in a "drug trafficking enterprise that included the sale of methamphetamine and fentanyl on the dark web as well as the manufacture of ecstasy . . . and methamphetamine in clandestine laboratories" was sentenced to fourteen years. *See* U.S. Att'y's Off., Southern District of Florida, Press Release (May 21, 2024), https://www.justice.gov/usao-sdfl/pr/dark-web-drug-vendor-and-clandestine-lab-manufacturer-sentenced-prison-trafficking. Although Orgil did not operate a darknet site, unlike Mr. Lin, he had a prior criminal record, was involved in gang activity, possessed a gun, sold illicit goods other than narcotics, and was personally involved in the manufacture of methamphetamine. *See id.*; *United States v. Orgil*, 23-cr-20018 (KMW), ECF No. 66 at 4, 7-8 (S.D. Fla. May 10, 2024); *Orgil*, 23-cr-20018 (KMW), ECF No. 67 at 4, 7-10 (S.D. Fla. May 14, 2024).

Mr. Lin is more similarly situated to individuals like Ryan Scott Cochran and Binh Thanh Le, who received seven- and eight-year sentences, respectively. Thirty-four-year-old Cochran pleaded guilty to distributing through the U.S. mail fentanyl, cocaine, and methamphetamine, which he sold over the darknet (he was one of the most significant vendors on Incognito), and agreed to forfeit $1,100,000. *See* U.S. Att'y's Off., Eastern District New York, Press Release (Aug. 28, 2024), https://www.justice.gov/usao-edny/pr/dark-web-vendor-pleads-guilty-distributing-fentanyl-through-mail. Though Cochran did not operate a darknet marketplace, he sold a substantial amount of narcotics—the government "conservative[ly] estimate[d]" Cochran was "responsible for distributing 9,000 grams of fentanyl, 5,442 grams of methamphetamine, 1,188 grams of cocaine base, 15 grams of cocaine, 10 units of ketamine and 40 grams of oxycodone." *United States v. Cochran*, 25-cr-00063 (RER), ECF No. 35 at 2, 7-8 (E.D.N.Y. Mar. 14, 2025). Le was twenty-two-years old when he worked as "[t]he leader and organizer of a highly sophisticated drug trafficking operation" in connection with which he "created and

operated a vendor site" on the dark web. *See* U.S. Att'y's Off., District of Massachusetts, Press Release (Mar. 11, 2022), https://www.justice.gov/usao-ma/pr/leader-dark-web-drug-trafficking-operation-sentenced-eight-years-prison-and-59-bitcoin. Le pleaded guilty to conspiracy to manufacture, distribute, and possess with intent to distribute MDMA, Ketamine, and Xanax and agreed to forfeit assets and property in excess of $2 million. *Id.* Like Mr. Lin, neither Cochran nor Le engaged in or showed a propensity to engage in violence. Also, like Mr. Lin, Le's background included being financially responsible for his struggling family and turning to the darknet to try to provide support.

Considering the foregoing, and notwithstanding the significant variance from the Guidelines range, a sentence of ten years is necessary to avoid unwarranted sentencing disparities.

## VII.    THE CONDITIONS OF CONFINEMENT TO WHICH MR. LIN HAS BEEN SUBJECTED WARRANT LENIENCY

The Court should also consider, and grant a variance in accordance with, the harsh and challenging conditions of confinement that Mr. Lin has endured over the past twenty months during which he has been incarcerated at MDC. As Your Honor is well aware, courts in this Circuit have repeatedly recognized that the harsh conditions at MDC counsel in favor of a shorter overall sentence. *See United States v. Nunez*, 23 Cr. 517 (AT), 2024 WL 4504493, at *6 (S.D.N.Y. Oct. 16, 2024) (collecting cases). At MDC, "[c]haos reigns, along with uncontrolled violence." *United States v. Colucci*, No. 23 Cr. 417, 2024 WL 364857, at *4 (E.D.N.Y. Aug. 5, 2024). The violence is so "staggering" that it "ma[kes] time spent there essentially the equivalent of either time and a half or two times what would ordinarily be served." *Nunez*, 2024 WL 4504493, at *6 (citation omitted). Due to this violence and chronic understaffing, "[i]nmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells,

prohibited from leaving for visits, calls, showers, classes, or exercise"—especially during the weekends and over holidays. *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024). MDC is also "notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates." *Id.* at 234. "Finally, the MDC's physical conditions have long been problematic." *Id.* at 235. These "problematic" conditions have included, but are not limited to, "mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Id.* (citation omitted).

The conditions at MDC during Mr. Lin's incarceration—May 2024 through present—have been disturbingly consistent with those described by these courts. MDC has neglected Mr. Lin's acute medical and dental needs, including by making him wait weeks to see medical professionals and, even then, failing to provide basic treatment. Moreover, through his participation in MDC's Suicide Watch Program, he has borne firsthand witness to the harsh treatment that inmates with mental health issues receive. Mr. Lin has endured countless days of severely restrictive lockdowns, been served spoiled food, and been denied access to his discovery. Though he has personally been spared violence, Mr. Lin has witnessed extreme violence among inmates, including knife fights, slashings, and strangulations. Indeed, shortly after Mr. Lin arrived at MDC, during the summer of 2024, "[m]ultiple MDC inmates were murdered at the facility." *Nunez*, 2024 WL 4504493, at *6. That fall, "[t]he conditions inside MDC . . . worsened to such a degree that the BOP . . . ceased designating prisoners to serve their sentences at MDC altogether." *Id.* (citation omitted). For Mr. Lin, who had never spent a day in jail before arriving at MDC, these experiences have been extremely traumatizing. And, as discussed above, Mr. Lin is highly likely to face even worse incarceratory conditions in Taiwan

49

when he is ultimately returned there after serving his sentence in this case. In light of these conditions, the Court should grant a variance and sentence Mr. Lin to a below-Guidelines sentence of ten years.

## CONCLUSION

We recognize that Mr. Lin committed a serious crime and that he did so over a sustained period of time. We, Mr. Lin included, have deep sympathy for the ████████ and other families who have suffered the loss of a loved one due to the scourge of fentanyl. And we recognize that a request for the mandatory minimum sentence under such circumstances is an extraordinary ask. But we respectfully submit that there are unique mitigating features of both Mr. Lin and of the offense conduct in this case that warrant an extraordinary act of mercy from the Court. For these reasons, we respectfully ask that the Court season justice with mercy and impose a sentence of ten years' incarceration, which is sufficient, and not greater than necessary, under 18 U.S.C. § 3553.

Dated:      New York, New York
            January 13, 2026

SHER TREMONTE LLP

By:  _/s/ Noam Biale_
        Noam Biale
        Katie Renzler
        Michael Bass
        90 Broad Street, 23rd Floor
        New York, NY 10004
        Tel.: (212) 202-2600
        Fax: (212) 202-4156
        nbiale@shertremonte.com

        *Attorneys for Rui-Siang Lin*

# <u>DECLARATION OF NOAM BIALE IN SUPPORT OF DEFENDANT RUI-SIANG LIN'S SENTENCING SUBMISSION</u>

(Filed under seal)

# EXHIBIT 1

Dear Judge McMahon,

I hope that this letter finds you well. Please allow me to briefly share my story, starting from a brief overview of the 24 years that I have walked the Earth.

Growing up, my mother always came up with what we asked for. Even some magical ones, such as my request for a younger brother as my four-year-old birthday present. After my father left our lives following a divorce, she still managed to continue doing just that, no matter how difficult it was for a middle-aged single-mom in an Asian society. While both me and my brother got a good education and never had to worry about our basic needs, my mother was under extreme stress. For nearly ten years, I saw first-hand how much weight the heavy burden had on my mother. I tried to help, I wanted to, but there's just such limited options you have when you were a teenager. The best thing I could do at the time, was to keep my grades top-notch, and make my mother proud by going to a good university.

As soon as I got into my dream school, I started finding ways to help financially. I took a tutoring job, and landed an internship at the largest Taiwanese financial firm two months into my freshman year. My life was on track as I had planned. I was shifting some burden from my family and studying at the best university in Taiwan. My original plan was an ordinary one: study hard, get a good-paying job, and take care of my family. My mother could then retire to travel the world, while my brother could enjoy college campus life free of the worries I had.

But the plan never took off. Days after my second year started,



I fully understand that there is no excuse for my actions. However, that was the pivotal moment when I made the worst decision of my life, choosing to take a financial shortcut that ended me up here today. I accepted ███████ and ██████████ offer to code Incognito Market a week after ████████████████████████ I convinced myself that helping to set up and run this site, and taking a potential payout, was the right choice to make. I was so wrong.

From 2020 through 2024, I worked hard in two worlds. As Incognito climbed its way to the top market slot, I graduated from university with three years of work experience in fintech, various open source coding projects, two research papers, and an open offer for a masters degree at the

top department in National Taiwan University. I was also working on a startup idea with a few friends.

I always knew that the skeleton in my closet had the potential to upend everything, but it was really not easy to let go when Incognito was giving me and my family the financial security that I had always wanted. However, pressure built up. ███████████████████████████████████████████████████████████████ That was when I finally made up my mind. This had to stop. In March 2024, I shut down Incognito. I slept considerably better after that.

When I was arrested, I almost felt relief that I no longer had to hide.  I admitted to my role at Incognito with the law enforcement officers who arrested me and pleaded guilty.  I coded Incognito, I was the architect, and narcotics were sold on the site. I have learned a lot of things I didn't know ████████████████████████████████

After seeing firsthand what drugs do to people at MDC Brooklyn on a daily basis, I now understand what I did was not just against the law, but also something morally incorrect. It is horrifying to witness what I used to perceive as numbers on the screen solidify into reality: able-bodied men turning into little more than zombies under the influence, lights going out of unfocused eyes as if there's no longer a soul underneath, bodies on the floor having seizures after an overdose.

I have met people from many different walks of life in jail, often at their worst due to my job as a suicide watch companion. The hours-long conversations I had with them were deep and often depressing. Most of the time, I just sat there and listened. Sorrow and regret were common themes. Sad about not able to see their families, and angry at themselves for making the wrong choices. However, there was one other topic that appeared much more often: drugs. The storyline was nearly the same each time. Impulsive decisions were made under the influence, and someone gets hurt in the process. It was devastating to hear them describe how drugs wrecked their lives and blew their families apart. This is not a road anyone should ever be provided the option to take, and my actions gave them exactly what they needed to go down that terrible path.

This belief was even further strengthened when I learned of the ██████████ tragic loss. I should have foreseen that fentanyl would still find its way onto Incognito no matter how hard I tried to prevent its sale. I believed at the time that my safeguards worked, but I should never have developed the platform in the first place. It was extremely foolish of me to try convince myself that a foolproof system exists, and that such a system can completely negate the harm of narcotics. As a result, a young man not much older than me ended up paying the ultimate price for it.  My conduct is inexcusable, and for which I am truly sorry.

Since pleading guilty over a year ago, I have given a lot of thought on plausible ways to curb the harm of fentanyl and things I could do in my life in the name of Mr. ███████ in the hope that what happened to him never repeats again to anyone else.

During my detention at MDC Brooklyn, I finally understood something very important. For all the years fueled by an urge to provide financially, maybe all my family ever wanted was for the three of us to be happily together, rich or poor. In the short fifteen-minute phone calls that are often buggy once every other day, it kills me to be only able to hear their voices but not able to be there with them. ████████████████████████████████ the distance from my family has become almost unbearable.

Now, I just wish to do the time I deserve, and get back to my family in Taiwan as soon as possible. And hopefully, grow old with them together. I'll do anything to have dinner with them again.

It is for sure that I do not plan to ever risk myself on the wrong side of the law again. I sincerely hope that I will be granted a second chance. The second chapter of my life will be carefully cherished, during which I promise I will continue utilizing my skills for the betterment of society.

Sincerely,

RuiSiang Lin

January 13, 2026

# EXHIBIT 2

# EXHIBIT 2–A

敬愛的法官您好：

　　我是睿庠媽媽，在得知孩子前往新加坡轉機被美國 FBI 拘留的當下，我幾乎癱軟，完全無法思考，也無法理解，一個積極進取、樂於助人、溫暖體貼的睿庠，怎麼會與司法問題有任何牽連。懇請法官容我在歷經晴天霹靂的打擊後，以片段記憶向您陳述睿庠的成長背景與求學過程，讓您能更全面地了解他，並看到他一直以來積極向上的品格與努力。

　　當孩子還是嬰幼兒時，我便全心投入在他們的教育上，深知陪伴成長的重要性。在不同的成長階段，我努力為孩子提供適時的養分與學習機會，讓他們的生活作息規律且單純。每天早睡早起，養成良好的生活習慣，期望兄弟倆能內化成為善良謙遜、勤奮不懈、溫暖如春的人。這樣簡單的生活方式，也讓他們更加容易相信他人。為了避免外界過於複雜的信息干擾，家中盡量避免使用 3C 產品，讓睿庠能專心沉浸於各種書籍與雜誌（如繪本、小說、科學漫畫、國語日報、小牛頓雜誌等），以及樂器、樂高和益智桌遊等，這些都有助於睿庠培養閱讀習慣、邏輯思維能力，並激發他多元興趣（如攝影、影音編輯、音樂創作、語言學習、西洋棋、籃球等）。

　　一直以來，我深知品格教育與學習環境對孩子成長的重要性，因此選擇讓孩子就讀嚴謹的私立學校，一直到高中畢業。在這樣的學習氛圍中，睿庠的數學才華和對數字的敏銳度與熱愛日漸增強。從小學開始，便多次參加國際奧林匹克數學競賽，屢獲佳績；到了國中，更在 IMC 世界數學競賽中摘得金牌。隨著科技新知的普及，睿庠逐漸認識到資安在未來世界中的關鍵地位。因此，從小六起，便立下了大學志向，希望攻讀資安相關科系，這也促使他從國中時期就開始學習程式設計，並在高中時，代表學校參加全國性競賽。雖然未能在決賽中晉級，但並未打擊睿庠的熱情，反而激發了他更加努力地學習不同的程式語言和相關技術，拓展自己的視野。在學校裡，睿庠是同學與師長眼中最稱職的小老師，無論是數學，還是其他理科科目的任何難題，他總是能夠用淺顯易懂的方式解釋，幫助同學們迅速理解。當大考臨近時，睿庠會和同學組成解題小組，共同復習，提升班上的整體成績。在這樣的學習過程中，他不僅積累了豐富的知識，也學會了如何與人合作，如何帶領他人一起進步，並在過程中不斷提升自己的領導與組織能力。

　　進入國立台灣大學(National Taiwan University)後，睿庠積極與同儕討論、分析問題，並共同完成各項專案。透過考取證照，他深入了解自身不足，持續努力提升專業能力。睿庠對於 Web3 及去中心化區塊鏈的技術專研，也讓他深入思考如何廣泛運用在金融、資安、法律與傳承等領域。他的學期報告「如何防止 DDOS」不僅受到教授們的高度評價，還轉化為學校的大型專案，使他以

兼職身份加入研究團隊，時間長達逾一年半。畢業專題「遺囑時空膠囊」更是獲得業界專業評審的青睞，展現了他在技術領域的深厚實力。此外，睿庠會不定期將自己編寫的程式開源，免費提供給大家使用，致力於讓世界變得更加便利與美好。他立志於大學畢業後，能夠透過自己微薄的力量設立獎學金，幫助需要幫助的學弟妹，減輕他們的經濟負擔，讓他們能專心學習，追求自己的夢想。回顧他高中畢業後的努力，為了減輕家裡的經濟壓力，他不僅兼任家教，還在國泰金控的區塊鏈研發單位實習，成為第一位大一實習生，並且是唯一在實習期滿後仍被延續聘用近 2 年半的實習生。除此之外，睿庠也積極研究投資虛擬貨幣，並靠著自己的努力，半工半讀完成大學學業。

在我身體健康出現問題的時候，睿庠更是展現了孝順與體貼的一面。還記得幾年前 ███████████████████████████████████████████████████ 在這段艱難的時光中，我看到了一個溫暖、細心、負責的孩子，他不僅努力鞭策自己，不斷提升專業能力，還在繁忙中考取了多項國內外的專業證照。同時也保留了國立台灣大學電機所的學籍，並在 2024 年順利錄取新加坡國立大學(NUS)，原計劃在外交替代役的役期結束後，前往新加坡繼續升學。睿庠是我引以為傲的孩子，無論在學業、工作，還是生活中的種種挑戰，他始終保持著樂觀進取的態度，並以自己的實際行動傳遞正向的力量。

睿庠是一位聰慧且擁有遠大理想與抱負的年輕人，無論在工作還是生活中，總是無比的專注和認真投入。他具備卓越的專業技能，無論是在學術領域或是實務操作上，都能精準掌握並創造出超凡的成果。這種才華與努力，不僅為他自己開創了廣闊的未來，也為國家和社會做出了顯著的貢獻。他在家庭中的角色，無疑是不可或缺的精神支柱，也是最堅實的依靠，更是促使家人在困難面前保持堅韌和信心的力量泉源。在社會層面，他所展現的創新能力與卓越專業素養，對整體社會的進步與發展具有深遠且不可或缺的影響。他不僅能在工作領域中帶來創新思維與突破，更在提升業界標準、推動技術革新等方面發揮著關鍵作用。特別是在當今這個快速變革的時代，每一位具備實力的專業人才，都有可能成為推動社會進步的中堅力量，而睿庠正是其中不可或缺的一員。他所代表的，不僅是個人價值的實現，更是對家庭、國家乃至整個社會的無形貢獻。

在此，懇請法官大人能夠充分考慮到睿庠對家庭、對社會的深遠影響。非常感謝法官撥冗垂閱！

Sincerely,
*/s/ Rui-Siang's Mother*

Dear Judge, Greetings,

I am Rui-Siang's mother. When I learned that my son had been detained by the FBI in U.S. while transiting through Singapore, I nearly collapsed. I was completely unable to think or comprehend how Rui-Siang, who has always been proactive, helpful to others, warm, and considerate, could possibly be tied to any judicial proceedings. I respectfully ask Your Honorable to allow me, after suffering such a devastating shock, to recount through episodes of Rui-Siang's upbringing and educational journey, so that you may gain a more comprehensive understanding of him and see the positive character and continuous effort he has demonstrated throughout his life.

From the time when my children were infants, I devoted myself wholeheartedly to their education, understanding deeply the importance of parental presence during their upbringing. At each stage of their growth, I endeavored to always provide timely nutritious nourishments and learning opportunities, ensuring that their daily routines remained regimented and straightforward; going to bed early and rising early each day, cultivating healthy habits, in hopes that my two kids would learn to internalize values of kind humility, diligent perseverance, and warmth. This simple lifestyle also made them more inclined to trust others. Considering the many disturbances from the outside world, at home, we minimized the use of electronic devices, allowing Rui-Siang to immerse himself in breadth of books and magazines (such as picture books, novels, science comics, newspapers in Mandarin, and Little Newton Science Magazine, etc.), as well as musical instruments, LEGO, and educational board games. These activities all helped him to develop strong reading habits and logical thinking abilities, as well as stimulating him to pursue his diverse interests (such as photography, video editing, music composition, language learning, chess, and basketball, etc.).

I have always understood the importance of moral education and learning environment in a child's growth and therefore chose to enroll my children in rigorous private schools through their primary and secondary education. In this kind of academic atmosphere, Rui-Siang's mathematical talent and keen sensitivity to mathematical figures steadily grew. Since elementary school, he participated in many international mathematics Olympiad competitions, achieving outstanding accolades throughout. In junior high school, he won gold medal at the IMC World Mathematics Competition (UK). And as technological knowledge became more widespread, Rui-Siang gradually recognized the critical role of cybersecurity in the future. Because of this, starting in sixth grade, he set his goal of pursuing a university major related to information security; this motivated him to begin learning programming in junior high school, and, in high school, he represented his school in national competitions. Although he did not advance to the finals, this did not dampen his enthusiasm; instead, it catalyzed him to study programming languages and related technologies even more diligently, broadening his horizons. At school, Rui-Siang was regarded by both classmates and teachers as the most competent peer-mentor, whether in mathematics or other science subjects, he could always explain difficult problems in a clear and accessible manner, helping classmates understand laborious concepts quickly. When

midterms approached, he formed study groups with classmates to review problems together, improving the collective performance of his class. In this kind of educational setting, he not only accumulated rich knowledge, but also learned how to collaborate with others, how to lead progress, and through them, continuously refining his leadership and organizational skills.

After entering National Taiwan University, Rui-Siang actively engaged with his peers, analyzed problems, and completed various projects together with them.  By obtaining professional certifications, he identified his shortcomings and worked to improve his technical skills. His in-depth research into Web3 and decentralized blockchain technologies led him to consider their broad applications in finance, cybersecurity, law, and legacy planning. His semester report, "How to Prevent DDoS," were not only highly received by his professors, but it was also later developed into a large-scale university project, enabling him to join a research team as a part-time for over a year and a half. Industry professionals that served on the panel of his graduation project, "Digital Time-Capsuled Will," thought very highly of the project and Rui-Siang's demonstration of the depth of his technical know-how. In addition, Rui-Siang periodically would write open-source programs, providing them free for public use, with the goal of making the world more convenient and better. He aspired, after graduating from university, to establish a scholarship, no matter how modest, to help his peers in need, alleviate their financial burdens, and allow them to focus on their studies and pursue their dreams. I reflect on his efforts after high school graduation, that, in order to reduce the family's financial burden, Rui-Siang worked as a tutor while also interning at the blockchain research and development division of Cathay Financial Holdings. He became their first college freshman intern and was the only intern whose employment was extended for nearly two and a half years after the internship period ended. In addition, he actively studied cryptocurrency investment and, through his own diligent efforts, successfully completed his university education while working part-time.

When my health encountered serious upheaval, Rui-Siang faced it all with remarkable filial attentiveness and thoughtfulness. I still remember that, several years ago, ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ During this difficult period, I saw a warm, attentive, and responsible child; he not only pushed himself to continuously improve his professional skills, but also obtained multiple domestic and international professional certifications despite his busy schedule. At the same time, he retained his enrollment at the Graduate Institute of Electrical Engineering at National Taiwan University and, in 2024, was successfully admitted to the National University of Singapore (NUS). The original plan was for him to continue his studies in Singapore after completing his diplomatic alternative military service. Rui-Siang is a child of whom I am deeply proud of, who, whether facing academic, professional, or life challenges, always maintained an optimistic and proactive attitude, and carried positive momentum through his own actions.

Rui-Siang is a bright young man with ideals and ambitions. In both work and daily life, he is focused and dedicated to a degree like no others. He possesses prodigal field knowledge, and in academic research and practical applications, he can grasp concepts precisely and produce exceptional results. His talent and diligence not only opened a broad future for himself, but also made meaningful contributions to his country and society. Within his family, he is an indispensable pillar of emotional support, the most unwavering, and more, the family's source of strength to spur resilience and confidence even in face of great adversity. In his communities, the innovation and professional excellence he demonstrates has a profound and indispensable impact on social progress and development. He not only brings innovative thinking and breakthroughs to his field of work, but he is also pivotal in elevating the industry and capable in pushing forth technological innovations. Especially in today's rapidly progressing technological revolutions, every capable professional has the potential to become a backbone of social progress, and Rui-Siang is one such indispensable individual. What he represents is not only the realization of personal value, but also an intangible contribution to his family, his country, and society as a whole.

Here, I respectfully ask Your Honorable to fully consider the seismic impact Rui-Siang has on his family and on society. Thank you, Judge McMahon, very much for taking the time to read this letter.

Sincerely,

*Rui-Siang's Mother*

# EXHIBIT 2–B

Dear Judge:

I'm Rui-Siang's brother. I am writing on behalf of my brother to respectfully request your honor to show leniency in his case.

From the moment I can remember, my brother has been my best friend, playing Lego, sports, and board games with me. He's also been my mentor, teaching me English, math, and science. Just like a professor, I can ask him any question, and he will always answers correctly and explains in ways that are very easy for me to understand. Most importantly, because my parents divorced when I was young, he became my "Dad", bringing me joy and happiness, giving me courage whenever I felt depressed, and advising me on important decisions such as my choice of major and future career.

My brother is a devoted son to our mom, a role model for me, and the pillar of our family. ███████████████████████████████████████ My brother woke up at 5 a.m. every morning to do laundry, prepare breakfast for me, and even make steamed eggs with chicken essence for Mom. He took me to school because he was worried about me going alone, then quickly rushed to the hospital with warm food for her. Finally, he would head to school just in time for class. Despite the immense responsibility, he never complained. In fact, these warm gestures of care and responsibility were acts of love that he carried out without hesitation. Deep in his heart, he loves us unconditionally and always puts the needs of others before his own. This is who my brother truly is: a selfless, caring person who prioritizes his family and friends, no matter the challenges he faces.

Not only is my brother kindhearted to us, but he also aspires to use his skills to make meaningful contributions to society. I vividly remember the day he proudly showed me the video of his college graduation project. The project, a time capsule powered by blockchain technology, serves as a "will" for elders who never had the opportunity to put their thoughts into words for their children and loved ones during their lifetimes. His innovative idea goes beyond preserving memories - it bridges the gap between generations, ensuring that heartfelt messages and wisdom were never lost to time. By leveraging technology to address deeply human needs, my brother showed how innovation can create tools that bring people closer together. That did not only reflected his deep empathy and vision for societal improvement, but also showed his dream of using his skills to make the world a better and kinder place.

Your honor, my brother is the smartest, bravest, and most compassionate person I have ever known. It would be a profound loss not only to our family but also to those whose lives he touches if he is imprisoned. As the pillar of our family, his presence and contributions are essential to us. His absence would leave an irreplaceable void, emotionally and practically. For me personally, he is not just my brother but also a mentor, protector, and guiding light who has shaped me into who I am today.

Moreover, my brother has so much potential to make positive changes in the world. His dreams and ideas reflect a deep desire to help others and foster meaningful connections through his innovative thinking and kind heart. Allowing him the opportunity to learn and grow from this experience outside of incarceration would not only benefit him but also enable him to continue contributing meaningfully to society.

I respectfully ask your honor for compassion and leniency when considering his case. I firmly believe that allowing him the opportunity to move forward from this situation would enable my brother to continue the good work he has started and return to the family and community that need him so dearly.

Thank you for taking the time to read my letter.

Sincerely,

*/s/ Rui-Siang's brother*

# EXHIBIT 2–C



敬愛的法官您好：
我是林睿庠的小提琴老師，
與睿庠相處五年以上。
我認識的睿庠，
是一位認真投入、乖巧聰慧的學生，
與媽媽的相處像朋友，
與弟弟的相處像夥伴，
全家的感情和樂融融，
每次與他們見面上課都感到很開心，
對睿庠的學習態度很感到很滿意。
為了準備小提琴晉級的檢定，
睿庠在繁忙的課業行程中，
不忘在閒暇之餘練琴、複習，
在中學緊密的課程壓力中逐步晉升成功，
身為老師，非常引以為榮。

Page 1 of 2

記得睿庠高中時，
曾代表學校到英國參加重要的會議，
能有如此萬中選一的機會，
正是睿庠平日好學上進、勤勉努力的
善果。

我認識的睿庠，
帶點害羞，但很有禮貌；
帶點可愛，又充滿溫暖；
有時迷糊，卻腳踏實地；

很樂意分享我心目中的睿庠，
讓法官大人認識睿庠的不同面向，
相信法官大人能藉此瞭解睿庠生活的
另一面，
謝謝您的包容、體貼與耐心，
希望事情能有更圓滿的發展

小提琴老師
陳宜琳 I LIN CHEN
2025/01/19



敬愛的法官您好：Dear Judge, Greetings,

我是林睿庠 This is Lin Rui-Siang's Violin Teacher

與睿 And I have known Rui-Siang for more than five years

我認識的睿庠 The Rui-Siang I know

是一位認真投入 is an earnest, committed, thoughtful and smart student,

與媽媽的相處像 a friend to his mom,

與弟弟的相處像 a good pal to his younger brother,

全家的感情 His whole family's sensibilities being harmonious and joyful,

每次與他們見 it made me happy to see them every time,

對睿 and it pleased me very much to see Rui-Siang's positive attitude towards learning.

為了準備 When he was preparing for his violin performance evaluation,

睿庠在繁 Amidst heavy schoolwork,
不忘在閒 he never forgot to practice and review during his free time,
在中學緊 and in the pressures of middle school course work he still was able to advance with high marks.

功，

身為老師 As a teacher, this made me very proud.

記得睿 I still remember when Rui-Siang was in High School,
曾代表學 having represented the school to attend an important conference in the UK,
能有如此 being able to have this one-in-a-million opportunity,
正是睿 is nothing but the crop of his studious uprightness and diligent drive.

的睿庠，The Rui-Siang I know,
帶點害羞，但很有禮貌 Is a bit shy, but extremely well-mannered;
帶點可愛，又充滿溫暖 Charming, and full of warmth;
有時迷糊，卻腳踏實地 Sometimes searching for answers, but always grounded;

樂意分享 I'm more than happy to share the Rui-Siang I know, as he is on our hearts and minds,
官大人 and have Your Honor meet the different nuances of his character,
相信法 and through which, I believe Your Honor can understand a different aspect of
另一面 Rui-Siang's life,
謝謝您的包 Thank you for your compassion, thoughtfulness and patience,
希望事情能 And I hope for a more fruitful outcome (for Rui-Siang) in this matter.

小提琴老 Violin Teacher
陳宜琳 I LIN CHEN
2025/01/19

# EXHIBIT 2–D

**寫給林睿庠的支持信** (a letter to support Mr. Lin)

**From** ████    ████████████████

**Date** Tue 1/13/2026 4:14 AM

**To** ████████████████████████████

您好
我是林先生的朋友，
Stephanie Chang.

我和林先生從小一起長大、並定期聯絡。 在我的記憶中，他是一位善解人意並值得信賴的朋友。我們分享日常，他也時常傾聽我的想法並給我建議。他有一位弟弟，在我們一起出去玩的時候，他是一個為弟弟著想又溫柔的好哥哥。

然而，在某一段時間，他們家遭遇了巨大的變故。他的父親失格，未能履行作為父親應有的責任。雖然當時我們年紀都很小，但我能清楚的感覺到這對他造成的影響以及他內心中的變化，從那時背負著超越同齡人的壓力、有著強烈想要負擔起家裡經濟的願望，以及對於自己當下無法替母親減輕負擔的痛苦和那份不甘。

我上大學時，偶然得知了他們家庭經濟遭遇了困難，他母親不得不向外尋求幫助。而他的弟弟在一所費用高昂的學校就讀。 我想，這樣的壓力讓他感到窒息，甚至動搖了他的價值觀。雖然我無法為他辯解，但我相信，這份壓力與絕望是他做出後續這一些行為的契機。

我時常想著，如果他擁有一個完整的家庭以及美好的童年，這一切都會有所不同。

我知道，在法庭上，他被視為一名犯罪者。 然而在他母親眼中，他是乖巧、懂事的兒子；在弟弟眼中，是引領自己前行的好榜樣；而在我眼中，他是無可取代的摯友。 我認為他是一名善良的人，只是有時被現實的殘酷與壓力蒙蔽了雙眼，做出了錯誤的選擇。

我誠懇地請求您，McMahon 法官，能夠再給他一次機會，讓他有機會彌補過去的錯誤，重新踏上正途。我深信，只要他有機會重新開始，他一定會用自己的行動證明，他值得被社會與人們再次接納。

誠摯敬上， Stephanie Chang

Greetings,

I am Mr. Lin's friend,

Stephanie Chang.


Mr. Lin and I grew up together and kept in touch regularly. In my recollection, he was a considerate person that could be trusted as a friend. We shared everyday moments together, and he frequently took the time to listen to my thoughts and offer advice. He has a younger brother, and when we would hang out together, he is an older brother that is caring and gentle.

However, at some point in time, their family encountered a major change. His father was unfit as a father figure, never fulfilled his responsibilities as a father. Although we were all very young at the time, I could clearly feel the impact the divorce had on Mr. Lin and how he was adjusting mentally. From then on, he was under insurmountable pressure in comparison to peers of his age and had a strong desire to support the family financially, while not being able to reconcile with the pain stemming from his inability to reduce the burden his mother was carrying at the time.

When I was in college, I learnt, by chance, that his family was in financial difficulties and his mother had to seek external help. And his younger brother was also attending an expensive school. I think this kind of pressure suffocated him, even shaking his core values. Although I cannot defend on his behalf, I believe that this pressure and despair were the motivation for his subsequent actions.

I often think that if he had a complete family and a good childhood, everything would be different.

I know that, in court, he is treated as a criminal. But in his mother's eyes, he is a well-behaved and sensible son; in his younger brother's eyes, a wonderful role model that always led the way for him; and in my eyes, he is an irreplaceable friend. I believe he is someone who is kind, just blinded by the cruelty and pressure of reality, making the wrong choices from it.

I sincerely ask you, Judge McMahon, to give him another chance to make amends for his past mistakes, to step back onto the right track. I firmly believe that as long as he has the opportunity to start over, he will use his actions to prove that he deserves to be accepted by society and people again.

Sincerely, Stephanie Chang

# EXHIBIT 2–E

**The Honorable Colleen McMahon**
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

敬尊敬的法官大人：

我謹以此信向您表達我對林睿庠先生的支持。我與林先生在大學認識，曾一起參加志工活動與製作畢業專題，畢業後也持續在聯絡，在我與林先生的來往中，我深刻感受到他的正面人格特質，包括但不限於耐心、創造力、執行力、責任感與善良。我將在下方用實例詳細闡述。

林先生非常有耐心，我們在 2021.09 參加的志工活動為至偏鄉提供程式教學服務，這包括志願性的教導學生學習程式語言 Python、設計額外活動帶給學童歡樂等，林先生在教學的過程中充分展現了耐心與善良的特質，他能讓學生驚嘆程式所帶來的可能性，他負責的幾位學生都非常喜歡林先生的教學，我相信那一次志工活動深深的改變了其中幾位學生的命運。

林先生的創造力與執行力十足，他常常提出有意思的點子並且實現它，比如他曾提出利用算力來取代現代常常使用的人機驗證器 Captcha 以自動化整個驗證過程，我估計他的作品能為每個人每次遇到驗證器省下十秒鐘的時間並增強使用者體驗。我個人深受他的創造力與執行力啟發，我認為很少人有像他一樣果斷的執行力。

林先生是一位負責任的人，並總是願意伸出援手幫助周圍的人。我們在製作畢業專題的過程中，他總是能按時完成分配到的任務，並主動詢問他人是否需要提供協助。他常常也不吝於分享他所學到的知識與技能給組員，以便加速整個專題的進度，最後我們的專題得到了很好的評價。

林先生具有善良的特質，我們的專題主題為「電子化保存遺書」，我們想確保「逝者生前秘密所寫的信件能夠在死後安全地交到家人手上」，這個問題非常困難，因為同時要確保：
1. 這封秘密信件在生前不被任何人發現，否則會對當事人造成傷害。
2. 信件被秘密地保存，除了當事人，任何人包括服務提供商都不應該有權限閱讀。
3. 只有在確認當事人已離世後才能釋放信件至收信人手中。
想像每個人都能隨時隨地在網路上一個非常安全的平台上規劃死後的安排，並且能在死後安全的送到收信者手裡。對於還在世的家人們來說，他們能夠收到思念家人生前所準備的信是多麼大的慰藉，如電影『P.S. I Love You』，電影中的主角就透過類似的方式幫助妻子找回活下去的動力。林先生在製作專題的過程中對此充分展現了興趣，並且認為這項專題若成功將會對社會帶來非常正向的幫助。令我印象深刻的是，一起製作畢業專題的組員在畢業後都沒有在繼續研究更好的解方，只有林先生直到入獄前還持續地為這個問題尋找

更好的解決方法，並常常與我分享，我認為沒有比關心這個問題更能證明林先生的善良，若某天林先生的技術成功了那會為社會帶來很大的福祉。

我與林先生相識五年，在這段時間內，我見證了他的勤奮與信念。林先生的生活並非一帆風順，然而，即便面對困境，他依然保持堅定的信念，努力改進自己，並且致力於成為對社會有貢獻的人。他的在押狀況不僅對他的家人和朋友造成極大的影響，也對社會帶來損失。林先生擁有極大的潛力，我相信，這次經歷能讓他變得更加成熟和有責任感，若能獲得再一次的機會，我認為以他的聰明才智、創造力與執行力必定能為社會帶來積極且正面的影響。

綜上所述，我懇請您在審慎考量此案時，能夠基於他的優秀特質和對社會的價值，給予他寬大的處理機會。

謝謝您撥冗閱讀這封信，也感謝您對此案的公正考量。

**敬上，**
李明翰

2024.02.12

**The Honorable Colleen McMahon**
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312


**Your Honor,**

I am writing to express my support for Mr. Lin Rui-Hsiang. I met Mr. Lin at University, where we volunteered together and collaborated in our graduation projects, whereupon graduation continued to stay in touch. In my friendship with him, I have deeply appreciated his positive character traits, including but not limited to his patience, creativity, ability to execute, a sense of responsibility and kindness. I will elaborate through the following examples.

Mr. Lin is incredibly patient. In September 2021, we participated in a volunteer project providing programming education in a remote rural village. This included teaching students Python programming language and designing extracurricular activities for the childrens' recreation. During the teaching process, Mr. Lin demonstrated his patience and kindness. His students were left in awe with the possibilities that programming offers. The students he was responsible for enjoyed his teaching very much, and I believe that our volunteering profoundly changed the lives of several of our students.

Mr. Lin carries great creativity and execution of ideas, he often brainstorms novel ideas and implements them, such as adopting computability to replace the commonly-used automated human verification tool, Captcha, and to automate the verification process. I estimate that his work could save users ten seconds each time they encounter a verification device and this would subsequently enhance the user experience. I am inspired by the depth of his creativity and execution; I think that few possess the decisiveness he has in their execution.

Mr. Lin is also a responsible person, and always ready to extend a helping hand to those around him. In the process of developing and making our graduation project, he always finished his part on-time, and asked others if they needed help. He is generous in sharing his knowledge and technical know-hows with his teammates, pushing the progress of the project ahead, with it receiving many positive feedbacks.

Mr. Lin has an ethos of kindness, our project's theme is "Digital Time-Capsuled Will," in it, we wanted to make sure that "letters written in private by the deceased can be safely delivered to their family after death," this posed many challenges, because at the same time we had to make sure:

1. This private letter cannot be discovered by others, or else it will harm the author.
2. The letters are kept in secret, and besides the person who penned the letter, no one, even the service providers for keeping the letter, should have permission to read the letter.
3. Only when the passing of the person has been ensured can the letter be released into the hands of the recipient.

Imagine that: anyone can plan out arrangements for after their death, anywhere and on a platform securely before their passing, and have those delivered safely and securely after their passing. For family members, being able to receive letters prepared by their loved one would be such an unimaginable comfort, like in

the movie "P.S. I Love You," where protagonist in the movie helps his wife to find the will to live through something similar. While putting together the project, Mr. Lin demonstrated a strong interest and believed that its success would bring a very positive uplift to society. What was especially memorable to me was that out of the cohort that worked on the project together, Mr. Lin was the only one who continued to search for better solutions to our proposition even after graduation, up until his incarceration, and often sharing them with me, which I think that nothing demonstrates Mr. Lin's kindness more than his ongoing thought toward this project; if someday, Mr. Lin's idea succeeds, it would bring about great social benefits.

I have known Mr. Lin for five years, during which I have witnessed his diligence and conviction. Mr. Lin's life has not been without its challenges; however, even in the face of adversity, he has maintained unwavering faith, striving to improve himself and dedicating himself to becoming a contributor to society. His incarceration has not only greatly impacted his family and friends but also caused a loss to his community. Mr. Lin possesses immense potential, and I believe this experience will make him more mature and responsible. Given another opportunity, I believe his intelligence, creativity, and execution skills will undoubtedly bring a positive impact to society.

Concluding from everything aforementioned, I earnestly request that you, in carefully considering this case, grant him leniency based on his outstanding qualities and value to society.

Thank you for taking the time to read this letter, and thank you for your fair consideration of this case.

**Sincerely,**

Li Minghan                                                                                          2024.02.12

# EXHIBIT 2–F

January 23, 2025

The Honorable Colleen McMahon
United States District Judge
Southern District of New York


Re: Character Reference for Lin, Rui-Siang

Your Honorable Colleen McMahon,

I am writing this letter in my capacity as colleague to provide a character reference for Lin, Rui-Siang during his tenure as a Diplomatic Specialist with the Taiwan Technical Mission in Saint Lucia from 2023 to 2024. During his seven-month military service abroad, I have come to know him as a honest, diligent, reliable, kind-hearted and compassionate individual who is deeply committed to his responsibilities and the well-being of others.

As a colleague, Rui-siang has always approached his work with integrity, diligence and hard-working, using his skills and knowledge to make a lot of positive impact to local society. He is a team player who is quick to lend a helping hand and ensure that all tasks are completed to the highest standards. His ability to collaborate effectively with others fosters a positive and productive work environment, highly regarded by all his colleagues. Beyond his technical skills and professionalism, Rui-siang consistently shows empathy and kindness toward those around him, creating a supportive atmosphere for his peers.

I have had the privilege of witnessing his dedication and resourcefulness firsthand. During his tenure in Saint Lucia, I see him to be not only a promising graduate but also a remarkable volunteer who has actively contributed to the society. His actions stemmed from a profound sense of kindness, warm-heartedness, and enthusiasm, without any

expectation of material reward. Here, I would like to highlight a few of the projects he had successfully undertaken, which showcase his character and commitment to service:

- One notable example of his outstanding contributions is his voluntary development of a Face ID application for Saint Lucian hospitals. This innovative and pioneered solution helped streamline patient identification processes, improving both accuracy and efficiency in administering treatment if widely applied. His willingness to take on such impactful projects without any expectation of personal gain speaks volumes about his character and altruistic mindset.
- Additionally, Rui-siang played a pivotal role in the development of an online e-commerce platform designed to empower Saint Lucian youths and entrepreneurs. Acting as the coordinator between Taiwanese designers and local partners, he ensured the platform met the needs of its users. His efforts have positively impacted the local community by providing new opportunities for economic growth and collaboration
- Another significant contribution was his support to provide cryptocurrency training for the Saint Lucia Police Force. This program equipped participants with valuable skills to investigate and analyze cryptocurrency transactions, addressing a critical need in modern society. His initiative significantly enhanced the capacity of local society to address modern challenges, underscoring his commitment to public awareness and education.

None of these projects were assigned to Rui-siang at the beginning, but every time when we requested for his assistance, h  was very willing to help and never turned us down. Throughout all his endeavors, Rui-siang has displayed unwavering professionalism, dedication, a collaborative spirit and a genuine desire to make a difference. These characters turn out to reflect his core values of kindness, responsibility, and a commitment to serving others, utilizing his expertise for the betterment of communities both locally and abroad.

Apart from being a generous coworker, Rui-siang is also a 23-year-old young man often speaks of the love and gratitude he holds for his family, and it is

evident in his actions that their well-being is a top priority for him. He is not only a source of strength and support for his family but also a role model to younger relatives who look up to him. His loyalty and dedication to his family reflect his strong moral character and sense of responsibility.

Before he came to Saint Lucia, Rui-siang just graduated from the top university in Taiwan and was ready to pursue his master degree in business school after his service in Saint Lucia. He worked so hard to successfully enroll in a top-ranking business school and planned to study in 2025.

I believe that he deeply regrets the offense he has committed, and has already learned huge lessons that he will use from here onwards. As his colleague during his tenure, I believe this is a first and one-off incidence. I sincerely believe that Rui-siang has the ability and determination to learn from this experience and continue growing into a person who makes meaningful contributions to the world around him. He is a young man with immense potential and a desire to contribute positively to his community. His absence would leave a void in the lives of those he supports and inspires, and it would deprive society of a compassionate and capable individual who has much to offer.

I humbly ask the court to consider his good character, his devotion to family and friends, and the significant loss his charge would represent when making its decision. It is my sincere hope that the court will take these aspects of his character into account when considering his case.

Thank you for your time and consideration. Should you require any further information or wish to discuss this matter in more detail, please do not hesitate to contact me.


Sincerely,


C.Y. Tsai

# EXHIBIT 2–G

尊敬的法官閣下：

您好，我是睿庠學生時期的一對一數學與物理老師劉育麟！我特此撰寫此信，分享我對他的了解和支持。

自睿庠小學六年級開始，我作為他的家教老師，教導他數學與物理，直到他高中畢業。在這段長期的教學過程中，我不僅見證了他的學業進步，也了解了他的品格與態度。

睿庠是一位對學習認真負責的學生。他在數學方面展現了強烈的興趣和潛力，並在高中期間積極參與了多項數學競賽，取得了不錯的成績。這些經歷激勵他進一步追求更高的學術目標，最終考取了台灣大學數學系。他的成功並非僅憑天賦，而是持續努力與認真學習的結果。

在教學過程中，我觀察到睿庠是一個誠實、善良且有責任感的人。他對學業充滿熱情，對家人和朋友也展現出真誠的關懷。他也願意幫助身邊的同學，在許多團體競賽中，他主動協助其他成員完成任務，展現出良好的合作精神。

睿庠的堅毅和穩重是我印象最深刻的特質。即使面臨挑戰，他也能冷靜處理，努力尋求解決之道。我相信，這些特質對他的未來和他人都能帶來正面影響。

如果睿庠因本案失去繼續發展的機會，不僅會對他本人和家庭產生影響，也會讓社會失去一個有潛力的人才。我相信，他能以正向的方式回饋社會，並珍惜所有改過自新的機會。

最後，我恭敬地請求您在裁定時考慮睿庠的優良品格和他對未來的承諾。我相信，他會以積極的行動證明自己值得信任，並能繼續為社會做出貢獻。

感謝您撥冗閱讀此信，並考慮我的觀點。

劉育麟（Jackson）



尊 Dear Judge,

Greetings. I was, during Rui-Siang's secondary schooling, his one-on-one math and physics tutor, Liu Yu-Lin. I write this letter to share my understanding of and support for him.

I was Rui-Siang's tutor Since when he was in 6th grade of elementary school, guiding him on mathematics and physics, all the way until he graduated High School. Through this long period of my tutoring, I not only saw him excel in his studies, but I also got to see his qualities and aptitude.

Rui-Siang is a student who is studious and responsible. He displayed a strong interest and potential in math, and during high school, he took great initiative to enter numerous math competitions, achieving excellent marks. These experiences motivated him to reach for higher goals, eventually being admitted by National Taiwan University's Math Department. His accomplishment didn't just come from only talent, but is the fruit of his persistence and studiousness in his studies.

During the tutoring process, I observed that Rui-Siang's an honest, kind, and responsible person. He treated his studies with great enthusiasm, and cared for his family and friends with genuine attentiveness. He also is willing to help his classmates around him, where in many competitions, he took the initiative to help his teammates finish their tasks, displaying a fine collaborative spirit.

Rui-Siang's steadfast determination and level-headedness made an especially strong impression on me. When facing great challenges, he can decipher solutions with great calm and unwavering attitude. I believe these qualities will help shape his character and have a positive influence on his future.

If Rui-Siang loses his chance to continue to grow because of this case, it will not only affect him and his family, but it will cause society to lose a talent with lots of potential. I believe he can contribute back to society in many positive ways, at the same time, cherish all the opportunities that society gave him to better and renew himself.

Lastly, I respectfully plead that Your Honor take into consideration of Rui-Siang's fine character and his promise for the future when adjudicating his case. I believe he will take initiative in exemplifying that he is trustworthy, and can continue to contribute to society.

Thank you for taking the time out of your busy schedule to read my better, and to consider my perspectives.

劉育麟 (Jackson)

劉育麟

# EXHIBIT 2–H



**Department of Information Management**
85 SEC 4 ROOSEVELT ROAD • TAIPEI • TAIWAN 106
PHONE: ████████    •EMAIL: ████████

January 30, 2025

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: Character Reference for Mr. Lin

Dear Judge McMahon,

I am writing to provide a character reference for Mr. Rui-Siang Lin, whom I have known since 2021 when I served as his senior year project advisor during his undergraduate studies at the National Taiwan University. Over a period of two years, I have observed his intelligence, generosity, and dedication to advancing his understanding of technology, as well as his willingness to uplift those around him.

Mr. Lin's character and leadership shone brightly during his work on *LetterYou*, a blockchain-based trustless escrow system for posthumous messaging. In this project, he not only excelled in his role as the tech lead but also took it upon himself to educate his less-experienced teammates about blockchain technology. His patient and selfless approach demonstrated his commitment to fostering a collaborative and supportive environment, allowing his team to achieve a higher level of technical understanding and teamwork. This willingness to share knowledge reflects his unselfish nature and his genuine desire to help others succeed.

Building on the insights from *LetterYou*, Mr. Lin embarked on a second project that explored a novel mechanism for time-locked information concealment on the blockchain. This work served as the foundation for his *Timesule* venture and also led to an academic research paper that he and I co-developed. The paper, of publishable quality, highlights Mr. Lin's scholarly abilities and his depth of understanding in technology research. His commitment to producing rigorous,

high-quality work reflects not only his academic potential but also his passion for contributing meaningful advancements to the field of data security.

Mr. Lin is a talented, resourceful, and self-driven individual who exhibits both intellectual curiosity and a commitment to supporting those around him. It is deeply unfortunate that he is facing legal challenges, and while I do not seek to minimize the gravity of the situation, I believe it is equally important to recognize the positive attributes he has demonstrated in both his professional and personal conduct.

I hope the court will take into account Mr. Lin's potential and his many contributions when evaluating his case. He is a young man with great promise and a bright future ahead, and I trust that he will use his talents to make a positive impact on society.

Thank you for your time and consideration. Please do not hesitate to contact me if I can provide any further information.

Sincerely,

Seng-cho Chou, Ph.D.
Professor of Information Management

# EXHIBIT 2–I

McMahon 法官閣下鈞鑒：

冒昧煩擾，尚祈見諒。

我叫謝見智，目前任職於臺灣新北市一所市立高中，講授國文，是睿庠的表舅。

睿庠小時候白胖可愛。可與多數三、四歲小孩頗為不同的是，即使面對糕餅、糖果而饞涎欲滴，也會先遞給周遭的長輩，再高高興興地大快朵頤。對長輩恭敬有禮，一直是睿庠令人印象深刻的特質之一。

睿庠的爸媽離異後，他和弟弟，選擇與各方面相形弱勢的媽媽一起生活。撫養兩個年幼的兒子無疑是媽媽的沉重負荷，但他們兄弟倆卻也成為媽媽生命中的支柱與良伴。還記得家族聚餐時，睿庠每每在飯後一約莫晚間七、八點的時候一提醒媽媽回家，好趕最後一趟垃圾車倒垃圾。儘管是生活瑣事，似可從中窺見睿庠的細膩之處。

每逢除夕，母子三人會來我們家，共進團圓飯。年紀較大的睿庠，總是會放下手邊的英文小說，不厭其煩地陪較為年幼的弟弟、表妹玩「躲貓貓」等遊戲。上高中後，睿庠益顯成熟。不僅身長抽高，更在言語間屢屢談及生涯發展，以及對家人的牽掛。剛進臺灣大學念書時，因主修(數學)與志趣不合，睿庠嘗試了重考學測、申請轉系等方式，終能以四年時間，順利自資訊管理學系畢業，並錄取臺大電機工程系碩士班，令家人與有榮焉。那年(2023)除夕當天，他曾提到也會一邊找工作；如果找到合適的工作就先上班，好減輕曾經罹患重病的媽媽肩上的重擔。睿庠希望能進入發展前景更好的外商公司，比方說Google。只是 Google 的某些工作機會或需赴外地(彰化)工作，可他希望能留在雙北，方便就近照顧媽媽、弟弟。睿庠對家人的體貼、周到，足見一斑。

凡此種種，均可體現睿庠善良的一面。懇請　　法官大人審酌睿庠未來的發展可能，及其對家人的重要性(特別是為體弱的媽媽分憂解勞)，給予改過自新的機會，俾能早日重返故鄉，與家人團圓。謝謝　　法官大人，實感德惠。

謝見智敬上

2025.02.07

Judge McMahon, the following is for your esteemed consideration,

I apologize for any inconvenience in advance and thank you for your understanding.

My name is Francis Hsieh, I am currently a Chinese Literature teacher at a municipal high school in New Taipei City, also Rui-Siang's maternal uncle.

Rui-Siang was chubby and adorable as a kid. But unlike his three- and four-year-old peers, even when they are drooling in front of the lure of cakes and candies, he would pass servings around to his elders first, then, he would enjoy, with gusto, what's in front of him. He treated his elders with polite respect, and this continues to be one of Rui-Siang's most defining and impressive qualities.

After Rui-Siang's parents divorced, he and his brother, chose to live with his mother, who was in every aspect less privileged. Raising two young boys inevitably is a great burden upon his mom, but the brothers also became their mom's pillar and companion in life. I still remember that during family gatherings, Rui-Siang, after dinner and around seven or eight o'clock, he always reminded his mom of the garbage pick-up schedule so that they can catch their disposal slot. Although a quotidian triviality, it reveals Rui-Siang's refined attention to detail.

Every New Years Eve, Rui-Siang's family would come to our place to have New Years Eve dinner celebration. Rui-Siang, who is the older of the bunch, would always drop the English novel he would be mesmerized in, with no spare trouble, to play hide-and-seek and other games with his younger brother and younger sister. When he was in High School, Rui-Siang grew into his maturity. Not only did he spring in height, he also talked about his career development and care for his family frequently to us. When he first started at the National Taiwan University, his major (Math) didn't quite align with his interest, Rui-Siang retook the college entrance exam and applied for department transfer, where he was able to graduate in four years with a major in Information Management, along with an admission to National Taiwan University's Electronical Engineering Master's program, sharing this achievement with his family in their pride for him. During our New Years eve chattering that year (2023), he mentioned he will also look for jobs on the side; mentioning that if he found something suitable, he'll work first to alleviate the pressures from his mom, who, over the years, suffered through and bore the heavy burden from a series of illnesses. Rui-Siang hoped to work for a multinational company with better prospects, like Google. However, the work at Google would require him to work out-of-town (at Changhua), yet he wanted to stay in the Taipei area, where he can be close to take care of his mom, younger brother. Rui-Siang's care for his family is thoughtful and heartfelt.

Time and time again, Rui-Siang's actions demonstrate his kindness. I plead with Your honor to consider Rui-Siang's possibilities in his future, importance of his presence to his family (especially to alleviate the burdens of his mother who is in frail-health), grant him a chance to reform himself, return to his home country to be reunited with his family. Thank you, Your Honor, and we thank you for your consideration and help.

from Francis Hsieh with sincerity,

2025.02.07

# EXHIBIT 2–J

## Court Reference Letter

To: The Honorable Judge Colleen McMahon

I am a peer of Rui-Siang Lin. We served together in the Taiwan Technical Mission in Saint Lucia— he in the ICT project and I in the community business revitalization project— from October 2023 to May 2024.

My initial impression of Lin was that of a highly knowledgeable tech enthusiast. His conversations were often filled with technical jargon that I could barely understand, and given my limited interactions with people in his field, I initially found him somewhat difficult to approach.

Shortly after our arrival in Saint Lucia, we participated in an event where we assisted with setting up booths for the public health project. It was my first time engaging with a large number of locals face-to-face. As we were explaining the event's details to the booth owners, one person abruptly interrupted me, stating that he couldn't understand my accent and requested Lin to take over. Before responding, Lin briefly glanced at me and then reassured me in Mandarin, saying something like, 'He just doesn't understand the Taiwanese accent, but everyone else does. It's not your problem—don't worry about it.' At that moment, I was less offended by the local's remark and more surprised by Lin's thoughtfulness—something I wouldn't typically expect from a stereotypical straight Asian young man.

There were also small, everyday moments. When the new ICT project manager, who was inexperienced in driving, accidentally damaged the car door, Lin bought him ice cream to cheer him up. Whenever we visited Lin's dorm, he would share his homemade milkshakes. Since he didn't know how to cook, he handled the cleanup and dishwashing when others prepared meals. When the public health project manager invited us over for dinner, he would express sincere appreciation for the rare taste of Asian cuisine and the effort put into cooking.

Given the limited accessibility of local supermarkets, Lin often called to ask if anyone needed anything while he was out shopping. Aside from practical items like seasonings, he'd also ask if anyone wanted to get a ball to play with—his youthful enthusiasm struck me as somewhat childlike but also fitting for someone his age.

These are my observations of Lin during the seven months we spent together. When I first heard about his arrest, I was not only shocked but also deeply regretful. It felt as though carefully built blocks had suddenly collapsed into disarray. The news coverage has portrayed him as a cunning and unscrupulous individual, and perhaps that is one aspect of him. But before his arrest, I saw someone who adapted well to group life, was willing to cheer up others, and was considerate.

Every word above is true. I first wrote this letter in Mandarin and then had it refined and translated into English by ChatGPT. I have never written a court reference letter before, so I apologize for any lack of clarity.

Sincerely,

Li, Po-I

李柏毅  Li, Po-I
2025/02/11

# EXHIBIT 2–K

The Honorable Colleen McMahon

United States District Judge

Southern District of New York

500 Pearl Street, New York, NY 10007-1312

Feb 21, 2025

Dear Honorable Judge,

I have known Goody since he was about three or four years old. My child met him in a music and movement class, and from that time on, our families became close friends. Goody has always been an intelligent and quick-witted child, not only excelling in learning but also showing great curiosity and enthusiasm for the world. In addition to that, he has a kind and pure heart, treats people with sincerity, acts with integrity, and always considers others' feelings.

He is very considerate of his mother's hard work, knowing how difficult it has been for her as a single mom to raise him and his younger brother alone while working tirelessly. Because of this, he has shown independence and maturity from a young age. He has never been lazy in his studies and always maintains a positive and motivated attitude.

I believe that Goody is a genuinely kind and good person, not an evil or a complicit individual. This incident is a test for him in life, but if he is given a chance of redemption, I am confident that he will learn and grow from this lesson. He will transform it into strength and go on to make positive and meaningful contributions to the world.

Sincerely,

ChienJu Kuo

EXHIBIT 2–L

**Fwd: 為林睿庠寫信**

| | |
|---|---|
| **From** | ███████ ███████████ |
| **Date** | Tue 1/13/2026 2:02 AM |
| **To** | Jefferson Sheng <jsheng@shertremonte.com> |

**寄件人:** ████████████████████████

**日期:** 2025年2月22日 GMT+8 晚上9:26:33

**收件人:** krenzler@shertremonte.com

**標題: 為林睿庠寫信**

敬愛的 McMahon 法官：

您好！我懇請您撥冗閱讀這封信，因為它承載了一位母親深深的期盼，也承載著一個年輕人的未來。

我是林睿庠母親的多年好友，從他年幼時便看著他長大。他的父母在他年紀很小的時候離婚，母親獨自承擔起撫養兩個孩子的重擔，而他的父親另組家庭後，便未曾真正關心過他。在這樣艱難的環境下成長，林睿庠卻始終保持著善良、謙遜、有禮的品格，對母親更是極為孝順。他是一個真誠、願意付出的年輕人，絕非壞心之人。

然而，生活的壓力，特別是經濟上的困難，使他在年僅 23 歲的年紀，誤觸了法律。他的錯誤，並非出於惡意，而是來自現實的無奈。作為一個一直努力奮鬥的年輕人，他並不該被這次的錯誤永遠定義。

敬愛的法官，我懇請您以寬容之心給他一個重新開始的機會。年輕人難免犯錯，但真正值得珍惜的，是他們從錯誤中學習、改過自新的決心。林睿庠擁有才能，若能得到一個機會，他一定能回饋社會，成為對世界有貢獻的人。

此外，在遙遠的台灣，他的母親日夜牽掛著這個她用盡一生心血撫養長大的孩子，盼望著有一天能再見到他。我衷心希望，法官能夠給予這位年輕人一個機會，也讓一位母親的思念能夠有實現的一天。

感謝您撥冗閱讀，願上天庇佑您的仁慈與公正。

敬上，
Lily Chang

**Dear Judge McMahon:**

Greetings! I earnestly request that you take the time to read this letter, because it bears the weight of a mother's profound expectations, and also carries a young man's future.

I am a long-time friend of Lin Rui-Siang's mother and have watched him grow up since he was young. His parents divorced when he was very young, and his mother took on the burden of raising two children alone. After his father started a new family, he never really cared about him. Despite growing up in such a difficult environment, Lin Rui-Siang always maintained a kind, humble and polite character, and was extremely filial to his mother. He is a sincere and giving young man, never a person with bad intentions.

However, the pressure of life, especially financial difficulties, led him to accidentally run afoul of the law at only the age of 23. His mistakes, were not out of malice but, came from the helplessness of reality. As a young man who has always worked unrelentingly hard, he should not be defined forever by this mistake.

Dear Judge, I implore you to give him a chance to start over through your forgiving heart. It is unavoidable that young people make mistakes, but what is truly worth cherishing, is that they learn from their mistakes, to turn over a new leaf with determination. Lin Rui-Siang has talent, and if he is given a new chance, he will give back to society, become someone who contributes to the world.

In addition, in faraway Taiwan, his mother is worried day and night about the child she has spent her entire life raising, hoping to see him again one day. I sincerely hope that the judge can give this young man a chance, and let a mother's longing have a day in which it can be realized.

Thank you for taking the time to read this, and may God bless your mercy and justice.

Respectfully yours,

Lily Chang

# EXHIBIT 2–M

敬愛的 McMahon 法官：

您好，我是林先生的長輩朋友，從小看著他成長，他是一個善良、待人謙恭有禮、孝順的孩子，對於學校的課業更是勤學認真，本身天資聰穎加上後天的努力，考上台灣第一高學府 台灣大學，在資訊工程領域有卓越優秀的表現。年紀輕輕23歲誤觸法律，懇請 McMahon 法官是否可以給年輕人一個改過自新的機會？讓林先生的所學專長可以貢獻回饋社會。也讓在台灣極度思念他的母親，能有一天可以跟她親愛的孩子團聚！

Thanks a million!

Sincerely

Wen Chien Chiu

*Wen Chien Chiu*

Feb, 22, 2025

Dear Judge McMahon,

Greetings, I am Mr. Lin's elder mentor, who watched his growth since his youth; he is a kind, modest and polite, and filial child; treats schoolwork with even more diligent hard work; with his gifted intelligence combined with disciplined effort, he got into Taiwan's top university, National Taiwan University, and made brilliant strides in the field of information engineering. Running afoul of the law at a young age of 23, I implore with Judge McMachon that if a chance can be given to a young man to renew himself? To let Mr. Lin's professional expertise be one that can contribute back to society. To also let his mother, have a day when she can be reunited with her beloved son!

Thanks a million!

Sincerely

Wen Chien Chiu