**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

RUI-SIANG LIN,

                Defendant.

Case No. 24 Cr. 178 (CM)

**SENTENCING MEMORANDUM OF RUI-SIANG LIN**

Noam Biale
Katie Renzler
Michael Bass
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
nbiale@shertremonte.com

*Attorneys for Rui-Siang Lin*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 3

    I.    MR. LIN'S PERSONAL BACKGROUND ...................................................... 3

        A.    Mr. Lin's Childhood and Adolescence ...................................................... 3

        B.    Mr. Lin's Educational Background ............................................................ 6

        ██    ████████████████████████████████████████████

        D.    Mr. Lin's Volunteer Work and Employment ............................................ 8

    II.    INCOGNITO ................................................................................................... 9

        A.    Mr. Lin Is Recruited to Join and Helps Develop Incognito ..................... 9

        B.    A New Administrator, Controlled by the FBI, Joins Incognito ............... 11

        C.    The FBI, through CHS, Exponentially Increases Incognito's
            Revenue and Profits .................................................................................. 12

        D.    The FBI, through CHS, Manages Narcotics Sales on Incognito ............. 13

        E.    Against Mr. Lin's Wishes, the FBI, through CHS, Facilitates
            the Sale of Fentanyl on Incognito ............................................................ 15

        F.    Mr. Lin Shuts Down Incognito ................................................................ 18

    III.    MR. LIN'S ARREST, PROSECUTION, AND INCARCERATION ................. 19

        A.    Arrest ........................................................................................................ 19

        B.    Pretrial Detention ..................................................................................... 19

        C.    Plea Agreement ........................................................................................ 23

        D.    The Presentence Report and the Probation Department's
            Recommendation ...................................................................................... 24

        E.    Criminal Investigation in Taiwan ............................................................ 24

ARGUMENT ................................................................................................ 25

   I.      LEGAL STANDARD ............................................................ 26

   II.     OUTSTANDING OBJECTIONS TO THE PSR .................................... 27

   III.    MR. LIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT
         A SENTENCE OF TEN YEARS' IMPRISONMENT ......................... 27

        A.    Mr. Lin Was Only Nineteen Years Old When Incognito Started ............. 28

        B.    Mr. Lin Is Genuinely Remorseful and Committed to Building
             a New, Law-Abiding Life ......................................................... 30

        C.    Mr. Lin Is a Caring and Intelligent Person ................................. 31

   IV.    LAW ENFORCEMENT'S SIGNIFICANT INVOLVEMENT IN INCOGNITO
         SUPPORTS A DOWNWARD VARIANCE ............................................ 34

   V.     A SENTENCE OF TEN YEARS IS SUFFICIENT TO MEET THE GOALS
         OF SPECIFIC AND GENERAL DETERRENCE ................................. 38

   VI.    A SENTENCE OF TEN YEARS IS APPROPRIATE AND NECESSARY
         TO AVOID UNWARRANTED SENTENCING DISPARITIES ........................ 43

   VII.   THE CONDITIONS OF CONFINEMENT TO WHICH MR. LIN
         HAS BEEN SUBJECTED WARRANT LENIENCY ........................... 48

CONCLUSION ............................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)...........................................................................................26, 28

*Jones v. Mississippi*,
  593 U.S. 98 (2021)..................................................................................................28

*Pepper v. United States*,
  562 U.S. 476 (2011)................................................................................................26

*United States v. Al Halabi*,
  563 F. App'x 55 (2d Cir. 2014) ..............................................................................26

*United States v. Beltran*,
  571 F.3d 1013 (10th Cir. 2009)..............................................................................35

*United States v. Bigley*,
  786 F.3d 11 (D.C. Cir. 2015)..................................................................................35

*United States v. Boykin*,
  785 F.3d 1352 (9th Cir. 2015).........................................................................34, 35

*United States v. Caban*,
  173 F.3d 89 (2d Cir. 1999)......................................................................................35

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)....................................................................................26

*United States v. Chavez*,
  710 F. Supp. 3d 227 (S.D.N.Y. 2024) ....................................................................49

*United States v. Ciszkowski*,
  492 F.3d 1264 (11th Cir. 2007)..............................................................................35

*United States v. Colucci*,
  No. 23 Cr. 417, 2024 WL 364857 (E.D.N.Y. Aug. 5, 2024)..................................48

*United States v. Cromitie*,
  No. 09 Cr. 558 (CM), 2011 WL 2693297 (S.D.N.Y. June 29, 2011).......................35

*United States v. Fontes*,
  415 F.3d 174 (1st Cir. 2005) ..................................................................................35

*United States v. Gagliardi*,
    506 F.3d 140 (2d Cir. 2007) .................................................................. 35

*United States v. Kenney*,
    756 F.3d 36 (1st Cir. 2014) .................................................................. 34

*United States v. Love*,
    710 F. App'x 351 (11th Cir. 2017) ...................................................... 38

*United States v. Mishoe*,
    241 F.3d 214 (2d Cir. 2014) .................................................................. 40

*United States v. Nunez*,
    23 Cr. 517 (AT), 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024) ........................................... 48, 49

*United States v. Salem*,
    597 F.3d 877 (7th Cir. 2010) ................................................................ 37

*United States v. Serrano*,
    No. 08-CR-612, 2010 WL 147924 (E.D.N.Y. Jan. 11, 2010) ................................. 42

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017) .................................................................. 27

*United States v. Studley*,
    47 F.3d 569 (2d Cir. 1995) .................................................................... 37

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014) .................................................................. 26

*United States v. Torres*,
    563 F.3d 731 (8th Cir. 2009) ............................................................ 34, 35

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017) .................................................................... 44

**Statutes**

18 U.S.C. § 3553 ................................................................ 2, 25, 26, 34, 50

18 U.S.C. § 3632 ................................................................................ 40

18 U.S.C. § 3661 ................................................................................ 37

21 U.S.C. § 848 ................................................................................ 44

## Rules

U.S.S.G. § 1B1.3.................................................................................................... 37

U.S.S.G. § 2D1.1 .................................................................................................. 23

U.S.S.G. § 3B1.1 .................................................................................................. 23

U.S.S.G. § 5H1.1 .................................................................................................. 29

## Other Authorities

*2022 Country Reports on Human Rights Practices: Taiwan*, U.S. Dep't of State,
    https://www.state.gov/reports/2022-country-on-human-rights-practices/taiwan/
    (last visited Jan. 13, 2026) ............................................................................ 39

*2024 Amendments in Brief*, U.S. Sent'g Comm'n, https://www.ussc.gov/sites/default/files/pdf/
    amendment-process/amendments-in-brief/AIB_2024-youthful.pdf
    (last visited Jan. 13, 2026) ............................................................................ 29

Azn Han Solo, *Inmates sleep on the floor in Taiwanese prisons*, Medium (Mar. 20, 2018),
    https://medium.com/@AznHanSolo/inmates-sleep-on-the-floor-in-taiwanese-prisons-
    bc868da06a8f .................................................................................................. 39

Daniel S. Nagin and Greg Polansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction
    Threats into a Model of General Deterrence: Theory and Evidence*,
    Criminology, 39(4) (2001) ............................................................................. 42

*Details of wanted criminals*, Taiwan Ministry of Justice InvestigationBureau (Nov. 25, 2025),
    https://www.mjib.gov.tw/Crimes/Crimes_Detail?uid=448 ............................. 25

Fawubu Fagui Ziliaoku, Narcotics Hazard Prevention Act, Art. 4 (as amended May 4, 2022) ... 39

*Five Things About Deterrence*, Nat'l Institute of Justice, https://www.nij.go.v/five-
    things/pages/deterrence.aspx (last visited Jan. 11, 2026) ............................. 42

*Guidance, Information for British people detained or imprisoned in Taiwan*, GOV.UK (last
    updated Dec. 11, 2024), https://www.gov.uk/government/publications/taiwan-prisoner-
    pack/information-pack-for-british-prisoners-in-taiwan#detention-conditions-in-taiwan ........ 39

*History*, Tor Project, https://www.torproject.org/about/history/ (last visited Jan. 13, 2026).......... 5

James C. Howell et al., *Bulletin 5: Young Offenders and an Effective Response in the Juvenile
    and Adult Justice Systems: What Happens, What Should Happen, and What We Need to
    Know*, Office of Justice Programs (Jul. 2013), https://www.ojp.gov/pdffiles1/nij .................. 28

Jonathan Lusthaus, Industry of Anonymity: Inside the Business of Cybercrime (1st ed. 2018).. 42

*List of Participating Countries/Governments*, U.S. Dep't of Justice,
https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments
(last visited Jan. 13, 2026) ......................................................... 40

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006)................... 43

*NTU Student Single-Handedly Building "Dark NetNarcotics Empire"; 120 Million NTD in
Taiwanese assets seized… Taipei DistrictProsecutor's Office issues a 40-year arrest warrant
台大學霸林睿庠一手打造「毒品暗網帝國」1.2 億在台資產都被扣...北檢下達
40 年通缉)*, MirrorMedia (Nov. 25, 2025),
https://www.mirrormedia.mg/external/amp/mirrordaily_31565............................................. 25

Solangel Maldonado, *Recidivism and Parental Engagement*,
40 Family L. 1. (2006) ......................................................................... 41

Steven Crook, *Seventy-two days in a Taiwanese jail*, Taipei Times (Dec. 31, 2019),
https://www.taipeitimes.com/News/feat/archives/2019/12/31/2003728456 ........................... 39

U.S. Att'y's Off., Central District of California, Press Release (Apr. 29, 2024),
https://www.justice.gov/usao-cdca/pr/oc-and-houston-men-sentenced-decades-prison-
supplying-fentanyl-and-other-drugs-sold.................................................................... 46

U.S. Att'y's Off., District of Massachusetts, Press Release (Mar. 11, 2022),
https://www.justice.gov/usao-ma/pr/leader-dark-web-drug-trafficking-operation-
sentenced-eight-years-prison-and-59-bitcoin .............................................................. 48

U.S. Att'y's Off., District of Utah, Press Release (Nov. 14, 2024), https://www.justice.gov/
usao-ut/pr/convicted-dark-web-drug-dealer-sentenced-360-months-imprisonment ....................

U.S. Att'y's Off., Eastern District New York, Press Release (Aug. 28, 2024),
https://www.justice.gov/usao-edny/pr/dark-web-vendor-pleads-guilty-distributing-
fentanyl-through-mail .......................................................................................

U.S. Att'y's Off., Southern District New York, Press Release (May 29, 2015),
https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-
manhattan-federal-court-life-prison ......................................................................

U.S. Att'y's Off., Southern District of Florida, Press Release (May 21, 2024),
https://www.justice.gov/usao-sdfl/pr/dark-web-drug-vendor-and-clandestine-lab-
manufacturer-sentenced-prison-trafficking.................................................................

U.S. Sent'g Comm'n, Guidelines Manual Ch. 1 (Nov. 2025) ..........................................

Vincent Chiraldi et al., *Community-Based Responses to Justice-Involved Youth Adults*,
Office of Justice Programs (Sept. 2015), https://www.ncjrs.gov/pdffiles1/nij/248900.pdf..........

## PRELIMINARY STATEMENT

Starting at ten years old, Rui-Siang Lin felt an acute responsibility for his family. His idyllic home life was shattered when, without warning, his father divorced his mother and abandoned their two sons, leaving the family barely surviving and ostracized by their broader community in Taiwan. Deeply devoted to his mother and to his little brother, Mr. Lin gave up his childhood dream of becoming a classical musician and turned to more practical pursuits that would allow him to financially support his family. He chose math and computer programming; it turned out he was brilliant at both—a whiz with computers and technology who taught himself to code. The Internet offered him an escape—a place where the financial strain of his family and his responsibility for his younger brother did not exist. Mr. Lin embraced that escape at a time when he had little guidance from adults, and at age thirteen he began spending time on the darknet, an online ecosystem rife with illegality and negative influences. It was in this ecosystem that, several years later, when he was still a young and naïve nineteen-year-old, Mr. Lin accepted employment as an administrator of Incognito, a darknet marketplace dedicated to the sale of narcotics. Mr. Lin first coded the site and built its back-end technical infrastructure and then ran it in partnership with two other administrators.

For the next three years, Mr. Lin led a double life—excelling as a college student and working in the Taiwanese Technical Mission in Saint Lucia as part of his alternative military service, while secretly running Incognito at night. But Incognito itself carried a secret that was hidden from Mr. Lin—one of the other administrators, the individual primarily responsible for monitoring and policing the narcotics transactions on the site, was in fact a confidential human source ("CHS") being run by a team of FBI investigators. Through this individual, the FBI got Incognito listed on several prominent darknet forums, which caused Incognito's business to grow

by a hundredfold.  Also through this CHS, the FBI weakened Incognito's internal checks, which Mr. Lin intended to prevent fentanyl from being sold on the site, leading to tragic consequences in at least one instance.  The FBI, through the CHS, was involved in running Incognito ███████ ███████ until Mr. Lin shut down the site.  In effect, Incognito may be one of the largest, if not the largest, reverse sting drug operations ever undertaken by federal law enforcement.

To be clear, Mr. Lin absolutely and unequivocally has accepted responsibility for his role in developing and running Incognito.  Indeed, he admitted as much shortly after his arrest, before he had any inkling of the government's involvement in the site.  And he pleaded guilty before this Court and fully accepted responsibility.  He has never looked back from that decision and is profoundly remorseful for his conduct, the harm of which he has come to appreciate even more while in the MDC, where he has seen firsthand—for the first time in his life—how drugs impact individuals and communities.  He is resolved to follow a different path if he is given a second chance.

He knows that is not guaranteed—Mr. Lin's stipulated Sentencing Guidelines range is life (based on the quantity of drug sales that are a direct result of the government's involvement in Incognito).  But a Guidelines sentence in this case would pile tragedy upon tragedy and would be greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a).  Moreover, Mr. Lin faces severe legal consequences in Taiwan: his crimes carry the potential for punishment up to and including the death penalty and life imprisonment.  Taiwanese prosecutors have already indicated that they intend to investigate and prosecute Mr. Lin (and his family) aggressively.  Further, he has been vilified by the local press, so even if he does walk free in Taiwan again, he will be a pariah.  Because of the unique mitigating circumstances of both Mr. Lin and the offense, detailed below, we respectfully submit that a sentence of ten years'

imprisonment, the mandatory minimum term, is sufficient to meet the statutory goals. We recognize that this is a request for extraordinary mercy, but it is warranted by the extraordinary circumstances present here.

## FACTUAL BACKGROUND

I. **MR. LIN'S PERSONAL BACKGROUND**

A. **Mr. Lin's Childhood and Adolescence**

Mr. Lin was born in Taipei, Taiwan on February 1, 2001. At the time, his parents were married and living together in a comfortable house in a safe, urban neighborhood in Taipei. When Mr. Lin was three years old, he asked his mother for a baby brother as a birthday present, and—"magically," as Mr. Lin describes it—his mother delivered his younger brother on Mr. Lin's fourth birthday.

Mr. Lin and his brother have always been extremely close. His brother explains that "[f]rom the moment I can remember, my brother has been my best friend." Declaration of Noam Biale ("Biale Decl."), Ex. 2-B at 1. As little kids, Mr. Lin and his brother happily passed the time playing together, enjoying "Lego[s], sports, and board games." *Id.* Mr. Lin always took the time to teach and guide his brother, including teaching him "English, math, and science." *Id.* Because of the role that Mr. Lin plays in his brother's life, his brother describes Mr. Lin as his "mentor" and "Dad." *Id.* Notwithstanding the geographical distance currently between them, Mr. Lin and his brother remain very close—sharing the details of their daily lives through regular calls and handwritten letters.

Aside from his brother, Mr. Lin's mother was the shining center of his childhood. Soon after his brother was born, she stopped working so that she could focus on raising her children. She was strict—for example, requiring Mr. Lin and his brother to stay inside to study while their friends were outside playing—but also extremely caring and loving. Mr. Lin's mother nurtured

3

her children's interests and innate skills. As a little boy, Mr. Lin dreamed of being a musician, so Mr. Lin's mother signed Mr. Lin up to take lessons for singing and multiple instruments. With his mother's encouragement, Mr. Lin began playing the violin, which he took to immediately. *Id.*, Ex. 2-C at 2. Above all, Mr. Lin's mother prioritized her children's education—making sure that they developed a love of learning and studied hard in school. *See id.*, Ex. 2-A at 3.

Mr. Lin's memories of his father are less vivid. When Mr. Lin was very young, his father was often working or traveling. Even when he was around, he was distant.

When Mr. Lin was about ten years old, however, his life changed significantly. Seemingly out of the blue, his parents got divorced. As Mr. Lin remembers it, one day his father came home, handed his mother divorce papers, and promptly moved out. For one year following the divorce, Mr. Lin's father paid child support and visited Mr. Lin and his brother. Then he stopped abruptly and disappeared entirely from Mr. Lin's life. Mr. Lin has not spoken to or seen his father since he was eleven years old.

Following Mr. Lin's father's abandonment, his mother tried to keep life as normal as possible. But doing so was difficult. No extended family members stepped into help. Mr. Lin's mother and her two sons were all alone. Although Mr. Lin's mother managed to keep Mr. Lin and his brother in the same private school that they had always attended, she could no longer afford their house, so they moved to a small apartment in a less safe neighborhood.

Mr. Lin's mother never explained the family's new circumstances to her children—such as why their father left, why they had to move, or why she went back to work. Nonetheless, at ten years old, Mr. Lin understood that his family was under financial stress. He felt a new and acute sense of responsibility and resolved to become the "man of the house" who could support his mother and brother financially. To ten-year-old Mr. Lin, this meant giving up on his dream of

4

being a musician and focusing instead on studying math and thinking about ways to support his family. In his letter, his brother attests to this shift in Mr. Lin, recounting that following their parents' divorce, Mr. Lin became his "Dad," "bringing [him] joy and happiness, giving [him] courage whenever [he] felt depressed, and advising [him] on important decisions such as [his] choice of [college] major and future career." *Id.*, Ex. 2-B at 1. Mr. Lin's childhood friend, Stephanie Chang, explained that following Mr. Lin's father's departure, Mr. Lin was "under insurmountable pressure in comparison to peers of his age," harboring "a strong desire to support the family financially, while not being able to reconcile with the pain stemming from his inability to reduce the burden his mother was carrying at the time." *Id.*, Ex. 2-D at 2.

Ashamed of the changes his family was experiencing, Mr. Lin withdrew from his friends. As a result, in middle school, Mr. Lin spent most of his time at home alone (or with his brother), where he became obsessed with playing video games. This hobby, in turn, inspired an interest in computer coding and programming—initially so that he could learn how to beat the games he was playing and create his own games, and later because he saw it as a path to financial stability.

Mr. Lin's interest in computer programming and coding ultimately led him to stumble across the darknet when he was only thirteen years old. While researching online to teach himself more about programming and coding, Mr. Lin learned about Tor,[1] the darknet generally, and specifically the darknet illicit marketplace Silk Road. At first, he did not explore the darknet—he went onto it only to see if he could get a fake passport as part of a juvenile fantasy

---

[1]     Tor, short for "The Onion Routing," is a tool for browsing the internet anonymously. When browsing with Tor, a user's real IP address and other system information are obscured from the websites visited, and the user's activity is hidden from their internet service provider. The network relies on a series of virtual tunnels, where a user's traffic is sent through server "hops" or "relays" that encrypt said traffic at each step. *See History*, Tor Project, https://www.torproject.org/about/history/ (last visited Jan. 13, 2026).

of running away.  Then, out of curiosity, Mr. Lin used Google to figure out how to get onto Silk Road, and he explored it without buying anything.  He returned to the darknet while in high school in search of tutorials about computer programming and coding.  At this early age, he had no guidance from adults on Internet safety.  His mother was busy working and the adults at Mr. Lin's school had no idea what he was doing at home.  He thus became inculcated in the lawless culture of the dark web at a time when his own sense of right and wrong was still developing.

Notably, however, while the darknet—and Silk Road in particular—is known for its free market for narcotics, Mr. Lin never bought drugs.  Indeed, he has never tried drugs in life and, prior to his incarceration at MDC, had virtually no exposure to drug users or addiction.  The concept of drug use was essentially abstract to him—what was occurring on the dark web felt to a smart but immature young teenager like one big video game.

### B.    Mr. Lin's Educational Background

Mr. Lin has always loved learning and sharing his knowledge with those around him. Throughout middle and high school, Mr. Lin consistently ranked among the top students in his classes.  From 2015 until 2019, Mr. Lin attended Fuhshing High School, where he excelled in math.  During one summer in high school, Mr. Lin volunteered to teach math and science to underprivileged children in a remote village in Taiwan.  After high school, Mr. Lin enrolled at National Taiwan University ("NTU") in September 2019.  Mr. Lin was enrolled in NTU's Mathematics program for two years and then transferred to NTU's Information Management program.  In June 2023, Mr. Lin graduated from NTU with a bachelor's degree in Business Administration.

In the fall of 2023, Mr. Lin applied to business school in the United States and Singapore. He was accepted to the Master of Science (Management) and CEMS Master's in International

Management double degree program at the National University of Singapore ("NUS") Business School, which he planned to attend had he not been arrested.

■        ████████████████████████████████

While Mr. Lin's family struggled financially in the absence of his father, their situation became far more dire in 2019, ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████. Mr. Lin was halfway through his first year of college and in the process of applying to study abroad in the United States. But he immediately abandoned that plan so that he could stay home and care for his mother and his brother, who was at the time in ninth grade. ███████████████████████████████████████████████, his days quickly transformed from that of a regular college student to days filled with "caring for his younger brother and managing household affairs" and balancing doctors' appointments and college classes. Biale Decl., Ex. 2-A at 4. Mr. Lin's younger brother recalls that Mr. Lin "woke up at 5 a.m. every morning to do laundry, prepare breakfast for [his brother], and even make steamed eggs with chicken essence for" their mother. *Id.*, Ex. 2-B at 1.

In September 2020, ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████    But this experience left an indelible mark on Mr. Lin, deepening his financial anxiety and feeling that he was responsible for caring for his family.

### D.    Mr. Lin's Volunteer Work and Employment

Concerned with providing extra financial support to his family and also wanting to use his natural talent at teaching, in addition to his studies, Mr. Lin participated in volunteer programs and worked while in college. As his mother recalls, "in order to reduce the family's financial burden, [while in college] Rui-Siang worked as a tutor while also interning at the blockchain research and development division of Cathay Financial Holdings." *Id.*, Ex. 2-A at 4; *see also* PSR ¶¶ 105-06. Mr. Lin was Cathay Financial Holdings' "first college freshman intern and was the only intern whose employment was extended for nearly two and a half years after the internship period ended." Biale Decl., Ex. 2-A at 4. Additionally, in the summer of 2021, Mr. Lin developed and led a one-week computer programming camp to students aged seven through twelve in a remote village in Taiwan as part of a program that his professor ran. *Id.*, Ex. 2-E at 3. He also worked as a research assistant at the NTU College of Electrical Engineering in 2022, PSR ¶ 104, where his contributions were so highly valued that the school offered him a spot in its master's program. From fall 2019 through winter 2020, Mr. Lin also tutored two primary-school-aged children in math. *See id.* ¶ 106.

As the Court is aware, from September 2023 until his arrest in May 2024, Mr. Lin completed his alternative military service as a Diplomatic Specialist with the Taiwan Technical Mission in Saint Lucia. *Id.* ¶ 102; Ex. Biale Decl., Ex. 2-F at 1. Mr. Lin's colleague from this time, C.Y. Tsai, describes working with him as a "privilege," noting that he was "not only a promising graduate but also a remarkable volunteer who has actively contributed to the society." Biale Decl., Ex. 2-F at 1. In her letter, Ms. Tsai highlights three projects Mr. Lin took on that

"showcase his character and commitment to service": the development of a facial identification application for Saint Lucian hospitals to use to streamline their patient identification processes; "the development of an online e-commerce platform designed to empower Saint Lucian youths and entrepreneurs," which "positively impacted the local community by providing new opportunities for economic growth and collaboration"; and the provision of cryptocurrency training for the Saint Lucia Police Force that was designed to teach "valuable skills to investigate and analyze cryptocurrency transactions." *Id.* at 2.

## II.    INCOGNITO

### A.    Mr. Lin Is Recruited to Join and Helps Develop Incognito

While Mr. Lin was succeeding in his studies and his work, from the time he was a sophomore in college until March 2024, he in fact was living a double life.

In early 2020, two individuals, "Administrator-1" and "Administrator-2," contacted Mr. Lin, who used the moniker "Pharoah," to solicit his help in creating a new darknet drug marketplace. *See* PSR ¶ 16. At first, Mr. Lin ignored Administrator-1's and Administrator-2's entreaties. He was nineteen years old and focused on college. When they reached out again in the fall of 2020, however, Mr. Lin's circumstances had changed. Mr. Lin was reeling from his ██████████████████████ and watching her recover from her difficult surgery. *See supra* Factual Background Section I.C. He was anguished that the family had not been able to afford the less invasive surgery. Determined to make enough money to ensure his family would never have to suffer like that again, in October 2020, Mr. Lin made the misguided decision to accept Administrator-1 and Administrator-2's offer to start Incognito with them. *See id.*

By December 2020, the website was operational. Incognito functioned as an e-commerce platform where users could purchase narcotics from vendors who advertised their product on the platform. PSR ¶ 16. In order to sell on Incognito, vendors first had to apply for access to the

site, then, as discussed below, Administrator-1 and Administrator-2 would decide whether to accept or reject them. *Id.* If accepted, vendors were allowed to advertise narcotics permitted under Incognito's policies at a price of their choosing. *Id.* Users, in turn, purchased those narcotics with cryptocurrency. *Id.* Incognito collected approximately five percent of the purchase price for every transaction on the site. *Id.*

Administrator-1, Administrator-2, and Mr. Lin ran Incognito collectively as a partnership, dividing the responsibilities among the three of them according to their skills. *See* Biale Decl., Ex. 3 at USAO_00006421, USAO_00006425-26. None had control over the others, and all three weighed in on matters of site policy and procedure. Significantly, at Incognito's inception, all three agreed that the site should ban the sale of all opioids, including fentanyl, because of their highly addictive nature and associated health risks. Administrator-1, Administrator-2, and Mr. Lin subsequently eased the ban on all opioids but maintained the ban on fentanyl and related products. *See id.*, Ex. 29. According to Incognito's site rules, which were posted for all vendors and users to see, "[w]e disallow any sale of fentanyl or its analogues and related chemicals, including carfentanyl or products containing fentanyl or carfentanyl. Any vendor found to be selling products containing fentanyl or carfentanyl under a different name to circumvent this rule will be promptly banned." *Id.*, Ex. 4-A at 1-2.

Mr. Lin was responsible for managing the technical aspects of the site, such as backend coding, user interface, security, and financial logistics. He coded and built the website, including its banking component, which allowed users to make purchases with cryptocurrency, and he managed the site's security and servers. Occasionally, Mr. Lin posted updates about Incognito on darknet forums, such as Dread. His posts typically related to the technical aspects of the

10

marketplace that were within his purview, like improvements to the user interface and solutions to technical problems. *See, e.g.*, ECF No. 1 ("Compl.") ¶¶ 23(e)-(g).

Administrator-1 and Administrator-2, on the other hand, managed the narcotics-related aspects of Incognito. Administrator-1's responsibilities included vetting and approving vendor applications, granting and revoking vendor and user privileges, monitoring and approving vendor listings, monitoring user activity, answering support tickets from users and vendors, which typically involved technical support related to shipping and refunds, and resolving disputes between users and vendors, such as those regarding the quantity, quality, or type of drugs sold. *See* Biale Decl. ¶ 43; *see also id.*, Ex. 6 ███████████; *id.*, Ex. 7; *id.*, Ex. 8 at USAO_00004245-46. Administrator-2 was in charge of promoting Incognito, which he did by placing ads on Dread, for example. *See id.*, Ex. 9 at USAO_00032720-21; Compl. ¶¶ 23(a)-(d).

From December 2020 until April 2022, Incognito experienced a relatively modest amount of activity. During that time, Incognito processed 6,634 orders, totaling $1,057,313.59. *See* Biale Decl., Ex. 5-A. With Administrator-1 and Administrator-2's approval, Mr. Lin programmed Incognito's bank so that when Incognito's wallet reached 0.2 Bitcoin or higher, the profits would be split in four equal parts to Mr. Lin's personal wallet, Administrator-2's personal wallet, Administrator-1's personal wallet, and Incognito's "market wallet." The market wallet, which only Mr. Lin could access, was used purely for site expenses, such as server costs or ad placements. *See id.*, Ex. 10 at 1 ("Half of [Incognito's] market profits are eaten up by server costs and ad placements.").

### B.    A New Administrator, Controlled by the FBI, Joins Incognito

███████████, Administrator-2 stopped working at Incognito. Compl. ¶ 23(j). ███████████, Administrator-1 and Mr. Lin began chatting with another individual, who was the CHS about the prospect of joining Incognito's leadership. *See* Biale Decl., Ex. 11 at 1;

*id.*, Ex. 3 at USAO_00006420-21, USAO_00006425-26.  CHS ██████████████████ ███████████████████████████████████████████████████, and touted his reputation for successfully promoting those marketplaces on the darknet.  For example, on March 24, 2022, CHS bragged to Mr. Lin ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████      Impressed by CHS's accomplishments, ███████████████, Mr. Lin and Administrator-1 agreed to partner with CHS to work on Incognito.  *See id.*, Ex. 3 at USAO_00006420-21; *id.*, Ex. 12 at USAO_00004089.  From then until the site's closure in March 2024, CHS assumed the role and executed the responsibilities of an administrator for Incognito.  Unbeknownst to Mr. Lin, throughout that time, CHS was a confidential human source managed by a group of FBI agents.  *See, e.g.*, *id.*, Ex. 13 at USAO_00004234 (October 3, 2022 chat group in which FBI agents instruct the CHS on how to communicate with Administrator-1 and direct the CHS's strategic decisions).

C.    **The FBI, through CHS, Exponentially Increases Incognito's Revenue and Profits**

One of the first projects that CHS tackled when he joined Incognito was to get Incognito listed on darknet indexes and news sites.  *See id.*, Ex. 14 at USAO_00004076, USAO_00004080.  Doing this, he explained to Mr. Lin and Administrator-1, would increase site traffic and thus drug purchases and profits.  *See id.*, Ex. 15 at USAO_00004056; *id.*, Ex. 14 at USAO_00004064,

USAO_0004076; *id.*, Ex. 13 at USAO_00004237-38; *id.*, Ex. 3 at USAO_00006418; *id.*, Ex. 16 at USAO_00006498-99.  He was right.

CHS successfully facilitated getting Incognito listed on DarkNetLive, a darknet news site, and ████████.  On May 17, 2022, CHS told Mr. Lin and Administrator-1 that Incognito should donate "3k plus 1k per month" to DarkNetLive to improve its ranking on the site.  *See id.*, Ex. 15 at USAO_00004054; *id.*, Ex. 14 at USAO_00004071.  Following that advice, Administrator-1 made a donation on Incognito's behalf.  *See id.*, Ex. 14 at USAO_00004071. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████  On May 18, 2022, CHS informed Administrator-1 and Mr. Lin that Incognito was listed "3rd place" on DarkNetLive.  *Id.*, Ex. 14 at USAO_00004075.  ████████████████████████████ ████████████████████████████████████  *id.*, Ex. 17 ████████████, and by July 13, 2022, CHS had succeeded in doing so, *see id.*, Ex. 18.

After CHS got Incognito listed on DarkNetLive ████████, the site's orders increased by *one hundred-fold*.  Whereas from December 2020 to April 2022, Incognito processed 6,634 orders, totaling $1,057,313.59, from when CHS joined ████████ through Incognito's closure in March 2024, Incognito processed 634,285 orders, totaling $103,427,444.21.  *Id.*, Ex. 5-A.

### D.     The FBI, through CHS, Manages Narcotics Sales on Incognito

Under the guise of CHS, the FBI directly handled a substantial portion of Incognito's operations—specifically, managing the sale of narcotics.  Indeed, during his tenure, CHS, who was hired initially to take over Administrator-2's role promoting the site, ultimately also replaced

13

Administrator-1 as the administrator primarily responsible for managing inquiries related to and disputes arising from the sale of drugs on Incognito. *See Id.*, Ex. 19. CHS, independent of Administrator-1 and Mr. Lin, vetted and approved vendor applications, banned vendors and users, granted and revoked vendor privileges, monitored and approved product listings, monitored user activity, answered support tickets from users and vendors, and resolved disputes between users and vendors. *See id.* (CHS can "access user lookup, manage tickets, manage disputes"); *id.*, Ex. 20 ███████████████████████████████████████ ██████████████████████████████████████████████████ *id.*, Ex. 21 at USAO_00004301 (CHS revoking a vendor's privileges).

Although Administrator-1 continued to handle some support tickets and user-vendor disputes, as the confidential human source explained in a conversation with the FBI agents handling him, "I do at least 95% of them." *Id.*, Ex. 22 at USAO_00004509. In fact, CHS encouraged Administrator-1 to take breaks from working, explaining he "like[s] tickets." *Id.*, Ex. 23 at USAO_00004339 (telling Administrator-1 to "[s]leep, you can work tommorrow [sic]"). ██ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████ In other words, the FBI took over the narcotics-related aspects of the website through CHS and worked to keep others out of that role.

CHS also determined what technical features Mr. Lin should implement in connection with CHS's review of tickets related to drug sales. For example, CHS rejected Mr. Lin's offer to help streamline his review of tickets and disputes by using artificial intelligence, stating there was "[n]o need" and that "[t]he personal touch helps with Customer relationship." *See id.*, Ex.

22 at USAO_00004501.  He also had the final "call" on what labels Mr. Lin should create to sort and manage the site's tickets.  *See id.*

CHS's principal role in facilitating Incognito's drug sales is demonstrated by the number of "messages" and "memos" he drafted.  On Incognito, "messages" are administrators' responses to tickets and disputes raised by users and vendors, and "memos" are internal communications among the administrators.  Among the three administrators, CHS was prolific in both of these areas.  Between February 2023 and March 2024,[2] CHS sent 13,793 messages, Administrator-1 sent 3,448, and Mr. Lin sent only 30.  *Id.* ¶ 42.  Between December 2023 and March 2024, CHS posted fifteen memos, Mr. Lin posted seven memos, and Administrator-1 posted five memos.  CHS's memos contained recommendations for site improvements and sometimes directed Mr. Lin to add new features and alerts.  *See id.*, Ex. 5-B (all memos).  All of Mr. Lin's memos appear to be in response to memos from CHS or Administrator-1.  *See id.*

**E.    Against Mr. Lin's Wishes, the FBI, through CHS, Facilitates the Sale of Fentanyl on Incognito**

CHS—backed by his FBI handlers—encouraged the sale of fentanyl on Incognito.  Within months of joining Incognito, CHS tried to lift Incognito's ban on fentanyl sales.  *See id.*, Ex. 27 at USAO_00005832.  In a conversation with Mr. Lin on July 19, 2022, CHS argued that permitting fentanyl to be sold on Incognito was more consistent with the dark web's "energy of free markets, allowing people to put whatever they want in their bodies it's their choice."  *Id.* Mr. Lin demurred.  He ultimately agreed to let users vote on whether to permit fentanyl, but he advised CHS that he would code the poll so that no matter how users voted, fentanyl would remain banned.  *Id.* ¶ 48; *id.*, Ex. 27 at USAO_00005833-35; *id.*, Ex. 28.

---

[2]     Message data from the Incognito database does not go back further than February 10, 2023.

Even though CHS was unable to persuade Mr. Lin to agree to change Incognito's fentanyl policy, he nonetheless promoted and permitted the sale of fentanyl on the site. Notwithstanding his ability (and responsibility) to remove vendors and Incognito's fentanyl ban, CHS and the FBI repeatedly chose not to ban vendors accused of selling fentanyl, without Mr. Lin's knowledge. To prevent the sale of fentanyl, Mr. Lin had coded a program that screened drug sale listings for words potentially associated with fentanyl, such as "potent opioids," and issued penalties and warnings to such listings and their vendors. Any listing with a flagged word would also be flagged for manual review, which fell within CHS's purview.

CHS and the FBI declined to ban vendors they knew were selling drugs containing fentanyl. For example, on October 14, 2023, CHS received a dispute ticket in which a user uploaded proof that a vendor was selling fentanyl. *Id.*, Ex. 5-C. Rather than ban the vendor, as required under Incognito's policies, CHS instructed them "to test your products" and warned that the "next positive fent test and you will be banned." *Id.*; *id.*, Ex. 29 (Chat between CHS and Mr. Lin in which CHS confirmed with Mr. Lin that Incognito's policy states "there will be no sale of fentanyl or its analogues and related chemicals"); *id.*, Ex. 4-A (Incognito's policy stating that "[a]ny vendor found to be selling products containing fentanyl or carfentanyl under a different name to circumvent this rule will be promptly banned"). After that warning, the vendor made 818 sales on Incognito. *See id.* ¶ 44.

Likewise, despite reviewing information on November 1, 2023, that a vendor sold fentanyl-positive drugs, CHS and the FBI did not ban that vendor, who went on to fulfill fifty-three more orders over the site in the following four months. *Id.* ¶ 45; *id.*, Ex. 5-E. In yet another dispute chat from November 2023 that CHS handled, a buyer provided a positive fentanyl test and reported that his mother went to the hospital after consuming fentanyl-laced

drugs purchased on Incognito.  *See id.*, Ex. 5-D at 1 ("Last two orders went fine, this order was sent with pills containing fentanyl.  Tested positive twice and also sent my mother to the hospital needing 2 cans of narcan.  Your listing specifically says no fentanyl.  Someone almost died. . . . We've had to deal with a lot because of what just happened.  Medical bills and the police.  Not ok.").  CHS simply refunded the order without taking any action against the vendor.  *Id.*  Later that month, a different buyer created a ticket reporting the presence of fentanyl in drugs purchased from *the same vendor*.  *See id.*, Ex. 5-D at 2 ("[I] see sexman66 is still in business. he states on all of his products especially the m30 oxycodone that they are fent free, using an alternative to fent.  BUT THEY ARE NOT THEY ALMOST KILLED ME BY SWALLOWING.").  Again, CHS did not ban the vendor.  *Id.*  The vendor went on to fulfill 1,076 more orders between November 30, 2023 and March 5, 2024.  *See id.* ¶ 46*.*

Not only did CHS and the FBI permit vendors accused of selling fentanyl by civilian users to peddle narcotics on Incognito, but they also allowed a vendor to continue to sell drugs after law enforcement confirmed that the vendor's drugs were laced with fentanyl.  According to an FBI report, the FBI made undercover drug purchases from an Incognito vendor named "KAOSIN" in November and December of 2023.  *See id.*, Exs. 31-32; *see also* PSR ¶ 30.  A DEA Special Agent recovered those orders and submitted them to a lab for chemical analysis.  *See* Biale Decl., Exs. 32-34.  The DEA's chemical analyses of the drugs—completed on December 15, 2023 and January 11, 2024—revealed that they contained fentanyl.  *Id.*, Exs. 33-34.  Yet, despite the FBI's knowledge that KAOSIN sold fentanyl, the government took no action against him.  As a result, KAOSIN fulfilled 324 orders between December 15, 2023 and March 5, 2024.  *See Id.* ¶ 47; *id.*, Ex. 32.

CHS's failure to prevent the sale of fentanyl on Incognito had fatal consequences.  For instance, on September 6, 2022, David Reed Churchill purchased oxycodone M30 pills from a vendor on Incognito called "RedLightLabs."  PSR ¶ 35.  The program Mr. Lin coded flagged the RedLightLabs listing from which Mr. Churchill purchased the fatal M30 pills as containing words potentially associated with fentanyl.  Biale Decl., Ex. 5-F.  CHS neglected to take any action in response to this warning.  Nearly a week later, Mr. Churchill passed away due to a drug overdose.  PSR ¶ 34.  His body was found in his apartment near a partial blue pill and a prescription bottle containing blue M30 pills and other assorted pills.  *Id.*  ████████████

████████████████████████████████████████████████

████████████████████████████████████████  *See* Biale

Decl., Ex. 35 ████████████████████████████████████

████████████████████████████████    ████████████████.

RedLightLabs's operators pleaded guilty and took responsibility for Mr. Churchill's death in a case in the Central District of California.  *United States v. Srinivasan*, 22 Cr. 183 (DOC), ECF No. 53 at 2 (C.D. Cal. Apr. 20, 2023).[3]

### F.    Mr. Lin Shuts Down Incognito

In 2023, Mr. Lin started thinking seriously about walking away from Incognito.  As he approached his college graduation in June 2023, Mr. Lin began to feel like he was collapsing under the anxiety of operating Incognito and keeping his involvement in the dark web secret from his friends and family.  He was barely sleeping because he was in school all day and was up all night working on Incognito.  Mr. Lin began experiencing shortness of breath, loss of feeling

---

[3]    As discussed *infra*, Mr. Lin has come to appreciate that his reliance on other darknet administrators to police the safety of the site was deeply misguided and does not in any way excuse his conduct.  He has fully accepted responsibility and sees that his role directly contributed to all of the harm that Incognito caused.

in his fingers, and insomnia.  ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  and Mr. Lin knew it.  The true source of his anxiety was his

participation in Incognito—his inability to confide in anyone about Incognito and the toll it was

taking on him mentally and physically made his anxiety even worse.

By March of 2024, Mr. Lin could no longer bear his anxiety, so he decided to use his

technical skills to shut down Incognito.  As part of the shutdown, Mr. Lin posted on Incognito's

message board stating that he would disclose Incognito's users' transaction histories unless they

paid him an additional fee, which he described as "EXTORTION."  *See* PSR ¶ 60.  Despite

Mr. Lin's words, he did not release anyone's transaction history; he moved on and focused on his

work in Saint Lucia and planning his future in business school after shutting down the site.  *See*

Biale Decl., Ex. 36 ████████████████████████████████████████████████

██████████████████████████████████████████████████

## III.    MR. LIN'S ARREST, PROSECUTION, AND INCARCERATION

### A.    Arrest

On May 18, 2024, Mr. Lin was arrested at John F. Kennedy Airport while traveling from

Saint Lucia to Taiwan, en route to Singapore to visit NUS Business School.  Immediately

following his arrest, Mr. Lin agreed to speak with the arresting agents without an attorney

present.  He participated in a nearly three-hour-long interview.  After initially minimizing his

conduct and evading the agents' questions, Mr. Lin admitted his role in Incognito to the agents

and answered their questions honestly and truthfully.

### B.    Pretrial Detention

Mr. Lin has been detained at the MDC in Brooklyn, New York, since his arrest on May

18, 2024.  Over the intervening twenty months, Mr. Lin has endured difficult conditions of

confinement due to a combination of factors, including obstacles to accessing his discovery, extended lockdowns, unsanitary conditions, the long distance from his family in Taiwan, exposure to violence, and poor medical care.

Since the beginning of this case, Mr. Lin has been an active participant in his defense. Mr. Lin's ability to assist in his defense, however, was severely curtailed for months by MDC's failure to provide him with adequate access to his discovery materials. Even with the government's assistance, it took months for Mr. Lin to receive his discovery at MDC. *See* ECF No. 20. And, after the materials arrived at MDC, he continued to struggle to secure regular access to review them. MDC staff routinely denied Mr. Lin's requests to review his discovery, Biale Decl., Ex. 37, notwithstanding a Court order requiring Mr. Lin be allowed access to his discovery laptop for fifteen hours per week, ECF No. 21.

The physical and environmental conditions of Mr. Lin's confinement have been abysmal. While at MDC, Mr. Lin has been forced to endure countless days of lockdowns—during which he is confined to his cell, unable to shower, and forced to drink the yellow water from his cell's faucet—served spoiled food, and exposed to extreme violence between inmates. He also has seen, for the first time in his life, individuals suffering from the effects of drug addiction, including mental health issues, withdrawal symptoms, and overdoses.

Mr. Lin has also received inadequate medical and dental care. Last winter, Mr. Lin contracted the flu and suffered from symptoms including a high fever, severe cough, and body aches. Despite promptly requesting medical attention, he was not able to see the MDC doctor until four weeks later. Beginning in the fall of 2025, Mr. Lin has also needlessly endured agonizing tooth pain due to MDC's inadequate dental care. While at MDC, a piece of Mr. Lin's tooth fell out of his mouth. After waiting five weeks to see a dentist, Mr. Lin was told that he

needed a filling but would not be able to get one for *two to three years*.  Mr. Lin was given two options: pull out the remaining piece of the tooth or continue to suffer with the broken tooth until he can receive a filling.  Mr. Lin chose the latter.

Adding to these challenges is the long distance between Mr. Lin and his mother and brother, both of whom live in Taiwan.  As a "pillar of [his] family," Mr. Lin's absence has left and will continue to "leave an irreplaceable void, emotionally and practically" in his brother's and mother's lives.  Biale Decl., Ex. 2-B at 1.  Knowing he has caused this harm to his family haunts Mr. Lin.  *See id.* at 3.  Due to the expense of travel between Taiwan and the United States, Mr. Lin's family has not been able to visit him during his pre-trial detention, nor do they anticipate being able to visit him for the duration of any future incarceration in the United States.  Mr. Lin and his family have stayed in close contact, nonetheless.  They try to speak every other day, with Mr. Lin calling early in the morning or late at night to accommodate the twelve-hour time difference.  Despite their best efforts, however, technical issues and lockdowns at MDC often prevent Mr. Lin from reaching his family, sometimes for weeks at a time.  Mr. Lin does not have any friends or other family members in or near the United States who can visit him.  As a result, Mr. Lin's only visits have been from counsel and representatives of the Taiwanese consulate.

Mr. Lin's distance from his family has been especially difficult in recent months.  █████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████    Mr. Lin's inability to be with his family during this difficult time has been devastating to him.

Notwithstanding these challenges, Mr. Lin has made the most of his time at MDC. Notably, since October 22, 2024, Mr. Lin has participated in MDC's Suicide Watch Companion Program. *See* Biale Decl., Ex. 38 at 1. "Suicide Watch Companions maintain a constant visual observation of individuals placed on Suicide Watch in order to ensure their safety and to better facilitate treatment with Psychology Services Staff." *Id.* at 8. Given the gravity of this role, MDC's Chief Psychologist, Dr. Schlessinger, explains, "Suicide Watch companions are selected based on strict criteria including their emotional stability, maturity, work ethic, and continued engagement in prosocial behavior." *Id.* As part of the program, Mr. Lin works six-hour shifts, often overnight and sometimes many nights in a row, in the suicide watch unit. The unit's observation cells house inmates who are on suicide watch or have other mental health issues and safety concerns. During his shifts, Mr. Lin serves as a source of comfort for those in the unit. If someone is having an outburst or is otherwise emotionally disturbed, Mr. Lin is the first one to try to calm them down and reassure them. Mr. Lin also takes it upon himself to educate the other inmates about the resources available to them at MDC, such as psychological services, administrative remedies, and how to contact counsel, family, and friends. According to Dr. Schlessinger, Mr. Lin "has served diligently in his role and has often provided assistance beyond the requirements." *Id.*

Mr. Lin recently completed a course taught by a professor at Columbia University, titled "Visualizing History: Photography in Conflicts and Crisis." *See id.* at 19. Mr. Lin has also participated in and completed at least ten programs, ranging in topics from health and exercise to business and personal skills. *See generally id.*; PSR ¶ 11.

Finally, as reported in the PSR, Mr. Lin has not incurred any disciplinary infractions while at MDC.  PSR ¶ 11.

### C.    Plea Agreement

On December 17, 2024, Mr. Lin entered into a written plea agreement with the government.  *See* Biale Decl., Ex. 39.  Pursuant to the plea agreement, Mr. Lin agreed to plead guilty to Counts Two, Three, and Four of the Indictment, charging Mr. Lin, respectively, with conspiracy to distribute and possess with intent to distribute narcotics in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and conspiracy to sell adulterated and misbranded medication in violation of 18 U.S.C. § 371.  As part of his plea agreement, Mr. Lin acknowledged and took responsibility for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  *See id.* at 10 (citing U.S.S.G. § 3B1.1).  He also agreed to enhancements for, among other things, distributing a controlled substance through mass-marketing by means of an interactive computer service, acting with willful blindness or conscious avoidance of knowledge that a drug marketed as legitimate contained fentanyl or a fentanyl analogue, and committing a narcotics offense as part of a pattern of criminal conduct engaged in as a livelihood.  *See id.* at 8-9 (citing U.S.S.G. §§ 2D1.1(b)(7), 2D1.1(b)(13), and 2D1.1(b)(16)(C), (E)).  Mr. Lin agreed to forfeit over $100 million dollars and specific property, including cryptocurrency and non-fungible tokens.  *Id.* at 2-7.  The plea agreement carries a mandatory minimum sentence of ten years and stipulates, among other things, that Mr. Lin's offense level is 53 and his Criminal History Category is I, with a resulting Guidelines range of life imprisonment.[4]

---

[4]    Count One, which the government has agreed to move to dismiss at sentencing, carries a mandatory life sentence.

At the change of plea hearing, Mr. Lin fully admitted his conduct and accepted responsibility. The Court accepted the plea.

### D.    The Presentence Report and the Probation Department's Recommendation

After a series of letter objections and responses from defense counsel and the government, on April 3, 2025, the Probation Department issued the Presentence Report and sentencing recommendation. Based on its calculation that Mr. Lin has a total offense level of 43[5] and belongs in Criminal History Category I, the Probation Department found that Mr. Lin's Sentencing Guidelines range is life. PSR ¶ 112. Notwithstanding its Guidelines calculation, the Probation Department recommends a downward variance to 360 months' imprisonment. *Id.* at 51. The PSR details at length the justification for this recommendation and includes among its reasons Mr. Lin's young age, his educational achievements, that "[h]e maintained employment prior to his arrest," the support he offered to his family, and his "positive adjustment to incarceration with no disciplinary infractions to date," including his participation in "several institutional programs," such as "MDC's suicide watch companion program." *Id.* at 50.

### E.    Criminal Investigation in Taiwan

In addition to the investigation and case brought by U.S. authorities, Taiwanese officials are investigating Mr. Lin for his conduct involving Incognito. Immediately following Mr. Lin's arrest in the United States, Taiwanese authorities froze Mr. Lin's bank accounts and commenced proceedings to seize his property. In a conversation with the undersigned and the government, Taiwanese prosecutors confirmed that they are investigating Mr. Lin for his conduct involving Incognito and are contemplating charges related to narcotics offenses and money laundering.

---

[5]    According to the PSR, "[p]ursuant to Chapter 5, Part A (comment n.2) [of the Guidelines], in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43." PSR ¶ 77.

The Taiwanese prosecutors also advised the undersigned that based on Mr. Lin's refusal to participate in an interview with them regarding their investigation into his conduct, he is currently considered to be a fugitive. Biale Decl. ¶ 50. On November 25, 2025, the Taiwan Ministry of Justice Investigation Bureau published on its website a June 27, 2025 warrant for Mr. Lin's arrest accusing him of money laundering. *See Details of wanted criminals*, Taiwan Ministry of Justice Investigation Bureau (Nov. 25, 2025), https://www.mjib.gov.tw/Crimes/ Crimes_Detail?uid=448. Mr. Lin's warrant is valid for forty years. *See NTU Student Single-Handedly Building "Dark Net Narcotics Empire"; 120 Million NTD in Taiwanese assets seized… Taipei District Prosecutor's Office issues a 40-year arrest warrant (台大學霸林睿庠一手打造「毒品暗網帝國」1.2億在台資產都被扣… 北檢下達40年通緝)*, MirrorMedia (Nov. 25, 2025), https://www.mirrormedia.mg/external/amp/mirrordaily_31565. The Taiwanese investigation has also focused scrutiny on Mr. Lin's family. This has caused Mr. Lin substantial anxiety and deep feelings of guilt and responsibility for causing his family's situation to worsen significantly, when his aim was to help them.

## ARGUMENT

On behalf of Mr. Lin, we respectfully request that the Court sentence him to ten years' imprisonment. We recognize that a ten-year sentence would be an extraordinary variance from the Guidelines range but, based on the confluence of unique factors present here, we respectfully submit that this sentence is sufficient, but not greater than necessary, pursuant to 18 U.S.C. § 3553(a).

## I.    LEGAL STANDARD

District courts have an "overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).  Section 3553(a) sets forth these purposes:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).  Though a sentencing court must consider the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Sentencing Guidelines]," *id.* § 3553(a)(4), "calculating the correct Guideline range [is] 'just an initial step in the sentencing process,'" *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (summary order) (citation omitted).  A "district court may not presume that a guideline sentence is reasonable." *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)).  Rather, a court must "make an individualized assessment based on the facts presented." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).  Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in Section 3553(a), including the "nature and circumstances of the offense" and the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Indeed, the United States Supreme Court has "emphasized that highly relevant—if not *essential*—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 488 (emphasis added) (citations, alterations, and quotation marks omitted).

26

"In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation omitted).

## II.    OUTSTANDING OBJECTIONS TO THE PSR

The Probation Department has resolved most of Mr. Lin's objections to the PSR, and Mr. Lin withdraws his objections to the paragraphs concerning Mr. Churchill's death.  Mr. Lin maintains his objections to Paragraphs 14, 17 (with the exception of the last sentence, which the final PSR modified), 61, and 71.  These paragraphs incorrectly characterize Mr. Lin's role as being superior to the other administrators of Incognito.  As described above, *see supra* Factual Background Section II, Incognito was run as a partnership and each administrator had a unique role, with none directing the activities of any other.  Indeed, the PSR itself acknowledges that Mr. Lin was recruited by the other administrators to write the code for the website, but at the same time contradictorily maintains that Mr. Lin was the "principal" administrator who directed the others.  *Compare* PSR ¶ 15, *with id.* ¶ 61.  While the facts concerning the respective roles of the Incognito administrators are not in dispute, the fair inferences from those facts do not support the aforementioned paragraphs of the PSR as currently written.

## III.    MR. LIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A SENTENCE OF TEN YEARS' IMPRISONMENT

When Mr. Lin started working on Incognito, he was a nineteen-year-old college student struggling to make sense of ███████████████.  Desperate to be helpful, he made the misguided and naïve decision to engage in criminal conduct with the hope of making money to support his family.  This choice was out of character for Mr. Lin, who had never before been in legal trouble and, by all accounts, had a bright future ahead of him.  He deeply regrets his

decision and, if given the opportunity to reenter society, has every intention of being a productive and law-abiding citizen.

### A.     Mr. Lin Was Only Nineteen Years Old When Incognito Started

A defendant's youth is universally recognized as extremely mitigating of culpability.  As the Supreme Court has explained, because "a lack of maturity and an undeveloped sense of responsibility" in young people "often result in impetuous and ill-considered actions," courts "should account for age when inquiring into the conduct of a defendant."  *Gall*, 552 U.S. at 57-8 (citations and internal quotation marks omitted); *see also Jones v. Mississippi*, 593 U.S. 98, 105 (2021) (explaining "youth matters in sentencing").  Scientific studies have even gone so far as to "conclude that human brain development may not become complete until the age of *twenty-five . . . .*"  *Gall*, 552 U.S. at 58 (emphasis added) (citation and internal quotation marks omitted).  Thus, "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment and control impulses."  James C. Howell et al., *Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know*, Office of Justice Programs (Jul. 2013), https://www.ojp.gov/pdffiles1/nij/grants/242935.pdf at 18; *see also* Vincent Chiraldi et al., *Community-Based Responses to Justice-Involved Youth Adults*, Office of Justice Programs (Sept. 2015), https://www.ncjrs.gov/pdffiles1/nij/248900.pdf ("Recent scientific work suggests that the human brain continues to develop well into the 20s, particularly in the prefrontal cortex region, which regulates impulse control and reasoning.").  In 2024, this research led the Sentencing Commission to revise the Guidelines Age Policy Statement, then reflected in U.S.S.G. § 5H1.1, to advise that a "downward departure also may be warranted due to the defendant's youthfulness

at the time of the offense or prior offenses."[6]  U.S. Sent'g Comm'n, Guidelines Manual § 5H1.1, p.s. (Nov. 2024).  It made this change based on "testimony and comment from experts in the science and data community conveying advancements in the understanding of youthful development and sentencing, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability."  *2024 Amendments in Brief*, U.S. Sent'g Comm'n, https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-youthful.pdf (last visited Jan. 13, 2026).

The Court should take into account Mr. Lin's youth when imposing a sentence.  Mr. Lin first started working on Incognito when he was only nineteen years old.  When he shut down Incognito, he was twenty-three.  When he stands before the Court for sentencing on January 27, 2026, he will be five days shy of turning twenty-five.  Thus, notwithstanding Mr. Lin's intelligence, throughout the entirety of his offense conduct, his prefrontal cortex—the part of his brain responsible for maturity, judgment, and decision-making—was still developing.  Much like the ten-year-old Mr. Lin who thought that if he studied math he could make his family's troubles go away, nineteen-year-old Mr. Lin naively thought that he had found a magic bullet in Incognito, a way to make enough money so that his mother and brother would never have to suffer for lack of funds.  At the time, from behind his computer screen, he did not fully appreciate the harmful, real-world effects of his choices—for himself and his family, as well as for those suffering from drug addiction, who, at the time, he understood only as "numbers on the

---

[6]    This policy statement, along with all other policy statements regarding departures, was removed pursuant to the 2025 Simplification Amendment.  U.S. Sent'g Comm'n, Guidelines Manual Ch. 1, intro. comment. (Nov. 2025) ("In 2025, the Commission amended the Guidelines Manual to remove departures and policy statements relating to specific personal characteristics.").

screen." Biale Decl., Ex. 1 at 2. He does now. Mr. Lin's physiological and psychological lack of maturity at the time of his involvement in Incognito warrant leniency.

### B.    Mr. Lin Is Genuinely Remorseful and Committed to Building a New, Law-Abiding Life

Mr. Lin deeply regrets his decision to participate in Incognito. It is the worst decision he has ever made. He recognizes that although his decision was motivated by his desire to take care of his sick mother and younger brother, "there is no excuse for [his] actions." Biale Decl., Ex. 1 at 1. Moreover, he is acutely aware that rather than help his family, his choice to engage in criminal conduct has caused them immeasurable harm—exposing them to criminal investigation and public opprobrium and preventing them from seeing him for years to come. Mr. Lin would never risk hurting them again.

Mr. Lin also acknowledges that Mr. Churchill died from an overdose from drugs purchased through Incognito, for which he is deeply remorseful. Recognizing the harmful effects of opioids, and fentanyl in particular, Mr. Lin sought to prevent their sale on Incognito (*see supra* Factual Background Section II.A, II.E), and, until he reviewed the discovery in this case, he believed that he and his partners had been successful in doing so. He recognizes now that this belief was an "extremely foolish" rationalization and, regardless, he in no way minimizes or excuses the tragedy of Mr. Churchill's death or the pain of his loved ones. Biale Decl., Ex. 1 at 2. Mr. Lin hopes to speak to the Churchills at sentencing and convey his profound regret for their loss. He has also discussed with counsel his desire to do something to honor Mr. Churchill's memory, including developing programs to disrupt drug sales over the darknet.

Mr. Lin committed a serious crime, and he deserves to be punished. Following the completion of that punishment, which will likely include additional incarceration in Taiwan,

however, Mr. Lin is focused on spending time with his family. He yearns to give his mother and brother a hug, to share his favorite dumplings with them across the dinner table, and to start a family of his own one day. He realizes now that what his family needed most from him was not financial support, but his time. And through his actions, Mr. Lin has deprived them of both. He will not make the same mistake again. As Mr. Lin puts it, "[f]or all the years fueled by an urge to provide financially, maybe all my family ever wanted was for the three of us to be happily together, rich or poor." *Id.* at 3. In the "second chapter" of life that Mr. Lin hopes to have, he is committed to using his "skills for the betterment of society." *Id.*

### C.    Mr. Lin Is a Caring and Intelligent Person

Though only twenty-four years old, Mr. Lin has managed to touch and improve the lives of many people. Letters submitted by his family members, colleagues, friends, and teachers illustrate that he is a natural teacher, drawn to helping those around him, family and strangers alike. Starting at home as a young boy, Mr. Lin assumed the role of mentor and teacher for his younger brother, teaching him about everything from math to board games. Biale Decl., Ex. 2-B at 1. As Mr. Lin's brother recounts in his letter, Mr. Lin has never stopped teaching him. To this day, Mr. Lin's brother looks to Mr. Lin for guidance, including what to study in college and what internships to take. *Id.* Mr. Lin's impact on his brother's development is so huge that his brother describes Mr. Lin as "a mentor, protector, and guiding light who has shaped [him] into who [he] is today." *Id.* at 2.

In school, Mr. Lin also played the role of teacher. Mr. Lin's mother recalls that as a little boy in school he was "regarded by both teachers and classmates as the most competent peer-mentor, whether in mathematics or other science subjects, he could always explain difficult problems in a clear and accessible manner, helping classmates understand laborious concepts quickly." Biale Decl., Ex. 2-A at 3. As he got older, Mr. Lin continued to fill the role of teacher

31

with his friends by "form[ing] study groups with classmates to review problems together, improving the collective performance of his class." *Id.* at 4.  Mr. Lin's teachers and classmates similarly recount his willingness to help others.  Biale Decl., Ex 2-E at 3; *id.*, Ex. 2-G at 2.  As both a high-schooler and a college student, Mr. Lin volunteered to teach week-long programs to underserved children in remote areas of Taiwan.  *Id.*, Ex 2-E.  Mr. Lin's co-teacher recalls that Mr. Lin's "students were left in awe with the possibilities that programming offers" and that he "profoundly changed the lives of several of our students."  *Id.* at 3.

Mr. Lin has actively worked to improve the communities to which he belongs.  During his college internship, Mr. Lin spearheaded efforts to improve the office's culture, including by creating and leading a book club and proposing technological solutions to improve internal communications.  Biale Decl., Ex. 2-H at 1.  Likewise, while completing his service in Saint Lucia, Mr. Lin was regarded as an "honest, diligent, reliable kind-hearted and compassionate individual," who was "deeply committed to . . . the well-being of others."  *Id.*, Ex. 2-F at 1.  As Mr. Lin's colleague at the Taiwanese Technical Mission notes, Mr. Lin's work at the Mission "stemmed from a profound sense of kindness, warm-heartedness, and enthusiasm, without any expectation of material reward."  *Id.*

Caretaking comes naturally to Mr. Lin.  When his father left his mother, one of Mr. Lin's first reactions was to think about how he could take care of his mother and brother—even though he was only ten years old.  Nine years later, when Mr. Lin was in college and ███████████ ██████████████, Mr. Lin again snapped into caretaking mode.  ███████████ ███████████████████████████████████.  He made sure that his brother, a high schooler at the time, got to school on time, did his homework, and ate dinner.  ████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Biale

Decl., Ex. 2-A at 4.

Even at MDC, Mr. Lin has continued to care for others.  As discussed above, through the

Suicide Watch program, Mr. Lin has devoted countless hours over the past fourteen-plus months

to monitoring, comforting, and assisting his fellow inmates in their most difficult moments.

Many of those moments have been truly disturbing.  Among many other devastating scenes,

Mr. Lin witnessed fellow inmates throw feces at the walls and scream for hours and three fellow

inmates being removed from their cells following suicide attempts, including two in which the

inmates had tried to slit their wrists and were bleeding profusely.  These experiences have had a

profound effect on him.  He has also seen firsthand in MDC how drugs destroy communities and

individuals, something he sees now he appreciated only at an abstract level when he was running

Incognito from behind a computer screen.  As Mr. Lin describes in his letter, "It is horrifying to

witness what I used to perceive as numbers on the screen solidify into reality: able-bodied men

turning into little more than zombies under the influence, lights going out of unfocused eyes as if

there's no longer a soul underneath, bodies on the floor having seizures after an overdose."  Biale

Decl., Ex. 1 at 2.

Mr. Lin's intelligence is undeniable.  The nature of his offense conduct demonstrates as

much.  As does his academic success, which includes graduating at the top of his classes in high

school and college, and his acceptance into business school in Singapore.  Past experience

demonstrates that Mr. Lin wants to and can use his gifts for good.  For example, for his capstone

graduation project, he created a prototype for a computer program he called "LetterYou," which

was "a time capsule powered by blockchain technology" that "serves as a 'will' for elders who

never had the opportunity to put their thoughts into words for their children and loved ones

during their lifetimes."  Biale Decl., Ex. 2-B at 1; *id.*, Ex. 2-E at 3; *id.*, Ex. 2-H at 1.  Reflecting

on this project, Mr. Lin's professor praised Mr. Lin's "commitment to producing rigorous, high-

quality work" that "reflects not only his academic potential but also his passion for contributing

meaningful advancements to the field of data security."  *Id.*, Ex. 2-H at 1-2.  Similarly, his

projects from his time in Saint Lucia, which included projects designed to help hospitals, law

enforcement, and young entrepreneurs, also speak to his ability and "genuine desire" to use

technology to "make a difference" in society and "showcase his character and commitment to

service."  *Id.*, Ex. 2-F at 2.  Mr. Lin has a strong desire and commitment to use his intelligence

for good.

## IV.    LAW ENFORCEMENT'S SIGNIFICANT INVOLVEMENT IN INCOGNITO SUPPORTS A DOWNWARD VARIANCE

Mr. Lin accepts responsibility for the seriousness of his conduct, but there can be no

doubt that he faces an inflated Guidelines range as a direct result of law enforcement's

involvement in the offense conduct.  The FBI, through CHS, played an integral role in

Incognito's success, helping the site increase vastly its drug sales and profitability.  To be clear,

Mr. Lin entered the conspiracy to run Incognito of his own volition and accepts responsibility for

getting the site up and running and maintaining it until he shut it down in March 2024.  But as

evidenced by the numbers of transactions and dollars in the period before CHS joined the site

and after, it is clear that law enforcement had a significant influence over the drug weight at

issue here.

At least six circuits recognize the government's manipulation of a defendant's offense

conduct—referred to as "sentencing manipulation"—as an important consideration under Section

3553(a).  *See United States v. Kenney*, 756 F.3d 36, 51 (1st Cir. 2014); *United States v.*

*Torres*, 563 F.3d 731, 734-36 (8th Cir. 2009); *United States v. Boykin*, 785 F.3d 1352, 1360-62

(9th Cir. 2015); *United States v. Beltran*, 571 F.3d 1013, 1019 (10th Cir. 2009); *United States v. Ciszkowski*, 492 F.3d 1264 (11th Cir. 2007); *United States v. Bigley*, 786 F.3d 11, 15 (D.C. Cir. 2015).    "Sentencing manipulation occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." *Torres*, 563 F.3d at 734; *see also United States v. Caban*, 173 F.3d 89, 93 n.1 (2d Cir. 1999) (sentencing manipulation occurs "when the government engages in improper conduct that has the effect of increasing the defendant's sentence" (citation omitted)).    When analyzing sentencing manipulation, "the judicial gaze should, in the usual case, focus primarily—though not necessarily exclusively—on the government's conduct and motives." *Boykin*, 785 F.3d at 1360 (quoting *United States v. Fontes*, 415 F.3d 174, 181-82 (1st Cir. 2005)).    Though the Second Circuit has neither explicitly recognized nor rejected the doctrine, the Circuit "has suggested that a viable sentencing manipulation claim would likely require a showing of outrageous government conduct." *United States v. Cromitie*, No. 09 Cr. 558(CM), 2011 WL 2693297, at *1 (S.D.N.Y. June 29, 2011) (McMahon, J.) (quotation marks omitted) (quoting *United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007)), *aff'd*, 727 F.3d 194 (2d Cir. 2013).

Here, it is no exaggeration to say that the government's conduct was outrageous and shocks the conscience.    Through CHS, the FBI was a partner in the administration of an illegal darknet narcotics marketplace.    It dramatically increased the volume of drugs sold on and profits generated by Incognito.    CHS was instrumental in advertising Incognito.    Based on his prior experiences with other darknet marketplaces, CHS knew that advertising Incognito on darknet news and index sites was key to increasing site traffic and sales.    Within his first few months as an administrator at Incognito, CHS leveraged his connections to get Incognito listed on two of

the most prominent dark web news and index sites, ██████ and DarkNetLive.  As a result, Incognito's drug sales and profits skyrocketed.  As noted above, from December 2020 to April 2022—prior to the FBI's involvement—Incognito processed 6,634 orders, totaling $1,057,313.59.  After CHS joined Incognito and secured its listings on ██████ and DarkNetLive, Incognito's orders increased by a hundred-fold: ████████████████████ ████████████████████, Incognito processed 634,285 orders, totaling $103,427,444.21.

Not only did the government increase the overall quantity of drugs sold on Incognito, but CHS also specifically facilitated the sale of fentanyl, in violation of Incognito's policies.  When CHS joined Incognito, one of the first changes he attempted to implement was to remove the site's fentanyl ban.  CHS tried to persuade Mr. Lin to permit the sale of fentanyl by arguing that permitting its sale was consistent with the Libertarian ethos of the darknet.  Mr. Lin refused. Though Mr. Lin agreed to create a poll for Incognito users to vote on a proposal to lift the ban on fentanyl, he rigged the vote so that the proposal would fail.

Notwithstanding his failure to lift the fentanyl ban, CHS permitted its sale on Incognito. CHS repeatedly neglected to ban vendors accused of selling fentanyl.  Primary among CHS's responsibilities on Incognito was ensuring that vendors and users did not violate Incognito's policies, including by selling fentanyl, and taking appropriate action when violations occurred. As CHS himself noted, he managed approximately 95% of all complaints from users and disputes between Incognito's vendors and users, sending nearly 14,000 complaint- and dispute-related messages in one year.  He also had the authority to make decisions regarding vendors and users, including, among other things, revoking vendor accounts.  Yet, notwithstanding his ability to remove vendors, CHS took no action against multiple vendors accused of selling fentanyl.

36

For example, he ignored pleas from at least two users to take action against a vendor who sold mislabeled, fentanyl-laced drugs. One of those users even submitted a positive fentanyl test for CHS's review and explained that the customer's mother had to go to the hospital after consuming fentanyl-laced drugs they purchased from the vendor. CHS refunded the user but let the vendor continue to sell on Incognito without consequence. In fact, CHS permitted vendors that he knew sold fentanyl to engage in *at least* 2,100 additional transactions after learning of their fentanyl dealings.[7]

While the full extent of the government's outrageous conduct is unknown, its actions undoubtedly played a significant role in the criminal conduct at issue. To be clear, Mr. Lin does not contend that there is anything wrong with law enforcement employing an undercover operation to infiltrate and investigate narcotics conspiracies, including those that occur on the darknet. But here, law enforcement went far beyond that—it had a role in running Incognito for

---

[7]     Mr. Lin concedes that it was reasonably foreseeable to him that fentanyl could be sold through the site, notwithstanding the ban, and he accepted responsibility for fentanyl sales through his plea to Count Four. But as the final PSR recognizes, because the government facilitated the sale of fentanyl on Incognito, which Mr. Lin tried to prevent, Mr. Churchill's death should not be considered as relevant conduct under the Guidelines in determining Mr. Lin's sentence. *See United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995). Under § 1B1.3 of the Sentencing Guidelines, a defendant is responsible for the acts of others only when their conduct is *both* reasonably foreseeable and part of the "jointly undertaken criminal activity" of the defendant and his co-conspirator, among other things. U.S.S.G. § 1B1.3(a)(1)(B). As the Second Circuit held in *Studley*, "the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation"; rather, to be included in the calculation, the conduct must have been in furtherance of jointly undertaken criminal activity. *Studley*, 47 F.3d at 575; *see also United States v. Salem*, 597 F.3d 877, 889 (7th Cir. 2010) ("It does not necessarily follow from the fact that a co-schemer's criminal activity was reasonably foreseeable to a defendant that the defendant joined in that co-schemer's criminal activity."). Here, although Mr. Lin concedes it was reasonably foreseeable that misbranded medication was sold on Incognito, he believed that CHS was fulfilling his responsibilities of monitoring flagged postings and keeping fentanyl off the site; therefore, selling fentanyl was not part of CHS and Mr. Lin's "jointly undertaken criminal activity." We agree with the Probation Department, however, that the Court may consider any facts it deems relevant to sentencing under 18 U.S.C. § 3661. *See* PSR Addendum at 46.

the better part of two years. It claimed responsibility for monitoring narcotics-related activity on the site. It could have shut down the site or taken measures to control the sale of fentanyl through it that would not have tipped off Mr. Lin or Administrator-1 to the government's involvement—rather, that would have been consistent with what they understood CHS's mandate to be. But it did not do either of those things, with tragic consequences.

Again, Mr. Lin does not make any excuse for his conduct, and he unequivocally accepts responsibility for the harm he caused. But, at a minimum, it cannot be disputed that law enforcement's involvement increased Mr. Lin's criminal exposure exponentially by multiplying the volume of drugs sold and money made on Incognito and by promoting the sale of fentanyl. Accordingly, under the exceptional circumstances here, a substantially below-Guidelines sentence is sufficient, but not greater than necessary, to account for the nature and circumstances of the offense. *See, e.g.*, *United States v. Love*, 710 F. App'x 351, 357 (11th Cir. 2017) (affirming below-Guidelines sentence where sentencing court considered "the nature and circumstances of [defendant's] offense, including the fact that it occurred in a reverse sting operation in which the government decided the quantity and type of drugs that Love believed she was transporting").

## V.    A SENTENCE OF TEN YEARS IS SUFFICIENT TO MEET THE GOALS OF SPECIFIC AND GENERAL DETERRENCE

This is Mr. Lin's first criminal offense, the consequences of which have been and will continue to be enormous for him regardless of what sentence the Court orders. At the young age of twenty-four, Mr. Lin is facing a sentence of at least ten years and up to the rest of his life. And, if the Court sentences him to anything less than life, upon the completion of his sentence, Mr. Lin will be sent back to Taiwan where he faces additional prosecution and punishment. *See supra* Factual Background Section III.E. The penalties for drug crimes in Taiwan are severe. Indeed, Mr. Lin may face a death sentence or life imprisonment if convicted of transporting or

selling "Heroin, Morphine, Opium, Cocaine, and their derivative products." Fawubu Fagui Ziliaoku, Narcotics Hazard Prevention Act, Art. 4 (as amended May 4, 2022). While the exact charges Mr. Lin will face in Taiwan remain uncertain, it is likely that the Taiwanese government will zealously prosecute him given the significant attention the government and media have already dedicated to his case. *See id.*; *see also* Biale Decl. ¶ 49.

Moreover, Taiwanese prisons are notorious for their poor conditions. Inmates sleep on bamboo mats in overcrowded cells and are permitted outside for only twenty to sixty minutes per week. *See* Guidance, *Information for British people detained or imprisoned in Taiwan*, GOV.UK (last updated Dec. 11, 2024), https://www.gov.uk/government/publications/taiwan-prisoner-pack/information-pack-for-british-prisoners-in-taiwan#detention-conditions-in-taiwan; Steven Crook, *Seventy-two days in a Taiwanese jail*, Taipei Times (Dec. 31, 2019), https://www.taipeitimes.com/News/feat/archives/2019/12/31/2003728456; Azn Han Solo, *Inmates sleep on the floor in Taiwanese prisons*, Medium (Mar. 20, 2018), https://medium.com/@AznHanSolo/inmates-sleep-on-the-floor-in-taiwanese-prisons-bc868da06a8f. In addition, even in investigative detention, defendants can be deprived of family visits and permitted to meet only with their lawyers (it is, moreover, unclear how Mr. Lin will be represented in Taiwan, which does not have a public defender system, given that all of his assets have been seized and forfeited). *See 2022 Country Reports on Human Rights Practices: Taiwan*, U.S. Dep't of State, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/taiwan/ (last visited Jan. 13, 2026). Thus, even if the Court sentences Mr. Lin to the mandatory minimum, the chances of him serving more than ten years for his offense conduct are

high.[8]  And if he is ultimately released in Taiwan, the notoriety of his case in that country will continue to haunt him, making the effects of his case lifelong, even if he is one day released from prison.

In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2014), in the context of the Career Offender Guidelines, the Second Circuit pointed out that "[t]he [Sentencing] Commission has explained that the escalating sentence ranges prescribed by the CHCs are intended to achieve the purpose of deterrence[.]"  *Id.* at 220.  Yet, courts have concluded that for defendants who have not yet experienced extended incarceration, a sentence far shorter than that set forth in the Guidelines may serve the purpose of specific deterrence.  For example, the *Mishoe* court remarked that:

> [A] major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. . . .  If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years.  Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.

*Id.*  Mr. Lin is in Criminal History Category I, yet he faces the possibility of a life sentence.  The logic of *Mishoe* applies with equal, if not greater, force here: a sentence of life, thirty years, or anything close to either of those, is simply not necessary to achieve a deterrent effect as to Mr. Lin specifically.

---

[8]      Unlike many other defendants, Mr. Lin will serve the full length of any sentence that the Court imposes on him.  As a deportable non-U.S. citizen, Mr. Lin cannot reap the benefits under the First Step Act of any good time credits he accrues while incarcerated.  *See* 18 U.S.C. § 3632(d)(4).  Moreover, there is no prisoner transfer treaty between the United States and Taiwan from which Mr. Lin would be able to benefit.  *See List of Participating Countries/Governments*, U.S. Dep't of Justice, https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments (last visited Jan. 13, 2026).

In addition to the logic set forth above, perhaps the most significant reason that Mr. Lin will avoid recidivism is his close relationship with his mother and brother. "The single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to . . . commit future crimes after their release than prisoners without such ties." Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family L. 1. 191, 196 (2006). Mr. Lin has strong ties to his family. From his arrest through present day, his family has supported him, including by speaking with him nearly every other day (notwithstanding the twelve-hour time difference and the expense of international calls), MDC conditions permitting. Indeed, Mr. Lin's desire to provide for his family was a primary reason that he engaged in the offense conduct in the first place—he recognizes now that his choice was gravely misguided and has ultimately caused his family more harm than good. For example, Mr. Lin's family has not been able to see him since his arrest and, due to the expense of international travel, likely will not see him until after his term of imprisonment concludes. His family has also suffered due to the Taiwanese investigation into Mr. Lin's involvement with Incognito, which has led to the seizure of Mr. Lin's assets, including his family's home, and the Taiwanese press's coverage of this case, which has villainized Mr. Lin. *See* Biale Decl. ¶ 49. Mr. Lin is highly incentivized to avoid causing any further harm to his loved ones.

Mr. Lin's age and intelligence provide additional reasons why a ten-year sentence would serve the goal of specific deterrence. As discussed above, Mr. Lin was in his late teens and early twenties at the time of the offense conduct. Though highly capable, Mr. Lin's brain was not yet fully developed, including especially those parts related to sound decision-making. *See supra* Argument Section III.A. At the conclusion of a ten-year sentence, Mr. Lin will be a thirty-three-

year-old man with a fully developed prefrontal cortex, significantly more capable of making reasoned and good decisions than he was at the time he decided to develop and participate in Incognito. *See United States v. Serrano*, No. 08-CR-612, 2010 WL 147924, at *2 (E.D.N.Y. Jan. 11, 2010) (citing, among other things, the defendant's "relative youth at the time of the offense" as contributing to specific deterrence). With the benefit of maturation and the hard lessons learned by his prosecution and incarceration, there is good reason to believe that, rather than return to crime, Mr. Lin will focus instead on using his skills and interest in technology in a socially productive manner. His offense, though conducted over an extended period, was out of character for Mr. Lin. Mr. Lin's employment history, which reflects balancing jobs while studying, demonstrates that he is capable of maintaining lawful employment. Research indicates that individuals like Mr. Lin who engage in cybercrime at a young age but have legitimate employment opportunities and educational pursuits "generally gravitate[] away from cybercrime as other life opportunities" arise. Jonathan Lusthaus, Industry of Anonymity: Inside the Business of Cybercrime 78 (1st ed. 2018). Finally, through his volunteer work teaching underserved children in Taiwan and his service work in Saint Lucia, Mr. Lin has demonstrated that he wants to, and can, put his intelligence and skills towards positive and productive ends.

As to general deterrence, numerous studies, including those conducted by the Department of Justice, have found that "punishment certainty is far more consistently found to deter crime than is punishment severity." Daniel S. Nagin and Greg Polansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, Criminology, 39(4) (2001); *accord Five Things About Deterrence*, Nat'l Institute of Justice, https://www.nij.go.v/five-things/pages/deterrence.aspx (last visited Jan. 11, 2026) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than

even draconian punishment."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (while the certainty of being caught and punished has a deterrent effect, research shows that "increases in severity of punishments do not yield any significant (if any) marginal deterrent effects"). That Mr. Lin was apprehended less than two months after Incognito shut down and will be sentenced to a significant term of incarceration sends a strong message that those who engage in the sale of drugs will be caught and punished—even if that conduct occurs overseas and behind the anonymity of the darknet. A sentence beyond the mandatory minimum of ten years will not achieve additional general deterrence and thus would be "greater than necessary" to achieve the goals of sentencing.

## VI.    A SENTENCE OF TEN YEARS IS APPROPRIATE AND NECESSARY TO AVOID UNWARRANTED SENTENCING DISPARITIES

Mr. Lin recognizes the seriousness of his conduct and that such conduct requires significant punishment. Given the unique circumstances of Mr. Lin's case a sentence of life or even the thirty years recommended by Probation would be disproportionately severe when viewed against other individuals' sentences for convictions related to the sale of drugs over the darknet. Those individuals who have received sentences in the life or thirty-year range have refused to accept responsibility for their actions, been previously convicted of crimes, and/or engaged in conduct significantly more serious than Mr. Lin—including that their conduct involved manufacturing narcotics, violence, and the sale of illicit goods other than narcotics. Instead, as discussed below, Mr. Lin is more similarly situated to individuals who received lower sentences in the ten-year range.

First, Mr. Lin's conduct is less serious than that of Ross Ulbricht, who was sentenced to life in prison in connection with his creation and administration of Silk Road, though he served approximately only eleven years of that sentence until January 21, 2025, when President Trump

pardoned him. *See* U.S. Att'y's Off., Southern District New York, Press Release (May 29, 2015), https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison [hereinafter, "Ulbricht Press Release"]; *United States v. Ulbricht*, 14-cr-00068 (LGS), ECF No. 403 (S.D.N.Y. Jan. 21, 2025). Ulbricht went to trial, and a jury convicted him of seven charges, including Continuing Criminal Enterprise (21 U.S.C. § 848(a)), which carries a mandatory minimum sentence of twenty years. *United States v. Ulbricht*, 14-cr-00068 (LGS), ECF No. 183 (S.D.N.Y. Feb. 5, 2015). Silk Road was a multi-million-dollar darknet marketplace that Ulbricht operated from January 2011 through October 2013, when he was in his *late* twenties, an important distinction in terms of maturity and brain development from Mr. Lin. *See* Ulbricht Press Release. Ulbricht "controlled and oversaw every aspect of Silk Road, and managed a staff of paid, online administrators, and computer programmers who assisted with the day-to-day operations of the site." *Id.* Vendors on Silk Road primarily sold narcotics, which were connected to at least six overdose deaths. *Id.* Ulbricht also agreed to allow deadly substances like cyanide to be sold on Silk Road, in addition to recreational drugs. *See United States v. Ulbricht*, 858 F.3d 71, 130 (2d Cir. 2017). In addition to narcotics, vendors on Silk Road sold other illegal goods, including internet hacking services, malicious software, and fake identification documents. Ulbricht Press Release. Finally, Ulbricht "demonstrated a willingness to use violence to protect" Silk Road by "soliciting six murders-for-hire in connection with operating the site . . . ." *Id.*

Mr. Lin's conduct is also less serious than that of Oluwole Adegboruwa, who was sentenced to thirty years' imprisonment after a jury found him guilty of seven federal offenses, including 21 U.S.C. § 848(a), in connection with his sale of narcotics on the darknet. *United States v. Adegboruwa*, 19-cr-00260 (JNP), ECF No. 756 (D. Utah June 5, 2024); *Adegboruwa*,

19-cr-00260 (JNP), ECF No. 1004 (D. Utah Nov. 13, 2024).  Adegboruwa conceived of, created, and managed a dark web drug trafficking operation that ran from October 2016 through May 2019 and generated millions of dollars from the sale of more than 300,000 oxycodone pills.  *See* U.S. Att'y's Off., District of Utah, Press Release (Nov. 14, 2024), https://www.justice.gov/usao-ut/pr/convicted-dark-web-drug-dealer-sentenced-360-months-imprisonment    [hereinafter "Adegboruwa Press Release"].  Adegboruwa managed at least five people whose responsibilities included, among other things, "locating and procuring pharmacy grade pills" and "packaging the pills and/or shipping them to customers."  *Id.*  Adegboruwa testified at trial that "he was the only one who had access to his vendor pages on the dark web markets to process order from customers," he "had the power to hire and fire individuals," and he "controlled sales on the dark web markets and the monetary accounts."  *Id.*; *United States v. Adegboruwa*, 19-cr-00260 (JNP), ECF No. 980 at 2 (D. Utah Oct. 31, 2024).  Adegboruwa was in his mid-to-late forties at the time of his offense and had a prior federal felony conviction.  *See* Adegboruwa Press Release; *Adegboruwa*, 19-cr-00260 (JNP), ECF No. 980 at 2.

In contrast to both Adegboruwa and Ulbricht, Mr. Lin accepted responsibility for his actions immediately upon being arrested and subsequently by pleading guilty.  Moreover, Mr. Lin's conduct, while no doubt serious, was less serious than that of Adegboruwa and Ulbricht.  As explained above, Mr. Lin did not possess sole control over Incognito in the way that Adegboruwa and Ulbricht did over their criminal operations.  *See* Factual Background Section II.  Unlike Adegboruwa, Mr. Lin did not personally participate in the manufacture or distribution of narcotics, nor does he have a prior criminal history.  And, unlike Ulbricht, Mr. Lin has shown absolutely no willingness to engage in violence.  It is significant also that, whereas Silk Road openly promoted the sale of narcotics, including fentanyl, and various other illicit

goods, Incognito allowed for the sale of narcotics only and Mr. Lin tried, albeit unsuccessfully, to prevent the sale of fentanyl.  *See supra* Factual Background Section II.A, II.E.  Finally, although Incognito is linked to one overdose, for which Mr. Lin is deeply remorseful, Silk Road was connected to six overdose deaths.  Accordingly, a sentence of life or thirty years would be a disparate outcome.

A sentence of twenty years would also be disproportionately harsh.  The operators of RedLightLabs, Michael Ta and Rajiv Srinivasan, who sold the drugs that caused Mr. Churchill's death, received sentences of 260 and 235 months, respectively.  *See* U.S. Att'y's Off., Central District of California, Press Release (Apr. 29, 2024), https://www.justice.gov/usao-cdca/pr/oc-and-houston-men-sentenced-decades-prison-supplying-fentanyl-and-other-drugs-sold.    Ta and Srinivasan were both personally involved in, among other things, procuring, processing purchases of, and distributing narcotics, including fentanyl, methamphetamine, fentanyl powder, black tar heroin, and cocaine.  *See id.*  In their plea agreements, Ta and Srinivasan admitted "to causing the fentanyl overdose deaths of three victims," including Mr. Churchill, and "to distributing fentanyl-laced pills to additional victims, both of whom suffered fatal drug overdoses shortly after they received the pills."  *Id.*  Ta and Srinivasan knew that they were sending lethal doses of fentanyl to unsuspecting users, and their conduct led to the deaths of five victims.  Mr. Lin's conduct, in contrast, though serious and harmful, reflects a lower level of culpability than these individuals and includes mitigating circumstances that were not present in their cases.  A sentence of or around twenty years for Mr. Lin, therefore, would be disproportionately long.

Sentences that dark web vendors have received further demonstrate that a ten-year sentence is appropriate for Mr. Lin.  Twenty-four-year-old Tenzin Orgil, who pleaded guilty to

charges in connection with his three-year participation in a "drug trafficking enterprise that included the sale of methamphetamine and fentanyl on the dark web as well as the manufacture of ecstasy . . . and methamphetamine in clandestine laboratories" was sentenced to fourteen years.  *See* U.S. Att'y's Off., Southern District of Florida, Press Release (May 21, 2024), https://www.justice.gov/usao-sdfl/pr/dark-web-drug-vendor-and-clandestine-lab-manufacturer-sentenced-prison-trafficking.  Although Orgil did not operate a darknet site, unlike Mr. Lin, he had a prior criminal record, was involved in gang activity, possessed a gun, sold illicit goods other than narcotics, and was personally involved in the manufacture of methamphetamine.  *See id.*; *United States v. Orgil*, 23-cr-20018 (KMW), ECF No. 66 at 4, 7-8 (S.D. Fla. May 10, 2024); *Orgil*, 23-cr-20018 (KMW), ECF No. 67 at 4, 7-10 (S.D. Fla. May 14, 2024).

Mr. Lin is more similarly situated to individuals like Ryan Scott Cochran and Binh Thanh Le, who received seven- and eight-year sentences, respectively.  Thirty-four-year-old Cochran pleaded guilty to distributing through the U.S. mail fentanyl, cocaine, and methamphetamine, which he sold over the darknet (he was one of the most significant vendors on Incognito), and agreed to forfeit $1,100,000.  *See* U.S. Att'y's Off., Eastern District New York, Press Release (Aug. 28, 2024), https://www.justice.gov/usao-edny/pr/dark-web-vendor-pleads-guilty-distributing-fentanyl-through-mail.  Though Cochran did not operate a darknet marketplace, he sold a substantial amount of narcotics—the government "conservative[ly] estimate[d]" Cochran was "responsible for distributing 9,000 grams of fentanyl, 5,442 grams of methamphetamine, 1,188 grams of cocaine base, 15 grams of cocaine, 10 units of ketamine and 40 grams of oxycodone."  *United States v. Cochran*, 25-cr-00063 (RER), ECF No. 35 at 2, 7-8 (E.D.N.Y. Mar. 14, 2025).  Le was twenty-two-years old when he worked as "[t]he leader and organizer of a highly sophisticated drug trafficking operation" in connection with which he "created and

47

operated a vendor site" on the dark web.  *See* U.S. Att'y's Off., District of Massachusetts, Press Release (Mar. 11, 2022), https://www.justice.gov/usao-ma/pr/leader-dark-web-drug-trafficking-operation-sentenced-eight-years-prison-and-59-bitcoin.  Le pleaded guilty to conspiracy to manufacture, distribute, and possess with intent to distribute MDMA, Ketamine, and Xanax and agreed to forfeit assets and property in excess of $2 million.  *Id.*  Like Mr. Lin, neither Cochran nor Le engaged in or showed a propensity to engage in violence.  Also, like Mr. Lin, Le's background included being financially responsible for his struggling family and turning to the darknet to try to provide support.

Considering the foregoing, and notwithstanding the significant variance from the Guidelines range, a sentence of ten years is necessary to avoid unwarranted sentencing disparities.

## VII.    THE CONDITIONS OF CONFINEMENT TO WHICH MR. LIN HAS BEEN SUBJECTED WARRANT LENIENCY

The Court should also consider, and grant a variance in accordance with, the harsh and challenging conditions of confinement that Mr. Lin has endured over the past twenty months during which he has been incarcerated at MDC.  As Your Honor is well aware, courts in this Circuit have repeatedly recognized that the harsh conditions at MDC counsel in favor of a shorter overall sentence.  *See United States v. Nunez*, 23 Cr. 517 (AT), 2024 WL 4504493, at *6 (S.D.N.Y. Oct. 16, 2024) (collecting cases).  At MDC, "[c]haos reigns, along with uncontrolled violence."  *United States v. Colucci*, No. 23 Cr. 417, 2024 WL 364857, at *4 (E.D.N.Y. Aug. 5, 2024).  The violence is so "staggering" that it "ma[kes] time spent there essentially the equivalent of either time and a half or two times what would ordinarily be served."  *Nunez*, 2024 WL 4504493, at *6 (citation omitted).  Due to this violence and chronic understaffing, "[i]nmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells,

prohibited from leaving for visits, calls, showers, classes, or exercise"—especially during the weekends and over holidays. *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024). MDC is also "notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates." *Id.* at 234. "Finally, the MDC's physical conditions have long been problematic." *Id.* at 235. These "problematic" conditions have included, but are not limited to, "mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Id.* (citation omitted).

The conditions at MDC during Mr. Lin's incarceration—May 2024 through present—have been disturbingly consistent with those described by these courts. MDC has neglected Mr. Lin's acute medical and dental needs, including by making him wait weeks to see medical professionals and, even then, failing to provide basic treatment. Moreover, through his participation in MDC's Suicide Watch Program, he has borne firsthand witness to the harsh treatment that inmates with mental health issues receive. Mr. Lin has endured countless days of severely restrictive lockdowns, been served spoiled food, and been denied access to his discovery. Though he has personally been spared violence, Mr. Lin has witnessed extreme violence among inmates, including knife fights, slashings, and strangulations. Indeed, shortly after Mr. Lin arrived at MDC, during the summer of 2024, "[m]ultiple MDC inmates were murdered at the facility." *Nunez*, 2024 WL 4504493, at *6. That fall, "[t]he conditions inside MDC . . . worsened to such a degree that the BOP . . . ceased designating prisoners to serve their sentences at MDC altogether." *Id.* (citation omitted). For Mr. Lin, who had never spent a day in jail before arriving at MDC, these experiences have been extremely traumatizing. And, as discussed above, Mr. Lin is highly likely to face even worse incarceratory conditions in Taiwan

when he is ultimately returned there after serving his sentence in this case. In light of these conditions, the Court should grant a variance and sentence Mr. Lin to a below-Guidelines sentence of ten years.

## CONCLUSION

We recognize that Mr. Lin committed a serious crime and that he did so over a sustained period of time. We, Mr. Lin included, have deep sympathy for the Churchills and other families who have suffered the loss of a loved one due to the scourge of fentanyl. And we recognize that a request for the mandatory minimum sentence under such circumstances is an extraordinary ask. But we respectfully submit that there are unique mitigating features of both Mr. Lin and of the offense conduct in this case that warrant an extraordinary act of mercy from the Court. For these reasons, we respectfully ask that the Court season justice with mercy and impose a sentence of ten years' incarceration, which is sufficient, and not greater than necessary, under 18 U.S.C. § 3553.

Dated:       New York, New York
             January 13, 2026

                                        SHER TREMONTE LLP

                                        By:  /s/ *Noam Biale*
                                             Noam Biale
                                             Katie Renzler
                                             Michael Bass
                                             90 Broad Street, 23rd Floor
                                             New York, NY 10004
                                             Tel.: (212) 202-2600
                                             Fax: (212) 202-4156
                                             nbiale@shertremonte.com

                                             *Attorneys for Rui-Siang Lin*