# EXHIBIT 9

**TO: Clerk's Office**
    **UNITED STATES DISTRICT COURT**
    **EASTERN DISTRICT OF NEW YORK**

_____

    **APPLICATION FOR LEAVE**
    **TO FILE DOCUMENT UNDER SEAL**

*********************************
IN THE MATTER OF AN APPLICATION FOR A SEARCH
WARRANT FOR: THE PERSON RUI-SIANG LIN AND
ANYCELLPHONES, ELECTRONIC DEVICES, OR
PERSONAL EFFECTS WITHIN HIS POSSESSION,
CUSTODY, AND CONTROL WHEN HE ARRIVES AT
JOHN F. KENNEDY INTERNATIONAL AIRPORT ON OR
ABOUT MAY 18, 2024

24-MC-1998
_____
Docket Number

*********************************

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✔
Name: AUSA Elias Laris
Firm Name:U.S. Attorney's Office - EDNY
Address: ___271A Cadman Plaza East___
        Brooklyn, NY 11201
Phone Number: 718-254-6599
E-Mail Address:elias.laris@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES____ NO ✔
**If yes, state description of document to be entered on docket sheet:**

_____

_____

_____

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

_____

**B) If a _new_ application,** the statute, regulation, or other legal basis that
authorizes filing under seal

Ongoing criminal investigation
_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY _NOT_ BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**
            May 17, 2024
DATED: Brooklyn               , NEW YORK

_____

**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE_____
                           DATE

**MANDATORY CERTIFICATION OF SERVICE**:
**A.)** ____ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ____ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation:_____; or **C.)** ✔ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

    5/17/2024                   _Elias Laris_
     DATE                        SIGNATURE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

THE PERSON RUI-SIANG LIN AND ANY
CELLPHONES, ELECTRONIC DEVICES,
OR PERSONAL EFFECTS WITHIN HIS
POSSESSION, CUSTODY, AND CONTROL
WHEN HE ARRIVES AT JOHN F.
KENNEDY INTERNATIONAL AIRPORT
ON OR ABOUT MAY 18, 2024, 2021R00280

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR A SEARCH
WARRANT

No. 24-MC-1998

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

ANDREW BENNETT, Special Agent, Federal Bureau of Investigation ("FBI"), being

duly sworn, deposes and states:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the person and effects of RUI-SIANG LIN when he

arrives at John F. KENNEDY International Airport ("JFK Airport") on or about May 18, 2024,

further described in Attachment A (the "SUBJECT PERSON"), including electronic devices such

as cellphones ("the "SUBJECT DEVICES"),[1] within the possession, custody, and control of the

---

[1] It is the Government's understanding that it may be permissible to search the SUBJECT
DEVICES and any extraction reports of electronically stored information from the SUBJECT
DEVICES without obtaining a warrant, in light of the circumstances under which the SUBJECT
DEVICES would be seized, namely a border search upon reasonable suspicion that the SUBJECT
DEVICES contain evidence of the Subject Offenses, as defined herein.  However, the Government
seeks this warrant out of an abundance of caution.

1

SUBJECT PERSON (the "PERSON SEARCH WARRANT"), for the items, including electronic devices such as cellphones, as described in Attachment B.

2.      I am a Special Agent with the FBI.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been a Special Agent with the FBI since approximately 2014.  I am currently assigned to a cyber intrusion squad at FBI's New York Field Office.  I have participated in investigations into criminal offenses involving computer crimes including the use of darkweb marketplaces to sell and distribute contraband and am familiar with the means and methods used to commit such offenses.  During the course of these investigations, I have participated in the execution of search warrants involving emails, servers, and other forms of electronic evidence.

3.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4.      The person to be searched is RUI-SIANG LIN, date of birth February 1, 2001, and any personal effects in his vicinity and/or under his control at the location where the warrant is executed, including any backpacks, bags, and briefcases, and checked bags, for cellphones and

2

electronic devices and paper that appears to contain passwords and/or seed phrases for electronic devices, online accounts, cryptocurrency wallets or accounts, upon the following condition: LIN is located in the Eastern District of New York at the time of the execution of the Person Search Warrant.  A picture of LIN is below:



5.    For the reasons detailed below, there is probable cause to believe that electronic devices in the possession of the SUBJECT PERSON contain evidence, fruits, and instrumentalities of the distribution and possession with intent to distribute illegal narcotics and conspiracy to do the same, through the operation and use of an online marketplace, in violation of Title 21, United States Code, Sections 841 and 846, and money laundering, and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956 (the "Subject Offenses").

**<u>PROBABLE CAUSE</u>**

<u>Probable Cause Regarding Commission of the Subject Offenses</u>

6.    Based on my review of documents, conversations with law enforcement officers and others, and my training and experience, I have learned the following, among other things:

a. The FBI, Drug Enforcement Administration, Homeland Security Investigations, Food and Drug Administration—Office of Criminal Investigations, and the New York City Police Department ("Investigating Agencies") have been investigating a particular online marketplace ("Marketplace-1").  Marketplace-1 was a darknet marketplace that was accessible from the United States and sold illegal narcotics.

3

b.        Marketplace-1 was managed by several administrators who are known by online monikers.  Based on open-source research, I have learned that one such administrator is known by the name "Pharoah."  Pharoah managed Marketplace-1 infrastructure, oversees its escrow wallet service, administers staff/employee pay, and is the overall leader of the business.

c.        On or about January 26, 2024, the Hon. Sarah N. Netburn (USMJ) signed an arrest warrant on the basis of a sworn complaint charging Rui-Siang Lin ("Lin") with certain of the Subject Offenses (the "Complaint").  The Complaint is attached hereto as **Exhibit A** and is incorporated by reference herein.  The Complaint alleges that LIN, *i.e.*, the SUBJECT PERSON, was the primary administrator of Marketplace 1, identified in the Complaint as "Adminstrator-1".  That is, for the reasons set forth in the Complaint, I believe Lin is "Pharoah."  The Complaint further details evidence that Markerplace-1 was a large, pervasive, online narcotics marketplace.  On or about March 26, 2024, a grand jury returned an indictment charging LIN with the Subject Offenses and other crimes.   The Indictment is attached hereto as **Exhibit B** and is incorporated by reference herein.

d.        As described in the Complaint, Marketplace-1 operated an escrow service, which is part of the website's business model.  The escrow service enabled Marketplace-1 vendors to securely transact with their customers.  Specifically, through the escrow service, customers deposited cryptocurrency (typically Bitcoin or Monero ) into the customer's Marketplace-1 wallet.  Then, after a buyer purchased a product from a vendor (e.g., narcotics) Marketplace-1 released funds from the escrow wallet to the vendor.  In this way, Marketplace-1 served as a financial link between vendors and customers and in so doing provided both parties a level of comfort.  Sellers know they will be paid for their illegal narcotics and buyers know their payments will be released to sellers only after the goods are shipped. Although not every transaction on Marketplace-1 uses

4

the "escrow" service, it is offered by Marketplace-1 and is an important component of Marketplace-1's business.

   e. As explained in the Indictment, and based on my review of documents, on or about March 5, 2024, Lin appeared to have engaged in an "exit scam" with respect to Marketplace-1.  Based on my training and experience, I am aware that an exit scam is when a darknet marketplace stops transmitting money it holds in escrow while it continues to take deposits. The operator(s) of the marketplace collect as many deposits as they can and then shut down the site and steal the deposited money.  Beginning in or about January 2024, public reports on online darknet forums indicated that many individuals were having difficulty withdrawing funds from their Marketplace-1 accounts.  In the days leading up to March 5, 2024, those complaints became more pronounced.

   f. Corroborating those reports, law enforcement officers were unable to withdraw funds from their undercover Marketplace-1 accounts.  Further, by examining the publicly available Bitcoin and Monero blockchains, including by using commercially available software, law enforcement officers observed an approximately 12 Bitcoin transfer out of Marketplace-1 associated wallets (worth approximately $800,000 on or about March 3, 2024). This transfer is significant and further indicative of an exit scam involving Marketplace-1.

   g. Further examination of financial activity of Marketplace-1 indicates that the site's overall withdrawals dropped precipitously in or about early March 2024.  In the below chart, which was sourced from open-source reporting concerning cryptocurrencies flows of wallets associated with Marketplace-1, the sharp line on the right end of the chart demonstrates a drop in withdrawals.  That means Marketplace-1 customers were unable to withdraw their money from the site, which is indicative of an exit scam:

USAO_00032687



Probable Cause to Believe the Subject Person and Subject Devices will be at JFK Airport and

Contain Evidence of the Subject Offenses

7.      There is probable cause to believe that Rui-Siang LIN will arrive at JKF Airport on the evening of May 18, 2024.  Based on my review of reports and documents and my conversations with other law enforcement officers involved in this investigation, I am aware that on or about November 3, 2023, law enforcement officers observed an individual matching the description of LIN at the Toronto International Airport boarding a flight to Saint Lucia.  On or about May 5, 2024, law enforcement received notification that Rui-Siang Lin is listed on on the passenger manifest for JetBlue flight B6 882 scheduled to depart Hewanorra International Airport in Vieux Fort, Saint Lucia on May 18, 2024, at 4:30 pm, and arrive at JFK Airport at 9:31 pm the same day.

8.      Based on my training, experience, and participation in this investigation, I am aware that electronic devices, such as cellphones and computers, were necessarily used in furtherance of the Subject Offenses.  As set forth in greater detail in the Complaint and Indictment, LIN, who is sophisticated in the use of computer infrastructure, *see, e.g.*, Complaint ¶ 25(f)(iii), used various types of computer hardware and online facilities in furtherance of the Subject Offenses.  Moreover,

6

one of the central features of Marketplace-1, the Marketplace-1 "bank," Complaint ¶ 19(e), required the use of electronic devices. Specifically, electronic devices, such as the Subject Offenses, were used to facilitate the transfer of drug proceeds in the form of cryptocurrency and to manage those cryptocurrency proceeds at exchanges like Binance[2] until such time as electronic devices must again be used to access these cryptocurrency accounts to further transfer these funds or convert these proceeds to fiat currency.

9.    Based on the following, there is probable cause to believe that LIN will have multiple electronic devices on his person and/or in his luggage when he arrives at JFK Airport on May 18, 2024.

a.    On or about November 22, 2023, the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York, signed a search warrant (the "November iCloud Warrant") for an Apple iCloud account (the "LIN iCloud Account") used by LIN.[3]

b.    Based on my review of records obtained from Apple pursuant to the November iCloud Warrant, I am aware that the LIN iCloud Account was created on or about November 4, 2017.

c.    Based on my review of records obtained from Apple pursuant to the November iCloud Warrant, I am aware that the LIN iCloud Account has had multiple electronic

---

[2] Binance is cryptocurrency exchange.

[3] Based on my review of reports and records, I am aware that the LIN iCloud Account is registered to a specific Gmail account (the "LIN Gmail Account"), which, in turn, is registered to a crypto currency account ("Crypto Account-1") that was used – in combination with cryptocurrency from a cryptocurrency wallet that the administrator of Marketplace-1 controlled – to purchase a specific domain. The registrar of that domain is documented as "Ruisiang LIN," which I believe is the name "Rui Siang Lin." Crypto Account-1 is subscribed to "Rui Siang Lin."

USAO_00032689

devices registered to it.  Most recently, I am aware of an Apple iPhone, Apple iPad, and Apple

MacBook registered to the LIN iCloud Account:[4]

        i.   On or about September 26, 2023, a device listing the product
description "IPHONE 15 PRO BLUE 512GB A3102-ITP" and
bearing serial number L9LNP6NVYF was registered to the LIN
iCloud Account.

      ii.   On or about March 4, 2020, a device listing the product description
"IPAD WI-FI 32GB SPACE GRAY-TWN" and bearing serial
number DMPC26LDMF3M was registered to the LIN iCloud
Account.

    iii.   On or about March 22, 2022, a device listing product description
"MBA 13.3 SLV/8C CPU/7C GPU/8GB/256GB" and bearing serial
number FVFH10CPQ6L7 was registered to the LIN iCloud
Account.

     d.     Based on my review of records obtained from Apple pursuant to the

November iCloud Warrant, I am aware that, for example, the iPhone registered to the LIN iCloud

Account has been accessed from an Internet Protocol ("IP") address[5]  controlled by Karib Cable,

and approximately geolocate to Castries, Saint Lucia.

---

[4] Based on my training and experience, I am aware that it is common to transfer data among their
electronic devices or from an old device to a new device.  Thus, even brand new devices may
contain data relevant to conduct that occurred in the past.

[5] Based on my training and experience, I know that an Internet Protocol ("IP") address is a
numerical label assigned to each device participating in a computer network that uses the Internet
Protocol for communication.  IP addresses serve to identify particular devices on a network and
to allow information to be routed to and from those devices.

USAO_00032690

10.      Based on the following, I am aware that LIN has used multiple electronic devices (including devices currently registered to the LIN iCloud Account) to access a Binance account that has received crime proceeds from Marketplace-1, further indicating that LIN will be in possession of multiple electronic devices and those electronic devices will contain evidence of the Subject Offenses.

a.      Through the course of this investigation, law enforcement agents have traced multiple cryptocurrency withdrawals from Marketplace-1, which constitute the proceeds of drug sales and are believed to have been conducted by the operator of Marketplace-1.  These withdrawals, either directly or through multiple intermediary wallets and cryptocurrency swapping services, have been traced to cryptocurrency wallet addresses controlled by Binance.  Based on a review of records obtained from Binance pursuant to grand jury subpoenas, law enforcement agents have identified the Binance account assigned identifier 37817359 (the "LIN Binance Account") as the beneficiary of these transactions.  Based on a review of records obtained from Binance, I am aware that the LIN Binance Account was created on October 5, 2019 with the name "Rui-Siang Lin."

b.      Accordingly, agents believe that LIN, as the operator of Marketplace-1, withdrew proceeds of drug sales in the form of cryptocurrency from Marketplace-1 and, using various techniques to obfuscate the source of these funds, transferred those proceeds to the LIN Binance Account, in an effort to convert the proceeds from cryptocurrency into fiat currency.

c.      Analysis of logs associated with software application updates performed from the devices associated with the LIN iCloud Account revealed numerous application updates associated with software applications related to the purchase and sale of cryptocurrency (the "Cryptocurrency Apps").  These applications included,"Binance: Buy Bitcoin & Crypto," "Wirex:

USAO_00032691

All-In-One Crypto App," "Coinbase: Buy Bitcoin & Ether," "Crypto.com Buy BTC," "ETH," and :Kraken Pro: Crypto Trading."

        d.      A review of software updates related to the Cryptocurrency Apps revealed that on 545 distinct occasions, between October 11, 2019 and November 20, 2023, these applications interacted with Apple servers, through the Apple AppStore, to check for and/or obtain application software updates. Additionally, among these 545 log entries indicating application updates for Cryptocurrency Apps, approximately 29 of these updates were made between September 26, 2023 and November 20, 2023 by an Apple iPhone having the same device version as the Apple iPhone currently registered to the LIN iCloud Account.

        e.      Based on my review of records obtained from Binance pursuant to a grand jury subpoena, I am aware that on or about September 26, 2023, a device running the iOS Binance client and assigned the device name "iPhone" accessed the LIN Binance Account. A review of the additional details related to this device revealed that this device appears to have the same device version as the Apple iPhone currently registered to the LIN iCloud Account.

      11.    Based on my training and experience, I know that individuals typically bring their cellphones/tablets and laptop computers with them when travelling. These devices can be stored on their person, in their carry-on luggage, or in checked luggage.

      12.    Based on my training and experience, I also know that individuals involved in darkweb marketplaces also may use multiple cellphones to communicate with different suppliers, buyers and other individuals associated with their narcotics trafficking activities and also so that there is less chance that law enforcement's discovery of one phone will reveal or disrupt all of an individual's illegal activities.

USAO_00032692

13. In addition, based on my training and experience investigating other darkweb marketplace, I know that cellphones and other electronic devices typically contain the following types of evidence relating to the commission of the Subject Offenses:

a. Cellphones and other electronic devices typically contain identifying information about a user of a cellphone, such as registration pages or device information, which can be used to verify the owner and user of a device. Cellphones and other electronic devices also typically contain evidence of other accounts and devices belonging to the cellphone user, as well as passwords to access those accounts or devices.

b. Cellular telephones frequently have telephone directory features, as well as methods to learn the call number associated with each cellular telephone, such as caller-identification features. Cellular telephones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names. Cellular telephone users often maintain lists, such as address books or contact information, that are stored on the cellular telephone or its SIM or memory card.

c. Cellular telephones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellular telephone user does not answer. Voicemail is typically stored on the computer network of the provider of the cellular telephone's telephone service, which network is external to the cellular telephone, but may also be stored on the cellular telephone itself.

d. Cellular telephones and other electronic devices typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service) messaging and email (collectively, "text messages"), that permit the cellular telephone user to send and receive text messages, including

11

messages with digital photographs and video attached. Text messages and any attachments are typically stored on the computer network of the provider of the cellular telephone's telephone service, which network is external to the cellular telephone, but may also be stored on the cellular telephone itself. Laptop computers may also have the same messaging features.

       e. Cellular telephones and other electronic devices have the ability to send certain of these text messages on messaging applications for that provide "end-to-end" encrypted messaging, such as WhatsApp and Signal, which I know are frequently used by drug trafficking organizations to discuss drug trafficking. I understand that providers of these encrypted applications purport not to store or keep logs of messages on the providers' servers once those messages are delivered, and that such messages are specifically encrypted to protect the messages' content from the providers or third parties, including U.S. law enforcement. In other words, a message on an encrypted application is generally decipherable to only the sender and intended recipient of a message. Based on my training and experience, I have learned that individuals engaged in criminal conduct, including the Subject Offenses, who have knowledge of and make use of encrypted applications, often use such applications to engage in communications relating to their schemes precisely because they know that such encrypted communications generally cannot be intercepted by law enforcement or searched without access to the individual's specific account or cellphone.

       f. Cellular telephones and other electronic devices often have electronic calendar features that allow the cellphone user to schedule appointments and meetings. Cellular telephone users often use that feature to remind themselves of meetings and appointments with friends and confederates.

USAO_00032694

g.   Some cellular telephones, like an iPhone such as the Apple iPhone currently registered to the LIN iCloud Account, offer capabilities such as sending and receiving email, and accessing and downloading information from the Internet.

h.   Cellular telephones and other electronic devices also can be used to create and/or store documents, spreadsheets, photographs, videos, audio recordings, and other forms of data.

i.   Cellular telephones and other electronic devices may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

j.   Cellular telephones and other electronic devices with camera functions permit the user to take photographs and videos, which are stored on the device itself.

k.   Cellular telephones and other electronic devices may record location data that records where the user has carried or used the device.

l.   The information described above usually remains accessible in the device's memory even if the device has lost all battery power and has not been used for an extended period of time.

m.   Cellular telephones and other electronic devices typically contain records that are months if not years old. Electronic files can be stored on a cellphone or other electronic device for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future. It is common for cellphone users to back up their data to the cloud or transfer data when they purchase a new device. Thus, it is common for an electronic device  to contain records older than the device itself. In particular, individuals engaged in criminal activity often store such records, sometimes for years, as records of past relationships with co-conspirators,

13

USAO_00032695

to keep track of co-conspirators' contact information, to keep a record of transactions in furtherance of the criminal activity, or to keep notes to follow up on other aspects of the scheme.

14. Based on the foregoing, there is probable cause to believe that the Subject Devices contains evidence of the Subject Offenses. In particular, I believe there is probable cause to search the Subject Devices for the following information:

a. Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, photographs, videos, and browsing history.

b. Evidence concerning the identity or location of co-conspirators involved the Subject Offenses.

c. Communications of any kind relating to the Subject Offenses or in furtherance of the Subject Offenses, including but not limited to text, data, chat, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service), email messages, or messages on social media or messaging applications installed on the Subject Devices (collectively, "text messages"), any attachments to those text messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the text message was sent;

d. Computer programs and other files used in connection with administering online drug marketplaces, which may reveal, among other things, the IP addresses of additional computers associated with online drug marketplaces, or other information that could be used to identify and locate such computers;

14

USAO_00032696

e.   Evidence reflecting the use of the Tor network, cryptocurrencies or other technological methods (such as encryption or proxy services) to evade monitoring or detection by law enforcement;

f.   Evidence reflecting the user(s) of the Subject Devices work as an administrator of a darknet market, such as communications about the darknet market with market users or leasing of online infrastructure used to maintain the darknet market;

g.   Evidence reflecting the user(s) of the Subject Devices involvement in financial transactions to conceal the source of their wealth, including documents for the purpose of creating companies, records of purported investments, or records of large financial transactions (including in cash or cryptocurrency);

h.   Encryption keys, passwords, or similar access devices that may be necessary to access data relating to online drug marketplaces;

i.   Means of payment for illegal narcotics and other contraband;

j.   Documents, spreadsheets and ledgers tracking memberships, sales and inventory, and accounts relating to online drug marketplaces and stolen credit card and financial account information;

k.   Evidence concerning the user's technical expertise;

l.   Search and web history records related to the Subject Offenses, including, if applicable, web and application activity history (including search terms), device information history, and location history;

m.   Information regarding the registration of email accounts, computer servers, or other computer network infrastructure, including servers and internet domains, or online communications facilities, and payment for such online facilities or services;

15

USAO_00032697

n.  Other information that may assist law enforcement in determining the true identity and location of the user of the Subject Devices or his/her accomplices, confederates or aiders and abettors, including but not limited to: IP addresses, names, addresses, phone numbers, email accounts, social networking accounts, website registration accounts, credit card accounts, bank accounts, cryptocurrency addresses, payment records, files with identifying metadata, and information regarding devices or accounts linked and/or used to access the Subject Devices, including device serial numbers, identifiers, and MAC addresses;

o.  Photographs, screenshots, and videos evidencing the foregoing;

p.  Evidence concerning any other online accounts or any computer devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

15. Based on my training and experience, I am aware that individuals – especially individuals sophisticated in the use of encryption and cryptocurrency – will write down passwords and/or seed phrases on paper as such a means of tracking passwords is considered one of the safest ways to guard against intrusion.

## PROCEDURES FOR SEARCHING ESI

### Unlocking Devices with Biometric Features

16. I request authority to allow law enforcement agents to obtain from RUI-SIANG LIN the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Devices, if it requires such biometric access and if law enforcement has reasonable suspicion that the physical biometric characteristics of LIN will unlock the Subject Devices.  The grounds for this request are as follows:

16

a.  I know from my training and experience, as well as from information found in publicly available materials published by Apple, that iPhones offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable its ability to unlock the device through his or her face.  For example, this feature is available on certain Apple devices and is called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

17

USAO_00032699

e.  The password that would unlock the Subject Devices currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Subject Devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

17. Due to the foregoing, I respectfully request that the Court authorize that, if the Subject Devices may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from LIN the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Devices, including to (1) press or swipe the fingers (including thumbs) of LIN to the fingerprint scanner of the Subject Devices; and/or (2) hold the Subject Devices in front of the face of LIN to activate the facial recognition feature, for the purpose of attempting to unlock the Subject Devices in order to search the contents as authorized by the proposed warrants.

USAO_00032700

<u>Review of ESI</u>

18. Following seizure of the Subject Devices and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

## REQUEST FOR SEALING AND DELAYED NOTICE

19. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the Affidavit and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and because the targets of the investigation remain at large. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by encouraging subjects' flight from prosecution, the destruction of evidence, and the tampering with or intimidation of potential witnesses.

19

USAO_00032701

## CONCLUSION

20. I submit that this Affidavit supports probable cause for a warrant to search the SUBJECT PERSON and the SUBJECT DEVICES described in Attachment A and seize the items described in Attachment B. WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued for the SUBJECT PERSON and SUBJECT DEVICES described herein and in ATTACHMENT A, authorizing the search and seizure of the items listed in ATTACHMENT B.

Respectfully submitted,

Andrew Bennett
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to
Fed. R. Crim. P. 4.1 and 41(d)(3) on this
17th day of May 2024,
by reliable electronic means.

THE HONORABLE ~~JAMES R. CHO~~   Sanket J. Bulsara
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

USAO_00032702

# EXHIBIT A

# (Complaint)

USAO_00032703

AUSA: Ryan Finkel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 351

UNITED STATES OF AMERICA

v.

RUI-SIANG LIN,
 a/k/a "林睿庠,"

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 371, 1956, and
2; and 21 U.S.C. §§ 846, 848

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

Mark Rubins, being duly sworn, deposes and says that he is a Task Force Officer with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Continuing Criminal Enterprise)

1.     From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, engaged in a continuing criminal enterprise (the "Continuing Criminal Enterprise"), in that LIN knowingly and intentionally participated in a continuing series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II, including, among others, Violations One through Four set forth below, undertaken by LIN in concert with at least five other persons with respect to whom LIN occupied a position of principal administrator, organizer, a supervisory position, and leader of the Continuing Criminal Enterprise, and  (a) from which continuing series of violations LIN and the Continuing Criminal Enterprise obtained substantial income and resources, in excess of $10 million and more in gross receipts during a 12-month period of its existence for the manufacture, importation, and distribution of cocaine, heroin, LSD, and methamphetamine; and (b) which continuing series of violations involved at least 300 times the quantity of mixtures and substances containing a detectable amount of cocaine, lysergic acid diethylamide ("LSD"), and methamphetamine, its salts, isomers, or salts of its isomers, described in Title 21, United States Code, Section 841(b)(1)(B).

### Violation One

2.     From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to distribute and possess with intent to distribute were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable

amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B); (vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), in violation of Title 21, United States Code, Section 841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (x) mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C), and 846.

<u>Violation Two</u>

3.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to (i) import a controlled substance into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, which controlled substances were mixtures and substances containing a detectable amount of heroin, cocaine, methamphetamine, Methylenedioxymethamphetamine ("MDMA"), and LSD in violation of Title 21, United States Code, Sections 952(a), 959(a), 960(a)(1), 960(a)(3), 960(b)(3), and 963.

<u>Violation Three</u>

4.    On or about February 7, 2023, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, knowingly and intentionally distributed and possessed with intent to distribute a controlled substance, to wit, mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2.

<u>Violation Four</u>

5.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, delivered, distributed, and dispensed controlled substances by means of the Internet, in a manner not authorized by law, and aided and abetted such activity, in violation of Title 21, United States Code, Sections 841(h) , and Title 18, United States Code, Section 2.

USAO_00032705

6.    The controlled substances that RUI-SIANG LIN, a/k/a "林睿庠," the defendant, delivered, distributed, and dispensed by mean of the Internet, were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B); (vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of MDMA, in violation of Title 21, United States Code, Section 841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (x) mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 848(a), 848(b), 848(c).)

## COUNT TWO
### (Narcotics Conspiracy)

7.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

8.    It was a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "林睿庠 ," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

9.    The controlled substances that RUI-SIANG LIN, a/k/a "林睿庠," the defendant, conspired to distribute and possess with intent to distribute were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B);

3

(vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), in violation of Title 21, United States Code, Section 841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (x) mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846)

## COUNT THREE<br>**(Money Laundering - Concealment)**

10.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, and conspiracy to commit narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, respectively, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i), and 2)

## COUNT FOUR<br>**(Money Laundering - Promotional)**

11.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, narcotics trafficking, and conspiracy to commit narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, respectively.

(Title 18, United States Code, Section 1956(a)(2)(A), and 2)

4

## COUNT FIVE
### (Money Laundering Conspiracy)

12.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), and 1956(a)(2)(A).

13.    It was a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, and conspiracy to commit narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, respectively, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i).

14.    It was further a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, narcotics trafficking, and conspiracy to commit narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, respectively, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

## COUNT SIX
### (Conspiracy to Sell Adulterated and Misbranded Medication)

15.    From at least in or about October 2020, up to and including on or about the date of the filing of this Complaint, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and others known and unknown willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, selling adulterated and misbranded drugs in violation of Title 21, United States Code, Sections 331, 333(a)(2).

16.    It was a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "林睿," the defendant, and others known and unknown with the intent to defraud and mislead, would and did introduce and deliver for introduction into interstate commerce, and attempt to do the same, and would and did cause the introduction and delivery for introduction into interstate commerce,

5

and attempt to do the same, of adulterated and misbranded drugs, as defined by 21 U.S.C. §§ 351(a)(1), 351(a)(3), 352(a), 352(b), 352(f), and 352(o), in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), 333(i) to wit, LIN and others known and unknown sold misbranded and counterfeit medication over the internet.

Overt Acts

17.    In furtherance of the conspiracy and to effect its illegal objects, RUI-SIANG LIN, a/k/a "林睿," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about December 5, 2023, in the Southern District of New York, law enforcement officers received five tablets, which were purchased on an online narcotics marketplace operated by LIN and shipped by the seller on the online narcotics marketplace to an address in the Southern District of New York.  Those five tablets bore the mark of a particular licensed pharmaceutical manufacturer, but those five tablets were not, in fact, produced by that licensed manufacturer.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

**Overview**

18.    Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

a.    RUI-SIANG LIN, a/k/a "林睿庠," the defendant, is the principal administrator and operator of one of the largest illegal narcotics marketplaces on the internet ("Marketplace-1"). LIN oversees the day-to-day operation of Marketplace-1, which has sold tens of millions of dollars' worth of heroin, cocaine, methamphetamine, LSD, and other illegal narcotics.  As the principal administrator of Marketplace-1, LIN has ultimate control over more than one thousand vendors (those who sell narcotics on Marketplace-1), more than 200,000 customers (those who buy narcotics on Marketplace-1), and at least one other employee who assists LIN in the management of the site.

b.    Marketplace-1 launched in or about October 2020.  Since that time, and through the date of this Complaint, Marketplace-1 can be accessed via the Internet using widely available encrypted and anonymous internet browsing software known as the "Tor" web browser.[1]  Using

---

[1] A Tor web browser allows individuals to access the Onion Router ("Tor") network sometimes known as the "darkweb" or "darknet."  Tor allows individuals to obscure their true IP addresses and their Internet traffic, by encrypting both the content of their internet traffic and the signaling information, and by directing that internet traffic to and from web sites on the Tor network through a series of intermediary relays.  Although the Tor network has legitimate uses, based on my training and experience, I have learned that the Tor network is often used for criminal

6

that software, Marketplace-1 can be accessed from anywhere in the world, including from the Southern District of New York.

c.   Marketplace-1 does not sell narcotics directly to customers.  Instead, Marketplace-1 is an e-commerce platform that enables its "customers" to purchase narcotics from "vendors," who advertise narcotics on Marketplace-1.   Each "vendor" is required to register with Marketplace-1. If approved by Marketplace-1 employees, each vendor can list for sale virtually any illegal narcotic they wish, for any price they choose.   "Customers" also must register with Marketplace-1.  After registering, customers can select which narcotics to purchase from which vendor and can pay for those narcotics using cryptocurrency, in transactions facilitated by Marketplace-1's "bank."  Both vendors and customers use Marketplace-1's bank to conduct narcotic transactions, which means both vendors and customers deposit money with Marketplace-1 and use Marketplace-1 to exchange money, as outlined in greater detail below.  In exchange for its services, Marketplace-1 earns approximately 5% of the purchase price of every narcotic sold on Marketplace-1.

d.   As the principal administrator of Marketplace-1, LIN profits the most from Marketplace-1's activities.  LIN also implements policies for the site, and ultimately determines whether a particular vendor is permitted to sell narcotics on Marketplace-1.  LIN also directs the activities of at least one other employee, who (at LIN's ultimate direction) assists in the management of the day-to-day operations of Marketplace-1.  (The number of employees has fluctuated since the launch of Marketplace-1.)

e.   Based on evidence uncovered through this investigation, in its more than three years of operations, Marketplace-1 has transacted approximately $80,000,000 in cryptocurrency and sold more than one thousand kilograms of narcotics, misbranded prescription medication, and other illicit products—including at least 364 kilograms of cocaine, 295 kilograms of methamphetamine, and 92 kilograms of MDMA.  LIN has earned millions in personal profits for his work as the principal administrator of Marketplace-1.

**Marketplace-1's Operations**

19.   Based on my involvement in this investigation, my training and experience, my review of documents and other materials, including my personal review of Marketplace-1, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

a.   Marketplace-1 has several established rules (which are posted on Marketplace-1) an individual must comply with before he or she is approved as a vendor on the site.  Among other things, vendors must "apply" to the administrators, describe their prior experience as a vendor on the darknet, identify whether they were (or are) a vendor at any other darknet markets, and pay a non-refundable fee of $750 to Marketplace-1.  By applying to the site, vendors acknowledge that 5% of their gross revenue will be paid to Marketplace-1.

---

activity, including to sell, and purchase, illegal products.  Indeed, there are a number of darknet narcotics markets available on Tor, although Marketplace-1 appears to be one of the largest.

USAO_00032710

b.  Even if they are accepted, vendors can be removed from Marketplace-1 for engaging in scams, generating a high volume of negative feedback from customers, refusing to answer inquiries from Marketplace-1 administrators, and/or posting their own feedback to boost their own sales.  The decision to remove a vendor from Marketplace-1 solely rests with the administrators and, in particular, with the primary administrator of the site ("Administrator-1")—who, as explained in greater detail below, is RUI-SIANG LIN, a/k/a "林睿庠," the defendant.

c.  Vendors are ranked on Marketplace-1 by positive customer reviews and sales volume.  Marketplace-1 even trumpets the highest ranked vendors in top-ten lists available on the site.

d.  Both vendors and customers can submit "disputes" to the administrators of Marketplace-1.  To submit a dispute, a customer or vendor fills out a form containing information about the nature of the dispute and transmits it to the administrators.  A customer might submit a dispute if, for example, they paid for, but did not receive, narcotics.  Vendors might submit a dispute if they believe a customer posted misleading negative feedback.  Marketplace-1 administrators resolve disputes at their discretion.  They can refund sales, remove customers, or take any other action they see fit.  Administrator-1 appears to retain the ultimate decision-making authority concerning customer and vendor disputes.

e.  Marketplace-1 operates its own "bank."  The "bank" is an important component of Marketplace-1's business.  Customers deposit cryptocurrency[2] such as Bitcoin[3] or Monero[4] into the Marketplace-1 bank and use deposited funds to make purchases from vendors.  Once a purchase is made, cryptocurrency is transferred from a buyer's "bank" account to the vendor's "bank" account.    Both vendors and buyers can withdraw from the "bank" into their personal cryptocurrency wallets.[5]  By depositing money into the bank, both customers and vendors evidence

---

[2] Cryptocurrency is a digital currency designed to work as a medium of exchange through a computer network that is not reliant on any central authority, such as a government or bank, to uphold or maintain it.  Asset records are maintained by a digital ledger (also known as a blockchain), which is a computerized database that tracks cryptocurrency ownership.  The digital ledger is maintained by a decentralized network of computing devices throughout the world.  Cryptocurrencies are highly volatile and can be purchased through a number of methods, including through cryptocurrency exchanges, which are online services that enable users to exchange fiat currency (*e.g.* U.S. Dollars) for cryptocurrencies.

[3] Bitcoin is the world's most popular cryptocurrency.  It is known in shorthand as "BTC."  The Bitcoin digital ledger is publicly available, and its transactions can be analyzed using software tools.

[4] Monero is a cryptocurrency which uses a blockchain with privacy-enhancing technologies to attempt to obfuscate transactions and seek to achieve anonymity and fungibility.  In shorthand "Monero" is known as "XMR."

[5] A cryptocurrency wallet can be a physical device or a software program that stores cryptocurrency passwords and allow users to access their digital currency.  Wallets typically have addresses, which are a long string of characters.  That "wallet address" corresponds to entries on

USAO_00032711

a substantial amount of trust in Marketplace-1 and, specifically, in its administrators. This is because once deposited, customer and vendor money is under the control, and in the possession, of Marketplace-1.[6] The "bank" is also designed to further obscure the locations and identities of vendors and customers from each other and from law enforcement by adding a layer of anonymity to transactions on the marketplace and keeping the financial information of vendors and buyers separate, making it more difficult for any one actor on the marketplace to learn any other actor's true identity. As further explained below, the bank also offers an "escrow" service enabling both buyers and customers to have additional security concerning their narcotics transactions.

      f.  Marketplace-1 offers its users the ability to transfer cryptocurrency among users and provides a user-to-user anonymous chat service.

      g.  Marketplace-1 offers a "community governance" program on its website. This program permits users (those who meet certain buying or selling thresholds) to vote on rules and regulations for Marketpalce-1.

### Narcotics Listings on Marketplace-1

20.    Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

      a.  Marketplace-1 has extensive advertisements for a broad array of narcotics including, but not limited to, heroin, cocaine, methamphetamines, LSD, PCP, and oxycodone. To advertise these drugs, each vendor posts a short description of the narcotics offered for sale and, if they choose, a photograph. Descriptions of narcotics include, by way of example, the following:

     i.   "Sweet Mama's China White Synthetic *EXTREMELY POTENT*;"

     ii.   "x10 OP80 80mg Oxycodone OcyContin/free shipx;"

     iii.   "0.5G High POTENT White Lion Stamp Heroin .HIGHEST PURITY;"

     iv.   "[Featured] 1G-28G Pure Colombian Cocaine (88-91%) NDD, HQ TR24;"

     v.   "Top Quality GHB;"

     vi.   "[Featured] #PURE AFGHAN HEROIN *uncut* TOP Quality (A*) (NDD AVAILABLE);"

---

the digital ledger or blockchain. That is, the blockchain will indicate how many digital coins a particular wallet owns.

[6] Several darknet markets have been accused of an "exit scam." An exit scam is when a marketplace stops transmitting money it holds in escrow while it continues to take deposits. The operators of the marketplace collect as many deposits as they can and then shut down the site and steal the deposited money.

USAO_00032712

vii.   "Lucky's IRANIAN OPIUM;"

viii.   "M30 OXYCODONE 30mg x 500;"

ix.   "1G CHINA WHITE HEROIN (WORLDWIDE)."

b.   Marketplace-1 also has extensive advertisements for a broad array of narcotics sold by vendors located in foreign countries who ship their narcotics into the United States.   For example:

i.   A particular vendor who offers for sale "S-ISO Ketamine," for $4500 per kilogram ships such narcotics from the United Kingdom to, among other places, the United States.

ii.   A particular vendor who offers for sale "Ether Washed Coke" for $110 ships such narcotics from Canada to, among other places, the United States.

iii.   A particular vendor who offers for sale "Coke 94.50% from Colombia," for $625.71 for 5 grams, ships such narcotics from Germany to, among other places, the United States.

iv.   A particular vendor who offers for sale "PURE PIKO Methamphetamine Crystal Meth ICE Shards" for $43.58 ships such narcotics from Poland to, among other places, the United States.

v.   A particular vendor who offers for sale "MDMA Dutch MDMA Champagne mdma 84% pure" for approximately $18.54 per gram ships such narcotics from the Netherlands to, among other places, the United States.

vi.   A particular vendor who offers for sale "10 tabs OxyContin 80mg MR AUTHENTIC OXYCODONE" for approximately $227.92 per ten tablets ships such narcotics from Spain to, among other places, the United States.

vii.   A particular vendor who offers for sale "LSD Blotters Reborn 350 ug Needlepoint Crystal 99% Labtested UK EU USA AUS WORLD" for approximately $3.45 per ten units ships such narcotics from the Netherlands to, among other places, the United States.

viii.   A particular vendor who offers for sale "Strong Heroin #3 +/- 65%" for approximately $22.00 per gram ships such narcotics from the Netherlands to, among other places, the United States.

c.   To assist its customers, Marketplace-1 organizes its narcotics listings into the following categories:   anxiolytics, benzodiazepines, cannabis, cannabinoids, deliriants, depressants, dissociatives, empathogens, nootropics, oneirogens, opioids, psychedelics, sedatives, steroids, stimulants, synthetics, tobacco, miscellaneous.  Customers can also perform searches for narcotics or browse the listings through a graphical interface, similar to those available on legitimate e-commerce websites.

USAO_00032713

d.   Indeed, much like a legitimate e-commerce site, each vendor on Marketplace-1 has a page which lists, among other things, the number of successful sales for each product and reviews from that vendor's customers.  In this way, customers rate the vendors for the quality of their narcotics, reliability, and delivery speed.  Based on my review of Marketplace-1, there are thousands of reported successful narcotics transactions for, among other things, cocaine, heroin, oxycodone, LSD, and methamphetamines.  The reviews corroborate that the sales of narcotics on Marketplace-1 are, in fact, narcotics transactions.

e.   To further corroborate that Marketplace-1 sells illegal narcotics, law enforcement officers made several undercover purchases from vendors on Marketplace-1, including:

i.   On or about April 6, 2022, while using a particular undercover identity ("UC-1") and, using a computer located in Manhattan, New York, I ordered 5 grams of "Crystal Meth" from a vendor on Marketplace-1.  I paid approximately $170, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank.  When purchasing the "crystal meth," I designated a shipment address to a particular mailbox in Manhattan, New York, which is controlled by law enforcement officers ("Mailbox-1").  On or about April 12, 2022, law enforcement officers recovered a package, which contained a powdery substance.  That substance was later tested and assessed to be approximately 5 grams and tested positive for the presence of methamphetamine hydrochloride.

ii.   On or about February 2, 2023, while using the UC-1 identity and a computer located in Manhattan, New York, I ordered "M30 (PRESSED) $8.99 EACH 60X STRONGER THAN HEROIN" from a particular vendor on Marketplace-1.  I paid approximately $50, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank.  When purchasing the "M30 (PRESSED) $8.99 EACH 60X STRONGER THAN HEROIN," I designated Mailbox-1 as the shipment address.  On or about February 7, 2023, law enforcement officers recovered a package, which contained approximately two pills.  Those pills were later tested and assessed to be approximately 0.210 grams and tested positive for the presence of fentanyl.

iii.   On or about November 28, 2023, while using another particular undercover identity ("UC-2") and a computer located in Manhattan, New York, I ordered "M30 Pressed OXY PILLS -HIGH QUALITY -USPS" from a particular vendor on Marketplace-1.  I paid approximately $43.60, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank.  When purchasing the "M30 Pressed OXY PILLS -HIGH QUALITY -USPS," I designated Mailbox-1 as the shipment address.  On or about December 5, 2023, law enforcement officers recovered a package, which contained approximately five tablets.  Those five tablets had imprinted on them an "M."  Those five tablets were later tested and assessed to be approximately 0.569 and tested positive for the presence of fentanyl.[7]

iv.   On or about November 29, 2023, while using the UC-2 identity and a computer located in Manhattan, New York, I ordered "5MG|OXYCODONE|OXYCONTIN|OC 5|

_____

[7] Based on my review of documents and conversations with law enforcement officers from the Federal Drug Administration, I have learned that a particular licensed pharmaceutical manufacturer ("Manufacturer-1"), and a company it licenses, are the only two entities authorized to manufacture tablets bearing an "M."  Manufacturer-1 has not authorized tablets bearing an "M" to be manufactured containing fentanyl.  Accordingly, these tablets appear to be counterfeit.

11

USAO_00032714

USA TO USA|LOW MIN ORDER" from a particular vendor on Marketplace-1. I paid approximately $44, via Monero, by depositing Monero into Marketplace-1's bank. When purchasing the "5MG|OXYCODONE|OXYCONTIN|OC 5| USA TO USA|LOW MIN ORDER," I designated Mailbox-1 as the shipment address. On or about December 6, 2023, law enforcement officers recovered a package, which contained approximately five pills. Those five pills were later tested and assessed to be approximately 0.663 grams and tested positive for the presence of oxycodone.

v. On or about December 8, 2023, while using the UC-2 identity and a computer located in Manhattan, New York, I ordered 1 gram of "JIRAFFE*CHINA WHITE HEROIN MIX*FAST USPS*CHINA WHITE" from a particular vendor on Marketplace-1. I paid approximately $90, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank. When purchasing the "JIRAFFE*CHINA WHITE HEROIN MIX*FAST USPS*CHINA WHIT," I designated Mailbox-1 as the shipment address. On or about December 20, 2023, law enforcement officers recovered a package, which contained a powdery substance. That powdery substance was later tested and assessed to be approximately 0.97 grams and tested positive for the presence of fentanyl.

vi. On or about January 4, 2024, while using the UC-2 identity and a computer located in Manhattan, New York, I ordered "one unit" of "BEST Cocaine in America FREE SHIPPING!" from a particular vendor on Marketplace-1.[8] I paid approximately $47, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank. When purchasing one unit of "BEST Cocaine in America FREE SHIPPING!," I designated Mailbox-1 as the shipment address. On or about January 18, 2024, law enforcement officers recovered a package, which contained a powdery substance, which, based on the training and experience of the law enforcement officer who recovered the package, appeared to be a controlled substance. Testing of the powdery substance is pending.

vii. On or about January 11, 2024, while using the UC-2 identity and a computer located in Manhattan, New York, I ordered "150mcg LSD Gel Tabs - Stronger and better (5 tabs packs)" from a particular vendor on Marketplace-1. I paid approximately $46.70, via Bitcoin, by depositing Bitcoin into Marketplace-1's bank. When purchasing one unit of "150mcg LSD Gel Tabs - Stronger and better (5 tabs packs)" I designated Mailbox-1 as the shipment address. On or about January 18, 2024, law enforcement officers recovered a package, which contained a package of gel tablets which, based on the training and experience of the law enforcement officer who recovered the package, appeared to be a controlled substance. Testing of the gel tablets substance is pending.

### Searches of Marketplace-1 Servers

21. Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

---

[8] The listing did not specify the weight of cocaine associated with "one unit."

USAO_00032715

a.   Law enforcement officers executed a search warrant  on or about July 20, 2022 and a second search warrant on or about August 2, 2023, on several servers that host data for Marketplace-1—including "Server-1" and "Server-2."  Law enforcement officers executed search warrants on or about August 16, 2022 and on or about January 5, 2024, on additional servers including "Server-3."  As explained herein, Server-1 appears to be a DDoS prevention system for Marketplace-1.[9]  Server-2 appears to host the back-end Marketplace-1 data, including a history of all completed narcotics transactions.    Server-3 appears to be the server responsible for Marketplace-1's bank, including its cryptocurrency transactions.    Law enforcement officers corroborated that Server-1, Server-2, and Server-3 are Marketplace-1 servers based on, among other things, the following:

i.   Server-1 is leased to a particular company ("Company-1"). Company-1 is a "server reseller." That is, Company-1 stands between an end client who leases server space from Company-1 and a server provider, another company, from whom Company-1 leases server space. This structure is common in illegal activities on the internet because it helps the end client hide their identity from a server provider. Indeed, here, Company-1 is a foreign company that advertises itself as an entity which offers servers for darknet marketplaces.  A particular end-client ("End-Client-1") leased Server-1 from Company-1 on or about January 10, 2022.  The day prior, on or about January 9, 2022, End-Client-1 leased Server-2 from Company-1.  End-Client-1 told Company-1, in substance and in part, to place Server-1 in "the closest possible proximity" to Server-2.[10]

ii.   From on or about January 30, 2023, through on or about May 9, 2023, law enforcement officers obtained a Pen Register and Trap and Trace order on Server-2 (the "PRTT"). The PRTT had more than approximately 14,000,000 connections to Server-1, which further indicates that Server-1 operated as "filter" for Server-2 to thwart DDoS attacks.  Further, based on law enforcement officers' review of the content of Server-1, law enforcement officers have assessed that Server-1 is designed to protect Server-2 from DDoS attacks.

iii.   During the time that the July 19, 2022 search warrant was executed, Server-1 and Server-2 were briefly taken offline.  At the time that Server-1 and Server-2 were taken offline, I  observed that Marketplace-1 went offline.  When Server-1 and Server-2 were reconnected to the internet, I observed that Marketplace-1 went back online.  These observations further corroborate that Server-1 and Server-2 are servers that host Marketplace-1's data.

iv.   Based on a review of Server-2's data, law enforcement officers, and others working with the FBI, observed that Server-2 hosted data necessary to run Marketplace-1.  This

---

[9] DDoS attacks, also known as Distributed Denial of Service attacks, are when malicious cyber actors attempt to disrupt the normal traffic of a particular server, service, or network by overwhelming the target or its surrounding infrastructure with a flood of Internet traffic.  Based on my training and experience, I have learned that darknet marketplaces are often the target of DDoS attacks by rival marketplaces.

[10] Based on my training and experience, I have learned that placing servers in proximity enables more efficient communication and is typically done when servers are to be in ongoing communication.

13

USAO_00032716

includes, among other things, databases pertaining to Marketplace-1, narcotics transaction information (discussed in detail, *infra* ¶ 22), and file folders bearing Marketplace-1's true name.

v. Based on a review of Server-2, law enforcement officers further observed that Server-2 was connected to another server, Server-3, via "SSH Tunnels." SSH Tunneling is a way two computers (or servers) connect over a secure encrypted connection. Based on my training an experience, generally, when two computing devices are connected via SSH tunnel, it indicates those computing devices share information, data, and are generally trusted by each system. I have also learned it is common for market administrator(s) to create SSH tunnels among several compartmentalized servers to allow them to be more easily accessed by all the other servers, and to route data in an encrypted state.

vi. Based on a review of Server-3, it contains, among other things, data corresponding to cryptocurrency transactions. Specifically, law enforcement officers observed Bitcoin wallets and Monero wallets stored in Server-3 (discussed in detail, *infra* ¶ 22). Based on review of this information, law enforcement officers observed Bitcoin transaction hashes and a Monero transaction hash pertaining to each of the undercover narcotics purchases through on or about January 5, 2024 that I had made using the identities of UC-1 and UC-2, which are described above.[11] (*Supra* ¶ 20.e.) This further corroborates that Server-3 (and Server-2 to which it is connected) maintains data for Marketplace-1.

b. Accordingly, I believe that Server-1, Server-2, and Server-3 are servers used to operate Marketplace-1 and contain data from Marketplace-1.

## Volume of Narcotics Sales on Marketplace-1

22. Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

a. As described above, Server-2 appears to contain the "back-end" data used to operate Marketplace-1. Law enforcement officers identified database files in a folder titled "[Marketplace-1]." Within are approximately dozens of database files that bear unique names including: "vendors," "users," and "orders." Each of those database files were analyzed and converted into tables with data arranged in both rows and columns.

b. The "vendors" table contains approximately 1,312 vendor usernames. Accordingly, based on the data in Server-2, Marketplace-1 appears to have 1,312 vendor accounts as of on or about August 2, 2023. Based on the vendors table, as of on or about August 2, 2023, approximately 756 vendors are listed as vendors who are located abroad and ship narcotics into the United States. The vendors table further indicates that those approximately 756 vendors offer shipments of narcotics including, among others, cocaine, heroin, ketamine, LSD, MDMA, marijuana, methamphetamine, amphetamine, and oxycodone into the United States.

---

[11] Each Bitcoin and Monero transaction is associated with a unique hash value. The hash value is a unique long string of computer-generated characters used to identify a transaction on a blockchain.

USAO_00032717

c.   The "users" table contains approximately 255,519 usernames (including username identities used by UC-1).  Accordingly, based on the data in Server-2, Marketplace-1 appears to have 255,519 customer accounts as of on or about August 2, 2023.

d.   The "orders" table appears to list every Marketplace-1 transaction.  There are approximately 224,791 transactions based on the number of rows of data in the "orders" table—*i.e.,* each row indicates a different transaction.  Further corroborating that this is Marketplace-1 data, within the "orders" table is a row corresponding to the April 6, 2022 UC-1 transaction and a row corresponding to the February 8, 2023 UC-1 transaction.  (*See supra* ¶¶ 20.e.i, ii.)

e.   There are multiple columns in the "orders" table, which appear to list particular information for each transaction including:  "buyer" (i.e. the username of the buyer), "vendor" (i.e. the username of the vendor), "listing_name" (*i.e.,* the title of the sales listing) "usd_total" (*i.e.,* the United States dollar value of the transaction), "btc_total" (*i.e.,* the Bitcoin value of the transaction), "xmr_total" (*i.e.,* the Monero value of the transaction), "timestamp" (*i.e.,* the date and time of the transaction), "status" (*i.e.,* whether the transaction was "finalized," "cancelled," "refunded," etc.), "currency" (*i.e.,* the currency used for the transaction, e.g. BTC or XMR), and "quantity" (*i.e.,* the amount of narcotics in each transaction).

f.   The investigative team analyzed the "orders" table and used the information in the "listing_name," "timestamp," "quantity," and "status" fields to assess the approximate total weight of narcotics sold on Marketplace-1, according to the data in Server-2.  To make this assessment, a computer program analyzed the "listing_name" column to group each transaction by the type of narcotic sold. [12]   Thereafter, the information in the "quantity" column was assessed for each

---

[12] As described above, many listing names use slang terms for narcotics.  To analyze the data, the following slang terms were used to identify various narcotics, which, based on my training and experience are common slang terms for the corresponding narcotic:

(1) Alprazolam: "alprazolam", "xanax";
(2) Amphetamine: "amphetamine", "bennies", "uppers", "methadate";
(3) Cocaine: "cocaine," "coke";
(4) Heroin: "heroin", "china white";
(5) Ketamine: "ketamine", "special k", "k2", "vitamin k", "kit kat";
(6) LSD: "lsd", "acid", "blotter", "dots", "sugar cubes";
(7) Marijuana: "marijuana", "pot", "weed", "skunk", "hash", "herb", "bud", "grass", "mary jane", "reefer", "trees", "flower", "thc", "haze";
(8) MDMA: "mdma", "ecstasy", "molly", "mda";
(9) Methamphetamine: "methamphetamine", "meth", "blue", "ice", "crystal"; and
(10) Oxycodone: "oxycodone", "oxycontin", "percocet", "o.c.", "oc", "oxy", "oxycet", "oxycotton", "ozone", "roxy"; "M30"; "M60".

USAO_00032718

transaction.[13]  Orders with a "cancelled" status were omitted.  The result of the analysis yields the following approximate narcotics weight for the time period from on or about October 2, 2021 through on or about August 2, 2023:

| Narcotic | Weight (kg) |
|---|---|
| Amphetamine | 112.34 |
| Cocaine | 364.20 |
| Heroin | 10.50 |
| Ketamine | 108.65 |
| LSD | 0.51 |
| MDMA | 92.19 |
| Marijuana | 402.37 |
| Methamphetamine | 295.41 |
| Oxycodone | 1.03 |

g.  The investigative team analyzed the "orders" table and used the information in "listing_name," "timestamp" and "usd_total" columns to assess the approximate total United States dollar value of narcotics sold on Marketplace-1 according to this dataset.  A computer program analyzed the "listing_name" column to sort the transactions by type of narcotic using the same parameters as the weight assessment described in footnote 12.  Thereafter, the information in the usd_total field was assessed for each transaction.[14]  The result of that analysis yields the following approximate total value of narcotics sold for the time period from on or about October 2, 2021 through on or about August 2, 2023:

| Narcotic | "usd_total" |
|---|---|
| Amphetamine | $446,094.72 |
| Cocaine | $7,851,009.85 |
| Heroin | $819,687.57 |
| Ketamine | $2,896,264.23 |
| LSD | $965,158.61 |
| MDMA | $1,946,423.63 |
| Marijuana | $2,793,636.69 |

---

[13]  Generally, quantity contains information in the following format: "X*Y(unit of measure)"—e.g. "1*5g."  An asterisk is a common signal for a multiplication operator in software coding.  To confirm that the * indicates multiplication, investigative personnel compared rows in the "orders" table to listings on Marketplace-1 and also examined the row corresponding to UC-1's April 6, 2022 transaction.  In the April 6, 2022 transaction UC-1 purchased 5 grams, and the "quantity" information in the "orders" table for that transaction is "1*5g," which further corroborates the asterisk is a multiplication operator.  Where the "quantity" column did not list a unit of measure, for example "1*2 pills," the row was excluded from the weight calculation unless the title listing indicated the weight.  If weight information was missing in the quantity tab, for example, 1*gram, the assessed weight was "1" which was consistent based on a comparison to Marketplace-1 listings on the public website.

[14]  It appears that the usd_total information was converted from the value of cryptocurrency transacted.

16

| Narcotic | "usd_total" |
|---|---|
| Methamphetamine | $3,453,924.50 |
| Oxycodone | $2,061,173.93 |

h.   With respect to the time period from on or about July 3, 2022 through on or about August 2, 2023, the data in Server-2 indicates that vendors on Marketplace-1 sold approximately $6.5 million of cocaine, $724,000 of Heroin, $847,7000 of LSD, and $3.06 million of Methamphetamine—approximately $11,198,000 in total.

i.   A review of the "orders" table further indicates that Marketplace-1's sales volume has increased over time. The below chart plots the approximate monthly gross sales volume on Marketplace-1, inclusive of all substances and products sold based on the data in Server-2:



**Administrator-1**

23.   Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

a.   Presently, including Administrator-1, at least two employees manage the day-to-day operations of Marketplace-1. Each employee uses a particular pseudonym to identify themselves in Marketplace-1 and across other internet platforms such as, for example, forums including "Forum-1." [15]  In so doing, the employees generate notoriety, which serves as an advertisement for the marketplace, and establish credibility within the broader darknet market community. Based on my involvement in this investigation including my review of darknet market forums, and of Marketplace-1, from the launch of Marketplace-1 in or about October 2020 through

---

[15] Forum-1 is a popular darknet online forum in which users discuss issues pertaining to darknet markets. Many illegal darknet marketplaces, including Marketplace-1, promote themselves on Forum-1. Adminstrator-1 frequently posts on Forum-1 about Marketplace-1, cryptocurrency, and other issues related to the darknet.

USAO_00032720

in or about February 2022, a particular individual ("Administrator-2") appeared to the principal administrator of Marketplace-1. During that time Administrator-1 worked, in a management capacity, at Marketplace-1. As of in or about February 2022, I believe that Administrator-1 became (and still is) the principal administrator of Marketplace-1.

b. Forum-1 operates several "sub-forums," each of which is dedicated to a particular subject. For example, many large darknet markets have their own sub-forum on Forum-1. Forum-1 also maintains sub-forums on topics such as "op-sec," "darknet markets," "monero," and "hacking". On or about October 19, 2020, Forum-1 opened a sub-forum dedicated to Marketplace-1 ("Marketplace-1 sub-forum"). The Marketplace-1 subforum was opened to assist in the launch of Marketplace-1.

c. On or about November 9, 2020, Administrator-2 authored a post in the Marketplace-1 sub-forum "announcing" Marketplace-1's "Beta Launch." The post indicated that vendors and buyers would initially be capped "to prevent against unsustainable growth."

d. On or about November 11, 2020, Administrator-2 authored a post in the Marketplace-1 sub-forum, which responded to feedback from the Beta Launch, and stated, in substance and in part, that Marketplace-1 would not sell opiates, that its administrators were recruiting vendors, and that "employment" opportunities with Marketplace-1 might be open to those interested in the future.

e. On or about May 22, 2021, Administrator-1 authored a post on Forum-1 titled "[Marketplace-1] is now fully developed with wonderful new features!" The post further stated, in substance and in part, that Marketplace-1 would now offer a chat feature and a referral program, had an improved user layout, and accepted both Bitcoin and Monero. This post appears to mark the official (*i.e.,* non-Beta) launch of Marketplace-1.

f. On or about December 6, 2021, Administrator-1 authored a post on Forum-1 titled "[Marketplace-1] Welcome Buyers and Vendors." The post stated, in substance and in part, that "we are a small but dedicated team that focuses on giving you the best market experience." The post continued by listing various Marketplace-1 features including "a casino."

g. On or about December 19, 2021, a user of Forum-1 posted a question regarding darknet markets in which the user queried, in substance and in part, "I often see the terms 'Canary' and 'Mirror' when I enter a market, could anyone tell me what I should do?" Administrator-1 responded, in substance and in part, "Canary is a PGP signed message that usually comes with a last updated date and crypto block has to prove that the site owner is still alive. Mirror is a list of official mirrors the is PGP signed." [16]

---

[16] PGP keys, which is short for "Pretty Good Privacy" keys, are cryptographically complicated string of letters and numbers that are used to, among other things, create a digital signature so the public can identify that a particular post is written by a particular individual.

USAO_00032721

h. On or about December 30, 2021, Administrator-1 authored a post in the Marketplace-1 subforum on Forum-1, which stated, in substance and in part, "[Marketplace-1] originally launched during the holidays last year. We've managed to maintain good continuous uptime during the year. Our small but dedicated team focuses on giving you the best market experience. If you've had some past experience with our feedback thread, you'll definitely be amazed at how fast we implement your suggestions in a rolling update." The post also listed several features of Marketplace-1 For example, the post stated, in substance and in part, "Vendor History. Not sure about whether or not to purchase from a vendor? No worries, we got you covered."

i. On or about January 27, 2022, Administrator-2 responded to a question about "why opiods [sic] are not allowed" on Marketplace-1. Adminstrator-2 responded, in substance and in part "Because we can. . . . To that end, we can pick and choose whatever we wish to host or not host on our anonymous corporation. . . . [A]t this point in time (we may or may not change in the future, but for now), we disallow the sale of opioids and opiates."

j. On or about February 23, 2022, Administrator-1 authored a post in the Marketplace-1 subforum on Forum-1, which stated, in substance and in part, "Blank Ban on Opioids Lifted. Dear all, The ban on opioid products is now lifted. However, fentanyl and related chemicals remain banned. Cheers." Thereafter, Adminstrator-2's stopped posting on Forum-1 and elsewhere. Indeed, at or about this time, the attribution signature for Administrator-2's previous posts on Forum-1 were changed from "Administrator-2" to "deleted," which signaled that Adminstrator-2 was no longer publicly involved in Marketplace-1.

k. Based on the foregoing, I believe that Administrator-1 served as an administrator, working with Administrator-2 for approximately one year until in or about February 2022, after which Administrator-1 took over from Administrator -2 as the principal administrator of Marketplace-1.

l. On other occasions, Administrator-1 has announced Marketplace-1 software upgrades, changes, and other announcements on Forum-1. These posts further evidence Administrator-1's control over the operations of Marketplace-1. For example:

i. On or about February 23, 2022, Administrator-1 posted, in response to a user question, which asked whether heroin was permitted on Marketplace-1, "Only fent and related chemicals are banned."

ii. On or about February 27, 2022, Administrator-1 authored a post in the Marketplace-1 subforum on Forum-1, which was titled "Explanation Unexpected Downtime – Back Online." The post stated, in substance and in part, "One of our servers in the cluster crashed, leading the site to enter a precaution state. Currently, we have an automatic security system in place that detects system anomalies and will suspend the system or even migrate the entire infrastructure while wiping out the old cluster according to the severity. This is to prevent LE [law enforcement] takeover or hijacking of the servers. . . . We sincerely apologize for the downtime. And rest assured we'll do our best to not let it happen again. P.S. We're pushing a new major update today or tomorrow."

19

iii.  On or about February 27, 2022, Administrator-1 authored a post in the Marketplace-1 subforum, which, among other things, announced the end of operations of the Marketplace-1 casino.

iv.  On or about March 1, 2022, Administrator-1 authored a post in the Marketplace-1 subforum, which, among other things, announced, in substance and in part, a new user interface and "Punk Avatars. . . .  Added punk avatars: randomly generated icons that represent you."

v.  On or about December 10, 2023, Administrator-1 posted, in substance and in part, "All services are restored and once again functional. . . .  As you all witnessed (and a reason for the panic today), [Marketplace-1] has maintained a near flawless uptime for the past three years.  Even with all those DDoS attacks going on last year, [a DDoS prevention software designed by Administrator-1] has kept the site stable. . . .  We sincerely apologize for any inconvenience we have caused, and thank you all for believing in us!"[17]

vi.  On or about December 23, 2023, Administrator-1 posted, in substance and in part, "Merry Christmas . . . We're organizing a list of features and updates on our end, we're listening to all your feedback. Promise I'll get it all sorted out asap, after I deal with current issues at hand.  Thank y'all for three years of support. . . . Sincerely [Administrator-1]."

m.  On other occasions, Administrator-1 has posted about ways in which individuals can keep their illegal activities on the internet protected from law enforcement.  Specifically, Administrator-1 posted about darknet marketplace operational security, speculated about efforts law enforcement takes to stop darknet markets, and offered tips to others.  For example,  on or about June 2021, Administrator-1 posted about "op-sec" (*i.e.* operational security) and speculated, in substance and in part, that a government would not seek to overtake the Tor network because it is not cost effective while they could, instead, "catch a bunch of low hanging fruit with bad opsec [i.e. darknet operators who do not provide sufficient operational security]."

n.  Every fourteen or thirty days, the administrators of Marketplace-1 post a "canary" with their unique PGP key.  The "canary," as explained by Administrator-1's December 19, 2021 post, *supra* ¶ 23.g, confirms to Marketplace-1 users that the site is operational and none of the administrators have been compromised.  As of on or about December 18, 2023, the "canary" post named Administrator-1 as one of the Marketplace-1 administrators along with two other administrators who manage the day-to-day operations of Marketplace-1.

### Bank Wallet-1 and Administrator Wallet-1

24.  Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned the following, among other things:

a.  All transactions on Marketplace-1 must use Marketplace-1's bank.  As explained above, Marketplace-1's "bank" enables Marketplace-1 to retail and distribute narcotics securely

---

[17] The reference to successful DDoS attack prevention may be a reference to the purpose of Server-1.

USAO_00032723

between users (e.g., buyers) and sellers (e.g., vendors).  Through the bank, customers deposit cryptocurrency (Bitcoin or Monero) into the customer's Marketplace-1 bank account—essentially a cryptocurrency wallet.  Once deposited, each user's marketplace wallet is controlled by Marketplace-1.  Then, after a buyer purchases a product from a vendor (*e.g.,* narcotics) Marketplace-1 releases funds to the vendor's Marketplace-1 bank account.  In this way, Marketplace-1 serves as a financial link between vendors and customers and in so doing provides both parties a level of comfort that the transaction will be consummated, while also allowing the parties to maintain distance and anonymity between each other.  Marketplace-1's bank also offers an escrow service, which provides sellers and buyers further protections.  The escrow service can be set such that a buyer's money will be released to a seller only after specified actions occur, for example, the shipment of narcotics.  With the escrow service,  sellers know they will be paid for their illegal narcotics and buyers know their payments will be released to sellers after specified events occur. Although not every transaction on Marketplace-1 uses the bank's "escrow" services, many do.

b.  Law enforcement officers identified the cryptocurrency wallets that Marketplace-1 uses for its bank (collectively, "Bank Wallet-1") and uses to funnel proceeds from Marketplace-1 to Administrator-1 ("Administrator Wallet-1"):

i.  Pursuant to the January 2024 judicially authorized warrant, law enforcement officers searched Server-3.  In Server-3, law enforcement officers identified the following directories (i.e. computer folder) "/root/.bitcoin/wallets/[Marketplace-1] 1/"; /root/.bitcoin/wallets/[Marketplace-1] 2/"; "/root/.bitcoin/wallets/[Marketplace-1] 3; and /root/.bitcoin/wallets/[name of a cryptocurrency tracking software promoted by Administrator-1]. Each of these computer folders contains a Bitcoin wallet file.  A Bitcoin wallet file is a database that contains public and private Bitcoin keys to a particular Bitcoin wallet. [18]  Because each of these Bitcoin wallet files were found on Server-3 and are named [Marketplace-1] or the cryptocurrency tracking software promoted by Adminstraotr-1, they appear to contain Marketplace-1 assets— specifically deposits made by customers and vendors into Bank-1.[19]  For simplicity, these four wallets are defined herein as "BTC Bank Wallet-1."

---

[18]  Every cryptocurrency wallet comes with a corresponding pair of cryptographically generated PGP keys—one public and one private. Public keys identify particular cryptocurrency wallets and can be shared with anyone to identify a particular wallet.  Private keys, on the other hand, are typically maintained securely as they allow anyone to control the funds inside a particular cryptocurrency wallet.  For example, if Person A wants to provide Person B an address where Cryptocurrency should be sent, Person A will provide Person B their public key, which serves as a cryptocurrency wallet to which Person B will direct a transfer.  In order to transfer cryptocurrency from a wallet to another the user must use their private key, which provides them control over the wallet.

[19]  At the time of the search, wallets [Marketplace-1] 1, [Marketplace-1] 2, [Marketplace-1] 3, contained most proceeds, a total of approximately 1315.6 BTC ($36.8 million) in deposits.  The wallet identified as a [name of a cryptocurrency tracking software promoted by Administrator-1] contained approximately 0.41 BTC ($11,921) in deposits.

USAO_00032724

ii.   A review of BTC Bank Wallet-1 indicates that from on or about November 9, 2020 through on or about January 9, 2024, there were approximately 244,483 Bitcoin transactions in and out of BTC Bank Wallet-1, consisting of approximately 183,772 deposits and approximately 60,711 withdrawals. The total Bitcoin deposited represents approximately 1,316.038719 BTC ($36,895,586.12), and the total Bitcoin withdrawn represents approximately 1,303.126267 BTC ($36,431,574.05).[20]

iii.   Server-3 also housed a Monero wallet ("XMR Bank Wallet-1"). Based on a review of XMR Bank Wallet-1, from on or about November 9, 2020, through on or about January 9, 2024, there were approximately 265,375 Monero transactions consisting of 181,918 deposits and 83,457 withdrawals. The total XMR deposited represents approximately 296,094 XMR ($46,728,991), and the total Monero withdrawn represents approximately 294,634 XMR ($46,482,976).

iv.   Combining BTC Bank Wallet-1 and XMR Wallet-1—"Bank Wallet-1"— indicates that from its inception to on or about January 9, 2024, Marketplace-1 generated at least approximately $83,624,577 in revenue, which yielded at least approximately $4,181,228 from its 5% commission.  A review of Bank Wallet-1 further indicates that Marketplace-1 activity increased year over year.  For example, in 2022, Bank Wallet-1 received approximately $14.8 million in deposits.  In 2023, Bank Wallet-1 received approximately $65.5 million in deposits.

c.   Using software tools, law enforcement officers reviewed the publicly available Bitcoin digital ledger and traced transactions involving BTC Bank Wallet-1.  In so doing, law enforcement officers identified a series of wallets that received the majority of funds from BTC Bank Wallet-1—*i.e.,* that received the proceeds of Marketplace-1.  One such particular wallet— "Administrator Wallet-1"—received the most funds from Bank Wallet-1, over approximately 58 deposits from in or about October 2021 through in or about September 2023.

i.   During that time period, of the approximately 58 deposits into Administrator Wallet-1 from BTC Bank Wallet-1, approximately 24 were whole value transfers (*e.g.* 1 BTC or 5 BTC as opposed to 1.789 BTC.)  Based on my training and experience, the transfer of whole amounts is indicative of transferring proceeds (*i.e.* the proceeds derived from the 5% fee) from to an administrator as a profit.  This is because when transferring funds, with the purpose of moving them, individuals tend use simple whole numbers.  On the other hand, when transferring funds, with the purpose of purchasing items, the amounts tend to not be in whole numbers because prices of items are pegged to fiat currencies and cryptocurrency is highly volatile.

ii.   Further, during that time period, the vast majority of Administrator Wallet-1's funds—approximately 123.14 BTC ($3,351,343)—came from BTC Bank Wallet-1.  That is, the cryptocurrency flowing into Administrator Wallet-1 is from Markerplace-1.  After receiving Marketplace-1 cryptocurrency, Administrator Wallet-1 transferred it elsewhere.  Specifically, from on or about March 25, 2020 through on or about October 1, 2023, Administrator Wallet-1 received approximately 77 deposits of Bitcoin, totaling approximately 126.0026 BTC, and then transferred all of it to other wallets.

---

[20] Due to the volatility of cryptocurrencies, as to all United States Dollar converted amounts herein are approximate and based on the floating exchange rate near the time of the transaction.

USAO_00032725

        iii.  Accordingly, Administrator Wallet-1 appears to be a "pass through" wallet used to obscure the source of funds (which is Marketplace-1), while transferring the cryptocurrency to other wallets under the control of Administrator-1.

      d.  <u>Administrator-1 Used "Swapping Service-1."</u>

        i.  On or about May 23, 2023 at approximately 12:07 UTC, Administrator-1 posted on Forum-1 that he "[g]ot fucked by [Swapping Service-1]."[21]  The post further indicated, in substance and in part, that "approximately one hour ago, 1 BTC was sent to [Swapping Service-1] for hot wallet rebalancing.  XMR didn't come out on the other end, and turned out to be confiscated.  Their support replied with: 'We received word from our exchange partner that your crypto were obtained through illegal proceedings.  Please provide proof of funds.'"

        ii.  On the day that Administrator-1 posted the comment about Swapping Service-1, *supra*, law enforcement officers observed on the Bitcoin public digital ledger a one (1) Bitcoin transfer from Administrator Wallet-1 to a particular wallet address associated with Swapping Service-1 ("Transaction-1").  Transaction-1 appears to be the transaction mentioned by Administrator-1 in the above post.  Indeed, the time of Transaction-1, approximately 11:15 UTC, aligns with the timing of the transfer recounted by Administrator-1 who indicated in the post, which was posted at approximately 12:07 UTC, that the transfer occurred "an hour ago."

      e.  Accordingly, I believe that Administrator Wallet-1 is controlled and managed by Administrator-1.  I believe this because, *inter alia*: (i) Administrator Wallet-1 received the most money from Bank Wallet-1, which is the wallet used by Marketplace-1; (ii) Administrator Wallet-1 primarily received whole amounts of Bitcoin from Bank Wallet-1; and (iii) Administrator Wallet-1 was involved in Transaction-1, which is a transaction that Administrator-1 complained about in an online post on Forum-1.

## RUI-SIANG LIN is Administrator-1

    25.  Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I believe that RUI-SIANG LIN, a/k/a "林睿庠," the defendant, is Administrator-1.  Thus, LIN is the principal administrator of Marketplace-1 who manages its entire operations, leads the activities the other two administrators, ultimately decides whether any of the more than one thousand vendors can sell narcotics on Marketplace-1, promotes Marketplace-1, controls Bank Wallet-1, controls Administrator Wallet-1, and profits from Marketplace-1's illegal operations.  I believe this based on, among other things, the following:

---

[21]  Swapping Service-1 is a particular online cryptocurrency swapping service.  A cryptocurrency swapping service allows its users to convert their cryptocurrency from one type of cryptocurrency to another for a fee.  For example, users can "swap" their Bitcoin for Monero or vice versa.  While it is possible such swapping could have a legitimate purpose, based on my training and experience, it is also a way individuals try to conceal the source of their funds to hide from law enforcement and others.

USAO_00032726

a. <u>LIN Used Administrator Wallet-1 to Purchase an Internet Domain.</u> As described below, Administrator Wallet-1 was used to purchase a domain registered to LIN.

i. Based on a review of the Bitcoin digital ledger, law enforcement officers learned that Administrator Wallet-1 conducted at least four transactions with Namecheap, an online domain registrar. In particular, Administrator Wallet-1 paid for, or partially paid for, at least four internet domains: (1) a domain which provides real-time status updates for popular darknet marketplaces and services, including Marketplace-1; (2) a domain which promoted a now defunct illegal darknet market; (3) a domain for a website associated with Marketplace-1—specifically a site that promotes the "[Marketplace-1] team," contains a link to Marketplace-1, and the description that Marketplace-1 allows users to "[b]uy whatever you desire with the best security, friendly interface and streamlined user experience there is. Real free trade starts here."; and (4) an additional particular domain ("Domain-1").

ii. Specifically, based on Namecheap documents, "Domain-1" was purchased on or about March 25, 2022, by a particular Namecheap account ("Namecheap Account-1") using funds from both Administrator Wallet-1 and a particular account hosted by a cryptocurrency digital marketplace ("Crypto Account-1").[22] The total price of Domain-1 was approximately $20,000—the vast majority of which was paid for from Crypto Account-1. But Administrator Wallet-1 also transferred approximately .00501 BTC ($22.09) to Namecheap to complete the purchase of Domain-1.

iii. Namecheap Account-1 appears to be LIN's Namecheap account. Namecheap Account-1 is registered to "RuiSiang Lin,"using a particular phone number with a Taiwanese country code ("Phone Number-1"), a physical address in Taipei, Taiwan, and a particular email address, which contains in its username the text "ruisiang" ("Lin Personal Email Account-1").[23]

b. <u>LIN's Crypto Account-1 Received Marketplace-1 proceeds.</u> As described below, Crypto Account-1 appears to have received substantial funds from Marketplace-1. Using software tools, law enforcement officers have reviewed the publicly available Bitcoin digital ledger, as well as the transaction history of Crypto Account-1, and learned the following, in substance and in part:

i. On or about July 26, 2021, at approximately 07:43 UTC, Administrator Wallet-1 transferred approximately .04 Bitcoin to a particular swapping service ("Swapping Service-2") (approximate value at the time of transfer was $1,528), where it was swapped for

---

[22] A cryptocurrency digital marketplace enables users to buy and sell cryptocurrencies. Users also maintain accounts with the marketplace where they can hold cryptocurrencies over time.

[23] On or about October 4, 2023, "RUISIANG LIN" with the alias "林睿庠" applied for a visa to enter the United States. In the application, LIN provided Phone Number-1 as his phone number and Lin Personal Email Account-1 as his email address. In the application, LIN described his employment duties as "RESEARCH AND DEVELOP BLOCKCHAIN APPLICATIONS AND BACKEND." LIN's application indicates he is from Taiwan and graduated National Taiwan University. Finally, LIN submitted a particular photograph of himself in connection with the visa application ("Photograph-1").

USAO_00032727

approximately 6.7681 XMR.  Approximately 21 minutes after the .04 Bitcoin transfer from Administrator Wallet-1, which was converted to 6.7681 XMR, Crypto Account-1 received a deposit of 6.7681 XMR (approximate value at the time of transfer was $1,476).

ii.  On or about May 15, 2022, at approximately 03:18 UTC, Administrator Wallet-1 transferred 1 Bitcoin to Swapping Service-1 (approximate value at the time of transfer was $29,745), where it was swapped for approximately 193.68 XMR.  Approximately 40 minutes after the 1 Bitcoin transfer from Administrator Wallet-1, which was converted to 193.68 XMR, Crypto Account-1 received a deposit of 180 XMR (approximate value at the time of transfer was $30,978).

iii.  On or about May 17, 2022, at approximately 09:59 UTC, Administrator Wallet-1 transferred 1 Bitcoin to Swapping Service-1 (approximate value at the time of transfer was $30,571), where it was swapped for approximately 176.07 XMR.  Approximately 27 minutes after the 1 Bitcoin transfer from Administrator Wallet-1, which was converted to 176.07 XMR, Crypto Account-1 received a deposit of 180 XMR (approximate value at the time of transfer was $31,104).

iv.  On or about May 31, 2022, at approximately 08:33 UTC, Administrator Wallet-1 transferred 2 Bitcoin to Swapping Service-1 (approximate value at the time of transfer was $63,432), where it was swapped for approximately 304.74 XMR.  Approximately 35 minutes after the 2 Bitcoin transfer from Administrator Wallet-1, which was converted to 304 XMR, Crypto Account-1 received a deposit of 300 XMR (approximate value at the time of transfer was $59,580).

v.  These transfers appear to indicate that the transferor used Swapping Service-1 to obscure the source of the money transferred from Administrator Wallet-1 to Crypto Account-1.  That is, rather than transfer money from Administrator Wallet-1 directly to Crypto Account-1, cryptocurrency was first swapped through Swapping Service-1 and converted from Bitcoin to Monero, which is a cryptocurrency that is much more difficult to trace.  After the swap, the funds were transferred into LIN's Crypto Account-1.

vi.  Documents from the provider of Crypto Account-1 indicate that its user provided Phone Number-1 as his mobile number, Lin Personal Email Account-1 as his email address, and the below pictured Taiwanese Driver's License as proof of identity.  The below Taiwanese Driver's License, with redactions applied over certain identifying information, lists an address in Taipei, Taiwan and the name is "林睿庠," which is the Mandarin language spelling of "Rui-Siang Lin."  In addition, the Taiwanese Driver's License listed the driver's license number for "林睿庠," ("License Number-1").

USAO_00032728



vii.   Accordingly, LIN appears to own and control Crypto Acccount-1, which has received Marketplace-1 proceeds.

### c.   LIN's Cryptocurrency Holdings Increased as Marketplace-1 Business Increased

i.   As indicated in the chart above, *supra* ¶ 22.i, a review of Bank Wallet-1 and the "orders" in Server-2 reveals that Marketplace-1 business increased from 2021 to 2023. While Marketplace-1 grew from 2021 to 2023, LIN's cryptocurrency holdings also increased.  Monero deposits into Crypto Account-1 increased in a similar pattern from 2021 (approximately $63,154 deposited) to 2022 (approximately $1,302,946 deposited) to 2023 (approximately $4,196,408 deposited).  Bitcoin deposits into Crypto Account-1 also increased from 2021 (approximately $1,195 deposited) to 2022 (approximately $37,784 deposited) to 2023 (approximately $1,792,096 deposited).

ii.   Law enforcement also identified another cryptocurrency exchange account ("Crypto Account-2") registered to the name "Rui-Siang Lin," using Lin Personal Email Account-1 and Phone Number-1.  Crypto Account-2 was created on or about July 25, 2023 and from that date to on or about November 21, 2023, it received approximately $4.5 million dollars of crypto currency deposits.

iii.   Based on a review of Lin Personal Email Account-1,[24] law enforcement officers located a copy of LIN's resume from in or about November 2023.  Based on that resume, LIN's employment history is not consistent with the large amount of assets in his cryptocurrency accounts.  That is, LIN's past employment does not appear to be the sort of employment for which an individual would have been paid or otherwise obtained millions of dollars.  Of the four listed "professional experience[s]" in LIN's resume, the first position is an "intern," the second is a "student researcher," the third is a "co-founder" of an obscure tech company, and the fourth is an "information technology" employee for a foreign-government office.  None of these positions suggest that LIN would have earned millions of dollars.   Accordingly, I believe that the large volume of assets in LIN's cryptocurrency accounts are the result of his work as Administrator-1.

---

[24] On or about November 22, 2023, law enforcement officers obtained a judicially authorized search warrant on Lin Personal Email Account-1.

USAO_00032729

d. <u>LIN Has the Required Technical Knowledge.</u>  Based on publicly available information, LIN appears to have the requisite technical knowledge and experience to operate and manage a complex darknet market such as Marketplace-1.

i.  Law enforcement officers identified a particular GitHub account, which is registered to Lin Personal Email Account-1.[25]  The name associated with this GitHub account is "Ruisiang."  Accordingly, it appears to be LIN's GitHub account.  In LIN's GitHub account, LIN describes himself as a "Backend and Blockchain Engineer, Monero Enthusiast."  LIN's GitHub account has approximately 35 publicly available software coding projects.  Collectively, these coding projects indicate that LIN has significant technical computing knowledge, including knowledge necessary to administer a site like Marketplace-1.  The coding projects include operation of cryptocurrency servers and web applications—such coding knowledge is necessary to administer Marketplace-1.  LIN's GitHub account includes, for example, the following coding projects:

1.  "PoW Shield," which is a tool to mitigate DDoS attacks.  Notably, as mentioned above, Marketplace-1 has trumpeted its ability to deflect DDoS attacks and implements Server-1 for that purpose.  (*See supra* ¶¶ 21.a, 23.i.v.)

2.  "Monero Merchant," which is a software tool that allows online merchants to accept XMR for payment.

3.  "Koa-typescript-framework," which is a webframe software program used as a foundation for web applications.  Marketplace-1 is built on Koa and Typescript.

e. <u>LIN's YouTube Interview.</u>  Law enforcement officers have identified a particular publicly available YouTube video ("Video-1").  Video-1 contains an approximately 15-minute interview with LIN regarding "PoW Shield."  During the interview, LIN explained that there are various methods to stop a DDoS attack, including by increasing bandwidth and setting up "edge servers."  Specifically, during the interview "Ruisang" describes, in English, software designed to disrupt DDoS attacks.  The interview contains an "About Me" title page in which "Ruisang" is identified as "Lin, RuiSiang," "Backend & Blockchain Dev," Undergraduate at National Taiwan University," "Crypto Enthusiast," along with a link to LIN's GitHub account.  The individual interviewed appears to be the same individual pictured in the Taiwanese Driver's License, *supra* ¶ 25.b.vi, and is identified with the mandarin language name for "Rui-Siang Lin," as pictured below:

---

[25] GitHub is a social media platform that allows software developers to create, store, and manage software codes.  Users can post software code on the site and/or communicate with others about software-based issues.

USAO_00032730



f. LIN's Personal Email Account-1 Demonstrates LIN is Adminstrator-1:

i. Lin Personal Email Account-1 is LIN's email account. Lin Personal Email Account-1 is registered to the name "林睿庠," which is the same name on the Taiwanese Driver's License used to register Crypto Account-1 and the name used in Video-1. Lin Personal Email Account-1 is also registered to Phone Number-1, which is the same phone number associated with Crypto Account-1. Based on a review of the content in Lin Personal Email Account-1, it appears to be LIN's personal email account. For example:

1. On or about May 4, 2022, Lin Personal Email Account-1 sent an email in response to a job post, which read, in substance and in part: "My name is RuiSiang Lin, and I'm currently a third year at National Taiwan University. I've developed blockchain and backend applications for 2.5 years now as an intern at [redacted]. Also, I've had a solid infrastructure and cybersecurity background." Attached to the email was LIN's English language resume which listed Phone Number-1 as LIN's phone number and Lin Personal Email Account-1 as LIN's email address. The resume listed various computer coding experience including links to LIN's GitHub account.

2. On or about November 22, 2023, Lin Personal Email Account-1 received an email from a particular Taiwanese Bank. Attached to that email was a bank statement, which was password protected. The email from the bank indicated, in substance and in part and based on machine translations, that the password to decrypt the bank statements was LIN's identification number. Law enforcement officers were able to decrypt the bank statement by using License Number-1. The bank statement indicated that LIN had over $1 million in his accounts.

ii. Lin Personal Email Account-1 Searches Coincide with Administrator-1 Activities. As described above, law enforcement officers obtained a search warrant on Lin Personal Email Account-1, which provided law enforcement officers access to the content of that account including, among other things, the Google searches that the user of Lin Personal Email Account-1 ran, and learned as follows:

USAO_00032731

1.  *Pixel Attacks*

a.  On or about May 7, 2021 at 08:51 UTC, the user of Lin Personal Email Account-1 searched Google for "one pixel attack for fooling deep neural networks github."  Thereafter, according to documents obtained from Google, Lin visited a particular url on GitHub ("GitHub URL-1").

b.  On or about May 7, 2021 at 18:40 UTC, Administrator-1 posted on Forum-1 a post titled "A Proposal for ML-proof improvement on DeCaptcha" within that post, Administrator-1 wrote, in substance and in part, "One pixel attacks should deem the spammers/DDoSers ML efforts to fail." The post provided GitHub URL-1 as a link for further reading on the topic—*i.e.,* the same link Lin Personal Email Account-1 visited earlier that day.

2.  *Marketplace-1 Casino*

a.  On or about September 2, 2021, the user of Lin Personal Email Account-1 searched Google for "provable fair calculator."  On September 3, 2021, the user of Lin Personal Email Account-1 searched Google for "slot game terminology."  On or about September 4, 2021, the user of Lin Personal Email Account-1 performed several searches that appear to be related to animating dice rolling using a particular software coding language.  On or about September 5, 2021, the user of Lin Personal Email Account-1 performed several internet searches regarding playing cards, poker, and blackjack.  On or about September 7, 2021, the user of Lin Personal Email Account-1 performed several searches regarding animating card flips and blackjack mathematics.

b.  On or about September 7, 2021, the Marketplace-1 "Changelog" lists the following changes to Marketplace-1 "Integrated online casino [Marketplace-1 nickname]bets."[26]

c.  On or about September 15, 2021, Administrator-1 posted on Forum-1, in substance and in part, that Marketplace-1 offers "[Marketplace-1 nickname]bets." The post contains the phrase "provably fair mechanism"—*i.e.,* a phrase similar to what LIN searched thirteen days earlier.

3.  *Three-Way Chat Feature*

a.  On or about September 19, 2021, the user of Lin Personal Email Account-1 searched Google for "three-way conversation."

b.  On or about September 20, 2021, Administrator-1 posted on Forum-1, in substance and in part, that Marketplace-1 now offers a redesigned dispute system with "per-order three-way chats."

---

[26] The Marketplace-1 "Changelog" is a running list of changes made to Marketplace-1. Those changes typically indicate software updates, bug fixes, and adding features to the site.

USAO_00032732

4.  *Cryptopunk Generator*

a.  On or about February 7, 2022, the user of Lin Personal Email Account-1 searched Google for "cryptopunk generator js," "array.reduce," "get random in array," and "js random true false."

b.  On or about February 28, 2022, the Marketplace-1 "Changelog" lists the following changes to Marketplace-1: "Added punk avatars, unique generated icons that represent you."  Similarly, as indicated above, on or about March 1, 2022, Admisntrator-1 posted that Marketplace-1 "[a]dded punk avatars: randomly generated icons that represent you" on Forum-1.

c.  Based on my training and experience, the search "cryptopunk" was performed to locate images of a popular internet NFTs and memes.  Those images were then used to create Marketplace-1 avatars.  The other February 7, 2022 searches appear to be related to randomizing functions, thus enabling Marketplace-1 to randomly, and uniquely, assign a "cryptopunk" avatar to each user.

5.  *Troubleshooting an Offline Server*

a.  On or about July 19, 2022, pursuant to a judicially authorized warrant, the FBI imaged a server, which hosted Marketplace-1.  To execute that search warrant, the FBI took the Marketplace-1 sever offline at approximately 23:30 UTC.

b.  On or about July 20, 2022, at approximately 00:18 UTC, 00:19 UTC, 00:20 UTC, and 00:23 UTC, the user of the Lin Personal Email Account-1 searched Google for "pm2 crashed," "view pm2 daemon logs," "pm2 daemon logs," and "pm2 changelog," respectively.

c.  Based on my training and experience, I have learned that "PM2" is process manager software which helps its users manage and maintain applications online.  Thus, these July 20, 2022 searches—which were performed less than an hour after Marketplace-1's server went offline—appear to be LIN attempting to troubleshot the fact that a Marketplace-1 server went offline.

30

USAO_00032733

### iii.  LIN Emailed Himself a Diagram of a Darknet Marketplace

1.  On or about March 12, 2020, the user of Lin Personal Email Account-1 emailed himself a diagram, which is pictured below.



b.  This diagram appears to be a plan for a darknet market. Notably, the diagram indicated "vendor," "listing," "pgp key," and "admin review," all of which are features of Marketplace-1.

c.  In addition to the above mentioned Google searches performed by the user of Lin Personal Email Account-1, this diagram is further evidence that LIN is Adminstrator-1.

**Surveillance of LIN Matches His Activities on Lin Personal Email Account-1**

26.  Based on my involvement in this investigation, my training and experience, my review of documents and other materials, as well as my conversations with law enforcement officers and others, I have learned that:

a.  On or about October 25, 2023, the user of Lin Personal Email Account-1 searched for, among other things, "What to Pack for Your Trip to St. Lucia (2023)."

b.  On or about November 2, 2023, the user of Lin Personal Email Account-1 searched for, among other things, "Online Check in - EVA Air | Global (English)."[27]

---

[27] EVA is a Taiwanese airline.

USAO_00032734

c.   The next day, the user of Lin Personal Email Account-1 searched for, among other things, "pearson toronto american express,"[28] "pearson priority security lane," "toronto airport priority pass," "toronto midnight bars," and "Harbor Club St. Lucia."

d.   On or about November 3, 2023, law enforcement officers observed a man who appeared to be the same individual in Photograph-1, Video-1, as well as the individual depicted in the Taiwanese Driver's License photograph described above—*i.e.* RUI-SIANG LIN, a/k/a "林睿庠," the defendant—walk through international customs at Toronto Pearson Airport in Canada, which indicates that LIN had arrived on an inbound international flight.  LIN was next observed at a baggage terminal.  The officers then surveilled LIN leave the airport in a rideshare car and arrive at a nearby hotel.  The next day, law enforcement officers observed LIN in Pearson Airport board a plane destined for St. Lucia. That is, consistent with the aforementioned Google searches, LIN spent an evening in Toronto, and after doing so traveled to  St. Lucia.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of RUI-SIANG LIN, a/k/a "林睿庠," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

//s authorized electronic signature

_____
Mark Rubins
Task Force Officer
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 26th  day of January, 2024.

_____
THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

---

[28] Toronto Pearson International Airport is an international airport located in Toronto, Canada.

32

USAO_00032735

**EXHIBIT B**

**(Indictment)**

USAO_00032736

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RUI-SIANG LIN,
   a/k/a "Ruisiang Lin,"
   a/k/a "林睿庠,"
   a/k/a "Pharoah,"
   a/k/a "faro,"

           Defendant.

**SEALED INDICTMENT**

24 Cr. ___

**24 CRIM 178**

## COUNT ONE
### (Continuing Criminal Enterprise)

The Grand Jury charges:

1.     From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, was the principal administrator of Incognito Market, which was one of the largest illegal narcotics marketplaces on the internet. Incognito Market sold at least approximately $100,000,000 worth of heroin, cocaine, methamphetamine, LSD, other illegal narcotics, and misbranded prescription medication. Those sales comprise more than one thousand kilograms of narcotics, misbranded prescription medication, and other illicit products—including at least 364 kilograms of cocaine, 295 kilograms of methamphetamine, and 92 kilograms of MDMA.

2.     Incognito Market was available globally to anyone with internet access, including users in the Southern District of New York. Incognito Market appears to have been designed to foster seamless narcotics transactions across the internet and to incorporate features of many

USAO_00032737

legitimate e-commerce sites, including, for example, branding, advertising, and customer service. Users logging into Incognito Market were greeted with the following splash page:



3.      Incognito Market launched in or about October 2020.  Since that time, and through at least in or about March 2024, Incognito Market could be accessed via the internet using a widely available encrypted and anonymous internet browsing software known as the "Tor" web browser. Tor enables individuals to conceal their true IP address to access what is commonly referred to as the "darkweb" or "darknet."  Incognito Market does not sell narcotics directly to customers. Instead, Incognito Market is an e-commerce platform that enables its "customers" to purchase narcotics from "vendors," who advertise narcotics for sale on Incognito Market.   An example of narcotics listings on Incognito Market for heroin are reproduced below:

2

USAO_00032738



4.      The principal administrator of Incognito Market was known by the alias "Pharoah," which at times was spelled as "Pharoah" or "faro." At all times relevant to this Indictment, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, operated the "Pharoah" aliases and controlled all aspects of Incognito Market. LIN had ultimate control over more than one thousand vendors (those who sell narcotics on Incognito Market), more than 200,000 customers (those who buy narcotics on Incognito Market), and at least one other employee who assisted LIN in the management of the site. LIN also implemented policies for the site, controls its severs, and its funds.

5.      As the principal administrator of Marketplace-1, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, profited the most from

3

USAO_00032739

Marketplace-1's activities.  As a result of LIN's control over Incognito Market, he has earned millions of dollars in profits.

6.     RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, used the "Pharoah" alias when making announcements on Incognito Market; in various internet forums that LIN used to promote Incognito Market; and while in communication with others who worked under LIN's direction on Incognito Market.  For example, after Incognito Market's servers disconnected for a period of time, LIN (using the alias "Pharoah") attempted to reassure the Incognito Market customer base by posting the following on a forum that promotes darknet market issues:




**23**

## December 10th Postmortem
by /u/pharoah  `Incogbot`  · 2 weeks ago* in **/d/IncognitoMarket**
**All services are restored and once again functional.**

7.     Both "vendors" and "customers" were required to register with Incognito Market and to be approved by Incognito Market employees.  Once registered and approved, each vendor was permitted to list for sale virtually any illegal narcotic they wished, for any price they chose.  "Customers" were also required to register with Incognito Market.  After registering, customers were able to select which narcotics to purchase from which vendor and to pay for those narcotics using cryptocurrency, in transactions facilitated by a payment platform that Incognito Market described as a "bank" (the "Incognito Bank").  Both vendors and customers used the Incognito Bank to conduct narcotics transactions, which meant that both vendors and customers deposited money with Incognito Market and used Incognito Market to exchange money.  Accordingly, both customers and vendors demonstrated considerable trust in Incognito Market and its

USAO_00032740

administrator—*i.e.*, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah,"

a/k/a "faro," the defendant—because once deposited, customers and vendors relied on LIN to

process withdrawal requests.   In exchange for its services, Incognito Market earned approximately

5% of the purchase price of every narcotic sold on Incognito Market.   A screenshot of the landing

page for the Incognito Bank is reproduced below:



8.      In or about March 2024, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠,"

a/k/a "Pharoah," a/k/a "faro," the defendant, suddenly closed Incognito Market and refused to

USAO_00032741

return funds vendors and customers held with the Incognito Bank. Instead, LIN threatened to disclose on the internet each users' transaction history unless the user paid LIN an additional fee. In a post about this fee (reproduced below), LIN wrote, in part, "YES, THIS IS AN EXTORTION!!"



## Statutory Allegations

9.     From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, engaged in a continuing criminal enterprise (the "Continuing Criminal Enterprise"), in that LIN knowingly and intentionally participated in a continuing series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II, including, among other violations, Violations One through Four set forth below, which were undertaken by LIN in concert with five and more other persons with respect to whom LIN occupied a position of organizer, a supervisory position, and any other position of management, and from which LIN obtained substantial income or resources.

## Violation One

10.     From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known

USAO_00032742

and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

11.     It was a part and an object of the conspiracy that, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

12.     The controlled substances involved in the offense were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B); (vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), in violation of Title 21, United States Code, Section 841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); and (x) mixtures

7

and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C), and 846.

<u>Violation Two</u>

13.     From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to (i) import a controlled substance into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance and chemical would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, which controlled substances were mixtures and substances containing a detectable amount of heroin, cocaine, methamphetamine, Methylenedioxymethamphetamine ("MDMA"), and LSD in violation of Title 21, United States Code, Sections 952(a), 959(a), 960(a)(1), 960(a)(3), 960(b)(3), 963, and Title 18, United States Code, Section 2.

<u>Violation Three</u>

14.     On or about January 4, 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, knowingly and intentionally distributed and possessed with intent to distribute a controlled substance, to wit, mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2.

8

Violation Four

15.     From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, delivered, distributed, and dispensed controlled substances by means of the internet, in a manner not authorized by law, and aided and abetted such activity, in violation of Title 21, United States Code, Sections 841(h), and Title 18, United States Code, Section 2.

16.     The controlled substances that RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, delivered, distributed, and dispensed by mean of the internet, were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B); (vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of MDMA, in violation of Title 21, United States Code, Section

9

USAO_00032745

841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (x) mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C).

<u>Notice of Special Sentencing Factors</u>

17.    From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, was the principal administrator, organizer, and leader of the Continuing Criminal Enterprise and was one of several such principal administrators, organizers, and leaders, in which the continuing series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II involved at least 300 times the quantity of mixtures and substances containing a detectable amount of cocaine, lysergic acid diethylamide ("LSD"), and methamphetamine, its salts, isomers, or salts of its isomers, described in Title 21, United States Code, Section 841(b)(1)(B); and from which the Continuing Criminal Enterprise received $10 million and more in gross receipts during a 12-month period of its existence for the manufacture, importation, and distribution of cocaine, heroin, LSD, and methamphetamine, its salts, isomers, or salts of its isomers, described in Title 21, United States Code, Section 841(b)(1)(B).

(Title 21, United States Code, Sections 848(a), 848(b), 848(c).)

## COUNT TWO
### (Narcotics Conspiracy)

The Grand Jury further charges:

18.    From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a

10

"Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

19.     It was a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

20.     The controlled substances that RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, conspired to distribute and possess with intent to distribute were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); (iv) 10 grams and more of mixtures and substances containing a detectable amount of lysergic acid diethylamide (LSD), in violation of Title 21, United States Code, Section 841(b)(1)(A); (v) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana in violation of Title 21, United States Code, Section 841(b)(1)(B); (vi) mixtures and substances containing a detectable amount of Oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C); (vii) mixtures and substances containing a detectable amount of ketamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); (viii) mixtures and substances containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), in violation of

11

Title 21, United States Code, Section 841(b)(1)(C)); (ix) mixtures and substances containing a detectable amount of amphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(C); and (x) mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846)

**COUNT THREE**
**(Money Laundering - Concealment)**

The Grand Jury further charges:

21.    From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, narcotics trafficking, and conspiracy to commit narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, respectively, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i), and 2)

USAO_00032748

## COUNT FOUR
### (Conspiracy to Sell Adulterated and Misbranded Medication)

The Grand Jury further charges:

22.　　From at least in or about October 2020, up to and including at least in or about March 2024, in the Southern District of New York, and elsewhere, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, selling adulterated and misbranded drugs in violation of Title 21, United States Code, Sections 331, 333(a)(2).

23.　　It was a part and an object of the conspiracy that RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown with the intent to defraud and mislead, would and did introduce and deliver for introduction into interstate commerce, and attempt to do the same, and would and did cause the introduction and delivery for introduction into interstate commerce, and attempt to do the same, of adulterated and misbranded drugs, as defined by 21 U.S.C. §§ 351(a)(1), 351(a)(3), 352(a), 352(b), 352(f), and 352(o), in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), 333(i) to wit, LIN and others known and unknown sold misbranded and counterfeit medication over the internet.

24.　　In furtherance of the conspiracy and to effect its illegal objects, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

　　　　a.　　On or about December 5, 2023, in the Southern District of New York, law enforcement officers received five tablets, which were purchased on Incognito Market operated by LIN and shipped by the seller on Incognito Market to an address in the Southern District of

13

New York. Those five tablets bore the mark of a particular licensed pharmaceutical manufacturer, but those five tablets were not, in fact, produced by that licensed manufacturer.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

25.    As a result of committing the offense alleged in Count One of this Indictment, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense; any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense; and any and all interest in, claims against, and property and contractual rights affording a source of control over the continuing criminal enterprise described in Count One of this Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offense including the following specific property (the "Specific Property"):

a.    All currency, including cryptocurrency, on deposit in Binance Account No. 37817359;

b.    All currency, including cryptocurrency, on deposit in Binance Account No. 281631139;

c.    All currency, including cryptocurrency, on deposit in Binance Account No. 526308705;

d.    All currency, including cryptocurrency, on deposit in Binance Account No. 38226114;

14

e.     All currency, including cryptocurrency, on deposit in Kraken Account No. AA39 N84G HES7 WXWY;

f.     All currency, including cryptocurrency, maintained in Monero wallet 49Nq38EpZDZG8RRPQYGGunHqLk63EJ71NHKWVircvjQqDhNuMBZtg13g9E4DhjBdJGfi C7ySyjS8Rc3RSduxNHSS2Mcdad;

g.     All currency, including cryptocurrency, maintained in Monero wallet 8AZhAbDoMefGjHCgS7FgDQDxyxxiJyqqR2SHVmyZKPdEUVNvWTTmS9i4wG7MqVExA 7HzXiYe9hai66Eha4YgEQrz49x1mAi.

26.     As a result of committing the offense alleged in Count Two of this Indictment, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense including the Specific Property.

27.     As a result of committing the offense alleged in Count Three of this Indictment, RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense including the Specific Property.

28.     As a result of committing the offense charged in Count Four of this Indictment,

15

USAO_00032751

RUI-SIANG LIN, a/k/a "Ruisiang Lin," a/k/a "林睿庠," a/k/a "Pharoah," a/k/a "faro," the

defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 334

and Title 28, United States Code, Section 2461(c), any and all drugs that were adulterated or

misbranded when introduced into or while in interstate commerce or while held for sale (whether

or not the first sale) after shipment in interstate commerce, or which may not, under the provisions

of section 311, 344, or 355 of this title, have been introduced into interstate commerce, including

but not limited to a sum of money in United States currency representing the value of such

property.

### Substitute Assets Provision

29.    If any of the above-described forfeitable property, as a result of any act or omission

of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided

without difficulty;

16

USAO_00032752

f.    it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 21, United States Code, Section 853.)

_____
FOREPERSON

_Damian Williams_
_____
DAMIAN WILLIAMS
United States Attorney

17

## ATTACHMENT A
*Person or property to be searched*

The person and property to be searched is RUI-SIANG LIN, date of birth February 1, 2001, and any personal effects in his vicinity and/or control, including any backpacks, bags, and briefcases, as well as any checked bags, for cellphones and electronic devices and paper that appears to contain passwords and/or seed phrases for electronic devices, online accounts, cryptocurrency wallets or accounts, upon the following condition: LIN is located in the Eastern District of New York at the time of the execution of this warrant. A picture of LIN is below:



The "Subject Devices" are any and all electronic devices in the possession of RUI-SIANG LIN, including any electronic devices in his checked luggage, including cellphones, tablets, computers, electronic storage media, and any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media, that are in the possession/custody/or control of LIN on or about May 18, 2024, when he arrives at John F. Kennedy International Airport in the Eastern District of New York.

During the execution of the warrant, law enforcement personnel are authorized to obtain from LIN the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Devices, including to (1) press or swipe the fingers (including thumbs) of LIN to the fingerprint scanner of the Subject Devices; and/or (2) hold the Subject Devices in front of the face of LIN to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Devices and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Devices consist of the following evidence, fruits, and instrumentalities of the distribution and possession with intent to distribute illegal narcotics and conspiracy to do the same, through the operation and use of an online marketplace, in violation of Title 21, United States Code, Sections 841 and 846, and money laundering, and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956 (the "Subject Offenses").

a.    Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, photographs, videos, and browsing history.

b.    Evidence concerning the identity or location of co-conspirators involved the Subject Offenses.

c.    Communications of any kind relating to the Subject Offenses or in furtherance of the Subject Offenses, including but not limited to text, data, chat, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service), email messages, or messages on social media or messaging applications installed on the Subject Devices (collectively, "text messages"), any attachments to those text messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the text message was sent;

d.    Computer programs and other files used in connection with administering online drug marketplaces, which may reveal, among other things, the IP addresses of additional computers associated with online drug marketplaces, or other information that could be used to identify and locate such computers;

e.    Evidence reflecting the use of the Tor network, cryptocurrencies or other technological methods (such as encryption or proxy services) to evade monitoring or detection by law enforcement;

f.    Evidence reflecting the user(s) of the Subject Devices work as an administrator of a darknet market, such as communications about the darknet market with market users or leasing of online infrastructure used to maintain the darknet market;

g.    Evidence reflecting the user(s) of the Subject Devices involvement in financial transactions to conceal the source of their wealth, including documents for the purpose

1

USAO_00032755

of creating companies, records of purported investments, or records of large financial transactions (including in cash or cryptocurrency);

h.  Encryption keys, passwords, or similar access devices that may be necessary to access data relating to online drug marketplaces;

i.  Means of payment for illegal narcotics and other contraband;

j.  Documents, spreadsheets and ledgers tracking memberships, sales and inventory, and accounts relating to online drug marketplaces and stolen credit card and financial account information;

k.  Evidence concerning the user's technical expertise;

l.  Search and web history records related to the Subject Offenses, including, if applicable, web and application activity history (including search terms), device information history, and location history;

m.  Information regarding the registration of email accounts, computer servers, or other computer network infrastructure, including servers and internet domains, or online communications facilities, and payment for such online facilities or services;

n.  Other information that may assist law enforcement in determining the true identity and location of the user of the Subject Devices or his/her accomplices, confederates or aiders and abettors, including but not limited to: IP addresses, names, addresses, phone numbers, email accounts, social networking accounts, website registration accounts, credit card accounts, bank accounts, cryptocurrency addresses, payment records, files with identifying metadata, and information regarding devices or accounts linked and/or used to access the Subject Devices, including device serial numbers, identifiers, and MAC addresses;

o.  Photographs, screenshots, and videos evidencing the foregoing;

p.  Evidence concerning any other online accounts or any computer devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

2

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Devices if necessary to evaluate its contents and to locate all data responsive to the warrant.

In addition to the foregoing, law enforcement personnel are authorized to seize from the Subject Person and or his personnel effects, and paper that appears to contain passwords and/or seed phrases for electronic devices, online accounts, cryptocurrency wallets or accounts.

USAO_00032757

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>THE PERSON RUI-SIANG LIN AND ANY CELLPHONES, ELECTRONIC DEVICES, OR<br>PERSONAL EFFECTS WITHIN HIS POSSESSION, CUSTODY, AND CONTROL WHEN HE<br>ARRIVES AT JOHN F. KENNEDY INTERNATIONAL AIRPORT ON OR ABOUT MAY 18, 2024 | )<br>)<br>)<br>)<br>)<br>)     Case No.    24-MC-1998 |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 31, 2024_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)* ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    May 17, 2024    4:45 PM _____

_____
*Judge's signature*

City and state:    Brooklyn, New York _____    Hon. Sanket J. Bulsara    U.S.M.J.
*Printed name and title*

USAO_00032758

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  24-MC-1998 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

USAO_00032759

## ATTACHMENT A

*Person or property to be searched*

The person and property to be searched is RUI-SIANG LIN, date of birth February 1, 2001, and any personal effects in his vicinity and/or control, including any backpacks, bags, and briefcases, as well as any checked bags, for cellphones and electronic devices and paper that appears to contain passwords and/or seed phrases for electronic devices, online accounts, cryptocurrency wallets or accounts, upon the following condition: LIN is located in the Eastern District of New York at the time of the execution of this warrant.  A picture of LIN is below:



The "Subject Devices" are any and all electronic devices in the possession of RUI-SIANG LIN, including any electronic devices in his checked luggage, including cellphones, tablets, computers, electronic storage media, and any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media, that are in the possession/custody/or control of LIN on or about May 18, 2024, when he arrives at John F. Kennedy International Airport in the Eastern District of New York.

During the execution of the warrant, law enforcement personnel are authorized to obtain from LIN the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Devices, including to (1) press or swipe the fingers (including thumbs) of LIN to the fingerprint scanner of the Subject Devices; and/or (2) hold the Subject Devices in front of the face of LIN to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Devices and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Devices consist of the following evidence, fruits, and instrumentalities of the distribution and possession with intent to distribute illegal narcotics and conspiracy to do the same, through the operation and use of an online marketplace, in violation of Title 21, United States Code, Sections 841 and 846, and money laundering, and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956 (the "Subject Offenses").

a.   Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, photographs, videos, and browsing history.

b.   Evidence concerning the identity or location of co-conspirators involved the Subject Offenses.

c.   Communications of any kind relating to the Subject Offenses or in furtherance of the Subject Offenses, including but not limited to text, data, chat, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service), email messages, or messages on social media or messaging applications installed on the Subject Devices (collectively, "text messages"), any attachments to those text messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the text message was sent;

d.   Computer programs and other files used in connection with administering online drug marketplaces, which may reveal, among other things, the IP addresses of additional computers associated with online drug marketplaces, or other information that could be used to identify and locate such computers;

e.   Evidence reflecting the use of the Tor network, cryptocurrencies or other technological methods (such as encryption or proxy services) to evade monitoring or detection by law enforcement;

f.   Evidence reflecting the user(s) of the Subject Devices work as an administrator of a darknet market, such as communications about the darknet market with market users or leasing of online infrastructure used to maintain the darknet market;

g.   Evidence reflecting the user(s) of the Subject Devices involvement in financial transactions to conceal the source of their wealth, including documents for the purpose

1

USAO_00032761

of creating companies, records of purported investments, or records of large financial transactions (including in cash or cryptocurrency);

       h.  Encryption keys, passwords, or similar access devices that may be necessary to access data relating to online drug marketplaces;

       i.  Means of payment for illegal narcotics and other contraband;

       j.  Documents, spreadsheets and ledgers tracking memberships, sales and inventory, and accounts relating to online drug marketplaces and stolen credit card and financial account information;

       k.  Evidence concerning the user's technical expertise;

       l.  Search and web history records related to the Subject Offenses, including, if applicable, web and application activity history (including search terms), device information history, and location history;

       m.  Information regarding the registration of email accounts, computer servers, or other computer network infrastructure, including servers and internet domains, or online communications facilities, and payment for such online facilities or services;

       n.  Other information that may assist law enforcement in determining the true identity and location of the user of the Subject Devices or his/her accomplices, confederates or aiders and abettors, including but not limited to: IP addresses, names, addresses, phone numbers, email accounts, social networking accounts, website registration accounts, credit card accounts, bank accounts, cryptocurrency addresses, payment records, files with identifying metadata, and information regarding devices or accounts linked and/or used to access the Subject Devices, including device serial numbers, identifiers, and MAC addresses;

       o.  Photographs, screenshots, and videos evidencing the foregoing;

       p.  Evidence concerning any other online accounts or any computer devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

USAO_00032762

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Devices if necessary to evaluate its contents and to locate all data responsive to the warrant.

In addition to the foregoing, law enforcement personnel are authorized to seize from the Subject Person and or his personnel effects, and paper that appears to contain passwords and/or seed phrases for electronic devices, online accounts, cryptocurrency wallets or accounts.

USAO_00032763